No. 23-1502

IN THE

# United States Court of Appeals for the Federal Circuit

CERAMTEC GMBH,

*Appellant*,

v.

COORSTEK BIOCERAMICS LLC,
FKA C5 MEDICAL WERKS, LLC,

*Appellee*.

On Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Cancellation Nos. 92058781 and 92058796

**PRINCIPAL BRIEF OF APPELLANT CERAMTEC GMBH**

KATHERINE B. WELLINGTON
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110

JESSICA L. ELLSWORTH
ANNA KURIAN SHAW
REEDY C. SWANSON
JOHANNAH WALKER
RYAN J. STEPHENSON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20001
(202) 637-5600
jessica.ellsworth@hoganlovells.com

June 26, 2023

*Counsel for Appellant CeramTec GmbH*

# CERTIFICATE OF INTEREST

Counsel for CeramTec GmbH certifies the following pursuant to Federal Circuit Rule 47.4:

1. Represented Entities (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

   **CeramTec GmbH**

2. Real Party in Interest (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **Not Applicable.**

3. Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **CeramTec GmbH is a (wholly-owned) subsidiary of CeramTec Group GmbH. No publicly held company owns 10% or more of stock in CeramTec Group GmbH.**

4. Legal Representatives – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   - **Hogan Lovells US LLP**
     - Raymond Kurz*
     - Gina Rodriguez*
     - Valerie Brennan*
     - Clay C. James*
     - Keith O'Doherty*
     - Andrea Hamilton Weinstein*
     - Shelby Martin*
     - Lauren Chamblee*
     - Lauren B. Cury
     - Katherine Bastian

*These attorneys are no longer affiliated with Hogan Lovells US LLP.

- **Orrick, Herrington &Sutcliffe LLP**
  - Daniel Justice
  - Derek Knerr
  - Peter D. Vogl*
  - Briggs M. Wright*
  - Lindsay Rindskopf

*These attorneys are no longer affiliated with Orrick, Herrington & Sutcliffe LLP.

5. Related Cases – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

   **Not Applicable.**

6. Organizational Victims and Bankruptcy Cases – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   **Not Applicable.**

Dated: June 26, 2023

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... v

STATEMENT OF RELATED CASES .......... 1

JURISDICTIONAL STATEMENT .......... 1

INTRODUCTION .......... 2

STATEMENT OF THE ISSUES .......... 5

STATEMENT OF THE CASE .......... 5

A. CeramTec Builds A Reputation For Quality .......... 5

B. C5 Struggles To Break Into An Evolving Ceramic-Implants Industry .......... 14

C. C5 Challenges CeramTec's Marks .......... 17

SUMMARY OF THE ARGUMENT .......... 24

STANDARD OF REVIEW .......... 27

ARGUMENT .......... 27

I. THE BOARD LEGALLY ERRED BY IMPOSING *TRAFFIX*'S HEAVY BURDEN OF DISPROVING FUNCTIONALITY ON CERAMTEC .......... 29

A. CeramTec's Utility Patents Do Not Disclose Any Functional Advantage For The Color Pink .......... 31

1. *The Board erroneously conflated chromia with pink* .......... 31

2. *The patents do not disclose any effects related to chromia other than hardness* .......... 37

**TABLE OF CONTENTS—Continued**

Page

B. Pink Color In Hip Joint Components Is Not The "Central Advance" Of CeramTec's Utility Patents ....................39

II. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE BOARD'S DETERMINATION THAT THE COLOR PINK AS APPLIED TO CERAMIC HIP JOINT COMPONENTS IS FUNCTIONAL ....................41

A. Independent Testing Established That Chromia Does Not Affect The Performance Of BIOLOX Delta ....................43

B. The Board Improperly Discounted Evidence Related To The Availability Of Alternatives And The Cost of Manufacture ....................51

C. Substantial Evidence Does Not Support The Board's Finding That Chromia Affects Toughness, Stability, Or Suppression Of Brittleness ....................56

III. THE BOARD LEGALLY ERRED BY HOLDING THAT THE UNCLEAN HANDS DEFENSE IS CATEGORICALLY UNAVAILABLE IN CANCELLATION PROCEEDINGS ASSERTING FUNCTIONALITY ....................60

CONCLUSION ....................64

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Applications in Internet Time, LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018) ....................41, 42

*Bodum USA, Inc. v. A Top New Casting Inc.*,
927 F.3d 486 (7th Cir. 2019) ....................36, 37

*Braun Inc v. Dynamics Corp. of Am.*,
975 F.2d 815 (Fed. Cir. 1992) ....................52

*C5 Medical Werks, LLC v. CeramTec GmbH*,
249 F. Supp. 3d 1210 (D. Colo. 2017)....................1, 18

*C5 Medical Werks, LLC v. CeramTec GmbH*,
937 F.3d 1319 (10th Cir. 2019) ....................1, 18

*Converse, Inc. v. ITC*,
909 F.3d 1110 (Fed. Cir. 2018) ....................53

*Coorstek Bioceramics LLC f/k/a C5 Medical Werks, LLC v. CeramTec GmbH*,
Nos. 92058781 & 92058796, 2022 WL 17547263 (T.T.A.B. Dec. 6, 2022) ....................1

*Cutsforth, Inc. v. MotivePower, Inc.*,
636 F. App'x 575 (Fed. Cir. 2016) ....................43

*Donner Tech., LLC v. Pro Stage Gear, LLC*,
979 F.3d 1353 (Fed. Cir. 2020) ....................52

*Eco Mfg. LLC v. Honeywell Int'l, Inc.*,
357 F.3d 649 (7th Cir. 2003) ....................28

*Fred Beverages, Inc. v. Fred's Cap. Mgmt. Co.*,
605 F.3d 963 (Fed. Cir. 2010) ....................50, 59

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944)....................61, 62

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Hupp v. Siroflex of Am., Inc.*,
122 F.3d 1456 (Fed. Cir. 1997) ....55

*Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*,
685 F.2d 78 (3d Cir. 1982) ....53

*In re Bose Corp.*,
476 F.3d 1331 (Fed. Cir. 2007) ....27

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....27

*In re Montgomery*,
677 F.3d 1375 (Fed. Cir. 2012) ....47, 48

*In re Morton-Norwich Prods., Inc.*,
671 F.2d 1332 (C.C.P.A. 1982) ....23, 52, 56

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....43, 60

*Loglan Inst., Inc. v. Logical Language Grp., Inc.*,
962 F.2d 1038 (Fed. Cir. 1992) ....61, 62

*McAirlaids, Inc. v. Kimberly-Clark Corp.*,
756 F.3d 307 (4th Cir. 2014) ....25, 36, 40

*McGowen Precision Barrels, LLC v. Proof Research, Inc.*,
No. 92067618, 2021 WL 2138663 (T.T.A.B. 2021) ....35

*On-Line Careline, Inc. v. Am. Online, Inc.*,
229 F.3d 1080 (Fed. Cir. 2000) ....27, 42, 51

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ....62

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) ....30, 42, 43, 49

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Qualitex Co. v. Jacobson Prods. Co.*,
514 U.S. 159 (1995)....................27, 51, 53

*Schlafly v. Saint Louis Brewery, LLC*,
909 F.3d 420 (Fed. Cir. 2018)....................27

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
532 U.S. 23 (2001)....................*passim*

*Valu Eng'g, Inc. v. Rexnord Corp.*,
278 F.3d 1268 (Fed. Cir. 2002)....................*passim*

**STATUTES:**

15 U.S.C. § 1071(a)....................1

15 U.S.C. § 1092....................1

28 U.S.C. § 1295(a)(4)....................1

**REGULATION:**

37 C.F.R. § 2.114(b)(2)....................60, 61, 62

**OTHER AUTHORITIES:**

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:75, 7-180-1 (4th ed. 2001)....................54

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:70 (5th ed. 2023 update)....................29

## STATEMENT OF RELATED CASES

Appellant CeramTec GmbH is not aware of any case pending within the meaning of Rule 47.5 that will directly affect or could be affected by the Court's decision.

Appellee C5[1] previously challenged the validity of the marks at issue in *C5 Medical Werks, LLC v. CeramTec GmbH*, 249 F. Supp. 3d 1210 (D. Colo. 2017), which was dismissed following appeal for lack of personal jurisdiction. *See C5 Medical Werks, LLC v. CeramTec GmbH*, 937 F.3d 1319, 1321 (10th Cir. 2019). The appellee also filed petitions to cancel the marks at issue before the Trademark Trial and Appeal Board (the Board), which the Board granted. *Coorstek Bioceramics LLC f/k/a C5 Medical Werks, LLC v. CeramTec GmbH*, Nos. 92058781 & 92058796, 2022 WL 17547263 (T.T.A.B. Dec. 6, 2022).

## JURISDICTIONAL STATEMENT

CeramTec appeals the Board's December 6, 2022, final decision granting petitions to cancel U.S. Registration Nos. 4319095 and 4319096. Appx4-5, Appx106. CeramTec timely filed a notice of appeal on February 3, 2023. Appx19723. The Board had jurisdiction under 15 U.S.C. § 1092. This Court has jurisdiction under 15 U.S.C. § 1071(a) and 28 U.S.C. § 1295(a)(4).

---

[1] While the cancellation proceedings below were pending, appellee changed its name from C5 Medical Werks, LLC to CoorsTek BioCeramics LLC. Because most record materials refer to "C5," CeramTec will continue using that name.

## INTRODUCTION

This case is about whether the color pink is functional. CeramTec is an innovation leader in the manufacturing of ceramic components for replacement hip joints. Years ago, CeramTec began adding a small amount of chromia to these components. At the time, CeramTec used chromia as a means of incorporating higher levels of a different element that dramatically improves the performance of the ceramics: yttria. A side effect of adding this small amount of chromia was that it turned the ceramic component pink.

Shortly thereafter, improvements to production processes made it possible to achieve the same benefits from yttria without any chromia. This alternative process is *less* expensive than using chromia. But CeramTec saw a marketing advantage to sticking with pink. Its customers had come to associate pink with CeramTec's reputation for quality, thanks in no small part to a strong campaign by CeramTec linking pink to its products. CeramTec ultimately registered the pink color of its ceramic components on the Supplemental Register.

When C5 entered the ceramic hip components market, it took notice of the market's association between CeramTec's products and the color pink. C5's head of marketing went to Home Depot, found the paint swatch closest to the shade of pink of CeramTec's components, and told C5's product team to match it. C5

subsequently launched a decade-long campaign to thwart CeramTec's efforts to secure legal protection for its distinctive pink products.

C5's case for cancellation centers on certain expired CeramTec utility patents and outdated promotional materials suggesting that chromia had a modest beneficial effect on the hardness of ceramics. To be clear: Early on, CeramTec believed that chromia *did* have that effect. Preliminary data supported it. But, as CeramTec and others continued studying the matter, it later became unmistakably clear that chromia had no such function. All told, *six* controlled experiments—some at CeramTec's request, and others by independent arbiters—have reached the same result: Small amounts of chromia have no impact on ceramic performance.

The Board nevertheless cancelled CeramTec's registrations. The Board's analysis rested on three fundamental errors. *First*, the Board committed legal error by imposing on CeramTec the "heavy burden" of disproving functionality based on the Supreme Court's decision in *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001). That burden applies only when a party seeks trademark protection for the same feature whose utilitarian advantages are disclosed in a patent. But the expired utility patents that the Board relied on claim a *range* of added chromia—resulting in a wide spectrum of colors from red to white to purple, and even black, gray, or yellow. Nothing in the patents, or any supporting materials, suggests that the particular percentage of added chromia that creates the color pink

has *any* advantage. *TrafFix* therefore does not apply. This legal error pervasively affected the Board's review of the scientific record, necessitating a remand.

*Second*, the Board's cursory engagement with the scientific record independently warrants reversal. Although the Board acknowledged the mountain of scientific evidence on CeramTec's side, it brushed this evidence aside by summarily deeming C5's expert's criticisms of that evidence "persuasive." But the Board did not explain *why* it found those criticisms persuasive—or why the detailed rebuttal from CeramTec's expert was unpersuasive. The Board also erred in its assessment of two factors highly probative of functionality: first, the undisputed evidence about ample alternative designs and, second, the undisputed evidence that including chromia is *more* expensive. Properly viewing the record as a whole, substantial evidence does not support the Board's functionality finding.

*Third*, the Board legally erred in evaluating CeramTec's affirmative defense based on C5's unclean hands. C5's long history of assuring the market that chromia has *no* functional effect casts C5's challenge in a much different light. The Board should have considered the merits of CeramTec's arguments that C5's own conduct is fatal to its claim of functionality. Instead, the Board purported to adopt a categorical rule that the public's interest in cancelling a functional mark *always* trumps a party's ability to assert unclean hands. That legal holding cannot be squared with the governing legal framework or traditional equitable principles.

In short, the Board's conclusions find no support in the law or in the record. This Court should reverse.

## STATEMENT OF THE ISSUES

1. Whether the Board erred in concluding that *TrafFix* imposed on CeramTec the "substantial burden" of disproving the functionality of the color pink as applied to ceramic hip joint components when the patents do not disclose any functional advantage of a pink ceramic, and the composition of hip joint components is not the central advance described in the patents.

2. Whether substantial evidence supports the Board's determination that the color pink as applied to ceramic hip joint components is functional.

3. Whether the Board legally erred by holding that the unclean hands defense is categorically unavailable in cancellation proceedings asserting functionality.

## STATEMENT OF THE CASE

### A. CeramTec Builds A Reputation For Quality.

**Hip Joint Replacement Systems.** Artificial hip joints mimic the ball-and-socket structure of a human hip. The typical hip replacement system includes four component parts: a shell, a liner, a ball head, and a femoral stem. Appx11262-63 (¶ 16).




Appx14535; *see also* Appx14536-38.

Although the shell and stem are almost always metal, there are multiple material options for liners and ball heads, including ceramic. Appx11262-63 (¶¶ 16, 18). Ceramics are solid materials made of compounds that are combined, then shaped and hardened under high heat. Appx3215 (¶¶ 39-41); Appx10588 (¶ 10).

Ceramic hip joint components must exhibit a range of mechanical properties, including hardness, or resistance to permanent deformation; fracture toughness, or resistance to the spreading of cracks; strength, or resistance to cracking or failing under force; and wear resistance, or resistance to loss, erosion, or displacement of material over time. Appx11267-69 (¶¶ 28, 31), Appx11286 (¶ 66). In the right mix,

these properties ensure that the implant does not fracture or shed particles while implanted in patients. Appx3736-37.

**Zirconia-Toughened Alumina Ceramic Implants.** CeramTec has manufactured ceramic hip joint components for nearly 50 years. Appx12802 (¶¶ 7, 9). At first, CeramTec produced liners and ball heads from alumina (comprised of aluminum and oxygen) under the name BIOLOX. Appx12802 (¶ 8); Appx10596 (¶ 35). Over time, CeramTec improved its alumina product through more advanced production methods and marketed the newer generation under the name BIOLOX Forte—a ceramic that was ivory, beige, or cream in color. Appx12802-03 (¶¶ 8, 10).

CeramTec later led the market in a shift from pure alumina hip joint components to ceramics that incorporate zirconia, known as "zirconia-toughened alumina" or "ZTA" ceramics. Appx13447-48 (197:23-198:2) (C5 witness testifying that CeramTec's product attracted customers away from alumina legacy products "far more rapidly than we had anticipated at C5"); Appx13449 (199:14-23). When added to alumina, zirconia toughens a ceramic. Appx10590 (¶ 15), Appx10594 (¶ 30), Appx10596 (¶ 35). The material becomes tougher still when reinforced with strontium aluminate platelets. Appx10590 (¶ 15). Although pure alumina ceramics are much harder than ZTA ones, the latter quickly became popular because their toughness and other properties made them function particularly well as hip joint components. Appx13446-47 (196:21-197:19); Appx10594 (¶ 30).

**BIOLOX Delta.** In 1989, CeramTec developed a ZTA ceramic for tools to cut steel or cast iron. Appx10593-94 (¶ 28); Appx13735-36 (1009:2-1010:20). While developing this ceramic, CeramTec learned that the compound yttria—comprising yttrium and oxygen—had a stabilizing effect on zirconia, which is a prerequisite in ZTA ceramics for good strength, toughness, and performance. Appx10590-91 (¶ 18); Appx11294 (¶ 76).

Production methods at the time made it difficult to bring yttria's benefits to scale. Appx10591 (¶¶ 19-21). Back then, the leading process was "wet milling." Appx13726 (1000:7-22). Manufacturers placed powdered ingredients into water; pounded the mixture in a mill; dried it; pressed it; and placed it in the furnace. Appx11299-303 (¶¶ 88-95); Appx13726-27 (1000:5-1001:20). But yttria on its own could not withstand the mill's high heat. Appx13724-25 (998:14-999:15), Appx13727 (1001:2-12). The resulting mixture contained yttria clumps, leading to cracks. Appx13727-28 (1001:5-1002:6).

CeramTec turned to yttrium chromite to introduce yttria. Appx13728-29 (1002:22-1003:17). The bonds in this compound prevented yttria from dissolving during the high-heat milling process, yielding yttria and chromia as a result of the production process. Appx10591 (¶¶ 19-21); *see* Appx10720. Using yttrium chromite required increasing or decreasing the amount of chromium in proportion to the amount of yttrium. Appx13731-32 (1005:7-1006:1). The two elements were

"[j]oined at the hip." Appx13731 (1005:22-23). Accordingly, BIOLOX Delta's chromia content rose and fell depending upon the amount of yttrium.

CeramTec, like others at the time, believed that including this moderate amount of chromia alongside yttria had the added benefit of increasing the ZTA ceramic's hardness. Appx10594 (¶ 30). Older scientific literature about the mechanical properties of chromia led to a popular, but far from universal, belief that adding chromia could improve hardness. Appx13741 (1015:3-7); *see* Appx13646-47 (520:12-521:8) (C5 witness acknowledging that scientific opinions were not uniform). At the same time CeramTec shifted to using chromia, it was also making other improvements in its manufacturing process, which left unclear exactly what was causing improvements in the company's ceramics. Appx13741-42 (1015:3-1016:5).

CeramTec first used the ZTA ceramic made with yttria—and thus with chromia too—for cutting tools. Appx10593-94 (¶ 28). The material was specially designed to withstand the alternating thermal stress that occurs during "interrupted cutting": the tool heats to over a thousand degrees Celsius when shaping steel or iron, and then immediately cools down when it falls out of contact with the metal. Appx13735-36 (1009:17-1010:9); Appx13916 (1273:3-19). CeramTec obtained U.S. Patent No. 5,830,816 (the '816 patent), which taught the ingredients for ZTA ceramics with the necessary strength, toughness, and hardness to endure extreme

temperature shifts. Appx13987-98. Specifically, Claim 3 taught the combination of zirconia and chromia in a wide range of ratios from 0.1% to 5% chromia—*i.e.*, a range of ratios from 1:1,000 to 1:20—compared to zirconia. Appx13998. This patent, reflecting the understanding at the time, suggests that chromia in the amounts claimed contributes to the overall hardness of the ZTA ceramic. *See, e.g.*, Appx13995 (cols. 3:50-4:4).

The development of CeramTec's new material also inspired BIOLOX Delta—a ZTA ceramic for hip joint components that practices Claim 3 of the '816 patent. Appx10595-96 (¶¶ 34-35). BIOLOX Delta is less hard than its predecessor, BIOLOX Forte. Appx10593-94 (¶¶ 28, 30); Appx13744-46 (1018:20-1020:10). But, thanks to the introduction of zirconia, the Delta material "shows significantly better wear performance" and "exhibit[s] superior strength and toughness." Appx10594 (¶ 30). BIOLOX Delta's failure rate for ceramic heads is 0.001%—the lowest on the market. Appx12804 (¶ 15).

**BIOLOX Delta's Distinctive Pink Color.** Chromia affects the color of a ZTA ceramic. Depending on the amount of chromia, the resulting ZTA ceramic may be green or "a reddish color, as can be seen in ruby." Appx12262 (¶ 20). The broad range of chromia discussed in the '816 patent is an illustration: Ceramics practicing that range might be pink, red, purple, yellow, black, gray, or almost white. Appx13572 (411:10-13); Appx13652 (526:16-20); Appx13750 (1024:7-11);

Appx13766-67 (1040:12-1041:2). ZTA ceramics that include other materials—such as cobalt—may be blue. Appx13767 (1041:13-17). For BIOLOX Delta, CeramTec ultimately landed on a 0.33 weight percentage (0.33%) chromia content. Appx10591-92 (¶ 22). This amount of chromia produced a pink ceramic. Appx10591-92 (¶¶ 22-23).

The amount of chromia in BIOLOX Delta was initially linked to the amount that would result in the desired amount of yttria. Appx10591-92 (¶ 22). But by 2000—before BIOLOX Delta even hit the market, Appx29—yttrium chromite was no longer needed from a manufacturing standpoint. Appx13730 (1004:7-25). Temperature-controlled mills became commonplace and eliminated the risk that yttrium oxide would destabilize in the high-heat milling process. Appx13730 (1004:7-25); *supra* p. 8. Nor did yttrium chromite carry cost advantages; the alternative, yttrium oxide, was less expensive. Appx13730 (1004:7-25), Appx13820-21 (1096:23-1097:7).

By then, however, CeramTec had realized that the pink color provided clear marketing advantages. When CeramTec initially released BIOLOX Delta, it was the only pink ceramic hip joint component on the market. Appx12804 (¶ 14). BIOLOX Forte, its predecessors, and its competitors had all been ivory, beige, or cream-colored components. And the market was unaccustomed to this new color. Appx12803-04 (¶¶ 10, 14).

As BIOLOX Delta's clinical results made headlines, CeramTec took every opportunity to tie the ceramic's color to the company's brand. Appx12804 (¶ 15). In an early issue of a brochure distributed to surgeons and original equipment manufacturers (companies that purchase components as part of selling complete hip replacement systems), CeramTec deemed pink "A New Colour for the Future" and announced newly printed marketing materials prominently featuring BIOLOX Delta pink. Appx12804 (¶ 16); Appx12992.

CeramTec delivered pink promotional and educational brochures; displayed pink products at trade shows; and handed out pink promotional items like mouse pads, bags, and lanyards. Appx12804-05 (¶¶ 16-19). CeramTec even charted a tour of the United States, visiting hospitals and clients across the country in a truck showcasing the BIOLOX Delta product, decorated with pink accents. Appx12806 (¶ 23); Appx12816-19; Appx13019-20. Since 2003, CeramTec has spent millions of dollars advertising and promoting its pink BIOLOX Delta product. Appx12806 (¶ 25); *see* Appx12996-13031 (marketing timeline).

**CeramTec's Pink Trademark.** At nearly the same time CeramTec recognized that it no longer needed chromium to achieve its desired levels of yttria, studies began to cast doubt on the idea that the tiny amount of chromia in BIOLOX Delta had any hardening benefit. Appx10622 (timeline of chromia studies). In 2006, for example, CeramTec was conducting experiments to develop a ZTA dental

implant. Appx13758 (1032:2-9). CeramTec wanted the dental implant to be white—and not pink—so it used yttria oxide instead of yttria chromite. Appx13758 (1032:13-15). The dental ceramic's hardness values fell in the same range as pink BIOLOX Delta, yet the product was white and did not contain chromia. Appx13758 (1032:15-18). A 2009 experiment yielded similar results. Appx13761 (1035:16-1037:6).

Meanwhile, CeramTec undertook a major effort to develop a next-generation ceramic by experimenting with finer raw materials. This study, known as "Project Sirius," yielded ceramics of varying compositions, spanning the color spectrum.



Appx10600 (¶ 46) (depicting 176 of approximately 350 specimens created during Project Sirius); *see also* Appx10624-37 (showing closer view of specimen); Appx13764-69 (1038:14-1043:4) (describing Project Sirius). Project Sirius did not ultimately lead to a new generation of ceramics; although some of the resulting ceramics were harder than BIOLOX Delta, they had diminished toughness, which was more important for performance. Appx10601 (¶ 49).

In 2012, CeramTec applied to register its trademarks for the color pink as applied to hip joint components. Appx237-245; Appx19832-40. The science surrounding the exact hardening effects of chromia was still developing, but CeramTec understood that, even if chromia had some minimal hardening effect at 0.33%—the amount in BIOLOX Delta—such a marginal effect had no material impact on the ceramic's quality or overall performance. Appx10594 (¶ 30); Appx12807 (¶ 27). The examining attorney reviewed information CeramTec provided about the relationship between hardness, chromia, and the color pink. Appx255-447; Appx19850-20042. CeramTec's marks were then placed on the Supplemental Register. Appx107-110.

### B. C5 Struggles To Break Into An Evolving Ceramic-Implants Industry.

As BIOLOX Delta gained popularity, C5's parent company experimented with ceramic implants for the first time. An admitted newcomer to the medical-implant industry, it lacked "competence in the regulatory environment [for medical

devices]" and "a clear understanding of the way the market worked and that [hip joint manufacturers] made purchasing decisions." Appx13431-32 (179:3-11, 180:20-24); *see* Appx13429 (177:2-11); Appx13435 (185:11-15). Nevertheless, C5 was incorporated and beer tycoon Brad Coors was tapped to build the business. Appx13426-28 (174:4-176:17), Appx13430 (178:7-20).

C5 faced hurdle after hurdle, "learn[ing] really the hard way" that they "didn't understand all of the complexities of what was required to engage with [a manufacturer] and to provide them the products that they wanted." Appx13433 (181:2-5). And the market was moving away from pure alumina ceramics to ZTAs far more quickly than C5 expected. Appx13446-48 (196:15-198:4). Coors tried to enlist the inventor of BIOLOX Delta to help develop a competing ZTA—but the attempt fell flat. Appx13438 (188:7-24), Appx13442 (192:7-12).

So C5 opted to copy BIOLOX Delta's *color* instead. Appx13618-19 (488:3-489:10). Customers had advised C5 of CeramTec's distinctive association with pink as early as 2009. Appx13541 (328:1-20); Appx6622-24. C5's Director of Marketing and Sales nevertheless went to Home Depot and found the paint swatch that matched the color of BIOLOX Delta. Appx13666-68 (865:7-867:24); Appx13649-50 (523:22-524:12); *see also* Appx8443-44 (Home Depot paint swatch); Appx14230-31 (C5 emails about color matching). He then instructed C5's

technical team to replicate that shade for C5's pink hip joint component, known as cerasurf-p. Appx13668 (867:19-24).

As C5 secretly launched "project pink," it was also selling customers on a white ceramic (cerasurf-w). Appx13444 (194:10-13); Appx10477-78 (952:24-953:5). In C5's view, the white material was "[o]bviously … cleanest from a IP standpoint," Appx13465 (238:12-13), and "all things considered," it was "equivalent" to the pink material, Appx13520-21 (307:24-308:2). *See also* Appx14173-74 (C5 employee explaining that ceramic color is "physician preference"); Appx14077 (C5 chart indicating same mechanical properties for pink and white material). C5 explained to customers that it had "found no difference in strength and hardness between [its] pink and white" products. Appx13505 (292:2-11), Appx13510 (297:4-12); *see* Appx13501-02 (288:23-289:11) (Hughes testimony about similar statement before the American Academy of Orthopedic Surgeons). It touted cerasurf-w as "substantially equivalent" to BIOLOX Delta, Appx13444 (194:14-20), and maintained that cerasurf-w even "shows slightly better wear properties than [cerasurf-p]," Appx13480 (267:3-5).

To its credit, C5 realized faster than CeramTec that chromia at the relevant levels does not affect hardness. Appx13480 (267:3-5), Appx13545 (332:16-20); *see* Appx13588 (427:4-12) (C5 witness describing chromia oxide as a "colorant"). C5 doubled down on this conclusion when talking to customers, insisting that cerasurf-

w was "equivalent to pink material, including its hardness," Appx13545 (332:16-20), and hammering home that "white is better." Appx13697-98 (908:14-909:5); Appx7302-03.

Customers took notice. Two of the largest manufacturers of replacement hip joints pursued major purchase orders of cerasurf-w, hoping to use white ceramics to differentiate themselves. Appx13453 (203:9-17) (Zimmer "very interested" in global exclusivity to cerasurf-w); Appx13532 (319:2-12) (DePuy interested in purchasing cerasurf-w).

But C5 had its heart set on pink. C5 published the first two images of its pink product, cerasurf-p, in early 2013. Appx14090-91. Months later, C5 showcased cerasurf-p at orthopedic conferences in the United States and abroad. Appx13532 (319:13-20). CeramTec took enforcement action against C5's infringing ceramics at a conference in Paris and filed suit against C5 in Germany. Appx1060 (255:12-16); Appx11997 (¶ 44).

### C. C5 Challenges CeramTec's Marks.

C5 initiated cancellation proceedings before the Board and filed a civil action challenging the marks in the District of Colorado. Appx498-499 (¶¶ 28-36); Appx20092-93 (¶¶ 28-36); Complaint, *C5 Medical Werks, LLC v. CeramTec GmbH*, No. 1:14-cv-00643-RBJ-CBS (D. Colo.) (the "*Colorado Litigation*"), ECF No. 1. The Board consolidated the two cancellation proceedings and suspended them

pending resolution of the civil suit. Appx542-543; Appx581-584; Appx20136-37; Appx20189-92.

**Colorado Litigation.** CeramTec moved to dismiss the suit in Colorado for lack of personal jurisdiction. CeramTec explained that it is a German entity with no customers, employees, or offices in Colorado. Motion to Dismiss at 1-3, *Colorado Litigation*, ECF No. 15. The District Court disagreed, citing CeramTec's attendance at three conferences in Colorado. Order at 7-8, *Colorado Litigation*, ECF No. 35. The case proceeded to a bench trial, where the District Court concluded that CeramTec's marks were functional. *C5 Medical Werks, LLC v. CeramTec GmbH*, 249 F. Supp. 3d 1210, 1221-22 (D. Colo. 2017). The Tenth Circuit reversed, holding that the District Court lacked personal jurisdiction over CeramTec. *C5 Medical Werks, LLC vs. CeramTec GmbH*, 937 F.3d 1319, 1325 (10th Cir. 2019).

**Agency Proceedings.** The Board resumed the consolidated cancellation proceedings once the Colorado case concluded. Appx607-609. C5 alleged that the color pink, as applied to hip joint components, is functional and that CeramTec committed fraud on the USPTO when it sought trademark protection for BIOLOX Delta. Appx491-500; Appx20085-94. According to the petition, the color pink is functional because "pink is the naturally occurring color caused by Respondent's addition of … chromium oxide for its hardening effect." Appx492 (¶ 8); Appx20086

(¶ 8). CeramTec denied the allegations and asserted unclean hands as an affirmative defense. Appx611-621; Appx20194-204.

1. In the proceedings before the Board, the parties relied on much of the evidence presented in the Colorado proceedings. C5 cited the results of observational testing it conducted by comparing production lots from its early-stage 2010 white product to its later-stage 2014 pink product. Appx12195-202 (¶¶ 208-222). Even though this comparison was not peer-reviewed, published, or a "statistically designed experiment," C5 concluded that its analysis demonstrated that its pink ZTA ceramic was on average slightly harder than its white ZTA ceramic. Appx13579 (418:7-25); Appx13661 (535:20-536:10). C5's study did not control for advances in manufacturing that occurred between 2010 and 2014. Appx13596-99 (435:22-438:16); Appx13660-62 (534:23-536:10). Meanwhile, CeramTec put forward the results of a controlled experiment by Dr. Meinhard Kuntz reaching the opposite conclusion, Appx13789-90 (1065:21-1066:12), Appx13794-95 (1070:21-1071:4); Appx10662-65, and a report by Dr. Jack Mecholsky, who reproduced Dr. Kuntz's findings. Appx13795 (1071:5-10); Appx11340-51 (¶¶ 161-167).

CeramTec reiterated that the '816 patent did not teach any advantage for the color pink. In fact, C5 had conceded during the Colorado proceedings that a ceramic need not be pink to practice the '816 patent; the patent teaches a range of chromia that results in a range of colors. Appx13652 (526:16-20) (C5 witness testifying that

ceramics made in accordance with the patent claims could be almost white, red, or purple); *see also* Appx13750 (1024:7-11) (CeramTec witness testifying that gray, yellow, and black ceramics can be produced under the ’816 patent); Appx13918 (1275:14-18) (describing range of chromia in ’816 patent). CeramTec likewise explained that the color pink was neither cheaper nor more effective than other colors available for ceramic implants. Appx13730 (1004:7-25); Appx13820-21 (1096:23-1097:7) (explaining yttrium chromite is more expensive than the yttrium oxide that would be used for white ceramic); Appx10593 (¶ 26) (Dr. Kuntz testifying that he had produced a white ceramic that was “fully equivalent compared to BIOLOX Delta, including strength, toughness, hardness and wear”).

2. CeramTec also presented new evidence of nonfunctionality before the Board, as the scientific record supporting chromia’s nonfunctionality continued to grow. In particular, CeramTec pointed the Board to results from a controlled experiment conducted by an independent expert appointed by a German court testing the same question presented here: Does the addition of small amounts of chromia affect the properties of CeramTec’s product? Appx11997-12032 (¶¶ 44-97). The German court asked the Federal German Institute for Materials Research and Testing (the Institute)[2] to compare the hardness and wear performance of materials with and

[2] The German name for the Institute is the Bundesanstalt Für Materialforschung und-prüfung, sometimes abbreviated as “BAM.”

without the approximate amount of chromia used to make CeramTec's material pink (0.3%) and other amounts in the surrounding range (from 0 to 0.5%). Appx11997 (¶ 44). Dr. Torsten Rabe, who leads the Institute's department of technical ceramics, conducted the Institute's testing. Appx11997 (¶ 44).

Dr. Rabe conducted four total tests on the effects of chromia on samples provided by CeramTec, C5, and a Swiss ceramics company. Appx11997-99 (¶¶ 45-47), Appx12013-14 (¶¶ 70-72). In all four instances, Dr. Rabe concluded that chromia, at the amounts tested, did not affect the hardness of the material. Appx12012-13 (¶¶ 68-69), Appx12032 (¶¶ 96-97); *see* Appx10828-32 (¶¶ 16-25) (Kadane report describing German experiments).[3] These independent results corroborated the evidence that CeramTec had presented to the Colorado court and reached the same conclusion as a peer-reviewed study that Drs. Kuntz and Krüger published after the Colorado proceedings. Appx12786 (¶ 96).

C5, by contrast, did not support its hypothesis about chromia's functional benefits with results from even a single controlled experiment. Appx72-78 (describing C5's hardness testing). It instead justified its shifting view of chromia with observational data that even a *C5 witness* deemed inconclusive. Appx12035

[3] The parties only introduced into the record the Institute's report from the litigation between CeramTec and C5, but both parties' experts also discussed the Institute's report from the proceedings between CeramTec and Metoxit, *e.g.*, Appx11997-12013 (¶¶ 44-69); Appx3284-90 (¶¶ 181-195), and C5 does not dispute the contents of the Institute's Metoxit report.

(¶ 105) ("C5's plant manager in charge of production of its Cerasurf-w and Cerasurf-p material … believes that 'further study' would be required" to conclude "that C5's pink material is stronger than its white material"). All the while, C5 condemned CeramTec's evolving view of chromia as an act of bad faith—despite C5's own switch in position. Appx19596-605, Appx19631-34.

3. The Board ultimately concluded that the claimed pink color was functional. The Board tied its functionality finding to the advantages that, according to the Board, CeramTec had touted about chromia in expired or abandoned patents and outdated promotional materials: toughness, hardness, stability, and suppression of brittleness. Appx92. In doing so, the Board declined to adopt C5's claims that chromia imparts other functional advantages like preventing hydrothermal aging, flexural strength, and wear resistance *in vivo*. *See* Appx19599-600 (¶¶ 21-28).

The Board first invoked *TrafFix*, which held that a presumption of functionality applies when a party claims trade dress protection for a product feature that has been disclosed in a prior utility patent. 532 U.S. at 31. The Board read CeramTec's patents to disclose chromia as having the advantages that were the basis of its functionality finding, even though C5 had only argued that the patents disclosed an effect on hardness. Appx92; *see* Appx19596-97, Appx19621-24; Appx19697-701. And, although the patents all discussed chromia in a wide range of values—undisputedly resulting in a wide range of colors—the Board held that the

patents' references to chromia were sufficient to impose the "evidentiary presumption[]" that the pink color resulting from 0.33% chromia was functional under *TrafFix*. Appx92.

After shifting the burden under *TrafFix*, the Board proceeded through the *Morton-Norwich* factors, which this Court has held are probative of functionality. Appx86-104; *see Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 (Fed. Cir. 2002) (citing *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1340-41 (C.C.P.A. 1982)). On the first factor—advertising and other public statements touting utilitarian advantages—the Board found that CeramTec's early statements about chromia's effect on hardness were strong evidence of functionality. Appx94-95, 97. The Board also cited master files submitted to the FDA reflecting CeramTec's prior belief that chromia influenced hardness. Appx95.

The Board then found that the next two factors—availability of alternatives and comparative expense—were neutral. Appx97-99. It made these findings despite C5's own statements that its white product was "equivalent" to its pink one, Appx13520-21 (307:24-308:2), and despite undisputed evidence that Dr. Kuntz had created a white ZTA ceramic that was "fully equivalent" to BIOLOX Delta and testified that the color pink made BIOLOX Delta *more* expensive to produce than a white alternative. Appx10593 (¶ 26); Appx13730 (1004:7-25), Appx13820-21 (1096:23-1097:7).

The Board closed its functionality analysis by refusing to credit the results of *six* controlled studies, including the four conducted by an independent court-appointed expert showing that small amounts of chromia have no effect on hardness. Appx99-103. With a single sentence, the Board summarily deemed "persuasive" a slate of critiques from a C5 expert who conducted none of his own testing, and declined to engage with the point-for-point rebuttal of those critiques offered by CeramTec's expert. Appx99. In the Board's view, CeramTec had gone "only so far, and not far enough" in overcoming its prior position on chromia. Appx100.

Finally, the Board rejected CeramTec's unclean hands defense as matter of law. Appx104-106. In doing so, the Board determined that the public policy of adjudicating a particular functionality challenge will *always* outweigh the public policy against rewarding the petitioner's inequitable conduct. Appx105-106.

CeramTec timely appealed. Appx19723.

## SUMMARY OF THE ARGUMENT

**I.** The District Court committed two independent legal errors by applying *TrafFix's* presumption of functionality. First, the Board erred by conflating the broad ranges of chromia claimed in CeramTec's patents with the amount of chromia used to produce the color pink. In fact, products within those ranges would be different colors—from white to black to gray, and from red to purple to yellow. Although the patents suggest—erroneously, in light of more recent science—that the

claimed *ranges* of chromia content have some marginal effect on hardness, they do not suggest any particular advantage for the amount used to produce the color pink. From the perspective of the patents, the amount of chromia that produces pink is "a purely aesthetic choice among many alternatives." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 313 (4th Cir. 2014). *TrafFix* does not apply in such a situation.

Second, the Board erred by applying *TrafFix* because the "central advance" of the '816 patent is an improved composition for cutting tools—which must function at incredibly high temperatures—not hip joint components. 532 U.S. at 30. It is undisputed that the desirable mechanical properties of hip joint components differ significantly from cutting tools. Even assuming the patents described a useful effect on hardness for cutting tools—that is, for ceramics that press down on metal so hard that they generate temperatures of over 1000 degrees Celsius—nothing in the record suggests that the increase in hardness is useful for hip joint components. On the contrary, it is undisputed that BIOLOX Delta's predecessor was harder, yet BIOLOX Delta has better toughness and wear resistance and is more commercially successful *despite being less hard*. The Board erred by assuming that any functional benefits for cutting tools would necessarily apply to hip joint components.

**II.** Even aside from its *TrafFix* error, the Board's functionality finding is not supported by substantial evidence. The Board summarily disregarded the most

relevant evidence in the case: the replicated results of controlled, scientific testing performed by neutral, third-party experts appointed by a German court. That testing confirmed that chromia in the amount used to impart the color pink simply does not have any relevant effect on BIOLOX Delta. The Board purported to accept C5's various critiques of this testing, but never explained why it found those critiques persuasive or why it rejected the point-for-point rebuttal of those critiques offered by CeramTec.

The Board also erred in its assessment of two *Morton-Norwich* factors: the availability of alternative designs and the impact on cost. The Board treated both factors as neutral, when in fact both weigh heavily in CeramTec's favor. There are a number of alternative designs, including actual competitors on the market, and chromia makes production *more* expensive, not less. These factors, combined with the clear results of the neutral testing, should have led the Board to conclude that the color pink plays no role in BIOLOX Delta's functionality.

**III.** The Board committed legal error in assessing CeramTec's affirmative defense of unclean hands by adopting a categorical rule that this defense can never be raised in cancellation proceedings involving functionality. That rule violates Board regulations and is inconsistent with traditional equitable principles. The Board should have instead weighed its findings against C5's long history of assuring

the market that chromia and the color pink played no functional role in CeramTec's product.

## STANDARD OF REVIEW

Whether the Board applied the correct legal standard for functionality is a question of law reviewed "de novo and without deference." *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 423 (Fed. Cir. 2018). Otherwise, "functionality of trade dress is a factual finding reviewed for substantial evidence." *In re Bose Corp.*, 476 F.3d 1331, 1334 (Fed. Cir. 2007) (citing *Valu Eng'g*, 278 F.3d at 1273). Substantial evidence review "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). It is "[c]onsidered to be less deferential than the 'arbitrary, capricious' standard," calling for a "stricter judicial review of agency factfinding." *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000) (citation omitted).

## ARGUMENT

Product features that are "essential to the use or purpose of the article" or "affect[] the cost or quality of the article" are functional and therefore cannot serve as trademarks. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995) (quotation marks omitted). The color pink is not essential to CeramTec's hip joint components, nor does it have any beneficial effect on cost or quality. Over the ten-

year history of this dispute, test after test has demonstrated that the 0.33% chromia responsible for BIOLOX Delta's pink color plays no role in the product's performance.

The Board reached a contrary conclusion by misreading the law and the record. It began by erroneously shifting the burden to CeramTec under *TrafFix* even though CeramTec's utility patents do not disclose any advantage to the color pink. This legal error independently warrants reversal. And in any event, the evidence simply does not support the Board's finding of functionality. The Board relied exclusively on CeramTec's patents and promotional materials, summarily disregarding the unbroken string of scientific testing proving that chromia in the relevant amount has no functional advantage. The Board's approach fails to account for a fundamental principle: Science evolves. *See Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 357 F.3d 649, 653 (7th Cir. 2003) ("Passage of time diminishes a utility patent's significance."). Although CeramTec once believed—as did others—that adding chromia in a range of small amounts had a modest effect on hardness, that belief has been thoroughly discredited. The Board's refusal to reckon with the developing scientific record, combined with its mistaken analysis of alternatives and cost, means its decision cannot stand.

Even affirming the Board's finding of functionality, however, does not end this case. CeramTec raised an affirmative defense of unclean hands, based on C5's

extensive efforts to convince the public that chromia *was not functional* before filing these cancellation proceedings. The Board refused to consider the factual basis for that claim, broadly holding that such conduct can *never* outweigh the need to cancel a functional mark. Applying that categorical rule was also legal error.

## I. THE BOARD LEGALLY ERRED BY IMPOSING *TRAFFIX*'S HEAVY BURDEN OF DISPROVING FUNCTIONALITY ON CERAMTEC.

*TrafFix* imposes a "heavy burden" of proving nonfunctionality on a party that seeks trademark protection when the "features in question" were previously disclosed in a utility patent. 532 U.S. at 29-30. The burden applies when the feature claimed in the mark was taught as part of "the central advance claimed in the expired utility patents." *Id.* at 30.

The Board committed legal error by applying *TrafFix* for two independent reasons. First, the Board conflated the color pink with the use of chromia described in the patents, even though the patents do not suggest that any utilitarian advantage is associated with adding the specific amount of chromia that yields the color pink—and even though it is undisputed that chromia within the range described in the patents creates ceramics of many colors. By consistently conflating the patent's references to chromia with the color pink, the Board ran afoul of the fundamental principle that the "functionality enquiry must focus on the functional utility of that exact feature … that is claimed as a protectable … mark." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:70 (5th ed. 2023 update). The

Board compounded this error by misreading the patents to attribute a wide variety of functional advantages to the disclosed ranges of chromia, when the only advantage discussed in the patent is on hardness.

Second, the Board applied *TrafFix* even though the patent's "central advance" was a ceramic used for *cutting tools*, not hip joint components. *TrafFix*, 532 U.S. at 30. The undisputed record establishes that the material properties necessary for cutting tools—which heat to over a thousand degrees Celsius—are very different from the properties useful for hip joint components. The Board thus erred by applying the patent's discussion of chromia outside the context of this "central advance."

The Board's erroneous application of the *TrafFix* burden clearly prejudiced CeramTec, thoroughly infecting the Board's view of the empirical evidence. *See* Appx99-102. As the Board recognized below, absent its mistaken application of *TrafFix*, C5 would have borne the burden of proving functionality—fundamentally altering how the Board assessed the evidence, which heavily favored CeramTec. *See* Appx4; *accord Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 965 n.2 (Fed. Cir. 2015). The Court should remand for the Board to reconsider the record free from its erroneous understanding of the parties' burdens.

### A. CeramTec's Utility Patents Do Not Disclose Any Functional Advantage For The Color Pink.

#### *1. The Board erroneously conflated chromia with pink.*

*TrafFix* involved a trade dress claim for a mechanism using two springs to keep outdoor signs upright during windy conditions. 532 U.S. at 25. The "essential feature of the trade dress" claims was the dual-spring design, yet before seeking trade dress protection the plaintiff had successfully obtained utility patents in which "the central advance claimed" was the very same dual-spring design. *Id.* at 30. Because the patent and trade dress claimed the same central feature "necessary to the operation of the device," the Supreme Court concluded that the patents were "strong evidence" that the dual-spring design was functional and imposed on the party seeking trade dress protection "the heavy burden of showing that the [dual-spring] feature [was] not functional." *Id.* at 29-30.

The "heavy burden" of *TrafFix* does not apply here because the utility patents cited by the Board do not disclose a utilitarian advantage for the color pink, which is the only feature claimed in CeramTec's trademarks. *Id.* at 30. Of the four patents cited by the Board, CeramTec's '816 patent contains the most extensive discussion of chromia's effects. Each claim in that patent discloses a broad range of chromia content. Appx13998 (cols. 9-10). For example, claim 3, which BIOLOX Delta practices, allows for 0.1% to 5% chromia compared to zirconia. *See* Appx13998 (claim 3(e)). The specification attributes to this "specific molar ratio" the

achievement of "hardness values such as have not previously been achieved at such zirconium dioxide contents." *See* Appx13995 (col. 3:59-66). During the patent's prosecution, CeramTec made a similar statement to explain in part why a particular prior art reference did not render other claims in the patent obvious. *See* Appx1628 (attributing "hardness values" to the "very specific molar ratio of the zirconium dioxide … and the chromium oxide" claimed).

There is no dispute that the zirconia-chromia ratios identified in the '816 patent—including the claim practiced by BIOLOX Delta—cover ceramics of many colors. A C5 witness admitted that "the claims in" the '816 patent "would cover colors from almost white" to "barely perceptible" pink to "purple or red." Appx13652 (526:16-20); *see also* Appx12751 (¶ 31) (CeramTec expert confirming that "one could develop a BIOLOX Delta-like material that both practices the patent and has a white color"). A CeramTec witness added that the patent's claims also cover ceramics that are "white," "yellow," "gray," or "black." Appx13750 (1024:7-11). Although C5's expert extensively discussed CeramTec's patents, he never disputed any of this testimony regarding the range of colors associated with the claims. *See* Appx3238-50 (¶¶ 86-111); Appx15525-35 (¶¶ 69-118).

Even if the patent's statements about the effects of chromia on hardness are assumed to be true—despite the avalanche of subsequent testing, *see infra* pp. 43-51—*those statements all refer to chromia in the entire range of claimed amounts.*

Neither the claims nor the specification suggest any unique effect for the specific ratio used in BIOLOX Delta (0.33%) to produce a pink color. From the patent's perspective, that specific amount is just one choice within an extensive range of options. Thus, nothing in the patent, the specification, or the prosecution history teaches any advantage *of the color pink* as compared to any of the other color options—ranging from white to black—of ceramics made with the broad range of chromia content claimed. Far from marrying the benefits of chromia to the color pink, the patent does not mention the color pink at all.

The Board briefly invoked two other utility patents and one abandoned patent application, suggesting they might also contribute to a *TrafFix* presumption. But those patents add nothing of substance to the '816 patent. The next-most extensive discussion of chromia occurs in U.S. Patent No. 6,452,957, which uses the same language as the '816 patent to discuss chromia's effect on hardness—including attributing that effect to the "specific molar ratio" of chromia to zirconia. Appx5850 ('957 patent col. 4:48); *compare* Appx5850-51 ('957 patent col. 4:45-53, col. 5:41-45), *with* Appx13995 ('816 patent col. 3:51-4:4). The two other documents cited by the Board, U.S. Patent No. 9,237,955 and abandoned Application No. 2012/0142237, are even further afield, as CeramTec abandoned the claims related to chromia in those documents, which in any event were even less extensive than those already discussed in the '816 patent. *See* Appx12036-37 (¶¶ 113, 116), Appx12039

(¶¶ 124-125). Indeed, when arguing that the *TrafFix* presumption applies, C5 relied exclusively on the '816 patent. *See* Appx19623 ("The expired '816 Patent alone compels cancellation of [CeramTec's marks]."); *accord* Appx19621-24; Appx19698-702. Thus, these additional materials add nothing to the chromia references in the '816 patent, and for the same reasons offer no reason to conclude that a pink-colored ceramic would have any advantage over a white, pink, purple, red, yellow, black, or gray one.

The Board reached a contrary conclusion by erroneously conflating chromia *in general* with the particular amount of chromia responsible for the pink color in CeramTec's marks. *See* Appx92-93. According to the Board, so long as the trademark could be generated by practicing the patent claims, that was sufficient to trigger the strong presumption of functionality under *TrafFix*—even if the patents do not suggest the specific combination that produces pink ceramics. *See* Appx92-93.

The Board tried to account for this error by claiming that the color pink is a "natural byproduct" of practicing the patent, but this ignores that practicing the patent might yield any number of colors *other* than pink too. Appx94. Under *TrafFix*, the question is whether the trademark "features in question" were the subject of the relevant disclosures in the utility patent. 532 U.S. at 30. Here, to the

extent the utility patents contained *any* relevant disclosures, they did not concern the "feature[]" in question": namely, the color pink.

The Board sought support for its erroneous conflation of chromia with the color pink in one of its precedents, *McGowen Precision Barrels, LLC v. Proof Research, Inc.*, No. 92067618, 2021 WL 2138663 (T.T.A.B. 2021), but *McGowen* only illustrates why the patents here do not trigger the *TrafFix* presumption. *McGowen* involved a trademark covering the mottled appearance of a gun barrel. *Id.* at *1. The appearance was a direct result of a manufacturing process disclosed in a utility patent. *See id.* at *20. The mark's proponent claimed that its utility patent did not trigger a presumption of functionality because the patent disclosed "a wide variety" of manufacturing options, some of which would produce different patterns from the one claimed in the mark. *Id.* at *27 (quotation marks omitted). The Board rejected that argument on the strength of disclosures within the patent that *any* choice within the range would have a unique impact on the functionality of the barrel—every possible choice represented "different compromises with regard to" the various functions. *Id.* at *28. Here, by contrast, nothing suggests that CeramTec's choice within the claimed chromia range has any impact on chromia's supposed advantages; the patent at most suggests that including any amount in that range would have the necessary effect.

In that regard, this case more closely resembles *McAirlaids*, where the Fourth Circuit reversed a district court for erroneously applying the *TrafFix* presumption based on an analytical error similar to the Board's here. In *McAirlaids*, the challenged mark covered an embossed pattern on absorbent products useful for medical supplies and other purposes. *See* 756 F.3d at 309. The mark owner held a patent on the production process, and it was undisputed that the pattern "result[ed] from the process." *Id.* at 312. But there was evidence "that the company could have used many shapes," and the specific pattern chosen "was a purely aesthetic choice among many alternatives." *Id.* at 312-313. The patents themselves indicated "that many designs [could] also be used" without suggesting a preference for any one in particular. *Id.* at 313. Because the patents did not disclose any functional advantages of "the same feature" covered by the mark—that is, the *particular* pattern claimed in the mark—the Fourth Circuit concluded that the *TrafFix* burden did not apply. *Id.* at 312. The same is true here: Based on the patents' disclosures, the color pink is "a purely aesthetic choice among many alternatives," *id.* at 313; nothing teaches or suggests that pink is preferable to any alternative colors that practicing the patents might yield.

The Seventh Circuit reached a similar conclusion in *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486 (7th Cir. 2019), which involved trade dress for a domed lid and other features on a French press coffee maker. The party

challenging the trade dress attempted to introduce utility patents depicting similar designs, claiming among other features a "removable cover." *Id.* at 496 (quotation marks omitted). The Court affirmed the District Court's refusal to admit the patents at trial, pointing out that none of the proffered patents "claimed a *domed* lid," even though a domed lid would indisputably have fallen within the broad language in the patent. *Id.* The same is true here, where pink is only one possible option among many disclosed within the patents' claims.

*2. The patents do not disclose any effects related to chromia other than hardness.*

At minimum, the Board erred by sua sponte attributing any effects other than hardness to CeramTec's utility patents and placing a burden on CeramTec to disprove those features. The Board read the patents to ascribe at least three other attributes to chromia: "toughness," "stability," and "suppression of brittleness." Appx92.

This conclusion misreads the patents. Regarding toughness, the Board points to statements in the patents that refer to the addition of *zirconia* to the ceramic. *See, e.g.*, Appx36 (quoting the '816 patent). These references do not suggest that chromia has any effect on toughness; rather, they confirm that the toughness results from zirconia and suggest that chromia compensates for any resulting reduction in hardness. *See, e.g.*, Appx13995 (col. 3:61-66) ("[Adding chromia in the claimed ratios] makes it possible for the first time to achieve hardness values such as have

not previously been achieved … even at the relatively high zirconium dioxide contents which may be necessary to obtain an especially good toughness.”).

As for “stability,” which it equates with “wear resistance,” the Board points to nothing in any of the patent materials suggesting chromia has an effect on wear resistance. *See* Appx24, Appx34-42. Instead, the Board appears to rely on the appearance of the phrase “stabilizing oxides” in the patents, which it emphasizes several times in its recitation of the ’816 patent’s specification. Appx37 (quoting the ’816 patent). But the phrase “stabilizing oxides” does not refer to chromia oxide. *See, e.g.*, Appx13998 (col. 9:31-35) (listing the “stabilizing oxides” as “oxides of cerium, praseodymium and terbium and/or … yttrium oxide”).

Finally, regarding “suppression of embrittlement,” the specification uses that phrase synonymously with “hardness.” *See* Appx13995 (col. 3:61-4:4). The specification states that chromia counteracts embrittlement of the material associated with lower zirconia content. Appx13995 (col. 3:61-4:4). This is just another way of saying that chromia counteracts brittleness that might otherwise result *through* chromia’s contributions to hardness. Appx13995 (col. 3:61-4:4).

The Board’s attribution of these additional characteristics to the range of chromia claimed in the patents thus rests on a misreading of the patent’s technical language. Tellingly, even C5 did not attempt to suggest that the patents disclose any advantages to chromia *other* than hardness. *See, e.g.*, Appx19622 (arguing based on

the specification that "the addition of chromium is purely functional: to increase hardness"); *accord* Appx19596-97, Appx19621-24; Appx19697-701. Thus, CeramTec should not have been required to shoulder *TrafFix*'s burden as to those properties.[4] And, because the Board did not distinguish among the various properties it ascribed to chromia when evaluating CeramTec's scientific evidence of nonfunctionality, *see* Appx99-102, this error likewise affected the Board's consideration of the evidence concerning functionality and requires remand.

### B. Pink Color In Hip Joint Components Is Not The "Central Advance" Of CeramTec's Utility Patents.

The Board's application of *TrafFix* was flawed for a second, independent reason: *TrafFix*'s heavy burden applies in the context of the "central advance" described in a utility patent. 532 U.S. at 30. Outside that context, a patent does not suggest how, if at all, a feature described in the patent improves functionality. *See id.*

Here, the "central advance" of the '816 patent was the inclusion of chromia in a ceramic "suitable as a cutting tool," not ceramic components in replacement hip joints. Appx13995 (col. 3:42-50); *see* Appx13996 (col. 6:35-39) ("Applications of

[4] To the extent the Court agrees with the Board that some of these attributes are ascribed to chromia, they are in the same boat as hardness—none of the patents ascribe any of these attributes to the *particular* level of chromia required to produce pink. *See* Appx35-42. Thus, these attributes also fail to trigger the *TrafFix* presumption for the same reason. *Supra* pp. 35-37.

the [invention] preferably lie in its use as a cutting tool ….”). The patent does not suggest how the addition of chromia, including its purported effect on hardness, would in any way improve hip joint components. Given that omission, there was no basis for the Board to presume that the patent taught any functionality for chromia in the hip joint context.

The Board primarily rejected this argument as relying on “a passing comment in *TrafFix*.” Appx93. That does not accurately characterize the Supreme Court’s analysis. The “central advance” language appears in the analytical heart of the opinion, and the Supreme Court repeatedly reiterates this aspect of its reasoning using synonymous phrases—explaining that a presumption arises because the features “are necessary to the operation of the device” described in the patent and constitute that invention’s “essential feature.” *TrafFix*, 532 U.S. at 30. CeramTec’s reading draws further support from the Supreme Court’s explanation of its “rationale,” which is that the patent discloses *how* the design feature serves a function in a given context. *Id.* at 31. In *McAirlaids*, the Fourth Circuit likewise recognized the importance of the “central advance” language in *TrafFix*. 756 F.3d at 311.

Unlike in *TrafFix*, where the Supreme Court emphasized that the dual-spring design allowed a sign to stand upright, nothing in the ’816 patent explains why chromia would be useful in the context of hip joint components. *See TrafFix*, 532

U.S. at 30. On the contrary, one of CeramTec's lead designers explained that "it was not CeramTec's understanding that [any] increase to the hardness of the material was of significant importance to the performance of the material, given that BIOLOX Delta remained far harder than metal and exhibited superior strength and toughness to" its predecessor, BIOLOX Forte, "even though hardness of BIOLOX Forte is higher." Appx10594 (¶ 30); *see also* Appx13736 (1010:10-20) (explaining why "the material requirements for cutting-tool applications" are "significantly different" from those "for hip-implant components"). By contrast, it is easy to understand why hardness—that is, resistance to indentation—would be much more critical for cutting tools that press against metal so hard they heat to over a thousand degrees Celsius. *Supra* pp. 9, 30. The Board thus erred by applying a legal presumption of functionality based on a patent claim that explained functionality in the context of a very different problem.

## II. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE BOARD'S DETERMINATION THAT THE COLOR PINK AS APPLIED TO CERAMIC HIP JOINT COMPONENTS IS FUNCTIONAL.

Setting aside the Board's misreading of *TrafFix*, the record simply does not support the Board's underlying functionality finding. "Substantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1356 (Fed. Cir. 2018) (cleaned

up). Substantial evidence review is "less deferential" than arbitrary-and-capricious review, *On-Line Careline*, 229 F.3d at 1085, and "[t]he Supreme Court has stressed the importance of not simply rubber-stamping agency factfinding," *Applications in Internet Time*, 897 F.3d at 1356 (quotation marks omitted).

Most critically, the Board inexplicably discounted the most probative evidence of whether chromia actually has any impact on CeramTec's ceramics. Independent testing by disinterested experts—ordered by an independent German court—repeatedly found that chromia in the range claimed in the patent has no such effect. The Board's discounting of this highly probative evidence by summarily adopting highly contested critiques from C5's expert ran afoul of the Board's obligation to "explain[] its decision[] with sufficient precision, including the underlying factfindings and … rationale." *Princeton Vanguard*, 786 F.3d at 970 (quotation marks omitted).

The Board further erred by concluding that two of the *Morton-Norwich* factors were neutral when they in fact weighed decisively in CeramTec's favor—namely, the availability of functionally equivalent designs and the impact of the disputed feature on cost. *See Valu Eng'g*, 278 F.3d at 1274. The Board "may not short-cut its consideration of the factual record" by labeling two of the four factors it relied on as neutral when they are not. *Princeton Vanguard*, 786 F.3d at 970.

The conclusion that small amounts of chromia affect any other properties of ZTA ceramics finds even less support in the record. C5 has not presented a single controlled experiment analyzing chromia's effect on toughness, phase stabilization, or the suppression of brittleness. And again, the only independent testing in the record—the Institute's assessment of wear resistance—demonstrated no effect.

### A. Independent Testing Established That Chromia Does Not Affect The Performance Of BIOLOX Delta.

An agency "is not required to discuss every piece of evidence," but it may not simply "select a few pieces of evidence" to support its conclusion or "disregard the results" of key testing. *Princeton Vanguard*, 786 F.3d at 970. Nor is it "adequate to summarize and reject arguments without explaining why" the prevailing argument is accepted. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (citing *Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575, 578 (Fed. Cir. 2016)).

Here, the Board did not explain "with sufficient precision" its decision to discount the Institute's independently conducted, controlled experiments. *Princeton Vanguard*, 786 F.3d at 970. Those experiments showed that small amounts of chromia, like the amount in BIOLOX Delta, have no effect on hardness. *See* Appx17599-668 (exemplar Institute report). This neutral testing is the gold standard for scientific evidence—rarely available in U.S. litigation—where each party typically relies on its own experts. Following requests from a German court, the Institute collected ZTA ceramic samples from C5, CeramTec, and a Swiss ceramics

company that contained 0, 0.1, 0.3, and 0.5 percent chromia content by weight. Appx11999 (¶ 47) (citing Metoxit German Federal Institute at 8); Appx12014 (¶ 72) (citing Appx17609). BIOLOX Delta includes chromia at approximately 0.33%, so these tests considered values well below and well above the actual amount at issue. *See* Appx10591-92 (¶ 22); Appx11999 (¶ 47), Appx12014 (¶ 72).

The Institute evaluated each sample by pressing an "indenter" on the surface of the tested material, analyzing the indentation left behind, and giving the sample a hardness score under a widely accepted scale. Appx12003-04 (¶ 55) (citing Metoxit German Federal Institute at 47-48; Appx12158-62 (¶¶ 155-160)); Appx12021-22 (¶ 84) (citing Appx17649-50, Appx12158-62 (¶¶ 155-160)); *see also* Appx11270-71 (¶¶ 36-37) (describing the hardness scale). None of the samples showed a detectable effect on hardness as the amount of chromia oxide increased. Appx12004 (¶ 56) (citing Metoxit German Federal Institute at 49, tbls. 12 & 13); Appx12022 (¶ 85) (citing Appx17649-51, tbls. 13 and 14). The Institute also tested for wear resistance, which was similarly unaffected. Appx11998-99 (¶ 46) (citing Metoxit German Federal Institute at 5).

The German studies, recently credited by the Higher Regional Court of Stuttgart,[5] warranted the Board's close attention. In the proceedings below, both

[5] Add. 10-11 (explaining that C5's allegations of bad faith did not warrant temporarily suspending the proceedings because the Institute's reports "confirm[]

parties stood accused of changing their position on chromia and conducting "litigation-driven" research. *See, e.g.*, Appx19610 (C5 denouncing Dr. Kuntz's 2018 white paper and Drs. Kuntz and Krüger's 2018 study as "litigation-driven"); Appx19687 (CeramTec identifying C5's changed position on whether chromia affects hardness). The Institute's experiments, by contrast, were immune from accusations of bias and party manipulation. Unlike the American legal system, German courts may play an active role in investigating the facts of the case. Appx11997 (¶ 44). The Stuttgart Regional Court carried out its mandate by appointing the Institute to serve as an independent expert. Appx11997 (¶ 44). The Institute's independent studies should have been accepted by the Board as particularly strong evidence of chromia's effects in ZTA ceramics.

The Board instead dismissed the independent findings out of hand, purporting to credit the "extensive[] critici[sm]" from C5's expert, Dr. William Carty. Appx99. Although Dr. Carty did not conduct a single experiment on the effects of adding small amounts of chromia to ZTA ceramics, he sought to cast doubt on the Institute's testing, claiming: (1) the specimens were too hard; (2) the report needed more detail about the conditions of testing, and about how chromia would perform differently if it were in an "optimized system"; (3) the data on wear resistance did not support the

---

that adding chromium oxide does not increase the hardness and durability of the ceramic").

Institute's conclusions; and (4) the experiments were conducted under laboratory conditions. Appx3285-87 (¶¶ 182-190).

CeramTec's expert, Dr. Mecholsky, conducted a point-for-point accounting of Dr. Carty's criticisms. Appx69-70; *see also* Appx12793-96 (¶¶ 114-121) (Dr. Mecholsky's rebuttal report). Dr. Mecholsky explained that Dr. Carty's first complaint—that the specimens were too hard—*supports* CeramTec's position, because it demonstrates that ZTA ceramics are incredibly hard regardless of the amount of chromia. CeramTec has long maintained that because ZTA ceramics are already quite hard, adding small amounts of chromia would not influence the performance of ceramic hip joint components *even if* chromia improves hardness in the abstract. Appx12793 (¶ 114); Appx10594 (¶ 30).

Dr. Carty's next criticism revolved around the level of detail in the Institute's reports about various testing conditions. Appx3285-86 (¶ 185), Appx3289-90 (¶ 194). These missed the mark because, as Dr. Mecholsky explained, Dr. Carty failed to explain how different conditions would have affected the results of the experiment. For example, Dr. Carty raised questions about whether the samples tested had been subject to autoclaving—a process designed to simulate *in vivo* conditions. Appx3289-90 (¶ 194). But Dr. Carty offered no data on how autoclaving would have influenced the Institute's experiment. Appx12793-94 (¶ 115), Appx12796 (¶ 120). The lack of data is significant because, as Dr. Mecholsky

explained, Dr. Carty's theory that the specimen may behave differently with respect to the relevant characteristics *in vivo* lacks any empirical backing—from Dr. Carty or anyone else. Appx12795-96 (¶¶ 118, 120).

In much the same way, Dr. Carty failed to explain why the Institute's report needed to provide precise sintering conditions (that is, a more detailed description of how the samples were produced). Sintering is the process of heating the raw materials used to make a ceramic to high temperatures. Appx11302 (¶ 92). And as Dr. Mecholsky explained, "as long as sintering conditions were held constant" for each group of samples, precise sintering conditions are "irrelevant." Appx12788 (¶ 101). As the Board recognized, the *Institute* set the "production parameters" for "the test specimens," requiring "identical production parameters" reflecting each company's "standard manufacturing conditions." Appx68. Dr. Carty also took issue with the lack of "optimized" testing conditions, but again, he gave no explanation of what an "optimized system" even entails, let alone how it would have affected the Institute's experiments. Appx12793-94 (¶ 115), Appx12796 (¶ 120).

Dr. Carty next claimed that—contrary to the Institute's own conclusions—one of the Institute's four experiments actually showed significant improvement in wear resistance with the addition of chromia. But Dr. Carty's analysis is missing a key step: There is no indication that Dr. Carty determined whether any difference in wear resistance was statistically significant. Appx12794-95 (¶ 117); *cf. In re*

*Montgomery*, 677 F.3d 1375, 1381 n.11 (Fed. Cir. 2012) (results that "were not statistically significant" did "not teach anything"). He therefore lacked any basis to disprove, or even cast doubt on, the Institute's conclusion, using "a common … statistical test," that the addition of chromia does not result in any "significant differences … between the measurement results for the friction and wear data." Appx12794-95 (¶ 117) (quotation marks omitted).

Dr. Carty's final criticism was that the Institute conducted its experiments in a laboratory, instead of conditions that mirrored *in vivo* (in the body) placement of a ceramic. Appx3287-90 (¶¶ 188-195). But, as with his prior critiques, Dr. Carty does not substantiate his suggestion that the Institute's reports may have been different if *in vivo* testing were performed. Appx12795 (¶ 118). Rather, Dr. Carty's statements "appear to state a hypothesis he has formed, which has not been tested by experiment." Appx12795 (¶ 118).

Beyond these specific rebuttals, Dr. Mecholsky identified a broader flaw with Dr. Carty's grievances: C5 "had the means and opportunity to communicate any disagreement it had with the testing methodologies" during the German proceedings because it *selected* the samples that the Institute studied for at least one of its experiments. Appx12792-93 (¶ 113). The Board did not consider C5's ability to provide real-time feedback to the Institute during the testing process, which undermines Dr. Carty's efforts to nitpick the testing procedures after the fact.

The Board failed to explain why Dr. Mecholsky's analysis of Dr. Carty's conclusions was wrong. As in *Princeton Vanguard*, the Board rejected key evidence and allowed the mere existence of Dr. Carty's report to simply "cancel[] … out" Dr. Mecholsky's defense of the Institute's independent findings. 786 F.3d at 971. The Board was required to provide some explanation for this decision, but it failed to do so. As a result, this Court cannot uphold the Board's decision. *Id.* at 970-971.

The Board also expressed "additional concerns" with the amount of chromia studied in the German proceedings, Appx99-100, but these do not justify its decision to discredit the Institute's reports. In the Board's view, the Institute faltered by studying the addition of small amounts of chromia (0 to 0.5% by weight) instead of the full range of the '816 patent (0.004 to 6.57% by weight). Appx99-100. Not so. The premise of C5's functionality challenge is that the color protected by CeramTec's mark is inextricably tied with "CeramTec's optimized level of chromium." Appx19712; *see also* Appx492 (¶¶ 6-7), Appx496-497 (¶ 22); Appx20086 (¶¶ 6-7), Appx20090-91 (¶ 22) (alleging that the color pink is tied to the particular composition of CeramTec's ceramics). Indeed, C5 insists that it copied the color of BIOLOX Delta only because it wanted to copy the *chromia content* of BIOLOX Delta. Appx19712. The chromia content of BIOLOX Delta is 0.33%—well within the range of the chromia content that the Institute tested. Appx10591-

92 (¶ 22); Appx11999 (¶ 47) (citing Metoxit German Federal Institute at 8); Appx12014 (¶ 72) (citing Appx17609).

The Board's unsettled curiosity about the effects of higher amounts of chromia, Appx100, had no bearing on C5's challenge to the color pink as used in BIOLOX Delta. Indeed, the Board cited no evidence that chromia in these higher amounts would even yield a pink ceramic. *See* Appx100-102.

Nor does any of the block-quoted technical literature in the Board decision justify rejecting the Institute's independent findings. *See* Appx42-49. To start, the Board does not claim to rely on these articles when rejecting the Institute's report. *See* Appx99; *Fred Beverages, Inc. v. Fred's Cap. Mgmt. Co.*, 605 F.3d 963, 967 (Fed. Cir. 2010) (reviewing court looks "only to the reasons given by the agency"). At most, the Board cites articles that featured contributions from CeramTec personnel as further support for the Board's view that CeramTec had previously touted chromia's functional benefits. Appx95.

In any event, Dr. Mecholsky properly contextualizes the Board's cherry-picked articles within the broader body of research on chromia. Appx11325-32 (¶¶ 127-142). Dr. Mecholsky explains that the literature is contradictory on the effects of chromia for the same reason that the literature provides little insight into whether chromia affects ZTA ceramics: Chromia's effect (if any) on a ZTA ceramic "depends upon the specific ceramic composition and the amount of chromium

added." Appx11325 (¶ 127). Many of the studies tested materials with different compositions than BIOLOX Delta or featuring much larger chromia amounts. *See, e.g.*, Appx11328-31 (¶¶ 131, 135-140). Further complicating matters, "the effect of different processing and experimental techniques" can obscure which mechanical properties are attributable to which ingredients. Appx11325 (¶ 127). This is why the Board should have relied on the Institute's studies—which were controlled, independent, and tailored to the precise scientific question at issue, and thus of critical importance to answering that question—and why the Board was wrong to summarily discount those studies.

**B. The Board Improperly Discounted Evidence Related To The Availability Of Alternatives And The Cost of Manufacture.**

The Board's functionality finding is also flawed because the evidence showed that the color pink is not "essential to the use or purpose of the article" and does not improve "the cost or quality of the article." *Qualitex*, 514 U.S. at 165 (quotation marks omitted); *Valu Eng'g*, 278 F.2d at 1275. The Board reached the opposite conclusion by discarding undisputed evidence regarding two key factors: the availability of alternatives and cost. No reasonable person could "find that the evidentiary record supports the agency's conclusion" that either of these two factors is neutral. *On-Line Careline*, 229 F.3d at 1085. The Board therefore failed to "articulate a satisfactory explanation for its action" or "a rational connection

between the facts found and the choice made." *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1358 (Fed. Cir. 2020) (quotation marks omitted).

1. The Board concluded that the "alternative designs" factor was "neutral" even though unrefuted evidence showed that the color pink is only one of many viable colors for ceramic hip joint components. Appx97-98. This finding is unsupported by substantial evidence because "there is simply no probative evidence" to support it. *Braun Inc v. Dynamics Corp. of Am.*, 975 F.2d 815, 826 (Fed. Cir. 1992).

CeramTec presented evidence that C5 could have created a competitive ceramic in a range of different colors. Within the '816 patent, C5 could have produced ceramics ranging from white to black, including off-white, red, purple, gray, yellow, or black. Appx13652 (526:16-20); Appx13750 (1024:7-11). Unrefuted evidence showed that the amount of chromia could be altered to produce these colors without affecting the ceramic's performance as a hip implant component. Appx13759-60 (1033:1-1034:3); Appx12790 (¶ 106).

CeramTec's unrefuted alternative-design evidence should have been "significant" evidence of nonfunctionality. *Morton-Norwich*, 278 F.3d at 1341. The availability of alternative colors indicates that a mark will not illegitimately constrain competition, which is "is really the crux" of the functionality doctrine. *Valu Eng'g*, 278 F.3d at 1277 (quotation marks omitted); *see id.* (policy underlying

functionality doctrine is to "preserve[] competition by ensuring competitors the right to compete effectively" (quotation marks omitted)). The color of a device does not impermissibly constrain competition when "other colors are equally usable." *Qualitex*, 514 U.S. at 166 (quotation marks omitted); *see Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78 (3d Cir. 1982).

In *Qualitex*, for example, the Supreme Court upheld a trademark for "a special shade of green-gold" as applied to dry cleaning press pads. 514 U.S. at 161, 174. Even though "it is important to use *some* color on press pads to avoid noticeable stains," a wide range of colors could achieve that result. *Id.* at 166. Because other colors were "equally usable," the Supreme Court held that the trademarked shade of green-gold was not functional. *Id.* (quotation marks omitted).

This Court followed similar reasoning in *Converse, Inc. v. ITC*, 909 F.3d 1110 (Fed. Cir. 2018). There, the Court rejected the notion that a mark covering a particular design for a toe cap, along with other design elements, was functional, holding that "[a]ny functional benefit is derived from the presence of toe caps and bumpers *generally*, not the particular design of the … trademark" and pointing out that there were "numerous commercial alternatives to that design." *Id.* at 1124 (emphasis added). The same logic applies here, where there are "numerous commercial alternatives" to CeramTec's pink color—even for hip joint components containing chromia.

2. The Board ignored the other colors produced by the ’816 patent and looked only to whether CeramTec “provided evidence that … competitors’ products are equivalent in desired ceramic mechanical properties” to BIOLOX Delta. Appx98. This was wrong. To begin with, evidence of “*potential* alternative designs” is probative of nonfunctionality. *Valu Eng’g*, 278 F.3d at 1276 (emphasis added) (citing 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:75, 7-180-1 (4th ed. 2001)).

In any event, CeramTec *did* present evidence of actual alternatives. As the Board itself acknowledged, CeramTec introduced testimony through multiple witnesses that Kyocera, a Japanese ceramics company, creates a blue ceramic hip joint “with similar properties to BIOLOX Delta.” Appx10601 (¶ 48); *see* Appx13767 (1041:18-24); *see also* Appx98 & n.225 (citing Appx986-987 (136:23-137:20); Appx1172 (1041:18-24); Appx13560-61 (399:24-400:23); Appx13767 (1041:18-24); and Appx10601 (¶ 48)). Moreover, C5’s own *white* product is an actual alternative. C5 has maintained for over a decade that cerasurf-w and cerasurf-p are *both* stronger than BIOLOX Delta. Appx6505-06, Appx6510, Appx6516; *see also*, *e.g.*, Appx14077 (depicting identical mechanical properties for cerasurf-p and cerasurf-w); Appx14311-14 (C5 representative assuring customer that it has “found no difference between pink and white”). The Board rightly rejected C5’s efforts to

cast doubt on its prior position through methodologically unsound testing. Appx72-78, Appx102-103.

The Board's finding of neutrality on the alternative-design factor is thus unsupported by substantial evidence. *See Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1461 (Fed. Cir. 1997) (finding not supported by substantial evidence when contradicted by evidence from both parties).

3. On the question whether the color pink results from a comparatively inexpensive method of manufacture, the Board again found a tie where none existed. Appx98-99. CeramTec presented evidence that the color pink is not comparatively inexpensive. To the contrary, the compound in BIOLOX Delta that is responsible for its color—yttria chromite—is *more expensive* than the compound that a manufacturer would use to create a white analog to BIOLOX Delta. Appx13730 (1004:7-25), Appx13820-21 (1096:23-1097:7). C5's witnesses never maintained otherwise. Appx13527 (314:17-22) (Hughes acknowledging he was not aware of any difference in costs for producing white and pink products). Indeed, C5 actually uses yttrium oxide, instead of yttrium chromite, as the yttrium component in its pink ceramic. *See* Appx1092 (470:20-23), Appx1094 (472:7-13) (noting C5 used chromium oxide and yttrium oxide, instead of yttrium chromite, to develop its pink ceramic).

The added costs of the raw materials needed to produce BIOLOX Delta's trademark pink should have factored into the Board's functionality analysis. The comparatively inexpensive, noninfringing options make it *easier*, not more difficult, for C5 to produce a competing ceramic hip joint component. This cuts firmly against a finding of functionality. *Morton-Norwich*, 671 F.2d at 1341.

The Board found otherwise, concluding without explanation or evidence that this factor was "neutral." *See* Appx98-99. This finding was not supported by substantial evidence. The parties should not have broken even on this factor when CeramTec presented evidence—and C5 had none.

### C. Substantial Evidence Does Not Support The Board's Finding That Chromia Affects Toughness, Stability, Or Suppression Of Brittleness.

There is likewise no substantial evidence supporting the Board's finding that chromia affects toughness, stability, or suppression of brittleness. Appx92. To the extent that finding rested on statements in the patents, CeramTec has already explained why they are misguided. *See supra* pp. 37-38. Indeed, C5 did not even argue that the patents encompassed any of these technical properties. *See supra* p. 23. The limited additional evidence that the Board cited likewise does not support such a finding. Notably, the Board did not rely on *any* evidence of scientific testing to attribute these characteristics to chromia, much less to the amount of chromia in

CeramTec's products; the Board instead rested on a misreading of CeramTec's prior statements.

1. Far from attributing the toughness of BIOLOX Delta to chromia, CeramTec has long said the opposite. The toughness in BIOLOX Delta is attributable to the *zirconia* content, not the chromia content. *See, e.g.*, Appx13995 (col. 3:64-66) (noting "the relatively high zirconium dioxide contents necessary to obtain an especially good toughness"); *supra* p. 38. That is why ceramics like BIOLOX Delta are known as "zirconia-toughened alumina" ceramics. And it is undisputed that it is possible to introduce the same level of zirconia through processes that do not involve chromia. *Supra* p. 11. The Board tries to link toughness to chromia by pointing to paragraphs from CeramTec's submissions to the FDA, bolding every reference to chromia and toughness, and ignoring the words in between. Appx53-55. But those submissions explain that BIOLOX Delta achieves nearly the hardness of alumina "while offering a major improvement in strength and toughness." Appx4649, Appx4651. And although these submissions mistakenly attribute BIOLOX Delta's *hardness* to chromia, they do not credit chromia with improving BIOLOX Delta's toughness (or strength). *See* Appx4649, Appx4651. The Board's decision plainly erred on this issue.

2. Substantial evidence likewise does not support the connection that the Board draws between chromia and stability, meaning wear resistance. Appx24,

Appx92. The Board refers to promotional statements referring to wear resistance, *see* Appx95, but those statements likewise draw no link to chromia. The statements cited by the Board either specifically link wear resistance to alumina or decline to link wear resistance to any particular ingredient. *See, e.g.*, Appx3686-87 (BIOLOX Delta is "designed to incorporate the wear properties and stability of alumina"); Appx3689 ("Alumina provides the material's hardness and wear resistance"); Appx4718-19 (stating generally that BIOLOX Delta's alumina composite matrix "improves wear characteristics").

If any doubt remained about chromia's effect on wear resistance, the Institute's independent findings resolved it through scientific testing. The Institute tested two separate sets of CeramTec material, one set of material produced and provided by C5, and one set of material produced and provided by a Swiss ceramics company. Appx11999 (¶ 47), Appx12014 (¶ 72). None of the four controlled experiments revealed a statistically significant relationship between the relevant amounts of chromia and wear resistance. Appx11998-99 (¶ 46) (citing Metoxit German Federal Institute at 5). As the only controlled experiment on this score, the Institute's findings should have been highly probative. *See supra* pp. 45-46. Instead, the Board erred by summarily rejecting these independent findings. Appx99.

3. The Board's finding that chromia suppresses brittleness is not only unsupported by evidence, it was also unrequested by either party. C5 never argued

that chromia carries the functional benefit of suppressing the brittleness of ceramics. On the contrary, C5's expert stated that strontium oxide is an important ingredient in ZTA ceramics including chromia because "the addition of chromium *increase[s]* the brittleness" even when added in small amounts. Appx3252-53 (¶ 117) (emphasis added). This only confirms that the Board misunderstood the statements about counteracting embrittlement in the patents, which, if properly read, were simply another way of stating the belief that chromia affected hardness. *See supra* pp. 38-39.

4. C5 may attempt to rehabilitate the Board's functionality findings regarding these attributes by reference to some of the technical articles excerpted by the Board in its exposition of the evidence presented by the parties. *See* Appx42-49. But, as CeramTec has explained, *supra* pp. 50-51, the Board did not rely on those articles when it ultimately determined that the color pink was functional, except as evidence of prior statements by CeramTec or its customers. *See* Appx89-104. The Board's functionality determination therefore cannot be affirmed based on these articles. *See Fred Beverages*, 605 F.3d at 967.

Even if the Board's opinion *could* be read as attempting to rely on these articles for the validity of their scientific conclusions, moreover, the paucity of the Board's analysis would preclude it from doing so. The Board did not purport to assess the reliability of the findings in these articles, or make any attempt to address

Dr. Mecholsky's criticisms of their many defects. At most, the Board "summarize[d]" those articles and accepted them without "a reasoned explanation," which would not pass muster under this Court's standard of review. *In re Nuvasive*, 842 F.3d at 1383 (quotation marks omitted). The Board's obligation to explain its decision is especially important here, where the technical articles "are somewhat contradictory," as some "suggest that chromium additions improve the properties of certain ceramics, others state that there is no effect on properties, while others state that the addition of chromium is deleterious to the properties." Appx11325 (¶ 127); *see also* Appx11325-26 (¶ 128) (collecting examples). The Board's failure to meaningfully engage with these issues only confirms that it did not rely on this literature in reaching its functionality determination.

## III. THE BOARD LEGALLY ERRED BY HOLDING THAT THE UNCLEAN HANDS DEFENSE IS CATEGORICALLY UNAVAILABLE IN CANCELLATION PROCEEDINGS ASSERTING FUNCTIONALITY.

Determining that chromia has a functional role should not have been the end of the Board's analysis in this case. CeramTec raised an affirmative defense of unclean hands, as it is authorized to do by Board regulations. 37 C.F.R. § 2.114(b)(2). CeramTec's defense rested on C5's long history of assuring the market that chromia has *no* functional effect in an effort to compete against

CeramTec, even as it was engaged in its campaign to reverse engineer the pink color that was CeramTec's hallmark. *See* Appx19686-90.

The Board refused to even consider the equitable circumstances raised by CeramTec. Instead, it adopted a categorical rule that "the unclean hands defense is unavailable in Board functionality proceedings in view of the prevailing public interest in removing registrations of functional marks from the register." Appx105. That categorical rule is legally unsound.

The Board's regulations expressly authorize an unclean hands defense in cancellation proceedings, without limiting the category of claims against which the defense may be raised. 37 C.F.R. § 2.114(b)(2) ("An answer may contain any defense, including the affirmative defenses of unclean hands, laches, estoppel, … or any other matter constituting an avoidance or affirmative defense."). The Board may within its discretion decide that an equitable defense does not "prevail" in a particular case. *Loglan Inst., Inc. v. Logical Language Grp., Inc.*, 962 F.2d 1038, 1024 (Fed. Cir. 1992). But it may not categorically refuse to consider the defense in all cases of a particular type. *See id.* ("The Board may have erred in stating that it lacked jurisdiction over the [equitable] defenses ….").

The categorical rule adopted by the Board cannot be squared with fundamental principles of equity, which seek to "mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

"Flexibility rather than rigidity has distinguished [equity jurisdiction]." *Id.* The Board's categorical rule also defies a bedrock principle of administrative law that agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Categorically refusing to consider an unclean hands defense in a cancellation proceeding involving functionality is tantamount to amending the promulgated regulation *authorizing* a party to raise such a defense. 37 C.F.R. § 2.114(b)(2). The Board cannot accomplish such an amendment through adjudication. *Perez*, 575 U.S. at 101.

The Board relied on this Court's decision in *Loglan* to support its categorical rule, but *Loglan* specifically held that the Board "must consider [equitable] defenses" and indicated the Board was likely wrong to conclude that it lacked jurisdiction to do so. 962 F.3d at 1042. *Loglan* involved a genericness challenge, and the registrant raised an unclean hands defense based on "allegations of trade secret theft and infringement." *Id.* This Court held that those allegations did not overcome the "controlling fact" of the mark's genericness. *Id.* But there was no suggestion that the allegations of theft or infringement had any influence on the underlying genericness of the mark.

This case could not be more different. To start, the color pink is not functional on its face. The Board's decision looks *beyond* the protected mark and concludes

that BIOLOX Delta's composition, not its color, has utilitarian benefits. Appx103-104. What's more, C5's unclean hands influenced the functionality analysis at every turn. The Board's perception of CeramTec's evolving understanding of chromia was a direct result of how C5 vilified CeramTec's change in position while masking its own history of flip-flopping and bad-faith copying. *See, e.g.*, Appx97 (indicating the Board's impression that CeramTec "sought trademark protection to stave off competition after the expiration of its patent protection"); Appx59 (condemning CeramTec's contemporary view of the effects of chromia as "suspect"). The Board's glancing assessment of the Institute's independent studies is just one example of how C5's one-sided narrative overpowered even the most probative evidence of nonfunctionality. *See supra* pp. 43-51. Considering C5's unclean hands is particularly important here given the Board's extensive reliance on CeramTec's own statements to support its functionality finding, to the exclusion of the empirical evidence of functionality in the record. *Supra* pp. 43-51.

From its first trip to Home Depot, C5's efforts to copy CeramTec's trademarks have been nothing more than an attempt to trade on the goodwill that customers associate with BIOLOX Delta's pink color. The Board erred by categorically eliminating an equitable safeguard for trademark proceedings and allowing C5's gamesmanship to carry the day.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Board's December 22, 2022, order cancelling CeramTec's marks.

Respectfully submitted,

/s/ Jessica L. Ellsworth

JESSICA L. ELLSWORTH
ANNA KURIAN SHAW
REEDY C. SWANSON
JOHANNAH WALKER
RYAN J. STEPHENSON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20001
(202) 637-5600
jessica.ellsworth@hoganlovells.com

KATHERINE B. WELLINGTON
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110

*Counsel for Appellant CeramTec GmbH*

June 26, 2023

# ADDENDUM

# TABLE OF CONTENTS

Page

Board Decision: Cancellation of Trademark Registration Nos. 4,319,095 and 4,319,096 Granted (12/6/2022) ....................................Appx1

Trademark Registration Certificate No. 4,319,095 (4/9/2013)....................Appx107

Trademark Registration Certificate No. 4,319,096 (4/9/2013)....................Appx109

Order, *CeramTec GmbH v. CoorsTek Bioceramics LLC*, No. 2 W 47/20 [Higher Regional Court of Stuttgart] Mar. 13, 2023 (Ger.) – Certified English Translation ...........................Add. 1

**This Opinion is Not a Precedent of the TTAB**

Hearing Date: February 22, 2022 Mailed: December 6, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

*CoorsTek Bioceramics LLC*
*f/k/a C5 Medical Werks, LLC*
*v.*
*CeramTec GmbH*

Cancellation Nos. 92058781 and 92058796

Diana Rutowski, Peter D. Vogl and Briggs M. Wright of Orrick, Herrington & Sutcliffe LLP
for CoorsTek Bioceramics LLC f/k/a C5 Medical Werks, LLC.

Anna Kurian Shaw, Katherine Bastian Phillips, Lauren Cury, Ryan Stephenson and Brendan Quinn of Hogan Lovells US L.L.P.
for CeramTec GmbH.

Before Goodman, Lynch and Hudis,
Administrative Trademark Judges.

Opinion by Hudis, Administrative Trademark Judge:

## I. Background

This pair of cancellation proceedings is another chapter in the parties' eight-year odyssey to decide whether the color pink as applied to a composition for hip joint implant parts is functional. CeramTec GmbH ("Respondent") is the owner of record of two registrations on the Supplemental Register for the following marks and goods:

| Mark | Mark Description | Appln. No.<br>Appln Filing Date<br>Reg. No.<br>Reg. Date | Goods |
|---|---|---|---|
|  | The color(s) pink is/are claimed as a feature of the mark. The mark consists of the color pink applied to the goods. The configuration of a hip joint ball is shown in dotted lines in the drawing. **The matter shown in broken lines indicates placement of the mark on the goods and neither the matter shown in broken lines nor the configuration of the goods are claimed as a feature of the mark.** (emphasis added). | 85521237<br>filed Jan. 20, 2012<br><br>4319095<br>issued Apr. 9, 2013<br><br>First use and first use in commerce alleged: Mar. 16, 2000 | Hip joint implants and their parts made of artificial materials, namely, hip joint balls, in International Class 10 |
|  | The color(s) pink is/are claimed as a feature of the mark. The mark consists of the color pink applied to the entire surface of the goods. **The matter shown in broken lines indicates placement of the mark on the goods and neither the matter shown in the broken lines nor the configuration of the goods is claimed as a feature of the mark.** (emphasis added). | 85521240<br>filed Jan. 20, 2012<br><br>4319096<br>issued Apr. 9, 2013<br><br>First use and first use in commerce alleged: Mar. 16, 2000 | Hip joint implants and their parts made of artificial materials, namely, acetabular shell, acetabular fossa, in International Class 10 |

To be clear, in neither registration does Respondent claim protection for the configuration of the goods. The sole claim for protection in each registration is for the color pink only.[1]

[1] Because of the size of the reproductions of the registration drawings above, the broken lines are difficult to discern. According to convention for color marks, in the drawings, the entire configurations appear in broken lines, "inform[ing] the viewer where and how color is used on the product…, while at the same time making it clear that the shape of the product … is not claimed as part of the mark." TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1202.05(d)(i) (2022).

In each Petition for Cancellation, both filed on March 3, 2014,[2] C5 Medical Werks, LLC, which by change of name is now known as CoorsTek Bioceramics LLC ("Petitioner"), seeks cancellation of Respondent's registrations under Trademark Act Section 23(c), 15 U.S.C. § 1091(c), on the grounds that the color pink, as applied to the goods identified in the registrations, is functional; and that Respondent committed fraud on the U.S. Patent and Trademark Office ("USPTO") in obtaining the registrations. The Board has updated the case caption to identify CoorsTek Bioceramics LLC as the petitioner and party-plaintiff.

In its Orders of May 8 and May 10, 2014, the Board suspended both proceedings,[3] pending the resolution of a then-pending civil action between the parties in the U.S. District Court for the District Court of Colorado (the "Colorado Litigation"). We address the Colorado Litigation below, following the Summary of proceedings.

On February 4, 2016 in Cancellation No. 92058796, Respondent moved without Petitioner's consent to amend the date of first use claimed in Registration No. 4319096 from March 16, 2000 to March 20, 2001.[4] Because, in its response, Petitioner

---

[2] Cancellation Nos. 92058781 and 92058796; each petition for cancellation is located at 1 TTABVUE. References to the pleadings, the evidence of record and the parties' briefs refer to the Board's TTABVUE docket system. Coming before the designation TTABVUE is the docket entry number; and coming after this designation are the page and paragraph references, if applicable.

[3] Board Order of May 8, 2014 in Cancellation No. 92058781, 8 TTABVUE; Board Order of May 10, 2014 in Cancellation No. 92058796, 8 TTABVUE.

[4] 12 TTABVUE in Cancellation No. 92058796.

did not provide its unequivocal consent to the amendment,[5] Respondent's motion was deferred until final disposition.[6]

In its Order issued February 14, 2017, the Board consolidated the two cancellation proceedings, with Cancellation No. 92058781 being designated the parent case.[7] Unless otherwise stated, from this point forward our citations to the evidentiary record and the parties' briefs shall be to the parent proceeding.

Following a final determination of the Colorado Litigation, on June 29, 2020 the Board resumed the cancellation proceedings.[8] In its Answers filed separately in each of these proceedings, Respondent denied the salient allegations of the Petitions for Cancellation and asserted the affirmative defense of unclean hands.[9]

The consolidated cases are fully briefed. The parties participated in an oral hearing on February 22, 2022.[10]

## II. Summary

Petitioner bears the burden of proving its Trademark Act Section 23(c) functionality claim by a preponderance of the evidence. *See Poly-America, L.P. v. Ill.*

---

[5] 14 TTABVUE in Cancellation No. 92058796.

[6] Board Order of June 21, 2016 in Cancellation No. 92058796, 15 TTABVUE.

[7] Board Order February 14, 2017 in Cancellation No. 92058781, 16 TTABVUE; and in Cancellation No. 92058796, 20 TTABVUE.

[8] Board Order of January 29, 2020, 26 TTABVUE.

[9] Answer in in Cancellation No. 92058781, 28 TTABVUE; Answer in Cancellation No. 92058796, 22 TTABVUE.

[10] The day before the hearing, Respondent moved to strike unspecified visual aids submitted by Petitioner, and to prevent these visual aids from being used at the hearing. *See* 166 TTABVUE. No such visual aids were presented at the hearing, nor did we rely on them in this decision. Respondent's motion, therefore, is denied as moot.

*Tool Works Inc.*, 124 USPQ2d 1508, 1520 (TTAB 2017) ("We conclude, based on the preponderance of the evidence, that Respondent's registered configurations are functional."). Having considered the evidentiary record, the parties' arguments and applicable authorities, as explained below, we find that Petitioner has carried this burden, and grant the cancellation sought in each proceeding.

Because we find Respondent's marks to be functional, we need not reach Petitioner's additional claim regarding Respondent's alleged fraud upon the USPTO. *Fuji Medical Instr. Mfg. Co., Ltd. v. Am. Crocodile Int'l Grp., Inc.*, 2021 USPQ2d 831, at *38 n. 69 (TTAB 2021) (citing *Multisorb Techs., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013) ("[T]he Board ... generally use[s] its discretion to decide only those claims necessary to enter judgment and dispose of the case. ... More specifically, the Board's determination of registrability does not require, in every instance, decision on every pleaded claim.")).

As explained in further detail below, we also find Respondent's affirmative defense of unclean hands inapplicable to these proceedings. Finally, we deny as moot Respondent's motion filed in Cancellation No. 92058796 to amend the claimed date of first use in Registration No. 4319096.

## III. The Colorado Litigation

Simultaneous with its filing of these cancellation proceedings, Petitioner initiated the Colorado Litigation, through which Petitioner sought cancellation of Respondent's trademark registrations now before us, and a declaratory judgment that it did not infringe the mark in either registration. Respondent (a German company) moved to dismiss Petitioner's lawsuit on the ground that the Colorado

district court lacked personal jurisdiction over it. *C5 Med. Werks, LLC v. CeramTec GmbH*, 112 USPQ2d 1857, 1858-59 (D. Colo. 2014) ("*CeramTec I*"). Finding that it had jurisdiction, the district court denied Respondent's motion. *Id.*, 112 USPQ2d at 1861.

Two years later, the parties proceeded to a bench trial, extending from August through October 2016. In April 2017, the district court issued its opinion (with a final judgment to follow) that Respondent's registered trademarks for the composition of its pink-colored ceramic hip implant components were functional and thus unenforceable, noted that Respondent's trademark registrations would be cancelled, and granted Petitioner judgment in its favor as to Respondent's counterclaims for trademark infringement and unfair competition under federal and Colorado state law. *C5 Med. Werks, LLC v. CeramTec GmbH*, 249 F. Supp. 3d 1210, 1212 and 1223 (D. Colo. 2017) ("*CeramTec II*").

On appeal, the U.S. Court of Appeals for the Tenth Circuit held that the Colorado district court did not possess personal jurisdiction over Respondent, *C5 Med. Werks, LLC v. CeramTec GmbH*, 937 F.3d 1319, 2019 USPQ2d 339846, at *1 (10th Cir. 2019) ("*CeramTec III*"), thus reversing the district court's denial of Respondent's motion to dismiss for lack of personal jurisdiction, and remanded the case to the district court with instructions that the case be dismissed. *Id.*, 2019 USPQ2d 339846, at *5. The

district court entered its amended final judgment, dismissing the case without prejudice for lack of personal jurisdiction, on November 12, 2019.[11]

As noted, these consolidated proceedings resumed on June 29, 2020, at which time the parties submitted their stipulated protective order and stipulation regarding discovery.[12] The Board approved and entered these stipulations into the record by its Order dated August 25, 2020.[13]

## IV. The Evidentiary Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of Respondent's involved registrations. In addition, the parties stipulated to or otherwise introduced the following evidence:

### A. The Parties' Stipulations

The parties entered into numerous stipulations regarding the evidence obtained during the Colorado Litigation and these proceedings, which they filed during the parties' testimony periods before the Board.[14] Thus, the parties stipulated to the

---

[11] The District Court Amended Final Judgment was submitted as an attachment to Respondent's Notice to Board of Disposition of Civil Action on December 10, 2019. 24 TTABVUE 5.

[12] Board Order resuming proceedings, 26 TTABVUE; stipulated protective order, 30 TTABVUE; stipulation regarding discovery 31 TTABVUE.

[13] Board Order approving stipulations, 32 TTABVUE.

[14] *See* Stipulation Regarding Discovery (31 TTABVUE, June 29, 2020). The parties' stipulation of 31 TTABVUE was approved and entered into the record on August 25, 2020. 32 TTABVUE. Stipulation for Presentation of Certain Trial Testimony and Exhibits (67 TTABVUE, July 1, 2021). Stipulation for Admission of Federal Court Evidence via Notice of Reliance and for Filing of Confidential Material (68 TTABVUE, April 21, 2021). The parties' stipulations of 67 and 68 TTABVUE were approved and entered into the record on July 12, 2021. 69 TTABVUE. Trial Testimony and Exhibits (132 TTABVUE, August 18, 2021). The parties' stipulation of 132 TTABVUE was approved and entered into the record on September 7, 2021. 142 TTABVUE.

introduction under Notices of Reliance of many materials not otherwise admissible when submitted in this form.[15]

### B. Petitioner's Evidence

- Petitioner's First Notice of Reliance ("PNOR1") on e-mail correspondence (many with attachments) exchanged among Respondent's personnel (41 TTABVUE).
- Petitioner's Second Notice of Reliance ("PNOR2") on excerpts of trial and deposition testimony from the Colorado Litigation (42 TTABVUE).
- Petitioner's Third Notice of Reliance ("PNOR3") on U.S. patents issued and patent applications filed in the name of Respondent or its predecessors, portions of patent file histories and Respondent's correspondence with the federal Food and Drug Administration ("FDA") (43 TTABVUE).
- Petitioner's Fourth Notice of Reliance ("PNOR4") on Respondent's internal correspondence and memoranda, Respondent's external e-mail correspondence; results of Petitioner's product analyses, technical articles, a data sheet featuring Respondent's product, and reports Respondent filed with the FDA (44 TTABVUE).
- Petitioner's Fifth Notice of Reliance ("PNOR5") on promotional materials featuring Respondent's product; Respondent's external and internal e-mail correspondence (some with attachments); technical articles; Petitioner's survey and expert witness report from the Colorado Litigation by Sara Parikh,

---

On April 21, 2021, Respondent filed the parties' joint stipulation regarding the admission of certain trial testimony and trial exhibits in Cancellation No. 92058796, the child proceeding. 25 TTABVUE in Cancellation No. 92058796. Inasmuch as these proceedings were consolidated in 2017, 16 TTABVUE, the stipulation should have been filed in the parent proceeding only. For purposes of efficiency, the then-assigned Interlocutory Attorney noted the April 21, 2021 stipulation and placed a copy in the parent proceeding. 68 TTABVUE.

[15] Submission of non-conforming materials under Notices of Reliance is normally impermissible under the Board's Rules of Practice. However, the parties stipulated to this method of introduction here. *See Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1678 (TTAB 2007) (parties stipulated to the entire record in the case including business records, public records, government documents, marketing materials, Internet materials, and numerous factual matters); *Blackhorse v. Pro-Football Inc.*, 111 USPQ2d 1080, 1084-85 (TTAB 2014) (parties stipulated that the record of a prior proceeding may be submitted into evidence under notice of reliance, reserving the right to object based on relevance), *aff'd,* 112 F. Supp. 3d 439, 115 USPQ2d 1524 (E.D. Va. 2015), *vacated and remanded*, 709 F. App'x 183 (4th Cir. 2018) (mem.); *See generally* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 705 (2022) (noting the various ways of stipulating to evidence not otherwise admissible pursuant to the Board's Rules of Practice).

Ph.D. ("Parikh Lit. Rpt."), Respondent's admissions' responses from the Colorado Litigation; declaration of D. Burkhardt in support of Respondent's motion to dismiss the Colorado Litigation ("Burkhardt Decl.") and trade show agenda and sponsor list (45 TTABVUE).

- Petitioner's Sixth Notice of Reliance ("PNOR6") on technical articles and third-party submissions to the FDA (46 TTABVUE).
- The testimony declaration and report of Petitioner's survey expert, Sara Parikh, Ph.D. ("Parikh Decl." and "Parikh Rpt.") (47 TTABVUE).
- The testimony declaration and initial report of Petitioner's materials expert, William M. Carty, Ph.D. ("Carty Decl." and "Carty Rpt.") (48 TTABVUE (confidential); 60 TTABVUE (public/redacted)).
- Petitioner's Seventh Notice of Reliance ("PNOR7") on European Union and U.S. patents issued and patent applications filed in the name of Respondent or its related companies and the Colorado district court's opinion in *CeramTec II* (49 TTABVUE).
- Petitioner's Eighth Notice of Reliance ("PNOR8") on technical articles; promotional materials featuring Respondent's product and an article on Master Files by the FDA (50 TTABVUE).
- Petitioner's Ninth Notice of Reliance ("PNOR9") on technical articles (51 TTABVUE).
- Petitioner's Tenth Notice of Reliance ("PNOR10") on technical articles (52 TTABVUE).
- Petitioner's Eleventh Notice of Reliance ("PNOR11") on technical articles (53 TTABVUE).
- Petitioner's Twelfth Notice of Reliance ("PNOR12") on Respondent's internal e-mail correspondence (some with attachments), Respondent's marketing materials, Respondent's correspondence with the FDA, Petitioner's evidentiary submissions pursuant to Fed. R. Evid. 1006 of presentations by Respondent, Petitioner's business plan, excerpts from the discovery deposition of Grant Shopoff, Respondent's Commercial Director for the Americas ("Shopoff Depo.") and Respondent's admissions' responses and interrogatory answers from this proceeding (54 TTABVUE (confidential); 61 TTABVUE (public/redacted)).
- The testimony declaration and rebuttal report of Petitioner's statistics expert, Arnold Barnett, Ph.D. ("Barnett Decl." and "Barnett Rebuttal Rpt.") (55 TTABVUE (confidential); 56 TTABVUE (public/redacted)).
- The testimony declaration of Lucian Strong, Petitioner's Commercial Vice President of the Americas ("Strong Decl.") (57 TTABVUE).

- The testimony declaration of Jonathan D. Haftel, Petitioner's Plant Manager ("Haftel Decl.") with exhibits (58 TTABVUE (confidential); 59 TTABVUE (public/redacted)).

### C. Respondent's Evidence[16]

- Respondent's First Notice of Reliance ("RNOR1") on excerpts of trial testimony from the Colorado litigation, Respondent's internal memoranda, a U.S. patent issued in the name of Respondent's predecessor, a Standard issued by the International Organization for Standardization ("ISO") and technical articles (70 TTABVUE).[17]
- Respondent's Second Notice of Reliance ("RNOR2") on Petitioner's engineering report, Petitioner's marketing materials, Respondent's external e-mail correspondence, technical articles and a U.S. patent (with its file history) issued in the name of Respondent's related company (71 TTABVUE).
- Respondent's Third Notice of Reliance ("RNOR3") on the file history for a U.S. patent issued in the name of Respondent's predecessor, portions of the initial expert report of Petitioner's materials expert in the Colorado Litigation, G. Fischman, Ph.D., a Standard issued by the ISO, Respondent's internal e-mail correspondence (with English translation), Petitioner's internal e-mail correspondence (many with attachments), U.S. patents issued and patent applications filed in the name of Respondent or its predecessors, portions of a patent file history, and one of Petitioner's trial exhibits (a timeline) from the Colorado Litigation (72 TTABVUE).
- Respondent's Fourth Notice of Reliance ("RNOR4") on Petitioner's internal and external e-mail correspondence (many with attachments), Petitioner's engineering report, Petitioner's marketing materials and Petitioner's business plan (73 TTABVUE).
- Respondent's Fifth Notice of Reliance ("RNOR5") on the technical file for one of Petitioner's products, and Petitioner's internal e-mail correspondence (one with an attachment) (74 TTABVUE).
- Respondent's Sixth Notice of Reliance ("RNOR6") on Petitioner's internal and external e-mail correspondence (some with attachments), a technical article,

[16] Pursuant to a Notice Respondent filed at 125 TTABVUE, Respondent withdrew its Eighteenth through Twenty-Third and Twenty-Fifth Notices of Reliance, at 88-94 and 96 TTABVUE.

[17] Respondent filed a Corrected First Notice of Reliance at 122 TTABVUE, in which portions of the trial testimony transcript of Respondent's FDA expert, Mark Kramer, were omitted. Since Mr. Kramer's trial testimony was never expressly withdrawn, and we find portions of it helpful, we have considered it.

Respondent's internal memorandum (entirely in German), Respondent's marketing material and an experimental data spreadsheet (75 TTABVUE).

- Respondent's Seventh and Eighth Notices of Reliance ("RNOR7" and "RNOR8") on Respondent's experimental data records (76 and 77 TTABVUE).
- Respondent's Ninth Notice of Reliance ("RNOR9") on Respondent's experimental data records, Petitioner's external and internal e-mail correspondence, technical articles, experimental data spreadsheets and records, exhibits to the report of Mark Kramer, Respondent's FDA expert witness, from the Colorado Litigation, photos of Respondent's product development archives, Respondent's lab testing notes, a color swatch and a color board (78 TTABVUE).
- Respondent's Tenth and Eleventh Notices of Reliance ("RNOR10" and "RNOR11") on photos of experimental sample discs (79 and 80 TTABVUE).
- Respondent's Twelfth Notice of Reliance ("RNOR12") on a U.S. patent issued in the name of Respondent's predecessor, Petitioner's external e-mail correspondence (some with attachments), Petitioner's technical file distribution log, and demonstrative exhibits used by Respondent's witnesses during the trial in the Colorado Litigation (81 TTABVUE).[18]
- Respondent's Thirteenth Notice of Reliance ("RNOR13") on portions of the transcript and certain exhibits from the discovery deposition of Jonathan Haftel ("Haftel Discov. Depo.") (82 TTABVUE (confidential); 129 TTABVUE (public/redacted)).
- Respondent's Fourteenth Notice of Reliance ("RNOR14") on Petitioner's interrogatory answers and responses to Respondent's production requests (83 TTABVUE).
- The testimony declaration and report of Respondent's survey expert, Robert Klein ("Klein Decl." and "Klein Rpt.") (84 TTABVUE).
- The testimony declaration of Grant Shopoff, Respondent's Commercial Director for the Americas ("Shopoff Decl.") (85 TTABVUE).
- Respondent's Fifteenth Notice of Reliance ("RNOR15") on Petitioner's admissions responses and interrogatory answers (86 TTABVUE (confidential); 130 TTABVUE (public/redacted)).
- Respondent's Sixteenth Notice of Reliance ("RNOR16") on Petitioner's marketing materials and social media postings (87 TTABVUE).

---

[18] Respondent filed a Corrected Twelfth Notice of Reliance at 124 TTABVUE, in which the demonstrative exhibits used by Respondent's witnesses during the trial in the Colorado litigation were omitted and expressly withdrawn.

- Respondent's Twenty-Fourth Notice of Reliance ("RNOR24") on a technical article (95 TTABVUE).
- Respondent's Twenty-Sixth Notice of Reliance ("RNOR26") on portions of the transcript and certain exhibits from the discovery deposition of Lucian Strong, Petitioner's Commercial Vice-President, Americas ("Strong Discov. Depo.") (97 TTABVUE (confidential); 131 TTABVUE (public/redacted)).
- The testimony declaration of Dr. Allessandro Alan Porporati, an employee in Respondent's Oxide Department ("Porporati Decl.") with exhibits (98 TTABVUE (confidential); 99 TTABVUE (public/redacted)).
- Respondent's Twenty-Seventh Notice of Reliance ("RNOR27") on excerpts of trial testimony from the Colorado Litigation, list of meetings/trainings attended and photos of Respondent's trade show materials (100 TTABVUE).
- The testimony declaration of Dr. Meinhard Kuntz, the former Manager of Respondent's Oxide Development and presently the Dean of and professor at Heilbronn University in Germany ("Kuntz Decl.") with exhibits (102 TTABVUE (confidential); 101 TTABVUE (public/redacted)).
- The testimony declaration, litigation expert report, litigation rebuttal expert report, TTAB expert report and TTAB rebuttal expert report of Respondent's statistics expert, Joseph B. Kadane, Ph.D. ("Kadane Decl.", "Kadane Lit. Rpt.", "Kadane Lit. Rebuttal Rpt.", "Kadane TTAB Rpt." and "Kadane TTAB Rebuttal Rpt.") with exhibits (103 TTABVUE (confidential); 104 TTABVUE (public/redacted)).
- The testimony declaration, litigation expert report, litigation rebuttal expert report, TTAB expert report and TTAB rebuttal expert report of Respondent's materials expert, Dr. John J. Mecholsky, Jr. ("Mecholsky Decl.", "Mecholsky Lit. Rpt.", "Mecholsky Lit. Rebuttal Rpt.", "Mecholsky TTAB Rpt." and "Mecholsky TTAB Rebuttal Rpt.") with exhibits (106-112 TTABVUE (confidential); 105 TTABVUE (public/redacted)).
- The testimony declaration of Florence Petkow, Respondent's Director of Marketing and Communications ("Petkow Decl.") with exhibits (113 TTABVUE (confidential); public/redacted (114-120 TTABVUE).
- Respondent's Twenty-Eighth Notice of Reliance ("PNOR28") on excerpts of discovery deposition testimony from the Colorado Litigation (121 TTABVUE).
- Respondent's Twenty-Ninth Notice of Reliance ("RNOR29") on Petitioner's internal and external e-mail correspondence (some with attachments), Petitioner's correspondence and reports exchanged with the FDA and Petitioner's marketing materials (123 TTABVUE).
- The transcript from the testimony deposition of Angel Abeyta, Petitioner's Market Development Manager in its Medical Division ("Abeyta Testim. Depo.") with exhibits (133 TTABVUE (confidential)).

- The transcript from the testimony deposition of Megan Maguire, Petitioner's Senior Marketing Communications Manager ("Maguire Testim. Depo.") with exhibits (134 TTABVUE (confidential)).
- The transcript from the testimony deposition of Nicole Stavish, Petitioner's Strategic Marketing Manager for the Americas ("Stavish Testim. Depo.") with exhibits (135 TTABVUE (confidential)).
- The transcript from the cross-examination testimony deposition of Jonathan Haftel ("Haftel CX Testim. Depo.") with exhibits (146-147 TTABVUE (confidential)).
- The transcript from the cross-examination testimony deposition of Arnold I. Barnett, Ph.D. ("Barnett CX Testim. Depo.") with exhibits (148 TTABVUE (confidential)).
- The transcript from the cross-examination testimony deposition of William M. Carty, Ph.D. ("Carty CX Testim. Depo.") with exhibits (149-151 TTABVUE (confidential)).
- The transcript from the cross-examination testimony deposition of Sara Parikh, Ph.D. ("Parikh CX Testim. Depo.") with exhibits (149-152 TTABVUE (confidential)).

**D. Petitioner's Rebuttal Evidence**

- Petitioner's Thirteenth Notice of Reliance ("PNOR13") on excerpts of the discovery depositions of Petitioner's former Scientific Consultants who are now Petitioner's Commercial Managers, Rebecca Echols ("Echols Discov. Depo."), with exhibits; ("McCormick Discov. Depo."); and Blake Miller ("Miller Discov. Depo.") (136 TTABVUE (confidential); 154 TTABVUE (public/redacted).
- The rebuttal testimony declaration of Jonathan D. Haftel ("Haftel Rebuttal Decl.") with exhibits (137 TTABVUE (confidential); 138 TTABVUE (public/redacted)).
- The rebuttal testimony declaration and rebuttal report of Petitioner's statistics expert, Arnold Barnett, Ph.D. ("Barnett Rebuttal Decl." and "Barnett Rebuttal Rpt.") (139 TTABVUE (confidential); 140 TTABVUE (public/redacted)).[19]
- The rebuttal testimony declaration and rebuttal report of Petitioner's materials expert, William M. Carty, Ph.D. ("Carty Rebuttal Decl." and "Carty Rebuttal Rpt.") (141 TTABVUE (confidential); 153 TTABVUE (public/redacted)).

[19] The confidential and public versions of Dr. Barnett's Rebuttal Report also were filed at 55-56 TTABVUE.

- The transcript from the cross-examination testimony deposition of Respondent's survey expert, Robert Klein ("Klein CX Testim. Depo.") with exhibits (143 TTABVUE).
- The transcript from the cross-examination testimony deposition of Respondent's statistics expert, Joseph B. Kadane, Ph.D. ("Kadane CX Testim. Depo.") with exhibits (144 TTABVUE (confidential); 156 TTABVUE (public/redacted)).
- The transcript from the cross-examination testimony deposition of Respondent's materials expert, Dr. John J. Mecholsky, Jr. ("Mecholsky CX Testim. Depo.") with exhibits (145 TTABVUE (confidential); 155 TTABVUE (public/redacted)).

## V. Evidentiary Issues

Before proceeding to the merits of the cancellation proceedings, we address a number of evidentiary matters.

### A. Applicability of the District Court's Decision in *CeramTec II*

To begin, in an Appendix to its Brief,[20] Respondent "objects to any reliance on or consideration" in these cancellation proceedings of the "now-vacated decision in the District of Colorado [action] … between the Parties" (that is, the district court's decision in *CeramTec II*). As a retort to Respondent's objection, Petitioner essentially argues that (i) Respondent did not object to the manner in which Petitioner introduced the Colorado district court's decision into evidence in these proceedings, and (ii) none of the evidence introduced in these proceedings which came into being subsequent to the *CeramTec II* trial would have persuaded the Colorado district court to rule any differently.[21] Respondent's objection is sustained.

[20] Respondent's Brief, 160 TTABVUE 55.

[21] Petitioner's Reply Brief, 162 TTABVUE 27.

The vacated decision has been set aside and has no effect. We therefore cite the Colorado district court's opinion solely for procedural context and to explain the sources of the evidence the parties submitted from the Colorado Litigation. We do not rely on it for any of the findings of fact, conclusions of law or the holdings of the district court in *CeramTec II*. The Board's rulings in these proceedings are based upon our own review of the evidence and application of pertinent law.

### B. Problems with Large Portions of the Evidentiary Record Labeled as Confidential

The parties over-designated as confidential large portions of the record. Only the particular exhibits, declaration passages or deposition transcript pages that truly disclosed confidential information should have been filed under seal pursuant to a protective order. *Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, at *12 (TTAB 2022).

If a party over-designates material as confidential, the Board will not be bound by the party's designation, and will treat as confidential only testimony and evidence that is truly confidential and commercially sensitive trade secrets. *See* Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."). In this decision, in instances where Petitioner or Respondent improperly designated material as confidential, we disregard the designation.[22] *See AT&T Mobility LLC v. Thomann*, 2020 USPQ2d 53785 , at *12

[22] Our treatment here of the parties' confidentiality over-designations should not come as a surprise. In the Board's August 25, 2020 order approving and entering the parties' Stipulated

(TTAB 2020) (parties reminded to limit confidential designation to truly confidential or commercially sensitive materials).

### C. Needless Duplication of Evidence

We credit the parties for having entered into the numerous stipulations discussed above regarding the entry and admissibility of evidence. However, less helpfully, the parties also elected to file duplicative evidence by different methods of introduction; for example, once (sometimes twice or even thrice) by Notice(s) of Reliance and again by way of exhibit(s) to testimony declarations or testimony deposition transcripts. *See Made in Nature*, 2022 USPQ2d 557, at *12 (criticizing the parties for this practice). The parties further paid little attention to Trademark Rules 2.120(k)(7) and 2.122(a), 37 C.F.R. §§ 2.120(k)(7) and 2.122(a), which provide that when evidence has been made of record by one party, it may be referred to by any party for any purpose permitted by the Federal Rules of Evidence.

Whether the parties are unfamiliar with the Board's Rules of Practice or simply disregarded them, the Board's evaluation of the evidentiary record required reviewing some of the same testimony, technical articles, patents, promotional materials and other exhibits numerous times (or at least spending the time to determine whether they were duplicates, if not actually reviewing them in toto). The Board views with disfavor the practice of introducing cumulative evidence at trial. *See Calypso Tech. Inc. v. Calypso Cap. Mgmt. LP*, 100 USPQ2d 1213,

---

Protective Order, 32 TTABVUE, they were warned of the potential consequences of over-designating as confidential materials filed with the Board.

1218 (TTAB 2011). Suffice it to say, testimony and evidence does not become more probative if introduced multiple times.

### D. Irrelevant Evidence

Moreover, noticeable portions of the evidentiary record were not pertinent to the functionality claim or unclean hands defense, such that the Board was forced to spend needless time sifting through an inappropriately large record in search of germane proofs. *See, e.g.*, *RxD Media, LLC v. IP Appln. Dev. LLC*, 125 USPQ2d 1801, 1803 (TTAB 2018), *aff'd*, 377 F. Supp. 3d 588 (E.D. Va. 2019), *aff'd*, 986 F.3d 361, 2021 USPQ2d 81 (4th Cir. 2021) ("Simply put, the parties introduced into the record thousands of pages of testimony and other evidence without regard to what they needed to prove, apparently in the hope that in wading through it, we might find something probative. This is not productive. 'Judges are not like pigs, hunting for truffles buried in ... [the record].'") (quoting *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

### E. Submission of Entire Discovery Deposition Transcripts

Accompanying submission of the trial testimony of witnesses Messrs. Klein and Haftel, as well as Drs. Kadane, Mecholsky, Barnett and Carty, were the entirety of the transcripts from each of their discovery depositions. These filings were in derogation of Trademark Rules 2.120(k) and 2.122(g), 37 C.F.R. §§ 2.120(k) and 2.122(g).

Of all these witnesses, only Mr. Haftel was a person designated by Petitioner to testify pursuant to Fed. R. Civ. P. 30(b)(6) at the time his discovery deposition was taken; all the others were expert witnesses. We first discuss the introduction of Mr.

Haftel's discovery deposition transcript in its entirety as an exhibit to his testimony cross-examination.

Notably, well prior to the submission of Mr. Haftel's testimony deposition transcript and exhibits, Respondent already had introduced by way of Notice of Reliance those portions of Mr. Haftel's discovery deposition transcript and select exhibits on which Respondent wished to rely, together with a statement of the relevance of those transcript portions and exhibits to the issues in the proceeding pursuant to Trademark Rule 2.122(g).[23]

Thus, refiling the entirety of Mr. Haftel's discovery deposition transcript again as an exhibit to his testimony deposition transcript[24] was not only unnecessarily duplicative, it skirted the requirements of Trademark Rule 2.122(g). We have considered only those portions of Mr. Haftel's discovery deposition transcript that were included with Respondent's applicable Notice of Reliance, or read or used as part of his testimony on cross-examination.

The entire discovery deposition transcripts of third-party expert witnesses, such as Mr. Klein and Drs. Kadane, Mecholsky, Barnett and Carty, should not have been offered in evidence except by stipulation of the parties or by order of the Board on motion under the specific circumstances noted in Trademark Rule 2.120(k)(2). The Rule requires that the party seeking to rely on a discovery deposition of a third-party witness for purposes of trial make an affirmative showing at the time of the proffer

[23] Haftel Discov. Depo., RNOR13, 82 TTABVUE 2-202 (confidential), 129 TTABVUE 2-199 (redacted/non-confidential).

[24] Haftel CX Testim. Depo., 146 TTABVUE 129-537.

of such evidence that circumstances exist that justify acceptance of the evidence, unless the party is invoking "exceptional circumstances," in which case the motion must be filed promptly after the party learns of the circumstances. *Vans, Inc. v. Branded, LLC*, 2022 USPQ2d 742, at *7 (TTAB 2022) (citing numerous cases). No such stipulations or motions were filed with respect to these trial witnesses.

As mentioned, Trademark Rule 2.120(k)(6) permits the reading or use of the transcripts from the discovery depositions of Mr. Klein and Drs. Kadane, Mecholsky, Barnett and Carty as part of their cross-examination trial testimony. However, use of these witnesses' discovery deposition transcripts to impeach or otherwise clarify their trial testimony does not automatically make the entire discovery deposition transcripts of record. *Vans*, 2022 USPQ2d 742, at *8. Therefore, only to the extent that portions of these expert witnesses' discovery deposition transcripts were read or used as part of their cross-examination testimony do we consider these witnesses' discovery deposition transcripts. Otherwise, we decline to consider these witnesses' discovery deposition transcripts in their entirety.

### F. The Parties' Citations to the Record

Finally, rather than using full TTABVUE citations with the docket entry and electronic page numbers, as recommended, *see* TBMP § 801.03 and *Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1477 n.6 (TTAB 2014), the parties used their own numbering systems. For exhibits, the parties used the TTABVUE docket number but then cited to exhibits by their assigned exhibit numbers (without specifying the TTABVUE page numbers). For testimony submitted by deposition transcripts, the parties used the page and line numbers provided by the court reporters rather than

the TTABVUE citations with the docket entry and electronic page numbers. For testimony submitted by declarations, the parties used the numbers assigned to each paragraph, but neglected to provide the TTABVUE electronic page numbers at which the text of each of these numbered paragraphs could be found.

Especially with the voluminous record compiled by the parties, this citation practice made it extremely cumbersome to locate the evidence and provide evidentiary references for use in this opinion. In turn, this lengthened the time for review of the record, drafting of the decision and ultimately for issuance of this opinion. *See Made in Nature*, 2022 USPQ2d 557, at *14-15 (criticizing this practice, and encouraging parties in future cases to cite properly to the evidentiary record).

## VI. The Parties

Respondent, CeramTec GmbH, is a limited liability company organized under the laws of Germany and headquartered in Germany. Since 1974, Respondent has manufactured ceramic prosthetic implant components for hip, knee and shoulder joint replacements. Respondent sells these products to medical device companies that incorporate those components into their own prosthetic devices. Those medical device companies subsequently sell such devices to their customers such as, for example, hospitals.[25]

Petitioner was formed in 2005, under its original name C5 Medical Werks, LLC, to become a new entrant to the medical-implant component supply business, initially focusing primarily on hip replacement implant components – recognizing at the

[25] Burkhardt Decl., 45 TTABVUE 250, ¶ 2; Petkow Decl., 114 TTABVUE 4, ¶¶ 7-9.

outset that Respondent would be its principal major competitor.[26] The original company has since undergone a number of re-organizations and name changes;[27] and today is known as CoorsTek Bioceramics, LLC, a limited liability company of Delaware whose manufacturing facility is located in Grand Junction, Colorado.[28]

## VII. Technical Terminology

Our resolution of these proceedings will involve the use of numerous scientific and other technical terms. For the benefit of the reader, we have culled from the record and present here the definitions of these terms. Throughout this opinion, for brevity, we include in any citations to technical articles only the principal author(s) and year of publication (unless no author is provided, in which case we recite the article title). We have omitted formal citations to article titles and the publications in which the articles appeared. However, we have included cites to the TTABVUE record, and there the reader can find the formal citations to the article titles.

- A **ceramic** is a compound of a metal and nonmetal element. Nonmetal elements in ceramics can include, among other things, oxygen, nitrogen, and carbides. **Oxide ceramics** include oxygen as the nonmetal element. These oxide ceramics have special properties, and require specialized techniques to properly produce.[29]
- **Ion:** An atom or molecule that has lost or gained one or more electrons, resulting in a net positive or negative charge. The net charge, positive or negative, is written with a superscript representing the net charge and whether it is positive or negative. A chromium ion that has given up three

[26] Brad Coors Colorado litigation trial testimony ("Brad Coors Lit. Testim."), PNOR2, 42 TTABVUE 129-134; Petitioner's business plan; PNOR12, 54 TTABVUE 475-78, 480, 483, 492-93, 504.

[27] Jonathan Coors Colorado litigation trial testimony ("Jonathan Coors Lit. Testim."), PNOR2, 42 TTABVUE 145-46.

[28] Strong Decl., 57 TTABVUE 2, ¶¶ 3-4; Haftel Decl., 59 TTABVUE 2-3, ¶¶ 4-7.

[29] Kuntz Decl., 101 TTABVUE 4, ¶ 10.

electrons (and is thus positively charged), for instance, would be represented as $Cr^{3+}$.[30]

- **Microstructure:** The structure of a material, including a ceramic material, at a microlevel. The microstructure of ceramic materials is composed of small crystals known as "**grains**."[31]
- **Lattice:** The arrangement of atoms in a crystal structure at the microstructural level.[32]
- **Aluminum/Aluminum Oxide/Alumina:** Aluminum (Al) is the elemental metal on the periodic table of elements. Aluminum Oxide ($Al_2O_3$) or Alumina is the oxide of Aluminum. Chemical names that end with an "a" denote the oxide form.[33]
- **Chromium/Chromium Oxide/Chromia:** Chromium (Cr) is the elemental metal on the periodic table of elements. Chromium Oxide ($Cr_2O_3$ or presented in its common ionic form $Cr^{3+}$) or Chromia is the oxide of chromium.[34]
- **Zirconium/Zirconium Dioxide/Zirconia:** Zirconium (Zr) is the elemental metal on the periodic table of elements. Zirconium dioxide ($ZrO_2$) or Zirconia is the oxide of Zirconium.[35]
- **Yttrium/Yttrium Oxide/Yttria:** Yttrium (Y) is the elemental metal on the periodic table of elements. Yttrium oxide ($Y_2O_3$) or Yttria is the oxide of Yttrium.[36]
- **Zirconia Toughened Alumina ("ZTA"):** A composite material composed of Alumina and Zirconia. It also may include other additives including, but not limited to, chromium.[37] Alumina ceramics are well known to be hard and biocompatible. Zirconia, when added to alumina, toughens the material. When strontium aluminate platelets are added to the material, it contributes to

[30] Carty Rpt., 60 TTABVUE 15, ¶ 33; Mecholsky Lit. Rpt., 105 TTABVUE 51, ¶ 78.

[31] Carty Rpt., 60 TTABVUE 15, 21-23, ¶¶ 33, 48, 50, 52; Mecholsky Lit. Rpt., 105 TTABVUE 40, ¶ 59.

[32] Carty Rpt., 60 TTABVUE 15, ¶ 33; Mecholsky Lit. Rpt. (confidential), 106 TTABVUE 108, ¶ 170.

[33] Carty Rpt., 60 TTABVUE 14, ¶ 33; Mecholsky Lit. Rpt., 105 TTABVUE 20, ¶ 20.

[34] Carty Rpt., 60 TTABVUE 14, ¶ 33; Mecholsky Lit. Rpt., 105 TTABVUE 20, ¶ 21.

[35] Carty Rpt., 60 TTABVUE 16, ¶ 33; Mecholsky Lit. Rpt., 105 TTABVUE 20, ¶ 20.

[36] Carty Rpt., 60 TTABVUE 16, ¶ 33; Mecholsky Lit. Rpt., 105 TTABVUE 20, ¶ 21.

[37] Carty Rpt., 60 TTABVUE 16-17, ¶¶ 33, 36; Mecholsky TTAB Rpt. 105 TTABVUE 197, ¶ 14.

higher toughness as well.[38] ZTA ceramics exhibit superior strength and toughness compared to conventional alumina and zirconia.[39]

- **Doping:** The addition of a small amount of a material to a composite to alter the composite's properties.[40]
- **Sintering:** The process of compacting and forming a solid mass of material through exposure to heat and pressure without liquefying the material. Sintering is a common method for manufacturing ceramic materials such as orthopedic ceramics.[41]
- **In vivo:** Within the body.[42]
- **Hydrothermal ageing:** Degradation of material when exposed to temperature and moisture, which increases with increased temperature and humidity, for example when in vivo for extended periods of time.[43]
- **Autoclaving:** Exposure to elevated temperatures and steam pressures to mimic long-term exposure to heated, humid conditions such as those experienced in vivo. Autoclaving previously has been used as a re-sterilization method for orthopedic ceramics, and is an accepted method for accelerated ageing of ZTA material.[44]
- **Hardness:** The resistance of a material to permanent deformation (such as surface impression) after force is applied to the surface from a standardized harder material.[45]

[38] Kuntz Decl., 101 TTABVUE 6, ¶ 15.

[39] Kurtz et al. (2014), PNOR9, Exh. 5, 51 TTABVUE 105-115 at 107.

[40] Carty Rpt., 60 TTABVUE 14, ¶ 33; Mecholsky Lit. Rpt., 105 TTABVUE 85-86, ¶ 135.

[41] Carty Rpt., 60 TTABVUE 15, 18-19, 22, ¶¶ 33, 41-42, 50; Mecholsky Lit. Rpt., 105 TTABVUE 58, ¶ 92.

[42] Carty Rpt., 60 TTABVUE 15, 64, ¶¶ 33, 140; Mecholsky Lit. Rpt. (confidential), 106 TTABVUE 42, ¶ 65.

[43] Carty Rpt., 60 TTABVUE 15, ¶ 33; Mecholsky Lit. Rpt. (confidential), 106 TTABVUE 68, ¶ 105.

[44] Carty Rpt., 60 TTABVUE 14, 19-20, ¶¶ 33, 45-47; Mecholsky Lit. Rpt. (confidential), 106 TTABVUE 76, ¶ 105.

[45] Carty Rpt., 60 TTABVUE 15, 26, ¶¶ 33, 60; Mecholsky Lit. Rpt., 105 TTABVUE 26, ¶ 34; DePuy Synthes brochure (2013), PNOR5, 45 TTABVUE 83; (Green (1998), PNOR9, 51 TTABVUE 163-171 at 166.

- **Fracture toughness:** The resistance of a material to crack propagation (i.e., the spreading of a crack through the material).[46]
- **Strength:** The ability of a material to withstand a force without cracking or failing. **Flexural strength** is the ability of a material to withstand **bending** without cracking or failing. **Burst strength** is the ability of a material to withstand an exertion of force without bursting.[47]
- **Wear resistance/Stability:** The ability of a material to withstand loss, erosion or displacement of material over time in response to an application of force caused by environmental factors, such as temperature or contact with other material (such as friction between moving surfaces).[48]
- **Debris:** Particles of different material and size shed from the surface of the various parts of an implant due to wear.[49]
- **Osteolysis:** Bone resorption due to biological response to debris that can compromise the bone around a medical implant device and lead to loosening of the prosthesis.[50]
- **Mechanical property:** Physical property that a material exhibits upon the application of force. Mechanical properties include such functional characteristics as hardness, fracture toughness, flexural strength and wear resistance.[51]
- **Biocompatibility:** A material's interaction and compatibility with the human body.[52]
- **Phase Stabilization:** For purposes of these proceedings, the **tetragonal** and **monoclinic phases** refer to the stages during which the physical properties of Zirconia may be affected during the heating and cooling of the sintering process. **Phase stabilization** refers to the proper balance that must be maintained between the tetragonal and monoclinic phases of the Zirconia. The

---

[46] Carty Rpt., 60 TTABVUE 15. 24-25, 85, ¶¶ 33, 56, 178; ; Mecholsky Lit. Rpt. 105 TTABVUE 23-24, ¶ 28; DePuy Synthes brochure (2013), PNOR5, 45 TTABVUE 83; (Green (1998), PNOR9, 51 TTABVUE 163-171 at 170.

[47] Carty Rpt., 60 TTABVUE 15, 22-23, ¶¶ 33, 50, 53; Mecholsky Lit. Rpt. 105 TTABVUE 24-25, ¶¶ 30-31; DePuy Synthes brochure (2013), PNOR5, 45 TTABVUE 83.

[48] Carty Rpt., 60 TTABVUE 16, 28-29, 66-67, ¶¶ 33, 65, 67, 146; Mecholsky Lit. Rpt. 105 TTABVUE 42, ¶¶ 66; DePuy Synthes brochure (2013), PNOR5, 45 TTABVUE 83; Zagra et al. (2018), PNOR8, Exh. 15, 50 TTABVUE 348-354 at 350.

[49] Zagra et al. (2018), PNOR8, Exh. 15, 50 TTABVUE 348-354 at 350.

[50] Zagra et al. (2018), PNOR8, Exh. 15, 50 TTABVUE 348-354 at 350.

[51] Carty Rpt., 60 TTABVUE 15, 22, ¶ 33, 50; Mecholsky Lit. Rpt. 105 TTABVUE 22, ¶ 25.

[52] Mecholsky Lit. Rpt. 105 TTABVUE 43, ¶ 68.

phase stability of the Zirconia portion of the ZTA compound in turn affects the toughness and wear performance of the material.[53]

## VIII. Trial by Implied Consent

Generally, plaintiffs in proceedings before the Board may not rely on unpleaded matters, and the Board will not consider them. *See P.A.B. Produits et Appareils de Beaute v. Satinine Societa In Nome Collettivo di S.A. e.M. Usellini*, 570 F.2d 328, 196 USPQ 801, 804 (CCPA 1978); *UVeritech, Inc. v. Amax Lighting, Inc.*, 115 USPQ2d 1242, 1244 (TTAB 2015). As an exception to this general rule, the Board will consider matters that have been tried by express or implied consent of the parties. Fed. R. Civ. P. 15(b)(2); *NT-MDT LLC v. Kozodaeva*, 2021 USPQ2d 433, at *14-15 (TTAB 2021). Matters will be found as having been tried by implied consent when, even if not expressly raised in the pleadings, the parties introduce evidence regarding the unpled matters without objection and discuss the issues relating thereto in their briefs. *Conolty v. Conolty O'Connor NYC LLC*, 111 USPQ2d 1302, 1305 (TTAB 2014).

In its Petitions for Cancellation, Petitioner asserts that the color pink as applied to the chemical composition of ceramic hip implant components is functional because, when chromium oxide is added to the composition, it naturally appears in that color. Moreover, Petitioner alleges, chromium oxide (chromia) is added for the hardening effect it provides.[54] However, the parties did not limit their functionality evidence and

---

[53] Porporati Decl., 99 TTABVUE 6, ¶¶ 15-16; Chevalier/Gremillard (2009), PNOR10, 52 TTABVUE 7-8.

[54] Petition for Cancellation, 1 TTABVUE 4, 6, 10-11, ¶¶ 7-8, 15, 28-32 in Cancellation No. 92058781; Petition for Cancellation, 1 TTABVUE 4, 6, 10-11, ¶¶ 7-8, 15, 28-32 in Cancellation No. 92058796.

arguments solely to the hardening effects of chromia. Both parties also presented evidence and arguments regarding chromia's contributions (or not) to other mechanical properties, such as the fracture toughness, flexural/burst strength, wear/aging resistance and phase stabilization properties of ZTA.[55] We therefore deem the pleadings amended to conform to the evidence and arguments of the parties pursuant to Fed. R. Civ. P. 15(b).

## IX. How the Parties' Products are Used within a Hip Replacement System

We reproduce here the drawings of the color pink as applied to Respondent's goods, as depicted in Respondent's registrations:



Registration No. 4319095
hip joint ball



Registration No. 4319096
acetabular shell or fossa

As used within a hip replacement system, the products appear and function as shown below:

[55] Petitioner's factual materials and expert opinions summarized in Carty Decl. and Carty Rpt., 48/60 TTABVUE, Carty Rebuttal Decl. and Carty Rebuttal Rpt., 141/153 TTABVUE; Respondent's factual materials and expert opinions summarized in Mecholsky Decl., Mecholsky Lit. Rpt., Mecholsky Lit. Rebuttal Rpt., Mecholsky TTAB Rpt. and Mecholsky TTAB Rebuttal Rpt., 105/106-116 TTABVUE. See respective arguments made in Petitioner's Brief, 157/158 TTABVUE 17-20; and Respondent's Brief, 159/160 TTABVUE 11-16.




[56]




[57]




[58]




[59]

As can be seen from the above diagrams, a hip joint "ball" is also referred to as a "head"; an acetabular shell or fossa is also referred to as a "cup" or a "liner," depending upon the overall construction of the total hip replacement system.

Stating the obvious, the implantation of a hip replacement system into the human body involves major surgery to provide a patient with a substitute for a significantly

---

[56] Stavish Testim. Depo., Exh. 6, 135 TTABVUE 258.

[57] Pektow Decl., Exh. 17, 116 TTABVUE 46.

[58] Abeyta Testim. Depo., Exh. 133 TTABVUE 213. "THR" is the acronym for Total Hip Replacement system.

[59] Pektow Decl., Exh 17, 118 TTABVUE 41.

deteriorating skeletal joint. This is not the type of surgery a patient would want to repeat. Thus, it is undesirable that any part of the replacement system would fail, degrade or cause an adverse bodily reaction in vivo.

The parties agree the development of materials that are highly resistant to impact fracturing and long-term wear has historically been a major challenge in the development of hip implant components. Metal heads and polyethylene inserts have been used, but these systems have created polyethylene wear debris causing osteolysis (bone decay) in patients. Ceramic implant components began replacing metal implants because they produced less polyethylene wear debris, thus reducing osteolysis. However, while ceramics have some favorable characteristics, they also have limited impact resistance and a greater risk of fracturing.[60] At one time, hip replacement systems outfitted with a poorly functioning femoral head implant component (the subject of unacceptably high fracture rates) were subject to a major product recall.[61] Therefore, the processing and manufacture of ceramic femoral heads and acetabular cups with the most efficacious chemical combination, resulting in the optimal mechanical properties, is critically important.

[60] Petition for Cancellation, 1 TTABVUE 4, ¶¶ 4-5 in Cancellation No. 92058781; Answer, 28 TTABVUE 2, ¶¶ 4-5 in Cancellation No. 92058781; Petition for Cancellation, 1 TTABVUE 4, ¶¶ 4-5 in Cancellation No. 92058796; Answer, 22 TTABVUE 3, ¶¶ 4-5 in Cancellation No. 92058796.

[61] Mecholsky Lit. Rpt., Ex. 3 - Major Recalls of Organ Replacement Devices, Saint Gobain Desmarquest Hip Implant Recall (2007) Exh. 3, 106 TTABVUE 217-223.

## X. The Parties' Ceramic Hip Plant Product Offerings

### A. Respondent's Ceramic Hip Implant Components

Respondent began offering ceramic femoral heads and acetabular cups as hip implant components using an alumina chemical composition sold under the name BIOLOX in 1974. The first generation introduced in 1974 was made of highly-pure alumina and was manufactured using a pressureless sintering process. The second generation of the BIOLOX composition was introduced in 1985, containing fewer impurities and featuring a decreased grain size. The third generation chemical composition was introduced under the name BIOLOX forte in 1995, featuring an even smaller grain that was manufactured using hot isostatic pressing (or "H.I.P."). The fourth generation chemical composition was introduced under the name BIOLOX delta in 2003, which is a zirconia-toughened alumina ("ZTA") composite (and which includes chromia that makes the compound pink).[62]

Today, in the United States, Respondent offers ceramic ball head and liner hip implant components made from the BIOLOX forte and BIOLOX delta chemical compositions. The BIOLOX forte composition features pure alumina ceramic, and the BIOLOX delta composition features a ZTA ceramic chemical combination. Respondent asserts that the BIOLOX delta composition has superior material properties – particularly the fracture rate and wear rates – compared to BIOLOX

[62] Petkow Decl., 114 TTABVUE 4, ¶¶ 7-8, Exh. 1, 27-28; *see also* Clark et al. (2007) describing the history of the development of ceramics used for hip replacement system components, PNOR4, 44 TTABVUE 645-655 at 645-646.

forte, but Respondent claims the BIOLOX forte composition has a higher hardness value.[63]

Whereas BIOLOX forte has an ivory, beige or cream color, BIOLOX delta is decidedly pink:[64]



BIOLOX forte



BIOLOX delta

We find, and the parties do not dispute, that the chemical composition of BIOLOX delta hip joint implant components are pink in color because of the presence of chromia as a material constituent.[65] BIOLOX delta is a ZTA composite ceramic with three main components: alumina, zirconia and strontium aluminate ($SrAl_{12}O_{19}$) platelets. Each of these three components contains other ingredients. Specifically, the alumina portion of the BIOLOX delta composition contains chromia. This chromia is dissolved into the alumina portion of BIOLOX delta material. Similarly, yttria is dissolved into the zirconia portion of the BIOLOX delta material.[66]

The production of the BIOLOX delta composition begins with four raw fine powder materials: alumina, zirconia, yttrium chromite ($YCrO_3$), and strontium

[63] Petkow Decl., 114 TTABVUE 4, ¶ 9.

[64] Petkow Decl., 114 TTABVUE 5, ¶ 10; images from Parikh Rpt., 47 TTABVUE 32-33.

[65] Kuntz Decl., 101 TTABVUE 5, ¶ 14; Petkow Decl., 114 TTABVUE 5, ¶ 10.

[66] Kuntz Decl., 101 TTABVUE 5-6, ¶¶ 13-15; Dobbs (2010), PNOR4, 44 TTABVUE 785-820 at 787.

zirconate ($SrZrO_3$). After quality control, Respondent's ceramics manufacturing process comprises milling, binder addition, spray drying, powder pressing, green shaping, sintering in a furnace at high temperatures and hard machining. During manufacturing, Respondent uses a technique called "pressure-assisted sintering," or hot isostatic pressing, towards the end of the sintering process to further densify the material and control the grain size of the material. Changes to any of these processes can affect the final properties and performance of the material.[67] As discussed in greater detail below, the parties dispute the contribution of chromia (which turns the product pink), versus the addition of yttrium, better sintering techniques, and control of grain size as contributing to the material performance of the composition.

Today, BIOLOX delta accounts for the vast majority of Respondent's hip implant components sales. This is because, as Respondent claims, components made with the BIOLOX delta compound have a superior mechanical performance and lower fracture rates than components made with the BIOLOX forte compound, although both products meet and exceed the international standards for hip implant components.[68] Petitioner continually opines that Respondent has maintained a dominant (90-95%

[67] Kuntz Decl., 101 TTABVUE 6, ¶¶ 16-17.

[68] Petkow Decl., 113/114 TTABVUE 5 ¶¶ 10-11. *See* ISO Standard 6474-2, Implants for Surgery – Ceramic Materials (2012), DNOR1 70 TTABVUE 709-726. This ISO Standard sets out prescribed chemical composition and mechanical performance requirements for ZTA material. Mark Kramer Colorado litigation trial testimony ("Kramer Lit. Testim."), DNOR1, 70 TTABVUE 639-44.

or greater) share of the ceramic hip implant component market.[69] Respondent has not shown or alleged to the contrary.

### B. Petitioner's Ceramic Hip Implant Components

Petitioner has developed two ZTA ceramic materials for hip implants: (1) CeraSurf-p, a material that contains chromium oxide, which renders it pink, and (2) CeraSurf-w, a white-colored material that does not contain chromium oxide. The primary difference between the two materials is the presence of chromium oxide in CeraSurf-p. The two products have different technical characteristics.[70] Petitioner's pink CeraSurf-p ceramic femoral head and acetabular cup appear as follows:


[71]

Almost all of Petitioner's customers buy CeraSurf-p instead of CeraSurf-w, because (says Petitioner) CeraSurf-p contains chromium oxide (which Petitioner contends the marketplace understands to improve the performance-related properties of the material), while CeraSurf-w does not. Petitioner claims the market

[69] Strong Decl., 57 TTABVUE 4, ¶ 9; Abeyta Testim. Depo., Exh. 3, 133 TTABVUE 148, 152; Respondent's Business Plan, PNOR12, Exh. 12, 54 TTABVUE 478; e-mail exchange between Nield and Wanadoo/Biotechni (April 2015), DNOR6, Exh. 6, 75 TTABVUE 37-41 at 38; Petitioner's Brief, 157/158 TTABVUE 7.

[70] Haftel Decl., 59 TTABVUE 5, ¶ 12.

[71] Image from CoorsTek Bioceramics Overview (2018), Stavish Testim. Depo., Exh. 7, 135 TTABVUE 284.

demands the current state-of-the-art material, which is a ceramic material that contains chromium oxide. It is Petitioner's understanding that, because of Respondent's education of the market, when surgeons see a pink hip ball, they recognize it as the state-of-the-art ceramic material.[72]

At least as of the close of testimony periods before the Board, Petitioner had not developed any specific marketing materials for its white product, CeraSurf-w,[73] and Petitioner had only one significant customer interested in purchasing CeraSurf-w for use as part of its hip replacement implant system.[74]

### C. Customers and Potential Customers for the Parties' Products

The customers and potential customers for the parties' ceramic hip implant components are original equipment manufacturers ("OEMs") – such as Zimmer Biomet, Smith & Nephew, DePuy Synthes and Stryker – that in turn produce total hip replacement implant systems supplied to hospitals, buying associations or surgeons.[75]

The parties compete in a highly demanding industry, operating under a complex regulatory system requiring assurances that their products comply with applicable requirements imposed by the U.S. Food and Drug Administration ("FDA") for implant grade materials. The OEM customers comprise major medical device companies that

[72] Strong Decl. 57 TTABVUE 5, ¶ 14.

[73] Strong Discov. Depo., RNOP26, 97/131 TTABVUE 99.

[74] Haftel Decl., 58/59 TTABVUE 6, ¶ 16.

[75] Shopoff Decl., 85 TTABVUE 3, ¶¶ 5-6; Petkow Decl., 114 TTABVUE 5, ¶¶ 12-13; Strong Decl. 57 TTABVUE 3, 6, ¶¶ 7, 19; Haftel Decl., 58/59 TTABVUE 6, ¶ 16.

are experts in the medical device field and have high standards for their suppliers.[76] They have deep technical knowledge of orthopedic implant products, complete their own internal product and material testing, perform their own clinical testing while working closely with surgeons and other healthcare professionals, and are responsible for obtaining regulatory approval for devices incorporating the parties' components.[77]

## XI. Respondent's Relevant Patents and Patent Application

On November 3, 1998, a related company to Respondent[78] was issued U.S. Patent No. 5830816 (the "'816 Patent"), Burger et al., for a chemical composition to be used in the manufacture of cutting tools, titled "Sintered Molding,"[79] the same chemical composition presently used in Respondent's BIOLOX delta hip implant components. The '816 patent expired on January 21, 2013.[80] As we discuss below, it is after this

[76] Strong Decl. 57 TTABVUE 3, ¶ 7.

[77] Haftel Decl., 59 TTABVUE 5-6, ¶ 14.

[78] A concise description of Respondent and its related or predecessor companies may be found at Dobbs (2010), PNOR4, 44 TTABVUE 785-820 at 787.

[79] '816 Patent, PNOR3, Exh. 1, 43 TTABVUE 5-18; Petition for Cancellation, 1 TTABVUE 4-5, ¶ 9 in Cancellation No. 92058781; Answer, 28 TTABVUE 4, ¶ 9 in Cancellation No. 92058781; Petition for Cancellation, 1 TTABVUE 5, ¶ 9 in Cancellation No. 92058796; Answer, 22 TTABVUE 4, ¶ 9 in Cancellation No. 92058796.

[80] Under 35 U.S.C. § 154(a)(2), a U.S. patent has "a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under [35 U.S.C. §] 120 …, from the date on which the earliest such application was filed." Pursuant to 35 U.S.C. § 120, "[a]n application for patent for an invention …, which names an inventor or joint inventor in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application." Here, the filing date of the earliest application from which, through

date that Respondent began to change its position regarding the contribution of chromia (which turns the compound pink) to the material properties of the composition.

In any event, the Abstract of the ’816 patent, in part, states: “[z]irconium dioxide containing 2 to 40 vol. % of stabilizing oxides is embedded in the matrix material of a sintered molding consisting of an aluminum oxide/**chromium oxide** mixed crystal.” (emphasis added). Independent Claim 3 of the ’816 Patent recites (emphasis added):

> **3.** A sintered molding comprising:
>
> a1) 60 to 98 vol.-% of a matrix material, the latter consisting of
>
> a2) 67.1 to 99.2 vol.-% of an aluminum oxide/**chromium oxide** mixed crystal
>
> a3) 0.8 to 32.9 vol.-% of a mixed crystal of the formula $SrA1_{12-x}$,$\mathbf{Cr_xO_{19}}$, x corresponding to a value of 0.0007 to 0.045,
>
> b) 2 to 40 vol.-% of zirconium dioxide incorporated into the matrix material, which
>
> c) contains as stabilizing oxides more than 10 to 15 mol.-% of one or more of the oxides of cerium, praseodymium and terbium and/or 0.2 to 3.5 mol.-% of yttrium oxide, with respect to the mixture of zirconium dioxide and stabilizing oxides,
>
> d) the added amount of the stabilizing oxides being chosen such that the zirconium dioxide is present predominantly in the tetragonal modification, and
>
> e) the molar ratio between the zirconium dioxide containing the stabilizing oxide and the **chromium oxide** amounting to 1,000:1 to 20:1,
>
> t) the portions of the components making up 100 vol.-% of the sintered molding, and

---

continuations, the ’816 issued was January 21, 1993. ’816 Patent, PNOR3, Exh. 1, 43 TTABVUE 13, col. 1, lines 3-8. Twenty years from that date is January 21, 2013.

> g) the zirconium dioxide has a grain size not exceeding 2 $\mu$m. (emphasis added).[81]

Respondent concedes that BIOLOX delta chemical combination practices one or more of the inventions described and claimed in the ’816 patent.[82] However, nowhere in the ’816 patent is the color pink mentioned. The disclosures and discussion within the ’816 patent, in relevant part, provide (emphasis added):

> The problem still exists of improving the known materials and to make available sintered moldings which have a high **strength** level and in which good **toughness** is combined with great **hardness**. The invention is aimed at making available a sintered molding which will satisfy these requirements, and due to its range of properties will have greater **resistance to wear**, so that the sintered molding will be suitable as a cutting tool, especially as a cutting insert, and quite especially as a cutting insert for the machining of cast-iron and steel materials, while an additional objective is seen in proposing a sintered molding which can be used as a cutting insert for interrupted cutting.[83]

> It has now been found that the solution of the problem in question requires a sintered molding with an entirely special composition. In addition to the transformation **toughening**, which is achieved by embedding in a ceramic matrix a zirconium dioxide containing stabilizing oxides, the invention, in accordance with a first embodiment, provides as the matrix a mixed crystal of aluminum oxide/**chromium oxide**. Furthermore, the invention provides that the zirconium dioxide embedded in the matrix, and the **chromium oxide** forming the mixed crystal with the aluminum oxide, are in a specific molar ratio to one another. This measure makes it possible for the first time to achieve **hardness** values such as have not previously been achieved at such zirconium dioxide contents, even at the relatively high zirconium dioxide contents which may be necessary to obtain an especially good **toughness**. On the other hand, at low zirconium dioxide contents,

[81] ’816 Patent, PNOR3, Exh. 1, 43 TTABVUE 17, col. 9, lines 59-67; col. 10, lines 21-37.

[82] Respondent’s Admission Response No. 28 from the Colorado litigation, PNOR5, 45 TTABVUE 239; Kuntz Colorado litigation trial testimony (“Kuntz Lit. Testim.”), PNOR2, 42 TTABVUE 195-97.

[83] ’816 Patent, PNOR3, Exh. 1, 43 TTABVUE 14, col. 3, lines 39-50.

> relatively low **chromium oxide** contents can be present, thereby counteracting the embrittlement of the material.[84]
>
> The statement that the zirconium dioxide and **chromium oxide** containing the stabilizing oxides are to be present in a specific molar ratio necessarily also implies specific ratios for the rest of the components, because for example as the zirconium dioxide content decreases, the contents of the stabilizing oxides also decrease with respect to the sintered moldings, while on the other hand the content of the aluminum oxide increases. **With respect to the aluminum oxide in the sintered molding, the chromium oxide is present in a weight ratio of 0.004 to 6.57% by weight**, but it must not be overlooked that chromium oxide and the zirconium dioxide containing the **stabilizing oxides** are in the stated molar ratio. …[85]
>
> The term, "mixed crystal," used in the claims and description, … means a solid solution of **chromium oxide** in aluminum oxide and in strontium aluminate.[86]
>
> The sintered molding in accordance with the invention is made by pressureless sintering or hot pressing a mixture of aluminum oxide/zirconium dioxide/**chromium oxide** and **stabilizing oxides** or a mixture of these components is used …[87]
>
> Applications of the sintered molding preferably lie in its use as a cutting tool for cutting paper, textiles and films, but especially preferred is the use of the sintered molding as a cutting insert for the machining of cast iron or of steel materials, especially interrupted cutting.[88]

During the prosecution of the underlying application to the '816 patent, in order to overcome a prior art reference to patentability raised by the patent examiner, Respondent's patent counsel at the time, in an Office action response, stated (emphasis added):

> The invention of the present application is not suggested by [the prior art reference]. The solution of the object according to the present

[84] '816 Patent, PNOR3, Exh. 1, 43 TTABVUE 4, col. 3, lines 51-67 through col. 4, lines 1-2.

[85] '816 Patent, PNOR3, Exh. 1, 43 TTABVUE 14, col. 4, lines 5-16.

[86] '816 Patent, PNOR3, Exh. 1, 43 TTABVUE 14, col. 4, lines 53-56.

[87] '816 Patent, PNOR3, Exh. 1, 43 TTABVUE 15, col. 6, lines 18-21.

[88] '816 Patent, PNOR3, Exh. 1, 43 TTABVUE 15, col. 6, lines 35-39.

> invention requires a sintered body with an entirely unique composition. For this purpose, inter alia, **a very specific molar ratio of the zirconium dioxide deposited in the matrix and the chromium oxide which together with the aluminum oxide forms the mixed crystal is required**. Only in this way has it for the first time been possible to obtain **hardness** values, even at higher zirconium dioxide contents, which have heretofore not been achievable with corresponding zirconium dioxide contents. On the other hand, relatively low chromium oxide contents can be present at low zirconium dioxide contents, whereby **a brittleness of the sintered body can be suppressed**. [The prior art reference] does not teach or suggest any of these advantages.[89] (emphasis added)

Respondent's materials expert, Dr. John Mecholsky, concedes that "[t]he '816 Patent … covers a broad range of chromium, including amounts so low that they would be almost undetectable … [f]or example, having .004 wt % chromium (with respect to alumina) … [and, o]n the high end, … at least 6 wt % chromium, and possibly higher. The '816 Patent also discloses a very broad range of ratios between the zirconia and chromia, from as low as 20:1 to as much as 1,000:1."[90]

That the '816 patent, on its face, is directed to a sintered molding of a particular composition for use as a cutting tool is of no moment. Respondent's internal and sales presentation documents (some of which mention the color pink as being caused by the addition of chromia) disclose that even though the material developed under the name DC25, now produced and sold under the name BIOLOX delta, was conceived in Respondent's industrial division and initially manufactured for cutting tools, it has since been optimized for medical use – specifically for prosthetic hip joint

[89] Patent Appln. Ser. No. 08/674,458, Office Action Response dated April 15, 1997, PNOR3, Exh. 7, 43 TTABVUE 404.

[90] Mecholsky Lit. Rpt., 105 TTABVUE 174, ¶¶ 301-02; *see also* Kuntz Decl., 101 TTABVUE 12, ¶ 36 ("The ['816 P]atent claims a wide range of chromium content.").

components.[91] The Gottwik memorandum identified in the footnote below explicitly identifies ZTA formulations including chromium oxide as contributing to desired mechanical properties such as hardness, toughness and strength.

Respondent has sought or obtained additional patent protection for compositions claiming the beneficial effects of chromia, the chemical that turns the compound pink. On September 17, 2002, a related company to Respondent was issued U.S. Patent No. 6452957 (the "'957 Patent"), Burger et al., "Sintered Shaped Body Reinforced with Platelets."[92] The '957 patent expired on November 2, 2018.[93] Chromium oxide is noted as a constituent element in nearly all of the claims of this patent.[94]

The disclosures and discussion within the '957 patent, in relevant part, provide (emphasis added):

> The subject-matter of the present invention is a sintered shaped body consisting of a matrix material that contains an aluminum oxide/**chromium oxide** mixed crystal and which is in situ reinforced with platelets.[95]
>
> [T]he invention provides that the matrix contains a mixed crystal of aluminum oxide/**chromium oxide**. Furthermore, the invention provides that the zirconium dioxide, incorporated in the matrix, and the **chromium oxide**, forming the mixed crystal together with the

[91] Questions and Answers for Respondent's Meeting Discussion (May 2013), PNOR1, 41 TTABVUE 49; Respondent's internal memorandum authored by Lukas Gottwik, (Translated Version, August 2, 2011), PNOR4, Exh. 3, 44 TTABVUE 38-44; CeramTec Sales Questionnaire and FAQs (March 2, 2012), PNOR5, Exh. 5, 45 TTABVUE 91-144 at 95; CeramTec/DePuy Sales Training (August 2013), PNOR12, Exh. 1, 61 TTABVUE 6-105 at 18; Kuntz Lit. Testim., RNOR1, 70 TTABVUE 388-96.

[92] '957 Patent, PNOR6, Exh. 6, 43 TTABVUE 215-222.

[93] The filing date of the earliest application from which the '816 patent issued was the Patent Cooperation Treaty (PCT) application filed on November 2, 1998. '957 Patent, PNOR3, Exh. 6, 43 TTABVUE 216.

[94] '957 Patent, PNOR3, Exh. 6, 43 TTABVUE 221, cols. 9-10.

[95] '957 Patent, PNOR3, Exh. 6, 43 TTABVUE 217, col. 1, lines 6-9.

> aluminum oxide, are in a specific molar ratio with respect to each other. This measure makes it possible for particular **hardness** values to be attained even in the case of comparatively high proportions of zirconium dioxide that may be required in order to obtain a particularly good level of **fracture toughness**. On the other hand, in the case of low proportions of zirconium dioxide there may even be a comparatively small **chromium-oxide** content, inhibiting embrittlement of the material.[96]
>
> In accordance with the invention, the matrix material contains an aluminum oxide/**chromium oxide** mixed crystal and a further mixed crystal in accordance with one of the general formulae … One effect that increases the **toughness** results from the zirconium dioxide that is incorporated in the mixed-crystal matrix, whilst the **chromium** addition counteracts any drop in the **hardness** values when the proportion of zirconium dioxide rises.[97]

On January 19, 2016, Respondent was issued U.S. Patent No. 9237955 (the "'955 Patent"), Niess et al., "Intervertebral Disc Endoprosthesis."[98] Chromium oxide is noted as a constituent element in one of the dependent claims of this patent.[99] The disclosures and discussion within the '955 patent, in relevant part, provide (emphasis added):

> The object on which the invention is based is to improve an intervertebral disc endoprosthesis …. [T]he sliding bodies should have extreme **hardness**, so that no abrasion occurs over the entire period of service.[100]
>
> [T]the invention provides that the zirconium dioxide, incorporated in the matrix, and the **chromium oxide**, forming the mixed crystal together with the aluminum oxide, are in a specific molar ratio with respect to each other. This measure makes it possible for the first time for **hardness** values to be attained, even with comparatively high proportions of zirconium dioxide that may be required in order to obtain

---

[96] '957 Patent, PNOR3, Exh. 6, 43 TTABVUE 218, col. 4, lines 43-56.

[97] '957 Patent, PNOR3, Exh. 6, 43 TTABVUE 219, col. 5, lines 13-15, 41-46.

[98] '955 Patent, PNOR7, Exh. 8, 49 TTABVUE 46-55.

[99] '955 Patent, PNOR7, Exh. 8, 49 TTABVUE 55, col. 12, lines 54-57.

[100] '955 Patent, PNOR7, Exh. 8, 49 TTABVUE 50, col. 1, lines 46-52.

> particularly good **fracture toughness**, that have not been attainable hitherto with corresponding proportions of zirconium dioxide. On the other hand, with low proportions of zirconium dioxide there may even be a relatively small **chromium-oxide** content, which counteracts embrittlement of the material.[101]
>
> [T]he **chromium** addition can counteract any drop in the **hardness** values due to the proportion of zirconium dioxide.[102]
>
> An effect that increases the **toughness** results from the zirconium dioxide that is incorporated in the mixed crystal matrix, whilst the **chromium** addition counteracts any drop in the **hardness** values when the proportion of zirconium dioxide rises.[103]

On February 14, 2012, Respondent's then-Manager of Oxide Development in its Development Department, Meinhard Kuntz,[104] with others, filed U.S. Patent Application No. 2012/0142237 (the "'237 Application"), Kuntz et al., "Sintered Moulded."[105] The Abstract of the '237 Application describes "[a] sintered molded body consisting of a material that contains aluminum oxide with **chromium** doping, zirconium oxide with Y-stabilization and strontium aluminates with variable **Cr**-doping, which is particularly suitable for medial [sic] application."[106] (emphasis added). Chromium oxide is noted as a constituent element in all of the published claims of this application.[107]

---

[101] '955 Patent, PNOR7, Exh. 8, 49 TTABVUE 50, col. 2, lines 51-63; *see also* 49 TTABVUE 52, col. 6, lines 35-44.

[102] '955 Patent, PNOR7, Exh. 8, 49 TTABVUE 51, col. 3, lines 38-40.

[103] '955 Patent, PNOR7, Exh. 8, 49 TTABVUE 53, col. 7, lines 31-35.

[104] Kuntz Decl., 101 TTABVUE 3-4, ¶¶ 4, 8-9.

[105] '237 Application, PNOR7, Exh. 7, 49 TTABVUE 42-45.

[106] '237 Application, PNOR7, Exh. 7, 49 TTABVUE 3.

[107] '237 Application, PNOR7, Exh. 7, 49 TTABVUE 44, second column, to 45, first and second columns.

The disclosures and discussion within the '237 Application, in relevant part, provide:

> The object of the invention is to provide a sintered moulding made of a ceramic material which combines optimum properties such as **hardness**, elasticity and thermal conductivity and is particularly suitable for medical technology applications.[108]

The material composition disclosed in the '237 Application includes "aluminum oxide with **chromium** doping" and "strontium aluminate (with variable **Cr** doping)." (emphasis added).[109]

## XII. Technical Literature Regarding the Advantages of Chromia in Chemical Compounds for Industrial and Medical Applications

The parties made of record a wealth of technical literature about the benefits of chromia to the mechanical properties of ceramics compounds comprising or including alumina, particularly hardness, strength and wear resistance, spanning about 54 years,[110] some of which was authored by current or former employees of Respondent (for example, Burger, Kuntz and Porporati). We summarize below pertinent portions from these scientific articles (emphasis added throughout):

- [T]he **enhancement of alumina's hardness, strength, wear resistance, and other mechanical properties** by **chromia** in solid solution is generally accepted …. This note describes the variation of the **microhardness** of

[108] '237 Application, PNOR7, Exh. 7, 49 TTABVUE 44, first column, paragraph 0002.

[109] '237 Application, PNOR7, Exh. 7, 49 TTABVUE 44, first column, table immediately following paragraph 0003.

[110] Petitioner and Respondent submitted many of the same technical articles as evidence. Due to the order in which the parties' evidence was presented, if Petitioner made of record a technical article first, we do not recite where the identical article submitted by Respondent appears elsewhere in the record. Further, neither party objected that any of these articles are hearsay or otherwise are inadmissible. We set out below the article excerpts not for their truth, but for what they show on their face at the time of publication, as stated by knowledgeable persons in the scientific community.

alumina with **increasing chromia content** in dense, fine-grained solid solutions. [Bradt (1966), PNOR6, Exh. 12, 46 TTABVUE 315-317 at 316].

- A positive influence of **$Cr_2O_3$** was observed for the … **grindability** of all samples. … [T]he **abrasion resistance** of alumina ceramics increases with increased additions of **chromium oxide**. … [T]here is a lack of correlation between the abrasion resistance of alumina ceramics and the porosity increase at all firing temperatures, when **$Cr_2O_3$** is added. This **increase of hardening and abrasion resistance** of hot-pressed $Al_2O_3$ with increased **$Cr_2O_3$** additions has been reported by Bradt and an **increase of the crater wear resistance** of vacuum-pressure-sintered alumina cutting tools alloyed with chromium oxide was observed by Ghate *et* al. This study indicates a **disadvantageous effect** of **$Cr_2O_3$** on the sintering of alpha-alumina in the presence of a liquid phase. The effect of **chromium oxide** is so significant as to **decrease** the sintered **density** of the alumina ceramics. This is correlated with the influence of **$Cr_2O_3$** in increasing the dihedral angle. As a result, the distinct **deterioration** of the mechanical properties of alumina ceramics is observed. [Tomaszewksi (1982), PNOR10, Exh. 15, 52 TTABVUE 176-181 at 181. The conclusions in this article appear to be an outlier compared to the other published scientific studies reported herein].

- The only positive role of **$Cr_2O_3$** on sintered $Al_2O_3$ was the improved grindability, and this was only at a low level of addition (≤ 0.34 mole% **$Cr_2O_3$**). The **$Cr_2O_3$ addition**, however, **improved densification** and **hardness** when $Al_2O_3$ with a little MgO as a grain growth inhibitor was hot-pressed in hydrogen and in vacuum. In the latter, the **$Cr_2O_3$** exhibited significantly greater **wear resistance** than the non-alloyed cutting tools. [Cho et al. (1990), PNOR10, Exh. 14, 52 TTABVUE 166-175 at 172].

- High **hardness** and **fracture toughness** can be achieved by forming solid solutions. of $Al_{2-x}$**$Cr_x$**$O_3$, and $SrAl_{12-x}$**$Cr_x$**$O_{19}$. In the system $Al_2O_3$-**$Cr_2O_3$**-SrO-$ZrO_2$-$Y_2O_3$ the **fracture toughness** reaches 10 MPa√m and in the system $Al_2O_3$-**$Cr_2O_3$**-SrO-$ZrO_2$-$CeO_2$ 15 MPa√m. Due to the excellent **hardness, fracture toughness and mechanical strength** of 800 MPa, these platelet- and zirconia toughened (ZPTA-) materials have great potential for future applications. … **Chrome oxide** forms a solid solution together with aluminum oxide. The **hardness** can be increased by incorporating **Cr** atoms into the $Al_2O_3$-grid. … [I]t could be proven that an increase in hardness in substance system $Al_2O_3$-$Cr_2O_3$-$ZrO_2$-$Y_2O_3$ can be realized with rather low additions of **chrome oxide**. … However, a significant **embrittlement** occurred due to the **chrome oxide** alloying of the matrix. … [Burger (1997), English transl.), PNOR11, Exh. 11, 53 TTABVUE 119-123 at 119, 122].

- The formation of $SrAl_{12}O_{19}$ platelets in the structure can be achieved with a suitable process with the addition of e.g., SrO to the $Al_2O_3$-$ZrO_2$-(:$Y_2O_3$) matrix. In addition to the suitable process, the ratio of SrO : $Al_2O_3$ is also important. In such ceramic materials, a significant increase in toughness can be achieved.

However, **due to the formation of platelets, a significant decrease in hardness** can be found in such ceramics. This has **an adverse effect on the wear resistance**. On a material basis, small amounts of **chromium oxide** can be **added to counteract this effect**. Apart from the formation of a $Al_2O_3$-**$Cr_2O_3$** solid solution, the solid solution $SrAl_{12-x}Cr_xO_{19}$ is also formed. This solid solution exhibits a **significantly increased hardness compared to the chrome-free ternary phase**. ... The in-situ platelet reinforcement through the deposit of ternary hexagonal aluminates into an alumina matrix or an alumina-zirconia-matrix leads to a significant increase of the mechanical properties. Through the additional formation of solid solutions, due to the **addition of chrome oxide**, the **hardness** may also be kept at a very high level. [Burger (1998, English transl.), PNOR11, Exh. 12, 53 TTABVUE 128-133 at 129, 131].

- Reference is made to the five-material system $Al_2O_3$-**$Cr_2O_3$**-SrO-$ZrO_2$-$Y_2O_3$ for the production of DC25, hereinafter described. … [I]t can be seen that even at high zirconium oxide concentrations, high **hardness** is maintained and facture toughness increases steadily, compared to ZTA materials. … The DC25 material is based on an aluminum oxide matrix. "Yttrium-coated" zirconium oxide is dispersed at a concentration of 25 wt% in this matrix. 0.8 wt% SrO and **0.3 wt% $Cr_2O_3$** are added as additional components. … With this material, it was possible to exceed the excellent mechanical properties of Y-TZP materials for the first time and at the same time, to achieve the **high hardness** of aluminum oxide materials. [Burger (2000), English transl.), PNOR11, Exh. 9, 53 TTABVUE 90-104 at 97-98].
- The effects of **$Cr_2O_3$** addition on the microstructural evolution and the mechanical properties of $Al_2O_3$ were investigated. … The **fracture toughness** and the **flaw tolerance** of $Al_2O_3$ were improved remarkably by the addition of small amounts (~2 mol % ) of **$Cr_2O_3$**. Crack bridging by the large platelike grains was the main cause for the improvements. The **hardness** and the **elastic modulus** also increased, however, the **fracture strength decreased** by the **$Cr_2O_3$** additions. [Riu et al. (2000), PNOR11, Exh. 1, 53 TTABVUE 6-13 at 7].
- Already in 1977 a composite material, based on an alumina matrix and therein homogeneously dispersed metastable tetragonal zirconia particles, was developed (ZTA). ... From literature, it is well known that alumina and **chromia** form a solid solution. Experimental investigation has shown that by addition of **chromia** the **hardness** is increased significantly. … [H]igh **hardness** is retained even at high zirconia concentrations by adding small amounts of **chromia**. … Wear tests … with rings and discs made of Biolox delta have shown extremely **low wear rate**. [Burger and Richter (2001), PNOR4, Exh. 7, 44 TTABVUE 174-179 at 176-77].
- [T]he **hardness** [of the ZTA matrix] is recaptured by alloying the material with **chromium oxide** which creates a solid solution with the basic alumina

matrix. The distribution of **chromium** inside the alumina atomic lattice activates **a colorizing effect similar to natural ruby**. … Matrix hardening [is achieved] … by creating a solid solution with **chromium oxide**. … The … addition of **chromium oxide** as a solid solution in the alumina matrix as a means of **compensating for the drop in hardness** caused by the addition of the lower hardness zirconia particles throughout the microstructure. [Kuntz (2006), PNOR6, Exh. 2, 46 TTABVUE 14-19 at 16].

- Additionally to the reinforcing components, there are also stabilizing elements doped to the material. **Chromium** is added which is soluble in the alumina matrix and **increases the hardness** of the composite. The minor amount of **chromium** is the reason for the **pink color** of the material …. [Kuntz (2008), PNOR6, Exh. 3, 46 TTABVUE 20-36 at 26].
- In order to further reinforce the [BIOLOX delta] components, stabilising elements are also doped to the material. **Chromium** is added, which is soluble in the alumina matrix and **increases the hardness** of the composite. The small amount of chromium is the reason for the **pink colour** of the material. [Pandorf and Kuntz (2009), PNOR6, Exh. 4, 46 TTABVUE 37-41 at 39].
- Additionally to the reinforcing components, there are also stabilizing elements doped to the material. **Chromium** is added which is soluble in the alumina matrix. and **increases the hardness** of the composite. The minor amount of chromium [1.4-2.0% by weight according to Table 2] is the reason for the **pink color** of the material. [Kuntz et al. (2009), PNOR6, Exh. 8, 46 TTABVUE 259-282 at 264].
- A new alumina-zirconia matrix composite (AMC: $Al_2O_3$ = 80.5%, $ZrO_2$= 18 vol%) was introduced in 2000 as a high-strength implant material with virtually double the fatigue resistance of alumina ... The improvement came from small and well-dispersed zirconia (24%; grains < 0.3 μm) constrained by the alumina matrix. The **chromium** and strontium (1%) platelet distributions (aspect ratio 3–6) combined with the zirconia allowed for **suppression of crack initiation, growth and deflection** while the alumina matrix contributed overall **hardness**. This new bioceramic is known as Biolox-delta (CeramTec Inc., Plochingen, Germany). [Clark et al. (2009), PNOR11, 53 TTABVUE 105-113 at 106].
- BIOLOX delta is an alumina based composite ceramic. … Additionally to the reinforcing components, there are also stabilizing elements doped to the material. **Chromium** is added which is soluble in the alumina matrix and increases the hardness of the composite. The minor amount of **chromium** is the reason for the **pink** color of the material …. [Kuntz (2010), PNOR4, Exh. 10, 44 TTABVUE 612-637 at 618].
- [T]he newest generation of ceramics (named Biolox Delta) … incorporate zirconia into the alumina matrix. … **Chromium oxide** (0.5%) has been added to improve the **hardness** and **wear characteristics**, and strontium crystals

(0.5%) to enhance toughness and diffuse crack energy. The final AMC [alumina matrix composite] material consists of roughly 75% aluminum oxide, 25% zirconia, and less than l % **chromium oxide** and strontium oxide. [Cai and Yan (2010), PNOR5, Exh. 6, 45 TTABVUE 145-152 at 149].

- [A]lumina/zirconia composites represent the newest generation of ceramic materials and the most promising candidates for replacing metallic bearing parts in arthroplastic applications. … **$Cr^{3+}$** addition to the composite structure could … affect … an ability of the alumina phase [during processing], thus ultimately leading to a different rate in polymorphic transformation in the zirconia phase. Results collected by [other authors] on the phase stability at room temperature of tetragonal zirconia added with **$Cr_2O_3$ dopant** indeed support this suggestion. According to the findings of those researchers, the observed stabilization … resulted from a strong interaction between $Cr_2O_3$ and the $ZrO_2$ surface, which prevented the diffusion of oxygen from the atmosphere into the $ZrO_2$ lattice. … [T]his paper … suggests a role of **$Cr_2O_3$** dopant on **thermal stability** and, thus, the possibility of **tailoring environmental performance** through a suitable doping not only of the $ZrO_2$ phase but also of the $Al_2O_3$ matrix phase. [Pezzotti, Porporati, et al. (2010), PNOR6, Exh. 1, 46 TTABVUE 5-13 at 6, 12].

- Some alumina-zirconia composites are already implanted or developed by companies (Biolox delta by Ceramtec being an improved version of these composites, with SrO and **$Cr_2O_3$ additions** and alumina grains with platelet-like morphology). As expected, they show **significant improvement in ageing resistance** …, and **excellent crack resistance**. [Douillard et al. (2012), PNOR10, Exh. 9, 52 TTABVUE 122-134 at 124].

- Additionally to the reinforcing components, there are also stabilising elements doped to the material. **Chromium** is added, which is soluble in the alumina matrix and which **increases the hardness** of the composite. The minor amount of **chromium** is the reason for the **mauve colour** of the material. [Masson and Kuntz (2013), PNOR6, Exh. 5, 46 TTABVUE 42-51 at 45].

- **Chromia** (**$Cr_2O_3$**) is one the many additives potentially able to **improve the physical properties** of alumina. … The addition of **$Cr_2O_3$** … increases the **hardness**, tensile **strength** and thermal **shock resistance** of alumina (Riu et al., 2000). When a small amount of $Cr_2O_3$ (~ 2 mol %) is added, the grains become larger and bimodal in size distribution. At the same time, the **fracture toughness** and **flaw tolerance** of alumina are also improved. The **hardness** as well as **elastic modulus** is increased. However, **fracture strength decreases** with the addition of **$Cr_2O_3$** (Riu et al., 2000). … The effects of **$Cr_2O_3$** addition on the mechanical properties and microstructurc of ZTA were investigated. When a small amount of $Cr_2O_3$ (~0.6 wt %) was added, the grains becomes larger and acquired a platelike shape. As a result, **fracture toughness was improved** remarkably by the small addition of $Cr_2O_3$ (~0.6 wt %). [Azhar et al. (2013), PNOR11, Exh. 2, 53 TTABVUE 14-21 at 16, 20].

- Th[e] fourth generation of composite ceramics of alumina matrix (BIOLOX Delta, CeramTec GmbH, Germany) is composed of 82% of alumina and 17% zirconia. **Improved oxidation resistance, hardness and wear** were achieved adding a 0.5% of **chromium oxide** …. [Gabarro et al. (2014), PNOR8, Exh. 6, 50 TTTABVUE 47-59 at 49].

- **Chromium oxide** is another additive used in Biolox Delta to **increase the hardness and wear** characteristics … [T]he addition of **chromia** is reported to lead to an **increase in toughness** with no change in hardness for ZTA composites with different zirconia and alumina contents. … **Chromium oxide** added to the alumina phase is also shown to **slow down the hydrothermal degradation** in the zirconia … The addition of **chromia** further enhances [the] … **protective effect** [of zirconia from **undergoing phase transformation**]. [Kurtz et al. (2014), PNOR9, Exh. 5, 51 TTABVUE 105-115 at 111.

- Biolox Delta, a commercialized product by CeramTec AG, is a ZTA but also **contains small quantities of** SrO and **$Cr_2 0_3$**. These additives react with alumina and form plate-like alumina grains that produce extra **toughening mechanisms** through crack deflection and crack bridging ... In addition to **enhancing toughness**, the addition of **chromium oxide** in alumina matrix **enhances the hardness, the tensile strength and resistance to corrosion and thermal shock** … In addition to the positive role of **Cr** in the enhancement of **wear resistance**, this dopant also helps **maintain the stability** of zirconia, under a hydrothermal environment. As **Cr** dopant changes the oxygen vacan[c]y concentration it prohibits or delays moisture transfer to zirconia. As a result, oxygen vacancy annihilation and thereby polymorphic phase transformation in a hydrothermal environment is postponed. … The enhancement of **density and mechanical properties** (**fracture toughness**/Vickers **hardness**) are achievable by incorporation of a specific amount of $Cr_2 0_3$ and $SrCO_3$. [Bostanchi (2017), PNOR8, Exh. 8, 50 TTABVUE 75-149 at 98, 100, 259, 272].

- BIOLOX delta, an example of a fourth-generation ceramic, has even higher grain uniformity and smaller grain size than previous generations. Alumina still makes up a significant portion of the material, but [z]irconium oxide crystals have been added in small amounts to help increase toughness. … **[C]hromium oxide** is added to the composite to help increase the **hardness** that was lost by the addition of zirconium. [Gamble et al. (2017), PNOR, Exh. 5, 53 TTABVUE 37-44 at 38].

- Nowadays the most commonly used ceramic is the alumina matrix composite (AMC) (Biolox Delta; CeramTec AG, Plochingen, Germany). AMC, introduced in the early 2000s, is the fourth generation of Biolox Ceramics, composed of 82% alumina and 17% zirconia, with the addition of **chromium oxide** (0.5%) **to enhance hardness** and strontium crystals (0.5%) to diffuse crack energy. [Zagra et al. (2018), PNOR8, Exh. 15, 50 TTABVUE 348-354 at 352].

- The Biolox delta ceramic was developed to address some of the drawbacks of the third-generation alumina designs using nano-sized yttria-stabilized zirconia particles (17%), which are dispersed in the alumina matrix (81.6%) along with strontium (1%) in the form of a platelet to inhibit crack propagation, providing more strength. The addition of zirconia greatly increases the fracture toughness; and the addition of **chromium oxide** recaptures the **hardness** of the basic alumina matrix. [Chang et al. (2018), Exh. 3, 53 TTABVUE 22-29 at 26].
- [T]he fourth and most recent edition of the ceramic (CeramTec, BIOLOX delta) femoral head has been optimized with zirconia, strontium oxide, and **chromium oxide** to **diffuse crack energy, limit crack propagation, and improve hardness**. This has shown to **further reduce the incidence of ceramic head fractures** …. [Robinson, et al. (2019), PNOR8, Exh. 14, 50 TTABVUE 341-347 at 343].
- Fourth-generation ceramics are called alumina matrix composites (AMC) and marketed as BIOLOX Delta (CeramTec GmbH, Plochigen; Germany). They have higher grain uniformity, smaller grain size, and contain about 82% alumina and 17% zirconia which is incorporated as tetragonal, nano-sized yttrium-stabilized particles and this improves the composite's mechanical properties by preventing initiation and propagation of cracks. **Chromium oxide** is added to increase **hardness** while addition of small quantity strontium oxide forms platelets which deflect subcritical cracks, further adding to the toughness. [Tapasvi, et al. (2019), PNOR10, Exh. 4, 52 TTABVUE 60-67 at 61].
- The effect of **$Cr_2O_3$ addition** in different volume ratios (0.5, 1, 5 vol %) on microstructure and mechanical properties of $Al_2O_3$ were examined to assess as an alternative to the pure $Al_2O_3$ for ceramic armour applications. … 0.5 vol% **$Cr_2O_3$** addition increased the **flexural strength** 44% by the grain boundary modification of the larger size of the **$Cr^{3+}$** ions. A 6% and 13% **hardness** increase was achieved because of the combined effect of increasing relative **density** and solid solution formation with 0.5 vol% and 1 vol% **$Cr_2O_3$ additions**, respectively. Even though the fracture toughness values remained unchanged for all the compositions, the **crack propagation behavior** turned from mostly intergranular to a mixture of intergranular and transgranular with the **$Cr_2O_3$** addition by the localized compressive stresses that induce the strengthening of the grain boundary. [Yildiz et al. (2019), PNOR10, Exh. 5, 52 TTABVUE 68-76 at 75].
- [T]he fourth and most recent edition of the ceramic (CeramTec, BIOLOX delta) femoral head has been optimized with zirconia, strontium oxide, and chromium oxide to diffuse crack energy, limit crack propagation, and improve hardness. This has shown to further reduce the incidence of ceramic head fractures. [Rankin et al. (2019), PNOR11, 53 TTABVUE 30-36 at 32].

- [A] fourth generation of CoC [ceramic on ceramic] bearings … incorporates yttria-stabilized tetragonal zirconia (Y-TZP) into alumina matrix. This new generation is marketed as Biolox Delta ceramic bearings and was introduced by CeramTec AG (Plochingen, Germany) in 2004 ... The aim of this composite is to reduce both the risk of fracture and wear rate, as well as to obtain excellent scratch resistance together with low coefficient of friction ... This new ceramic consists of 82% alumina, 17% zirconia, and **0.5% chromium oxide to improve hardness and wear characteristics** …. [Fernández-Fairén et al. (2020), PNOR8, Exh. 7, 50 TTABVUE 60-74 at 62].
- BIOLOX delta represents the latest advancement in alumina ceramic technology due to the addition of zirconium oxide which provides the basic hardness and wear resistance, and strontium oxide and **chromium oxide** which provide the **improved mechanical properties**. Compared with pure aluminum oxide, ceramic BIOLOX delta offers **higher mechanical properties including higher fracture toughness** …. [Davis et al. (2020), PNOR8, Exh. 13, 50 TTABVUE 338-340 at 339].

## XIII. Respondent's Submissions to the U.S. Food and Drug Administration ("FDA")

As explained, in its filings with the FDA, Respondent states that the presence of chromium oxide causes the pink color of the chemical composite.

The FDA is a large agency, organized into centers. For example, there are centers for medical devices, drugs, biologics, veterinary medicines, foods and cosmetics, and tobacco products. The Device Center primarily reviews and approves or clears new medical devices prior to their coming to the market.[111]

The categories of medical devices for which the Device Center has oversight responsibility cut across multiple medical disciplines from orthopedics to cardiovascular and more. The FDA categorizes these devices into classes. The amount of regulatory control applied to a particular class of device is a function of its relative

[111] Kramer Colorado litigation trial testimony ("Kramer Lit. Testim.") on FDA practices, RNOR1, 70 TTABVUE 611-12. Petitioner did not introduce any testimony of its own expert on FDA practices.

risk and novelty or the extent of information known about the product. Class 1 includes simple devices, some of which do not even require FDA clearance prior to marketing. Class 3 devices carry the highest risk, such as heart valves and pacemakers. Class 2 devices fall in the middle. Orthopedic hip implants are categorized into either Class 2 or Class 3. How a medical device is classified depends on a variety of factors, including the type of surfaces that are articulating or moving against each other. For example, an orthopedic device having a femoral head that is ceramic articulating against a polyethylene acetabular component is a Class 2 device. If the device has two ceramic components articulating against each other, it is a Class 3 device.[112]

If a company wants to sell a new orthopedic device, the documentation it needs to file with the FDA depends on the class in which the device is categorized. If it is a Class 2 device, for example a ceramic component articulating against a polyethylene component, then the company would file a Premarket Notification, commonly referred to as a 510k, from the section of the law where it originated. The premise of a 510k is to demonstrate that one's device is "substantially equivalent" to a "predicate device." For one device to be substantially equivalent to another, the two devices must have the same intended use. A new device does not need to be identical to a predicate device in order to be substantially equivalent to that predicate device. A predicate device typically is a legally marketed product. The predicate device most often is itself found substantially equivalent to an earlier legally marketed device through the 510k

[112] Kramer Lit. Testim., RNOR1, 70 TTABVUE 612-13.

process, and shown to be in the same generic category as the new device. If a company is unsuccessful in convincing the FDA that its Class 2 device is substantially equivalent to a predicate device, then it would be considered a Class 3 device and have to undergo the process for Premarket Approval (or "PMA") used for Class 3 devices.[113]

The FDA found hip-implant systems incorporating components made from the BIOLOX delta composition to be substantially equivalent to hip-implant systems integrating a different ceramic component on at least four separate occasions. The very first 510k for a device incorporating BIOLOX delta components was such an example because there was no prior BIOLOX delta. Yet the FDA still found the devices with and without BIOLOX delta components substantially equivalent because they had the same technological characteristics. That is, BIOLOX delta was (and is), a ZTA-type material and the predicate devices contained components made from alumina and zirconia. Even though there was a change to the material composition, the FDA cleared the medical device incorporating a component made from the BIOLOX delta composition for marketing and sale in the U.S.[114]

Component parts for medical devices are not subject to being cleared through the 510k clearance process. The FDA reviews or clears and approves finished medical devices, not pieces and parts. So unless for some reason a component is presented as a finished medical device in its own right, it would be approved only in the context of

[113] Kramer Lit. Testim., RNOR1, 70 TTABVUE 614-16.

[114] Kramer Lit. Testim., RNOR1, 70 TTABVUE 619-23.

a larger system. A medical device component could be a material, software within a device, an assembly, but not a finished device in its own right.[115]

For some medical devices, the component manufacturer might have information in its possession that is helpful to its customer, the final medical device manufacturer needing to submit a 510k or PMA application to the FDA. In such a case, a method has been set up for a component manufacturer, if it wishes to maintain confidentiality over some of its information, to provide that information directly to the FDA. The form for providing confidential information directly to the FDA is called a "master file." A master file permits a third party, such as a component supplier, to provide information directly to the FDA, confidentially, but the finished-device manufacturer would not have direct access to it. However, the finished-device manufacturer could tell the FDA it knows this master file exists, and provide a letter from the master file owner permitting the FDA to access it on the finished-device manufacturer's behalf. Component suppliers are not required to submit master files to the FDA; it is a voluntary process.[116]

Petitioner made of record Respondent's master files (or their amendments) submitted to the FDA in 2004, 2008, 2012, 2013 and 2015, in which Respondent

---

[115] Kramer Lit. Testim., RNOR1, 70 TTABVUE 624-25.

[116] Kramer Lit. Testim., RNOR1, 70 TTABVUE 625-26; *see also*, U.S. FDA "Introduction to Master Files for Devices (MAFs)," PNOR8, Exh. 4, 50 TTABVUE 37-40 at 38 ("To help preserve the trade secrets of the ancillary medical device industry and at the same time facilitate the sound scientific evaluation of medical devices, FDA established the device master file system. In addition, a master file may be considered when several applications may be submitted for different products which may use a common material or process, etc. ….").

stated that chromium oxide had been added to BIOLOX delta ceramic matrix to increase the hardness of the ceramic, explaining in some, but not all, instances that the addition of chromia is the cause of the pink color of the material (emphasis added):

> The selected Alumina Matrix Composite [BIOLOX delta] makes use of three different principles in order to achieve its excellent properties. These are: [1] [t]ran[s]formation toughening resulting from the addition of the small Zirconia particles homogeneously dispersed in the Alumina Matrix, [2] [platelet reinforcement resulting from the in situ formation of elongated oxide crystals, [3] [c]omposite **hardening** by the addition of **chromium oxide**. … The final mechanism is the addition of **chromium oxide** as a solid solution in the Alumina Matrix composite as a **means of compensating for the drop in hardness** caused by the addition of the lower **hardness** zirconia particles throughout the microstructure. (2004).[117]
>
> * * *
>
> [A]n [a]lumina matrix composite of approximately 82% by volume [a]lumina with roughly 17% by volume of zirconia, **chromium oxide** and other oxides presented the ideal base for … [improved] material [when compared to BIOLOX forte]. … Additionally to the reinforcing components, there are also stabilizing elements doped to the material. **Chromium** is added which is soluble in the alumina matrix and increases the **hardness** of the composite. The minor amount of **chromium** is the reason for the **pink** color of the material. … (2008).[118]
>
> * * *
>
> The intention of this submission is to assure that our future customers' filings for their hip replacement products incorporating BIOLOX delta or BIOLOX forte ceramic ball heads will refer to accurate and recent data with respect to CeramTec's manufacturing processes and quality systems data. … Description of BIOLOX delta[:] … BIOLOX delta is an alumina based composite ceramic. Approximately 80 vol.-% of the matrix consist[s] of fine grained high purity alumina which is very similar to the well[-]known material BIOLOX forte. … Additionally to the reinforcing components, there are also stabilizing elements doped to

---

[117] Respondent's updated information on Alumina Matrix Composite, BIOLOX delta, into Master File No. 197 for Respondent's ceramic ball heads (April 17, 2004), PNOR3, Exh. 2, 43 TTABVUE 19-59 at 24-25; Exh. 5, 43 TTABVUE 173-193 at 178-79.

[118] Respondent's BIOLOX forte and BIOLOX delta ceramic cups and inserts (October 1, 2008), PNOR3, Exh. 3, 43 TTABVUE 60-107 at 62-63, 86.

> the material. **Chromium** is added which is soluble in the alumina matrix and increases the **hardness** of the composite. The minor amount of **chromium** is the reason for the **pink** color of the material. … (2012).[119]

* * *

> BIOLOX delta Alumina Ceramic is an alumina based composite ceramic that was created based on the proven attributes of the BIOLOX forte Alumina Ceramic. The goal of the development of the BIOLOX delta material was to preserve the desirable properties of the BIOLOX forte – as an excellent bioceramic with more than 30 years clinical experience – while increasing the strength and toughness. … This goal was accomplished by integrating reinforcing components (tetragonal zirconia particles and platelet shaped crystals of the composition strontium aluminate) and by adding stabilizing elements (Yttrium and **Chromium**) into the BIOLOX delta material. … **Chromium oxide** is added as a solid solution to increase **hardness** and compensate for the decrease in **hardness** caused by the addition of the lower hardness zirconia particles in the microstructure. The minor amount of **Cr** is the reason for the **pink** color of the composite. … The resulting BIOLOX delta material further develops nearly the **hardness** of Alumina while offering a major improvement in **strength** and **toughness**. (2013).[120]

* * *

> BIOLOX delta is the tradename of a Composite Material based on high purity alumina matrix with zirconia reinforcement (ZTA). … BIOLOX delta Alumina Ceramic is an alumina based composite ceramic that was created based on the proven attributes of the BIOLOX forte Alumina Ceramic. The goal of the development of the BIOLOX delta material was to preserve the desirable properties of the BIOLOX forte – as an excellent bioceramic with more than 30 years clinical experience – while increasing the **strength** and **toughness**. … This goal was accomplished by integrating **reinforcing components** (tetragonal zirconia particles and platelet shaped crystals of the composition strontium aluminate) and by adding stabilizing elements (Yttrium and **Chromium**) into the BIOLOX *delta* material. …**Chromium oxide** is added as a solid solution to increase **hardness** and compensate for the decrease in **hardness** caused by the addition of the lower hardness zirconia particles in the microstructure. The minor amount of **Cr** is the reason

[119] Respondent's Master File 197, Amendment 11, BIOLOX forte, [a]nd BIOLOX delta ceramic ball heads (October 11, 2012), PNOR3, Exh. 4, 43 TTABVUE 197-172 at 109, 134.

[120] Respondent's Master File 746, Amendment 20, BIOLOX delta ceramic liners (June 25, 2013), PNOR12, Exh. 6, 61 TTABVUE 343-428 at 377, 379.

> for the **pink** color of the composite. … The resulting BIOLOX delta material further develops nearly the **hardness** of Alumina while offering a major improvement in **strength** and **toughness**. (2015).[121]

Respondent did not retract the statements made in its master files regarding the contributions of chromia to the desired mechanical properties of the BIOLOX delta composition until 2015 and 2016 in correspondence and enclosures filed with the FDA. This was after Petitioner filed its district court action and these cancellation proceedings against Respondent.

Specifically, in its letters to the FDA dated August 26, 2015 and April 25, 2016,[122] Respondent cited to an October 22, 2014 article written by Dr. Meinhard Kuntz entitled "The Effect of Chromia Content on Hardness of Zirconia Platelet Toughened Alumina Composites" (the so-called "White Paper" discussed in detail below). In its correspondence, Respondent reported Dr. Kuntz's conclusions to the FDA that the chromia in the BIOLOX delta ceramic material did not contribute to the hardness of the material. Respondent's correspondence sought to amend historical statements previously made in its Device Master Files, quoted above, that chromium increases hardness in the BIOLOX delta ceramic material, which Respondent said were at odds with its most recent research to be found in the Kuntz article.

---

[121] Respondent's Master File 746, BIOLOX delta ceramic liners (Update March 15, 2015), PNOR4, Exh. 5, 44 TTABVUE 50-156 at 77-78, 80.

[122] Petkow Decl., 114 TTABVUE 12, ¶ 41 and 120 TTABVUE 15-20, Exh. 19; Stroetgen Colorado litigation trial testimony ("Stroetgen Lit. Testim."), PNOR28, 128 TTABVUE 41-46.

## XIV. Product Advertising by Respondent and its OEM Customers Regarding the Benefits of the BIOLOX delta chemical composition used in Hip Implant Components

Respondent and its customers (OEM medical device manufacturers) have for many years engaged in product advertising, extolling the benefits of chromia within the BIOLOX delta ZTA ceramic composite:

- BIOLOX delta is a new alumina matrix composite, which makes use of the following principles: [1] Transformation toughening resulting from the addition of small homogeneously dispersed oxide particles in the alumina matrix, [2] Platelet reinforcement resulting from the formation of larger oxide crystals. [3] Composite **hardening** resulting from the addition of **chromium oxide**. BIOLOX delta is composed of aluminum oxide (approximately 75%), zirconium oxide, **chromium oxide** and other oxides. [BIOLOX delta, A new ceramic in Orthopaedics, CeramTec (undated), PNOR5, Exh. 1, 45 TTABVUE 5-13 at 8].
- BIOLOX delta is an aluminum oxide matrix composite ceramic consisting of approx. 82% alumina ($Al_20_3$), 17% zirconia ($ZrO_2$) and other trace elements (percent by volume). The **pink color** is due to the **chromium oxide ($Cr_2O_3$)**. … Alumina provides the material's hardness and wear resistance, while zirconia, together with **other additives**, provides **improved mechanical properties**. These properties are achieved, among other things, by means of the high strength, the high density of the material and the very small grain size of the alumina matrix. [Ceramic-on-Ceramic – Scientific Information, BIOLOX delta Ceramic, Zimmer website (undated), PNOR8, Exh. 10, 50 TTABVUE 301-03 at 302].
- The alumina material provides BIOLOX delta with high **hardness**, excellent biocompatibility and hydrothermal stability. Yttria-stabilized zirconia particles (Y-TZP) are finely dispersed throughout the alumina matrix, increasing mechanical strength and fracture toughness over pure alumina. In zirconia-toughened alumina (ZTA) materials, some of the original hardness of the alumina material is lost. The addition of **chromium oxide** restores the desired material **hardness** to the matrix. [BIOLOX delta ceramic femoral heads material rationale, DePuy Synthes (2003), RNOR5, Exh. 7, 45 TTABVUE 153-65 at 157].
- BIOLOX delta is an aluminum oxide matrix composite ceramic consisting of approx. 75% alumina ($Al_2O_3$), 24% zirconia ($ZrO_2$) and other trace elements. The **pink** color is due to the **chromium oxide ($Cr_2O_3$)** that improves the **hardness** of the composite material. [BIOLOX delta ceramic femoral head data sheet, Zimmer (2008), PNOR4, Exh. 8, 44 TTABVUE 180-84 at 182].

- Alumina Matrix Ceramic Composite, **chromium oxide** compensates the **hardness** difference. [Ceramic Market and Main Trends Worldwide: Technical Evolution of Ceramics in Orthopaedics, CeramTec (2008), PNOR5, Exh. 9, 45 TTABVUE 201-228 at 208].
- Vadin Implants uses the newest ceramic material which is an alumina matrix composite, labeled BIOLOX Delta. BIOLOX delta is a zirconia-toughened, platelet-reinforced alumina ceramic (ZPTA), designed to incorporate the wear properties and stability of alumina with vastly improved material strength and toughness. BIOLOX delta contains approximately 74% alumina and 25% zirconia. Additives of **chromium dioxide** and strontium oxide **enhance the performance** of the material. [Vadin Implants (website) (© 2008-2020), PNOR8, Exh. 9, 50 TTABVUE 298-300 at 299-300].
- Biolox delta is an alumina composite matrix comprised of 74% alumina, 25% zirconia and 1 % additives such as strontium and **chromium** to **enhance the performance** of the material. As we will see later, this matrix improves wear characteristics and fracture toughness which are critical factors for hard bearings. … BIOLOX delta is a nanocomposite, of 82% Alumina and 17% Zirconia nanoparticles with traces of Strontium Aluminate platelet crystals for crack shielding and **Chromium Oxide** for **stabilization**. … The last components of the Biolox delta matrix are mixed oxides …. The mixed oxides consist of **chromium oxide** which helps to achieve the desired **hardness**. Strontium oxide prevents micro cracks in the material from advancing by dissipating crack energy. These two oxides further increase the materials **strength** and fracture **toughness**. 453 [BIOLOX delta Education Guide (DePuy) (September 2009), PNOR12, Exh. 11, 61 TTABVUE 438-67 at 446-47, 453]
- BIOLOX delta: Alumina Matrix Composite, **Chromium Oxide, Phase Stabilization, Hardness**; Questions before my presentation or during the coffee breaks: Why Biolox delta has a **pink** color? Answer: **$Cr^{3+}$** [Advanced metrology of bioceramics: an independent overview on BIOLOX delta, Sponsored by CeramTec (December 2011), PNOR1, Exh. 1, 41 TTABVUE 5-36 at 14]
- Biolox delta: 82 Vol.% aluminum oxide, 17 Vol.% zirconium oxide (zirconia oxide) and less than 1 Vol.% strontium aluminate platelets and **chromium oxide** [for] **hardness**. … Why is Biolox delta pink colored? A: The added **chromium oxide** gives the **pink** color after sintering. **Chromium oxide** is added to increase the **hardness** of Biolox delta. [CeramTec Sales Questionnaire and FAQs (March 2, 2012), PNOR5, Exh. 5, 45 TTABVUE 91-144 at 99, 101].
- BIOLOX delta composition (AMC) Alumina Matrix Composite: **Chromium oxide ($Cr_2O_3$)** [added] to balance **hardness** reduction introduced by the

Y-TZP [Yttria Stabilized Zirconia]; CeramTec/DePuy Sales Training (August 2013), PNOR12, Exh. 1, 61 TTABVUE 6-105 at 31].

- BIOLOX delta (AMC) Chemical Composition: Chromium Oxide (0.5 vol %), phase stabilization, hardness; Chromium makes it pink. It is from ruby [CeramTec/Biomet Training (March 2013), PNOR12, Exh. 2, 61 TTABVUE 106-84 at 123].
- BIOLOX Delta [i]s composed of approximately 75% aluminum oxide, which provides the basic hardness and wear resistance. and approximately 25% zirconia. which together with other additives (mixed oxide platelets like **chromium oxide**) provide the **improved mechanical properties**. Compared with pure aluminum oxide, ceramic BIOLOX Delta offers higher mechanical properties including **higher fracture toughness**. R3◦ acetabular system, design rationale, Smith & Nephew (2013), PNOR8, 50 TTABVUE 317-37 at 324].

Respondent readily concedes that "in certain older advertising and marketing for BIOLOX delta," it "stated that the product was pink because of the presence of chromium in the BIOLOX delta material and in some instances also stated that the chromium increased the hardness of the product," and "included this statement originally in some of [its] … materials in order to provide … customers with the full information about the BIOLOX delta material and to explain why the components were pink."[123] Prior to late 2014 (as noted in the numerous examples above), the statement that chromium increased the hardness of the BIOLOX delta compound appeared in Respondent's marketing materials, such as presentations to OEM customers, Respondent's website, brochures, as well as on Respondent's customers' websites and materials – going (by Respondent's own account) as far back as 2001.[124] Since at least as early as 2012, Respondent in fact was actively giving presentations

[123] Petkow Decl., 114 TTABVUE 8-9, ¶¶ 26, 31.

[124] Petkow Decl., 114 TTABVUE 9, ¶ 30; *see also* Exh. 14, 115 TTABVUE 225-38 at 228, 231.

and telling customers that chromium oxide contributed to hardness,[125] and as late as 2019 Respondent was still sending articles to its customers referencing the fact that chromium oxide increases the hardness of the BIOLOX delta ceramic.[126]

All of the above statements made by Respondent or its OEM customers in scientific literature, filings with the FDA, and advertising and marketing activities, regarding the contribution of chromia to the mechanical properties of the BIOLOX delta composition, render suspect Respondent's current assertions that (1) "it was not [Respondent]'s understanding that this increase to the hardness of the material [from chromia, when added to alumina] was of significant importance to the performance of the material" and that (2) Respondent "did not believe chromia materially impacted the quality of BIOLOX [d]elta or was essential to the use or purpose of BIOLOX [d]elta."[127]

As an attempted counter-balance to the above-quoted advertising literature and above-noted marketing activities, Respondent states it was the first to offer pink ceramic hip implant components, and points to its advertising and marketing efforts around the color pink, from 2009 through 2021, evincing its evolving strategy to build an entire brand around the color pink.[128] Respondent also states that, once one of its scientists (Dr. Meinhard Kuntz) in late 2014 (after the petitions for cancellation were

---

[125] Echols Discov. Depo., PNOR13, 154 TTABVUE 13, 23-25, Exh. 1.

[126] Echols Colorado litigation trial testimony ("Echols Lit. Testim."), PNOR2, 42 TTABVUE 167-69; Echols Discov. Depo., PNOR13, 154 TTABVUE 31-41, 52-117, Exhs. 1, 3-6.

[127] Kuntz Decl., 101 TTABVUE 10, ¶ 30.

[128] Petkow Decl., 114 TTABVUE 6-8, ¶¶ 14-15, 17, 19-22, 24 and 115 TTABVUE 138-74, Exh. 8.

filed) investigated and reported that chromia did not contribute to the hardness of the BIOLOX delta ceramic, Respondent formulated a plan to contact all customers and inform them of this new information and ask them to correct their websites and marketing materials accordingly.[129]

## XV. Reported Experimental Data

The parties submitted a wealth of experimental data and reports, and suggested implications to be drawn from them, regarding whether the addition of chromia to the ZTA compound (resulting in the pink color of the ceramic) contributes to the mechanical performance of the compound. Unsurprisingly, for each set of experimental data and report submitted by the proponent (by way of experts or employees), its adversary criticizes the experimental methodology, data collection procedures or stated conclusions.

### A. The Kuntz White Paper (2014)

Dr. Meinhard Kuntz joined Respondent's Oxide Ceramics Department in 2005, which he later managed until his departure from the company in 2017.[130] Based on other experimental activities conducted by his work colleagues in 2006, 2008 and 2009, Dr. Kuntz began to suspect that chromium possibly may not be contributing to

[129] Petkow Decl., 114 TTABVUE 9-11, ¶¶ 29, 33-39 and 115 TTABVUE 175-79, 206-250, 116 TTABVUE 2-46, 117 TTABVUE 2-30, 118 TTABVUE 2-59, 119 TTABVUE 2-51, 120 TTABVUE 2-13, Exhs. 9, 12-17, 113 TTABVUE 23-47, Exh. 18.

[130] Kuntz Decl., 101 TTABVUE 4, ¶¶ 8-9; Kuntz Lit. Testim., RNOR1, 70 TTABVUE 373-74.

the desirable mechanical properties of BIOLOX delta notwithstanding Respondent's ongoing marketing statements that it did so.[131]

In order to confirm his suspicions, Dr. Kuntz conducted an experiment testing the effect of chromium on the material properties of BIOLOX delta. Dr. Kuntz published the results of his findings in a so-called "White Paper" in October 2014.[132] In his White Paper, Dr. Kuntz concluded:

> The acceptable range of chromia content for BIOLOX delta is between 0.31 – 0.37% [by weight]. … [My test] results demonstrate that the existence or non-existence of chromia in a ZTA material that is otherwise identical to BIOLOX delta has no influence on the hardness of the material, at least in the range of the amount of chromia investigated here ([0.0%, 0.14%, 0.32% and] 0.5% by weight). ... [T]he statistically substantiated test results discussed herein demonstrate that the chromia content of BIOLOX delta does not measurably influence the hardness.[133]

At the trial in the Colorado Litigation, Petitioner's materials expert, Dr. Fischman, criticized the experiment and results of Dr. Kuntz's white paper in several respects: (1) Dr. Kuntz's experiment was not reproducible because the oxide information was not provided, (2) the alumina levels were not held constant in the different vats of materials Dr. Kuntz compared, and (3) Dr. Kuntz's study lacked a control.[134] Even Respondent's materials expert at the Colorado Trial, Dr. Mecholsky,

---

[131] Kuntz Decl., 102 TTABVUE 14-17; ¶¶ 42-50; Kuntz Lit. Testim., RNOR1, 70 TTABVUE 413-429.

[132] Kuntz Decl., 101 TTABVUE 20-21; ¶¶ 56-57; Kuntz Lit. Testim., RNOR1, 70 TTABVUE 450-57.

[133] Kuntz White Paper, Kuntz Decl., Exh. 7, 101 TTABVUE 77-81 at 78, 81.

[134] Dr. Gary Fischman Colorado litigation trial testimony ("Fischman Lit. Testim."), DNOR1, 70 TTABVUE 284-86, 291-92.

had his own criticisms of Dr. Kuntz's white paper: (1) it wasn't peer-reviewed, and (2) it contained insufficient references to and consideration of prior experimental literature in this area.[135] Dr. Kuntz himself recognized some of the shortcomings of the White paper when he testified at the Colorado trial that (1) it was not peer-reviewed by persons outside of Respondent, (2) it was important to Respondent that the White Paper be sent out as quickly as possible, so the paper was not scientific journal quality, and (3) Dr. Kuntz did not show in the White Paper the complete experimental techniques he employed.[136]

In his initial report for these proceedings, Petitioner's materials expert, Dr. William Carty, discusses his similar criticisms of Dr. Kuntz's White Paper, and included others, namely: (1) lack of peer review, (2) the samples Dr. Kuntz used for the White Paper were processed differently than the equivalent medical grade product intended for implantation, (3) the paper does not fully disclose the chemistries of the samples tested, making the study as published impossible to reproduce, (4) the underlying worksheet memorializing the data from Dr. Kuntz's study contains numerous errors, again making a reproduction of the study underlying the White Paper impossible, (5) Dr. Kuntz's study does not attempt to optimize the mechanical properties of the material for purposes of implantation in the body, (6) the White Paper does not evaluate any mechanical properties of the samples other than hardness, and (7) the White Paper does not disclose the sintering conditions of the

[135] Dr. John Mecholsky Colorado litigation trial testimony ("Mecholsky Lit. Testim."), PNOR2, 42 TTABVUE 230-31.

[136] Kuntz Lit. Testim., PNOR1, 41 TTABVUE 221-25.

samples tested, which can have significant impact on the properties of the composite.[137] In his rebuttal report for these proceedings, Dr. Mecholsky dismisses Dr. Carty's criticisms at every turn, either as irrelevant or because of additional factors outside of the White Paper's scope (that is, the mechanical properties other than hardness).[138]

### B. The Kuntz and Krüger Paper (2018)

As we noted earlier, the trial in the Colorado Litigation ended in late 2016, the district court's decision issued in 2017, and the Tenth Circuit's decision reversing the district court on jurisdictional grounds issued in 2019. In between these events, Dr. Kuntz and his colleague, Dr. Reinhard Krüger, performed experiments on different material properties of the same samples Dr. Kuntz used for his 2014 White Paper.[139] In 2018, Drs. Kuntz and Krüger published their paper in a scientific journal (which was anonymously peer-reviewed) discussing the results of their findings.[140] In their paper, Drs. Kuntz and Krüger concluded:

> [U]p to an amount of 0.5 wt% [the amounts tested here were 0.00, 0.14, 0.32 (prepared with a compound $YCr0_3$ oxide), 0.33 (prepared with separate $Y_20_3$ and $Cr_20_3$ oxides) and 0.5 wt%], there is no effect of chromia to the mechanical performance (hardness, toughness, stiffness, scratch performance) or manufacturing process [of ZTA compositions and alumina similar or equivalent to the commercial materials BIOLOX delta and BIOLOX forte]. It was further investigated how variation of grain size and final density influence the material properties of ZTA and

[137] Carty Rpt., 60 TTABVUE 74-76, ¶ 159.

[138] Mecholsky TTAB Rebuttal Rpt., 105 TTABVUE 437-440, ¶¶ 94-97, 99-101.

[139] Kuntz Decl., 101 TTABVUE 22, ¶ 59.

[140] Kuntz Decl., 101 TTABVUE 22, 134-44, ¶ 60, Exh. 9. Respondent also made the Kuntz/Krüger article of record at RNOR24, Exh. 1, 95 TTABVUE 5-15. We cite herein to the version of the article submitted under Respondent's Twenty-Fourth Notice of Reliance.

> alumina. There is a measurable effect on hardness but a negligible effect on fracture toughness. The scratch performance seems to be closely linked to the toughness as can be seen from the comparison of ZTA and alumina. There is a certain probability that formerly misleading results about the correlation of hardness and chromia content arise from secondary effects (grain size, density) and measurement uncertainty of inappropriately chosen [hardness testing] load levels.[141]

As he did with Dr. Kuntz's 2014 White Paper, Dr. Carty had a number of criticisms of the 2018 Kuntz/Krüger paper: (1) the actual chemistry of the test specimens was not provided, so it is impossible to duplicate or reproduce the test results, (2) the specific sintering conditions for the samples in order to isolate potential effects of grain growth on mechanical properties are not disclosed, (3) the levels of raw materials and the densities of chromium used to prepare the samples for testing were not given, i.e., the batch information, or recipe, used to create the test specimens were not provided, (4) the Kuntz/Krüger paper does not consider the impact of the variation of chromium on a ceramic hip implant component system that is optimized for performance in vivo, (5) in their paper, Dr. Kuntz and Dr. Krüger claim their research and conclusions are consistent with the Bradt (1966) article,[142] when Dr. Carty believes they are not, and (6) the data in Dr. Kuntz and Dr. Krüger's 2018 paper is also insufficient to rebut the well-established literature[143] that chromium has an impact on hardness.[144] Once again in his rebuttal report, Dr. Mecholsky dismisses Dr. Carty's criticisms point-by-point, either as immaterial to the results Dr. Kuntz

---

[141] Kuntz/Krüger article, RNOR24, Exh. 1, 95 TTABVUE 5-15 at 14.

[142] See discussion of the Bradt (1966) article in Section X above.

[143] See discussion and summary of the technical literature in Section X above.

[144] Carty Rpt., 60 TTABVUE 75-77, ¶¶ 161-67.

and Dr. Krüger obtained or because Dr. Carty did not conduct these experiments himself using Dr. Carty's desired methodology.[145] However, when pressed on cross-examination, Dr. Mecholsky did admit to many of the above-noted shortcomings of the Kuntz/Krüger paper[146] – although on re-direct he suggested methods to address those shortcomings[147] – and that the data used for the Kuntz White Paper and Kuntz/Krüger paper indeed were the same.[148]

Of particular import in adjudicating witness credibility, Dr. Mecholsky was chosen as an anonymous, independent peer reviewer for the Kuntz/Krüger paper,[149] yet he did not reveal to the publication in which the article appeared that he was a testifying expert on Respondent's behalf. This presented Dr. Mecholsky with a clear conflict of interest, on which he remained silent despite the publication's policies he should disclose his interest in the matter.[150] When asked about his apparent conflict of interest during cross-examination, Dr. Mecholsky conceded that he did not bring the pertinent facts to the publication's attention, because he thought the parties' litigation was over and that his participation in the litigation was not relevant.[151] Dr. Mecholsky also noted there was another designated anonymous reviewer for the

---

[145] Mecholsky TTAB Rebuttal Rpt., 105 TTABVUE 440-442, ¶¶ 102-107.

[146] Mecholsky CX Testim. Depo., 155 TTABVUE 17-22, 40-44.

[147] Mecholsky CX Testim. Depo., 155 TTABVUE 31-36.

[148] Mecholsky CX Testim. Depo., 155 TTABVUE 16.

[149] Mecholsky TTAB Rpt., 105 TTABVUE 201 at n.3.

[150] Carty Rebuttal Rpt., 153 TTABVUE 18-22, ¶¶ 39-44, 48.

[151] Mecholsky CX Testim. Depo., 155 TTABVUE 28-30, 37-38.

Kuntz/Krüger paper, Jerome Chevalier, but later when pressed, Dr. Mecholsky could not say for sure whether Dr. Chevalier was actually another reviewer of the paper.[152]

### C. Dr. Mecholsky's Testing and Analysis (2016)

Part of Dr. Mecholsky's report in the Colorado Litigation included his own analysis of ceramic test samples he requested and received from Respondent.[153] Unfortunately, a very sizeable portion of this part of Dr. Mecholsky's report has been filed under seal in these proceedings. We therefore can only discuss Dr. Mecholsky's analysis and conclusions in general terms.

Similar to the experiments supporting the Kuntz White Paper and the Kuntz/ Krüger paper, Dr. Mecholsky conducted hardness testing on ZTA ceramic compounds containing < 0.01, 0.15, 0.33 and 0.5 %-vol. chromium oxide, discussing the make-up of the samples and his testing procedures in detail.[154] Based upon this data, as confirmed with Respondent's statistics expert Dr. Kadane, Dr. Mecholsky concludes that "the hardness values are the same for all compositions" and "that chromium did not impact the hardness of these ZTA samples."[155] Except in a passing footnote,[156] Dr. Carty appears not to have critiqued Dr. Mecholsky's testing and analysis of the ceramic samples he obtained from Respondent.

---

[152] Mecholsky CX Testim. Depo., 155 TTABVUE 38-39, 45-47.

[153] Mecholsky Lit. Rpt. 105 TTABVUE 89-102, ¶¶ 144-65 (public/redacted); 106 TTABVUE 89-102, ¶¶ 144-65.

[154] Mecholsky Lit. Rpt. 106 TTABVUE 89-102, ¶¶ 145-160, 162-65. All of this discussion has been redacted from the public version of the Mecholsky Lit. Rpt.

[155] Mecholsky Lit. Rpt. 105 TTABVUE 96, ¶ 161; 106 TTABVUE 96, ¶ 161.

[156] Carty Rpt., 60 TTABVUE 83 at n.123.

### D. Testing and Analysis Conducted in Connection with German Litigation between the Parties (2018)

In addition to the Colorado Litigation and these proceedings, Petitioner and Respondent were engaged in trademark litigation in Germany (the "German Litigation"). Respondent also was engaged in trademark litigation in Germany with Metoxit, another supplier of ZTA ceramic hip implant components based in Switzerland. As a part of those litigations, the Stuttgart Regional Court directed the Federal German Institute for Materials Research and Testing (Bundesanstalt Für Materialforschung und-prüfung, hereinafter the "German Federal Institute" or "BAM") to examine whether chromium had any effect, other than color, on the material properties of certain ceramic hip implant components. The German Federal Institute is a senior scientific and technical federal institute with responsibility to the German Federal Ministry for Economic Affairs and Energy. In the German Litigation, BAM was commissioned as an independent, scientific fact-finder. Dr. Torsten Rabe, the leader of the German Federal Institute's department of Technical Ceramics, conducted BAM's testing and drafted these reports.[157] As the only BAM report for the German Litigation (translated into English) made of record in these proceedings was the one for the litigation between Petitioner and Respondent (and not between Respondent and Metoxit), that is the only report we discuss here. Since the BAM report in its entirety was filed as confidential, we discuss it only in general terms.

[157] Mecholsky TTAB Rpt., 105 TTABVUE 210, ¶ 44.

In the German Litigation, Dr. Rabe obtained ceramic specimens from both Petitioner and Respondent containing 0, 0.1, 0.3 and 0.5 % chromium oxide content by weight percent.[158] Otherwise, the material variations of the specimens provided by both companies were produced with identical production parameters, with BAM requiring that these parameters for the test specimens correspond to the respective standard manufacturing conditions for ZTA materials at both companies as much as possible.[159] The BAM report notes there were no significant differences in the $Al_2O_3$ (alumina), $ZrO_2$ (zirconia), $HfO_2$ (hafnia), $Y_2O_3$ (yttria) and SrO (strontia) content between the specimens provided by the parties, except the strontia content of the samples free from chromium oxide was somewhat higher in the samples provided by Petitioner.[160]

BAM tested the parties' specimens for color, hardness and wear resistance. The German Federal Institute concluded that, with the addition of chromium oxide to a ZTA ceramic in quantities up to 0.5 Ma.-% wt., the pink color intensity increases as the chromium oxide content increases, but there was no increase in the hardness or wear resistance of either company's ZTA ceramic test specimens.[161]

Petitioner's materials expert, Dr. Carty, criticizes BAM's testing methodology and conclusions as follows: (1) the hardness levels start high and remain high with the addition of chromium oxide throughout Respondent's samples in the BAM study, and

---

[158] BAM Report, Haftel CX Testim. Depo., Exh. 11, 147 TTABVUE 4 at 13-14.

[159] BAM Report, Haftel CX Testim. Depo., Exh. 11, 147 TTABVUE 4 at 15.

[160] BAM Report, Haftel CX Testim. Depo., Exh. 11, 147 TTABVUE 4 at 24-25.

[161] BAM Report, Haftel CX Testim. Depo., Exh. 11, 147 TTABVUE 4 at 7-8, 48, 56, 63.

this high baseline hardness serves to mask any contribution of chromium oxide; (2) the BAM report does not state that the tested samples were subject to autoclaving before testing; (3) the BAM report does not provide the precise sintering conditions of the samples; (4) the BAM report does not seek to determine the role of chromium in a ZTA system optimized for performance in the body over long periods of time; (5) contrary to the conclusions of the BAM report, the wear data of Petitioner's tested samples shows a significant improvement in wear resistance with the addition of chromium; and (6) BAM's experimental procedure does not mirror the environmental conditions under which it has been demonstrated that chromium improves the in vivo wear performance of ZTAs.[162]

Dr. Mecholsky's replies to Dr. Carty's criticisms of the BAM report were all filed as confidential, so here we only discuss them in general terms. Dr. Mecholsky's rebuttals to Dr. Carty may be summarized as follows: (1) as noted by Dr. Carty, chromia's contribution, if any, to the tested ZTA specimens is undetectable through measurement techniques, and thus could not result in a sufficient difference in material properties to represent a functional difference in the material; (2) Dr. Carty does not explain what he means by "an optimized system" or how such discussion is relevant to the question presented (whether chromium affects any property of a ZTA ceramic material); (3) Dr. Carty cites to no experimental data on the relevant materials to establish that chromia at a level within the range tested, and not any

[162] Carty Rpt., 60 TTABVUE 89-90, ¶¶ 184-185, 187.

other factor, contributes to any material property of a ZTA ceramic; (4) Dr. Mecholsky questions Dr. Carty's conclusion regarding the improvement in wear resistance with the addition of chromia to Petitioner's samples, because Dr. Carty does not appear to have conducted any statistical analysis of the BAM data; and (5) Dr. Carty's criticisms that BAM did not perform its examinations using in vivo testing or autoclaving is not supported by any such testing Dr. Carty performed himself, and no such testing appears to exist anywhere else.[163]

### E. Research Conducted by Dr. Porporati

As noted above in our review of the technical literature, Dr. Alessandro Alan Porporati was co-author of a paper with Dr. Giuseppe Pezzotti suggesting a role of $Cr_2O_3$ (chromium oxide) dopant on thermal stability and, thus, the possibility of tailoring environmental performance through a suitable doping not only of the $ZrO_2$ (zirconia) phase but also of the $Al_2O_3$ (alumina) matrix phase.[164] At trial in the Colorado Litigation, Dr. Porporati testified about his theories that chromium might be impacting phase stabilization of the ZTA material, which in turn would mean it had an effect on fracture toughness or aging resistance of the material.[165] Dr. Porporati's experiments first indicated to him that chromium oxide might improve

---

[163] Mecholsky TTAB Rebuttal Rpt., 112 TTABVUE 820-23, ¶¶ 114-21.

[164] Pezzotti, Porporati, et al. (2010), PNOR6, Exh. 1, 46 TTABVUE 5-13 at 6, 12.

[165] Porporati Colorado Litigation trial testimony ("Porporati Lit. Testim."), RNOR1, 70 TTABVUE 496-97.

phase stabilization, then that it might negatively affect phase stabilization, then that chromium oxide had no effect on phase stabilization at all.[166]

Dr. Porporati also testified at the Colorado trial regarding his hardness testing on Respondent's materials with and without chromium oxide. When reporting his inconclusive results to Respondent (some results indicating that chromia was contributing to hardness, others not), Respondent pointed to a number of possible mistakes in Dr. Porporati's measurements.[167] Another topic of Dr. Porporati's trial testimony concerned his experiments on the effect of yttria on zirconia stabilization, and in turn its positive effect on fracture toughness and aging resistance in Respondent's ZTA material.[168]

Dr. Porporati also submitted a testimony declaration in these proceedings.[169] In his declaration, Dr. Porporati seeks to distance himself from the paper he co-wrote with Dr. Pezzotti, stating "Prof. Pezzotti's observations when comparing chromia and chromia-free material were due to the fact that the yttria contents in the chromia and chromia-free material varied, and were not due to the chromia content in the material."[170] Dr. Porporati's present position is that "small changes in yttria content have a significant effect on the toughness, zirconia phase stabilization, and potentially the wear performance of a ZTA ceramic material .... By contrast, my

[166] Porporati Lit. Testim., RNOR1, 70 TTABVUE 498-500, 519.

[167] Porporati Lit. Testim., RNOR1, 70 TTABVUE 520-27, 530-51.

[168] Porporati Lit. Testim., RNOR1, 70 TTABVUE 506-10.

[169] Porporati Decl., 98 (confidential)/99 (public, redacted) TTABVUE.

[170] Porporati Decl., 99 TTABVUE 3, ¶ 3.

research does not establish that changes in chromia content between 0 and 0.33 wt % have any impact on the material properties or wear performance of a ZTA ceramic ...."[171]

We reviewed Dr. Porporati's internal research report submitted to Respondent,[172] his current employer.[173] What Dr. Porporati reports in his declaration as "changes in yttria content" having an "effect on … toughness, zirconia phase stabilization, and potentially … wear performance" of the ZTA material is in fact the addition of yttrium chromite ($YCrO_3$), a chemical combination of yttrium and chromia, not the addition of yttrium by itself, albeit increasing the overall yttria content while keeping chromia content relatively constant.[174] In addition to this observation from our own reading of the evidence, Petitioner responds that "[e]ven assuming … Dr. Porporati's experiments demonstrate that yttria can have an impact on zirconia phase stability in ZTA ceramic materials, this does not establish that chromium oxide does not **also** impact zirconia phase stability." (emphasis original).[175]

### F. Analysis of Certain Mechanical Properties of Petitioner's Ceramic Materials at Certain Intervals and over the Passage of Time

In 2020, Jonathan Haftel, Petitioner's Plant Manager,[176] analyzed data from internal hardness testing Petitioner conducted on its CeraSurf-p and CeraSurf-w

---

171 Porporati Decl., 99 TTABVUE 4, ¶ 8.

172 Porporati Decl., 99 TTABVUE 10, 56-76, ¶ 28, Exh. 3.

173 Porporati Decl., 99 TTABVUE 4, ¶ 7.

174 Porporati Decl., Exh. 3, 99 TTABVUE 56-76 at 56-58.

175 Haftel Rebuttal Decl., 138 TTABVUE 3, ¶ 6.

176 Haftel Decl., 59 TTABVUE 2, ¶ 4.

materials between 2010 and 2020. Petitioner's tests show that CeraSurf-w — which does not contain chromium oxide — is not as hard as CeraSurf-p — which does contain chromium oxide (0.33 wt%).[177] Also in 2020, Petitioner conducted and analyzed strength testing on its CeraSurf-p and CeraSurf-w materials in addition to hardness. Petitioner's test data showed significantly higher flexural strength values for CeraSurf-p than for CeraSurf-w.[178] In 2021, Petitioner conducted further testing and analysis, again to demonstrate that its CeraSurf-p material has greater hardness and greater flexural strength than its CeraSurf-w material from that year.[179]

Dr. Mecholsky's critique of Petitioner's analysis of and conclusions from its CeraSurf-p and CeraSurf-w testing data was filed in this proceeding as entirely confidential.[180] We therefore discuss Dr. Mecholsky's numerous criticisms in general

177 Haftel Decl., 59 TTABVUE 7-9, ¶¶ 18-23; and Exhs. 2-4, 58 TTABVUE 35-64 (confidential).

178 Haftel Decl., 59 TTABVUE 9-10, ¶¶ 26-26; and Exh. 5, 58 TTABVUE 65-67.

179 Haftel Rebuttal Decl. 138 TTABVUE 2-3, ¶¶ 4-5; and Exhs. 1-2, 137 TTABVUE 5-48 (confidential).

180 The critique from Dr. Joseph Kadane (Respondent's statistics expert) of Petitioner's CeraSurf-p and CeraSurf-w testing data mirrors that of Dr. Mecholsky, except from a statistical analysis point of view. Kaden Rpt. 103 TTABVUE 21-31, ¶¶ 26-43. Dr. Kadane's critique too was filed in this proceeding as entirely confidential. Like Dr. Mecholsky, Dr. Kadane opines that, over time, the hardness of Petitioner's pink samples increased. This increase, Dr. Kadane says, was not related to chromium oxide concentration because, over time, all of the pink samples had the same amount of chromium oxide by percentage of weight. To determine whether the inclusion of chromium oxide increases the hardness of a sample, says Dr. Kadane, it is necessary to compare samples from the identical time periods. According to Dr. Kadane, Petitioner's data from 2013-2016 was unreliable for the reasons explained by Dr. Mecholsky. Thus, the only reliable test data Petitioner provided, from 2010, shows at best weak evidence that the 2010 pink samples were harder than the 2010 white samples. Petitioner's statistics expert, Dr. Arnold Barnett, opines that Dr. Kadane's remedy of excluding the vast majority of Petitioner's pink measurements between 2010 and 2020 is far more extreme than warranted. Dr. Barnett's analyses that compare pink measurements with a far larger data set from the disputed time periods generates statistically-significant

terms. In the Colorado Litigation, Dr. Mecholsky investigated the hardness testing performed by Petitioner and concluded that Petitioner's hardness testing failed to show that chromium oxide had any impact on the hardness of Petitioner's material.[181] Among other things, Dr. Mecholsky concluded that:

- Even assuming that there is some hardness difference between Petitioner's Cerasurf-w and Cerasurf-p materials, it is an inconsequential difference that would not have any impact on the performance of Petitioner's white and pink ZTA materials when used in hip implant components.[182]
- The hardness of Petitioner's pink material increased over time. If Petitioner's pink material went from the same hardness as its white material to slightly harder over a number of years, without any change in chromium content, then chromium must not be responsible for any hardness improvement in the pink material. If chromium was causing the pink material to be harder, it would have been harder in 2010, and would not have gotten harder between 2010 and 2016, without any chromium increase. Thus, something else must be responsible for the hardness increase. The potential causes of this apparent change in hardness include one or more of: measurement inconsistencies; differences in processing over time; improvements in the hardness measurement technique and procedure; differences in the number of samples tested (far more pink than white); and improper, and/or inconsistent, measurement techniques.[183]
- In 2011, Petitioner opened a new facility, and powder production was performed at this new facility sometime after that date. This new facility helped solve contamination and processing issues that Petitioner was experiencing with its material. Thus, the processing and manufacture of Petitioner's ZTA materials went through significant change between 2010 and 2012.[184]

---

evidence that chromium oxide increases the hardness of Petitioner's ZTA samples. Kadane Rpt., 56 TTABVUE 15-24, ¶¶ 23-38.

[181] Mecholsky TTAB Rpt., 112 TTABVUE 59, ¶ 98.

[182] Mecholsky Lit. Rpt., 106 TTABVUE 128, 137, 151-52, ¶¶ 204, 225, 227, 246 and 249.

[183] Mecholsky Lit. Rpt., 106 TTABVUE 128, 133-34, 136, 137-150, ¶¶ 205, 216, 223, 226, 228-241 and 243.

[184] Mecholsky Lit. Rpt., 106 TTABVUE 129, 135, 150, ¶¶ 207, 219, 221 and 245; *See also* Steven Hughes Colorado Litigation trial testimony ("Hughes Lit. Testim."), RNOR1, 70 TTABVUE 71-74 and Frank Anderson Colorado Litigation trial testimony ("Anderson Lit. Testim."), RNOR1, 70 TTABVUE 246-248.

- Dr. Mecholsky noted several irregularities calling into question the hardness measurements and the ultimate conclusions reached by Petitioner. Any hardness differences Petitioner found was due to one or more of the following deficiencies or discrepancies: differences in the number of samples tested (far more pink than white), differences in the timing and testing and powder preparation from which the samples were made, differences in testing methods over time, differences in material processing.[185]

Mr. Haftel appears to agree with Dr. Mecholsky's conclusion that Petitioner has gotten better at making ceramic samples over time including "getting better repeatability out of the preparation process." Mr. Haftel also notes that Petitioner has seen improvements to both its pink and white material over time, but that "there [are] not a lot of data points" with regard to any potential improvement in the white material. Mr. Haftel notes that Petitioner produces pink material on a regular basis, but, with the exception of two batches made in 2020, does not regularly produce white material.[186]

As Dr. Mecholsky noted during the Colorado Litigation, Petitioner's hardness testing was performed at different times, on samples created during different time periods, and using different techniques. An analysis of Petitioner's pre-2016 hardness testing showed that four different testing methods were used.[187] The measurement variance in Petitioner's testing of its white samples alone appears to be atypically

[185] Mecholsky Lit. Rpt., 106 TTABVUE 130-135, ¶¶ 210-215 and 218.

[186] Mecholsky TTAB Rpt., 112 TTABVUE 60, ¶ 99; Haftel Discov. Depo., RNOR13, 129 TTABVUE 75-77; Haftel CX Testim. Depo., 146 TTABVUE 42-44.

[187] Mecholsky TTAB Rpt., 112 TTABVUE 60, ¶ 101; Mecholsky Lit. Rpt., 106 TTABVUE 131, ¶ 213; Haftel CX Testim. Depo., 146 TTABVUE 42-44.

high, having a wide range of potential testing values, making it less likely to accurately represent the properties of the material.[188]

According to Dr. Mecholsky, there are many potential explanations for measurement variance that have nothing to do with chromium content in a material, including differences in: testing machinery, testing methodology, testing machine calibration, electronic measuring equipment calibration, the skill of the technicians performing the tests and taking the measurements, the performance of visual versus automatic measurements; material variability, such as surface finish, and processing methods.[189]

Even if Petitioner's pink material is, on average, harder than its white material, as Petitioner's average of hardness measurements suggests, Dr. Mecholsky opines such difference is slight, having no functional effect on the quality of the ceramic material produced. The ceramics used to make hip implant components are very hard, and small changes in hardness (on the order of the changes that Petitioner is arguing exist in these proceedings) do not impact the performance or function of the material used to produce the hip implant components.[190]

Dr. Mecholsky also says his criticisms discussed above of Petitioner's hardness testing apply to its fracture toughness testing measurements of its pink and white materials as well. Dr. Mecholsky notes Mr. Haftel's belief that a further "scientific

---

[188] Mecholsky TTAB Rpt., 112 TTABVUE 60-61, ¶ 102.

[189] Mecholsky TTAB Rpt., 112 TTABVUE 61, ¶ 103; Mecholsky Lit. Rpt., 106 TTABVUE 133-34, ¶ 215.

[190] Mecholsky TTAB Rpt., 112 TTABVUE 61-62, ¶ 104; Mecholsky Lit. Rpt., 106 TTABVUE 151, ¶¶ 246-47.

endeavor" would be required to draw any conclusion that Petitioner's pink material is tougher than its white material.[191]

Dr. Carty reviewed Petitioner's comparative hardness and flexural strength test results of Petitioner's pink CeraSurf-p product and its white CeraSurf-w product. In Dr. Carty's opinion, Petitioner's data confirms that chromium oxide affects the material's hardness. Specifically, Petitioner's hardness testing data shows significantly higher values in hardness for CeraSurf-p over CeraSurf-w. Additionally Petitioner's flexural strength test data shows significantly higher values in flexural strength in CeraSurf-p as compared to CeraSurf-w.[192]

Responding to Dr. Mecholsky's criticisms of Petitioner's testing data, Dr. Carty says that even though there is scatter (outliers in the measurement observations) in the data, hardness measurably increases with the addition of chromium oxide, even at the low levels observed in Petitioner's chromium-doped ZTA.[193] Dr. Carty was not surprised that the hardness properties of Petitioner's pink ZTA material changed over time, because this was also true with respect to Respondent's pink ZTA material based on Respondent's data Dr. Carty analyzed.[194] Finally, Dr. Carty points out that

---

[191] Mecholsky TTAB Rpt., 112 TTABVUE 62, ¶ 105; Haftel CX Testim. Depo., 146 TTABVUE 50-52.

[192] Carty Rpt. 48 TTABVUE 61-64, ¶¶ 134-39 (confidential); 60 TTABVUE 62-65, ¶¶ 134-39 (charts redacted).

[193] Carty Rebuttal Rpt., 153 TTABVUE 26, ¶ 65.

[194] Carty Rebuttal Rpt., 141 TTABVUE 27, ¶ 66 (confidential).

the documents on which Dr. Mecholsky relied in criticizing Petitioner's fracture toughness data were actually measurements of flexural strength.[195]

As to the additional testing data that Petitioner provided for its ZTA ceramic products for 2021, it appears that the backup documentation on Mr. Haftel's summary chart (in his rebuttal declaration) was not provided for Petitioner's white, CeraSurf-w product; only for Petitioner's pink, CeraSurf-p product.[196] This renders Mr. Haftel's summary chart suspect as it purports to include testing data for both products.

Respondent's experts, Drs. Mecholsky and Kadane, as well as the cross-examination of Jonathan Haftel, raised sufficient concerns about Petitioner's processing and testing methods, data collection, reporting and conclusions reached over the relevant time period to cast doubt on the probative value of this evidence. We further find wanting the efforts of Petitioner's experts, Drs. Carty and Barnett, to explain away Respondent's critique of Petitioner's testing data.

### G. Petitioner's Survey Evidence

Petitioner's expert, Dr. Sara Parikh, prepared and conducted a survey of orthopaedic surgeons to establish that the primary significance of the color pink used in the context of hip implant components is to tell orthopaedic surgeons from what type of material the hip implant component is made. Ninety percent of respondents in Dr. Parkih's survey considered the color pink used in the context of hip implant

---

[195] Carty Rebuttal Rpt., 153 TTABVUE 228-29, ¶ 67.

[196] Haftel CX Testim. Depo., 146 TTABVUE 77-81, 554-556 Exh. 6 at ¶¶ 4-5.

components to be an indicator of the material composition of the component, and 85% consider it to indicate that the material is ceramic.[197] Dr. Parikh's test stimulus was a BIOLOX delta (pink) hip joint ball or head; the control stimulus was a BIOLOX forte (ivory) hip joint ball or head.[198] Dr. Parikh's understanding of "primary significance" refers to the general meaning of something, for example when someone encounters something what it tells them, brings to mind or connotes.[199]

Respondent's survey expert, Robert Klein, opines that neither the methodology nor the primary question employed by Dr. Parikh tests for or measures functionality. Dr. Parikh conceded during her cross-examination that her survey did not test for functionality.[200] Instead, Dr. Parikh's survey purports to measure the "primary significance" of the color pink for a femoral ball hip implant component. The "primary significance" of a trademark, however (says Mr. Klein), commonly relates to the issue of whether a mark is generic; it is not the proper methodological inquiry for measuring any alleged functionality of a mark.[201] That is, the key question of Dr. Parikh's survey: "What, if anything, does the color tell you about the hip implant component in the photograph? Please be specific," in no way inquires as to whether the color pink is essential to the use or purpose of a hip implant component (the

[197] Parikh Decl., 47 TTABVUE 2, ¶ 3; Parikh Rpt., 47 TTABVUE 4-40 at 19-20.

[198] Parikh Rpt., 47 TTABVUE at 32-33.

[199] Parikh CX Testim., 152 TTABVUE 24-25.

[200] Parikh CX Testim., 152 TTABVUE 18-22. In fact, Dr. Parikh conceded that she had never worked on a functionality survey before. 152 TTABVUE 22-24.

[201] Klein Decl., 84 TTABVUE 6, ¶ 16.

considerations used to determine whether trade dress is functional based on utilitarian concerns).[202] Mr. Klein's other criticisms of Dr. Parikh's survey include:

- The question presented to the respondents was leading;[203] and
- The near identical answers and their virtually identical distribution in Dr. Parikh's test and control cells when comparing material responses contradicts Dr. Parikh's conclusion that the primary significance of the color pink, used in this context, is to tell orthopedic surgeons from what type of material the hip implant component is made.[204]

Other problems with Dr. Parikh's survey methodology were elicited from her during cross-examination, namely:

- The survey universe was too broad, in that it included both users and prospective users of metal and ceramic hip implant components. That is, they could use any type of material as implant components in the surgeries that they perform, and they would still qualify for Dr. Parikh's survey. Even an orthopedic surgeon who had never used a ceramic hip implant component before, or an orthopedic surgeon who would never consider using a ceramic hip implant component were considered part of the survey universe.[205]
- Dr. Parikh did not screen for respondents who were familiar with ceramic hip implant components in particular. Dr. Parikh did not know whether it was possible that respondents in her survey may never have used ceramic hip implant components before in their surgeries.[206]
- In reporting her results, Dr. Parikh did not "net out" (subtract) the ivory (control) survey results from the pink (test) survey results. This is important, because one of the conclusions Parikh drew when she looked at the results in the test group and in the control group was that the results were similar in several respects; if not virtually identical.[207]

---

[202] Klein Decl., 84 TTABVUE 6-7, ¶ 17.

[203] Klein Decl., 84 TTABVUE 7, ¶ 19. Dr. Parikh agreed on cross-examination that questions which are suggestive or leading in nature are an inappropriate Parikh CX Testim., 152 TTABVUE 31-34).

[204] Klein Decl., 84 TTABVUE 8, ¶¶ 20-21.

[205] Parikh CX Testim., 152 TTABVUE 37-40.

[206] Parikh CX Testim., 152 TTABVUE 43-46.

[207] Parikh CX Testim., 152 TTABVUE 53-56.

Respondent's critique raised significant concerns – with which we agree – regarding Dr. Parikh's survey methodology (namely, a leading question, insufficient accounting for control group results, an overly broad survey universe and insufficient screening of survey respondents). These concerns alone cast significant doubt on the probative value of Petitioner's survey evidence.

Our greater problem with Petitioner's survey is that it asked the wrong question. Inquiring about the primary significance to orthopaedic surgeons of the color pink in connection with a hip implant component in no way seeks to resolve the issue involved in this case: whether pink as applied to a ceramic implant component is functional from a utilitarian perspective. On cross-examination, Dr. Parikh testified that her survey did not test for functionality. For this reason alone, we give Petitioner's survey evidence no probative weight.

## XVI. Entitlement to a Statutory Cause of Action

A plaintiff's entitlement to invoke a statutory cause of action for opposition or cancellation is a necessary element in every inter partes case. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021). To establish entitlement to a statutory cause of action under Trademark Act Section 14, 15 U.S.C., § 1064, a plaintiff must demonstrate "an interest falling within the zone of interests protected by the statute and … proximate causation." *Corcamore,* 2020 USPQ2d 11277, at *4 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067-70 (2014)).[208] Stated

[208] Our decisions have previously analyzed the requirements of Trademark Act Sections 13 and 14, 15 U.S.C. §§ 1063-64, under the rubric of "standing." We now refer to this inquiry as

another way, a plaintiff is entitled to bring a statutory cause of action by demonstrating a real interest in the proceeding and a reasonable belief of damage from the registration. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021); *see also Empresa Cubana Del Tabaco v. Gen. Cigar Co.,* 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014).

There is "no meaningful, substantive difference between the analytical frameworks expressed in *Lexmark* and *Empresa Cubana*." *Corcamore*, 2020 USPQ2d 11277 at *4. Thus, "a party that demonstrates a real interest in canceling a trademark under [Trademark Act Section 14, 15 U.S.C.] § 1064 has demonstrated an interest falling within the zone of interests protected by § 1064. Similarly, a party that demonstrates a reasonable belief of damage by the registration of a trademark demonstrates proximate causation within the context of § 1064." *See Corcamore*, 2020 USPQ2d 11277 at *7.

When Petitioner first sought to enter the ceramic hip replacement component market as a competitor to Respondent, Petitioner was aware of Respondent's then-extant patent rights covering ceramics containing chromium oxide. In developing its first ceramic component products, Petitioner waited to introduce its

---

entitlement to a statutory cause of action. Despite the change in nomenclature, our prior decisions and those of the Federal Circuit interpreting Trademark Act Sections 13 and 14 remain applicable. *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388, at *2 (TTAB 2020).

products until Respondent's '816 patent had expired in 2013.[209] Upon introduction of Petitioner's pink ceramic component products, Respondent caused them to be seized at a Paris trade show. This event was the first time Petitioner became aware that Respondent claimed trademark rights in the color pink for the compound used to make ceramic hip implant components.[210] Following the seizure, Respondent sent Petitioner a cease-and-desist letter, dated November 20, 2013, reading in part as follows:

> At [a trade show] … that took place in Paris [in] … November 2013, [Respondent] … learn[ed] about [Petitioner's] pink coloured hip joint balls. As you know, [Respondent] … immediately requested … an authorization to have an infringement seizure conducted by a court bailiff during the [trade show] … which was granted …. We initiated these measures because [Respondent] considers this use of the colour pink in connection with hip joint balls as an infringement of its trademark rights and … unfair competition.
>
> As you know as being a direct competitor, [Respondent] … is [a] .. manufacturer of technical ceramics, specializing in the development, manufacture and distribution of … products made of ceramics …. [Respondent] … has been producing ceramic components for the manufacturer of hip implants for more than 30 years.
>
> In 2004, [Respondent] … launched a new product line of hip joint balls and hip shells as well as other hip and knee joint components named BIOLOX-delta[,] … distinguished by the unusual and unique colouring in pink ….
>
> * * *
>
> [Respondent] has applied for various trademarks worldwide illustrating its pink coloured hip joint balls. Several registration proceedings are already completed …. In other countries, the applications are at least already published ….
>
> * * *

---

[209] Jonathan Haftel Colorado Litigation trial testimony ("Haftel Lit. Testim."), PNOR2, 42 TTABVUE 103-104; Haftel Decl., 59 TTABVUE 4-5, ¶¶ 9-11.

[210] Hughes Lit. Testim., PNOR2, 42 TTABVUE 85-88.

> The … colouring of [Petitioner's] … implant components … infringes [Respondent's] … trademark rights and violates unfair competition law.
>
> [Petitioner's pink] colour [on its products] …constitutes a likelihood of confusion. The relevant public of implant manufacturers, orthopaedists and surgeons will … assume that [Respondent] … is the manufacturer or cooperates with [Petitioner].
>
> * * *
>
> [**Respondent**] will not tolerate this infringement of its rights and **is willing to commence legal action in each and every country in which it is necessary to stop the use of the colour pink**.[211] (emphasis added).

As discussed earlier, nearly simultaneous with its filing of these cancellation proceedings, Petitioner filed an action for a declaratory judgment of non-infringement and for cancellation of Respondent's trademark registrations in Colorado federal court. Respondent counterclaimed for infringement and unfair competition with respect to its asserted trademark rights in the color pink.

Based on the foregoing, Petitioner has demonstrated that its interest in cancellation of Respondent's registrations falls within the zone of interests protected by the statute, and Petitioner has a reasonable belief that damage is proximately caused by continued registration of Respondent's asserted marks. *See Tanners' Council of Am., Inc. v. Gary Indus., Inc.*, 440 F.2d 1404, 169 USPQ 608, 609 (CCPA 1971) ("It seems clear enough that registration of the mark as applied for could weaken the sales positions of appellants' members and hence reduce the income of appellant. We think this last factor is alone sufficient to bring appellant within the category of 'any person who believes he would be damaged' by the registration.");

[211] Respondent's cease-and-desist letter, PNOR5, Exh. 12, 45 TTABVUE 272-93.

*McGowen Precision Barrels, LLC v. Proof Research, Inc.*, 2021 USPQ2d 559, at *17-17 (TTAB 2021) (entitlement to a statutory cause of action found where Respondent filed complaint in federal court against Petitioner as the defendant, alleging that gun barrels being manufactured and sold by Petitioner's sister company infringed Respondent's registered trademark rights); *Ipco Corp. v. Blessings Corp.*, 5 USPQ2d 1974, 1977 (TTAB 1988) (Opposer's "use of the word [CONFIDENCE] on its brochures, its right to continue such use, and the cease and desist letter sent by applicant, evidence a sufficient interest by opposer to demonstrate its [entitlement to a cause of action]."). Petitioner has thus established its entitlement to petition for cancellation of Respondent's registrations.

## XVII. Functionality: Applicable Law and Analysis

Generally, for matter claimed as trade dress to be capable of protection as a "mark," it must be distinctive and not functional. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 23 USPQ2d 1081, 1084 (1992). These also are requisites when the claimed "mark" is a particular color applied to the entirety of a product. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 34 USPQ2d 1161, 1163-64 (1995) (green-gold as applied to dry cleaning press pads); *Brunswick Corp. v. British Seagull Ltd.*, 35 F.2d 1527, 32 USPQ2d 1120, 1121-22 and 1125 (Fed. Cir. 1994), *cert. denied*, 514 U.S. 1050 (1995) (black as applied to outboard boat motors). Petitioner has not pled that the color pink as applied to Respondent's hip implant components lacks distinctiveness, and the parties have not argued that question in their briefs. The sole issue to be decided in these proceedings pertaining to Respondent's trademark rights is functionality.

The Trademark Act does not exist to reward manufacturers for their innovations. "It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time …, after which competitors are free to use the innovation." *Qualitex*, 34 USPQ2d at 1163. "[T]rademark … law can[not] properly make an 'end run' around the strict requirements of utility patent law by giving equivalent rights to exclude." J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:64 (5th ed., Sept. 2022 update). Thus, a product feature that is functional "is incapable of registration on either the Principal or Supplemental Register." *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107 U.S.P.Q.2d 1829, 1837 (TTAB 2013). Accordingly, Trademark Act Section 2(e)(5), 15 U.S.C. § 1052(e)(5), prohibits registration of "a mark which ... comprises any matter that, as a whole, is functional."

There are two types of functionality recognized by controlling case law. One formulation states that "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982). This we refer to as "utilitarian functionality." The other theory of functionality posits "that, if a design's 'aesthetic value' lies in its ability to 'confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs,' then the design is 'functional.' … The 'ultimate test of aesthetic functionality,' … [under this theory], 'is whether the recognition of trademark rights would significantly hinder competition.'" *Qualitex*, 34 USPQ2d at 1165 (citing RESTATEMENT (THIRD) OF UNFAIR

COMPETITION § 17, Comment c, pp. 175-176 (1993)). This we refer to as "aesthetic functionality." It is clear from our reading of the pleadings, evidence and briefing in this case that Petitioner's functionality claim under Trademark Act Section 2(e)(5) is based on functionality based on utilitarian considerations and not aesthetic functionality. Neither Petitioner nor Respondent argue otherwise.

The Court of Customs and Patent Appeals, in *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982), suggested four factors to consider when evaluating utilitarian functionality:

> (1) the existence of a utility patent that discloses the utilitarian advantages of the registered subject matter;
>
> (2) advertising by the registrant that touts the utilitarian advantages of the subject matter;
>
> (3) facts pertaining to the availability of alternative designs; and
>
> (4) facts pertaining to whether the subject matter results from a comparatively simple or inexpensive method of manufacture.

*See also, In re Change Wind Corp.*, 123 USPQ2d 1453, 1456 (TTAB 2017) ("*Morton-Norwich* identifies four nonexclusive categories of evidence which may be helpful in determining whether a particular design is functional[.]").

However, the U.S. Supreme Court has stated that if functionality is established under the *Inwood* test (essential to the use or purpose of the article or affecting the cost or quality of the article), a full analysis of all types of *Morton-Norwich* evidence is not necessary. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006-07 (2001) ("Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for

the feature. … There [also] is no need, furthermore, to engage … in speculation about other design possibilities, … which might serve the same purpose. ... Other designs need not be attempted.”).

The U.S. Court of Appeals for the Federal Circuit later had occasion to comment on the Supreme Court’s observations in *TrafFix*:

> We do not understand the Supreme Court’s decision in *TrafFix* to have altered the *Morton-Norwich* analysis. … [T]he *Morton-Norwich* factors aid in the determination of whether a particular feature is functional, … [one] factor focus[ing] on the availability of “other alternatives.” (citation omitted). … Nothing in *TrafFix* suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court’s observations in *TrafFix* as rendering the availability of alternative designs irrelevant. Rather …, once a product feature is found functional based on other considerations [such as if it “affects the cost or quality of the device,”] there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available. But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.

*Valu Eng’g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1427 (Fed. Cir. 2002).

Functionality is a question of fact and depends on the totality of the evidence in each particular case. *Valu Eng’g*, 61 USPQ2d at 1424. Petitioner bases its functionality claim on an application of the *Morton-Norwich* factors, and Respondent equally argues the non-application of those factors to its trademark rights.[212] We consider the *Morton-Norwich* factors to the extent raised in the arguments and based on the evidence made of record. All four *Morton-Norwich* factors need not be

[212] Petitioner’s Brief, 158 TTABVUE 41-51; Respondent’s Brief, 160 TTABVUE 40-49.

considered or proven in every case, nor do all four factors have to weigh in favor of functionality to support a functionality refusal. *Poly-America*, 124 USPQ2d at 1514. However, for the sake of completeness, we will address each *Morton-Norwich* factor below.

**A. Respondent's Utility Patents and Patent Application**

As the Supreme Court said long ago, "there passe[s] to the public upon the expiration of [a] patent … the right to make the article as it was made during the patent period …." *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 39 USPQ 296, 299 (1938). That is because "[s]haring in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all – and in the free exercise of which the consuming public is deeply interested." *Id.* at 301. The public policy as stated in *Kellogg* has been brought into the modern age by the Supreme Court's functionality case law; particularly when expired patent rights are involved.

Whether one can assert trademark rights following the expiration of its utility patent is not newly trodden ground in trademark law. For example, in *TrafFix*, the plaintiff, Marketing Displays, Inc. ("MDI") was the holder of two utility patents for a two-spring mechanism (the "dual-spring design") to keep outdoor signs upright despite adverse wind conditions. After the patents expired, a competitor, TrafFix Devices, Inc. ("TrafFix"), sold sign stands with a visible spring mechanism that looked like MDI's. MDI brought suit against TrafFix for, inter alia, trade dress infringement based on the copied dual-spring design. *TrafFix*, 58 USPQ2d at 1003-04. The district court granted summary judgment to TrafFix, in part on the basis that MDI's asserted dual-spring design was functional. *Id.* at 1004. The court of appeals reversed,

suggesting that the district court committed legal error in its functionality ruling on the dual-spring design. *Id.*

Considering the legal significance of an expired utility patent on a trade dress claim, the Supreme Court stated:

> A prior patent, we conclude, has vital significance in resolving the trade dress claim. **A utility patent is strong evidence that the features therein claimed are functional**. If trade dress protection is sought for those features the strong evidence of functionality based on **the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection**. Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must **carry the heavy burden of showing that the feature is not functional**, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device. … Th[is] rule … bars [a] … trade dress claim [when the plaintiff] … cannot[] carry the burden of overcoming the strong evidentiary inference of functionality based on the disclosure of the [invention] … in the claims of the expired patents.

*Id.* at 1005 (emphasis added).

Our inquiry whether a utility patent renders asserted trade dress functional is not limited to our examination of the patent's claims:

> The inquiry into whether such features, asserted to be trade dress, are functional by reason of their inclusion in the claims of an expired utility patent could be aided by **going beyond the claims and examining the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention**.

*Id.* at 1005 (emphasis added); *see also*, *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1478 (TTAB 2017) (Our "analysis requires us to do what we must do in considering Applicant's issued United States patents to determine whether the claims and disclosures in the patent show the utilitarian advantages of the design

sought to be registered as a trademark.") (citing *In re Becton, Dickinson and Co.*, 675 F.3d 1368, 102 USPQ2d 1372, 1377 (Fed. Cir. 2012)). The Supreme Court, in fact, did just that in *TrafFix* by looking not only at the claims of MDI's expired patents but also their specifications and "statements made in the patent applications and in the course of procuring the patents demonstrat[ing] the functionality of the design." *TrafFix*, 58 USPQ2d at 1006.

The exception to the general rule expressed in *TrafFix* is stated as follows:

> In a case where a manufacturer seeks to **protect arbitrary, incidental, or ornamental aspects of features** of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, **a different result might obtain**. There the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent.

*Id.* at 1007 (emphasis added).

We start with the parties' agreement that the addition of chromia to a ZTA ceramic causes the material to become pink. In further support of its argument that practicing the '816 patent renders Respondent's pink trade dress functional, Petitioner directs us to (1) Respondent's admitted practicing of the claimed invention in its BIOLOX delta product, with each patent claim including the presence of chromium oxide, (2) statements made in the patent's specification regarding the benefits of chromia to the mechanical properties of the material, and (3) assertions made by Respondent's patent counsel during prosecution regarding the addition of chromia in a specified ratio to the other chemical additives (alumina and zirconia) in

order to overcome prior art;[213] all of which we set out in detail above. Looking at this evidence collectively, the claims, specification and prosecution history of the '816 patent disclose the functional benefits of chromia with respect to the toughness, hardness, stability and suppression of brittleness of the ZTA ceramic.

Petitioner also directs us to Respondent's '955 and '970 patents, the disclosures of which discuss the benefits of chromia to toughness and hardness; as well as Respondent's '237 application that discusses the benefits of Cr-doping to make the material particularly suitable for medical applications.[214]

Respondent asserts that the expired '816 patent does not, by the evidentiary presumptions outlined in *TrafFix*, render its trade dress functional because pink is not claimed in the patent.[215] However, Respondent readily concedes that a pink ceramic results from the implementation of the patent.[216] Nonetheless, Respondent argues that the patent claims a range of chromium that could naturally produce a broader range of pinkish hues ("almost white, red, or purple").[217] However, "[t]he fact that the patent[] may encompass a wide variety of [design variations] means only that the patent[] [is] broad in scope, not that [Respondent's] particular [registered]

---

[213] Petitioner's Brief, 158 TTABVUE 16-17.

[214] Petitioner's Brief, 158 TTABVUE 17.

[215] Respondent's Brief, 160 TTABVUE 41. Respondent's corollaries to this argument are that "[o]ne can practice the patent's claims without yielding a pink product, and … one can produce a pink-colored hip implant component without practicing the patent." Respondent's Brief, 160 TTABVUE 41. These arguments at best are the product of circular reasoning; at worst a red herring.

[216] Respondent's Brief, 160 TTABVUE 43.

[217] Respondent's Brief, 160 TTABVUE 42.

design is not functional." *McGowen Precision Barrels,* 2021 USPQ2d 559, at *75. Respondent's further statement that "the color pink is not a natural byproduct of practicing [its] … patent"[218] is thus a non sequitur. In any event, we need not, and do not, constrict our inquiry to the '816 patent claims. As noted above, the patent's specification and prosecution history provide additional evidence regarding the contribution of chromia to the inventions claimed therein.

Respondent further contends that the so-called "central advance" of the '816 patent is not directed to the improvement of the composition for hip implant components, but rather for cutting tools.[219] This argument fails for two reasons. First, Respondent derives its "not the central advance" theory from a passing comment in *TrafFix*, 58 USPQ2d at 1005 ("the central advance claimed in the expired utility patents … is the dual-spring design"). This passing comment comprises neither a holding of nor arguably even dicta from *TrafFix*. Second, as noted numerous times in the record, even though the ZTA chemical combination developed, produced and now sold under the name BIOLOX delta originally was conceived for cutting tools, it has since been optimized for medical use – specifically for prosthetic hip joint components – with ZTA formulations including chromium oxide as contributing to the desired mechanical properties of hardness, toughness and strength.

We thus find that the expired '816 patent, as supported by the statements made in the '955 and '970 patents and the '237 application combined with Respondent's

---

[218] Respondent's Brief, 160 TTABVUE 42.

[219] Respondent's Brief, 160 TTABVUE 43-44.

admissions that the addition of chromia renders the ZTA ceramic pink, is strong evidence that the color pink for ceramic hip implant components is functional. We further find that the color pink is not merely an ornamental, incidental, or arbitrary aspect of what is disclosed in the patent, but rather the natural byproduct of practicing the patent. *See McGowen Precision Barrels,* 2021 USPQ2d 559, at *81 ("[T]he appearance of the barrel [resulting from practicing expired patent] is dictated by its function").

### B. Respondent's Advertising and Other Public Statements Touting Utilitarian Advantages

"If a seller advertises the utilitarian advantages of a particular feature of its product, this constitutes strong evidence of functionality." *Kohler*, 125 USPQ2d 1468, 1502 (TTAB 2017) (quoting *Kistner Concrete Prods., Inc. v. Contech Arch Techs., Inc.*, 97 USPQ2d 1912, 1924 (TTAB 2011)). In the context of the evidence made of record, we examine the promotional literature and other public statements made by Respondent, as well as statements made on Respondent's behalf (or with its apparent permission and consent).

As noted, Respondent's hip implant components comprised of its BIOLOX delta pink ceramic material were introduced in 2003. Since at least that time until 2013, the record discloses that Respondent and its OEM customers made promotional literature available to the public extolling the benefits of chromia to the mechanical properties and performance of its compound used to make ceramic hip implant components; particularly hardness but other mechanical properties as well. Some of this literature also mentions that chromia is responsible for the pink color of the

material. As late as 2019, Respondent was still sending articles to its customers referencing the fact that chromium oxide increases the hardness of the BIOLOX delta ceramic compound.

The record also includes technical literature dated from 1966 to 2020, expressing the benefits of chromia to the mechanical properties of compound ceramics comprising or including alumina; particularly hardness, strength and wear resistance. A good number of these articles excerpted above were written or co-written by Respondent's current or former employees – such as Drs. Burger, Kuntz and Porporati. Some of these articles also mention that chromia is responsible for the pink color of the material.

The evidence further contains references to Respondent's master files submitted to the FDA in 2004, 2008, 2012 and 2013, stating that chromia contributes to the hardness of its ceramic hip components, once again mentioning that chromia is responsible for the pink color of the material. Respondent did not alter or revise these statements made in its FDA filings until 2015.

Collectively, the above statements regarding the contribution of chromia to the mechanical properties of BIOLOX delta made by Respondent or its OEM customers in scientific literature, filings with the FDA, and advertising and marketing activities, served to educate the relevant market for an extended period of time that hip replacement components made from ceramic compositions including chromia (thus turning the compound pink) were superior in mechanical performance.

In the context of Respondent's current litigation position that chromia does not contribute to the mechanical properties or performance of ceramic hip implant components, contrary to what Respondent has publicly stated over an extended period of time, Respondent's internal correspondence made of record in these proceedings is probative:

- **Challenges - new Branding + Advertising Campaign**: In former times were [sic] our market share was low a higher price of our technology was not a big problem. … This have [sic] changed dramatically - WW increasing demands for Ceramics … BIOLOX is going in the direction of "Commodity " … Increasing price pressure for our customers in their hospital price negotiations … BIOLOX Patents expired … Risk that cheaper Generika [sic] Ceramic from our competition will enter the market … Establishment of the color pink in conjunction with the branding BIOLOX inside [2012-2013].[220]
- **Strategy Project: Pink Trademark Protection:** Our pink color is closely connected with our Biolox Delta product in the market and thus greatly helps with Biolox Delta branding. … Now we have verifiable information that our competitors are preparing to enter the market with a ceramic in the color pink. For this reason, we are currently engaged in activities designed to obtain trademark protection for the color pink in connection with orthopedic implants [2013].[221]
- The Coorstec [sic] guys are not just "ceramic bloody starters", in my eyes their current strategy will become very very dangerous for us and this very very soon. … This is conjunction with our pricing strategy were we [sic] blaming all of our customers and destroying long term relationships - this is poison for us. … The feedback we got so far from customers is absolut[e]ly negativ[e] – all of them are looking for alternatives. Nobody is understanding and also not accepting our current approach. It's coming at the wrong time [2014].[222]

---

[220] Review 2012 and BIOLOX Brand: New Slogan, New advertising Campaign Message 2013, PNOR1, Exh. 9, 41 TTABVUE 201-274 at 233.

[221] Internal memorandum from Dieter Burkhardt, October 17, 2013, PNOR1, Exh. 8, 41 TTABVUE 197-200 at 199 (English translation).

[222] Email from Dieter Burkhardt, November 27, 2014, PNOR1, Exh. 6, 41 TTABVUE 145-151 at 147.

The impression we are left with is that Respondent sought trademark protection to stave off competition after the expiration of its patent protection. We find Respondent's extended and continual advertising and other public statements (made at least until the institution of these proceedings), highlighting the utilitarian advantages of chromia in its ceramic product mix and that adding chromia turns the product pink, constitute strong evidence of functionality.

### C. Facts Pertaining to the Availability of Alternative Designs

Although above we found that pink is a natural byproduct of the manufacturing process for Respondent's BIOLOX delta chemical composition, we examine the *Morton-Norwich* "alternative designs (or colors) factor" to determine if it weighs against a finding of functionality. To consider this question, we begin with the understanding that there are only a few companies that make these ceramic hip implant components because of the technical challenges involved; there are only a few companies that have the proper technology.[223]

Respondent provided evidence that, in addition to Respondent's components, OEM customers purchase other manufacturers' ceramic components – produced and sold in different colors – and integrate them into their own total hip replacement systems, which are then sold to hospitals or buying associations. Respondent cites the following examples: a Swiss company called Metoxit AG offers blue and peach-colored ceramic hip implant components; a Japanese company called Kyocera offers a blue ceramic hip implant component; a Swiss company called Mathys AG

[223] Haftel Lit. Testim., RNOR1, 70 TTABVUE 147-48.

manufactures and sells a white ceramic hip implant component; and Smith & Nephew offers a black ceramic-coated hip implant component.[224]

A problem we have with these examples is that, except for Kyocera,[225] Respondent has not provided evidence that the competitors' products are equivalent in desired ceramic mechanical properties to those of Respondent. *See Valu Eng'g*, 61 USPQ2d at 1427 (discussing that the law of functionality considers in part "[t]he existence of **actual or potential alternative designs that work equally well** [which] strongly suggests that the particular design used by plaintiff is not needed by competitors to effectively compete on the merits." (emphasis added)) (citing J. Thomas McCarthy, 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 7:75, 7-180-1 (4th ed. 2001)).

In view of the dearth of probative evidence, we find the presence or absence of alternative "designs" (colors) to be a neutral factor regarding our ultimate determination whether the color pink for the products of interest is functional.

### D. Whether the Subject Matter Results from a Comparatively Simple or Inexpensive Method of Manufacture

Petitioner is not aware of any difference in the overall cost for manufacturing its pink and white products, whether in manufacturing or raw material. They are pretty similar to make and manufacture.[226] Respondent, on the other hand, believes that because the raw material yttrium chromite is much more expensive than if

[224] Petkow Decl., 114 TTABVUE 5, ¶ 13, 115 TTABVUE 104-131, Exhs. 2-5.

[225] As to the competitive equivalence of Kyocera's product, *see, e.g.,* Dieter Burkhardt Colorado Litigation Testimony ("Burkhardt Lit. Testim."), PNOR2, 42 TTABVUE 9-14; Kuntz Lit. Testim., PNOR2, 42 TTABVUE 198-99 and DNOR1, 70 TTABVUE 423; Haftel Lit. Testim., DNOR1, 70 TTABVUE 146-47; Kuntz Decl., 101 TTABVUE 17, ¶ 47.

[226] Hughes Lit. Testim., RNOR1, 70 TTABVUE 113.

Respondent were to use yttrium oxide, chromia does impact the cost of its product. That is, using chromia makes Respondent's product more expensive to produce.[227] In either event, in view of this testimony, we find that adding chromia to a ZTA ceramic does not make the product simpler or less expensive to make. We therefore find this *Morton-Norwich* factor to be neutral.

### E. Other Considerations

#### 1. Respondent's Testing Data

Respondent spent a great deal of time and effort to support its argument that "recent" reported experimental data should convince us that chromia has little to no impact on the desired mechanical properties of a ZTA ceramic. The experimental data to which we refer comprises the Kuntz 2014 White Paper, the Mecholsky 2016 litigation findings, the Kuntz/Krüger 2018 paper and the BAM 2018 findings from the German Litigation. As detailed above, Dr. Carty extensively criticized this research, and we find his criticisms persuasive.[228] Our additional concerns with this research over and above what Dr. Carty testified to are of a different ilk.

Specifically, the theme running through most of the experimental research offered in Respondent's favor is that the addition of chromia to a ZTA ceramic **up to 0.5% by weight** has no influence on the hardness, toughness, stiffness or mechanical

---

[227] Kuntz Lit. Testim. RNOR1, 70 TTABVUE 475-77.

[228] We are additionally troubled that the Kuntz 2014 White Paper and the Kuntz/Krüger 2018 paper appear to have been written to justify Respondent's litigation positions that are contrary to its public statements regarding chromia made for over a decade prior. We also noted above our concern that the Kuntz/Krüger 2018 paper was peer reviewed by Respondent's litigation expert, Dr. Mecholsky, who failed to disclose his conflict of interest to the publisher.

performance of the composite material. Kuntz and Krüger suggest other reasons for improvements in the material, such as grain size and final density. Dr. Porporati's research suggests that changes in yttria content have an effect on toughness, zirconia phase stabilization, and potentially wear performance of the ZTA material (although the product actually tested was yttrium chromite ($YCrO_3$), a chemical combination of yttrium and chromia, not the addition of yttrium by itself, albeit increasing the overall yttria content while keeping chromia content relatively constant).

The problem with Respondent's research is that it goes only so far, and not far enough in its scope – to address the full range of chromia content encompassed by the '816 patent. For one, suggesting other reasons for improvements in the material does not perforce exclude the contributions of chromia as well based upon the technical literature made of record. Further, we recall here the disclosures in the '816 patent that the addition of **chromium oxide in a weight ratio of 0.004 to 6.57% by weight** contributes to hardness and toughness, and can serve to counteract the embrittlement of the material. When the '816 patent expired, its claimed and disclosed inventions were dedicated to the public. *Kellogg*, 39 USPQ at 299.

In 2008, Respondent produced hundreds of specimens of varied material properties as part of an internal research project. The picture below shows Respondent's so-called "color board," containing some of the samples Respondent created along with composition information for the samples:[229]

[229] Kuntz Decl., 101 TTABVUE 16, ¶ 46.



As can be observed, the materials vary in color. The first three materials on the top left comprise a combination of alumina and chromia with no zirconia. At much higher chromia concentrations than the 0.33 wt % of BIOLOX delta, the material becomes dark red. In between the lightest shades (practically white) and the dark red are multiple gradations of pink, growing progressively darker. The materials colored blue and green were simply test samples as a proof of concept that Respondent could develop material in several different colors.[230]

What this evidence shows is that chromia can be added to the ceramic composite **in greater concentrations by weight percent than the 0%-0.5% wt. levels tested**. It is certainly possible that, based on the historical literature made of record and reviewed by both parties' materials experts, [231] greater concentrations of chromia

---

[230] Kuntz Decl., 101 TTABVUE 17, ¶ 47.

[231] Summarizing his prior testimony and reports, Respondent's materials expert, Dr. Mecholsky, suggests that we should dispense with this body of experimental research (the "older" literature from 1967 to 2013) as being of limited (if any) use in these proceedings because: (i) the compositions of ceramics addressed by the literature are either not reported or are different than the products at issue in these proceedings; (ii) the concentrations of chromium are different than the range of concentrations relevant to these proceedings; and (iii) other variables that affect material properties, such as grain size and density of the tested ceramic, are not reported. Mecholsky TTAB Rebuttal Rpt., 105 TTABVUE 393-94, ¶ 8. Petitioner's materials expert, Dr. Carty, notes that even the composition of BIOLOX delta did not remain constant during its development. However, with the exception of two testing samples, all of Respondent's samples contained chromia. Once an optimal chromia level was

by weight than those Respondent tested do contribute to the desired mechanical properties of the ceramic material and still come within the coverage of the now-expired ’816 patent. However, we do not know this because the research was not done and brought to our attention.

Thus, due to a lack of proof, we do not know whether adding levels of chromia in excess of 0.5% (by %-wt.) to the ZTA ceramic would contribute to the mechanical properties of the material, yet the material would still turn out pink – as shown in Respondent’s trademark registrations.

### 2. Petitioner’s Testing Data and Survey Evidence

Petitioner also spent a great deal of time and effort to support its argument that, over time, its pink ZTA ceramic containing chromia, CeraSurf-p, exhibited greater hardness and strength than its white ZTA ceramic not containing chromia, CeraSurf-w. As we extensively discussed above, Respondent’s experts, Drs. Mecholsky and Kadane, as well as the cross-examination of Jonathan Haftel, raised sufficient doubts about Petitioner’s processing and testing methods, data collection, reporting and conclusions reached over the relevant time period to cast doubt on the

---

established, that level was kept constant. In any event, Respondent’s developmental timeline for the BIOLOX delta composition showed that hardness clearly increased linearly with chromium content. Accordingly, different compositions (including those in the so-called “older” literature) are relevant to the ultimate issue of whether chromia contributes to the hardness of a ZTA ceramic compound. Accordingly, Dr. Mecholsky’s suggestion that measured properties in prior literature should not be considered, because they are not the same composition as BIOLOX delta, is unsupportable given the developmental timeline for the development of the BIOLOX delta compound. Carty Rebuttal Rpt. (confidential), 141 TTABVUE 11-13 ¶¶ 15-18. We decline Dr. Mecholsky’s invitation to cast aside the findings made and conclusions from the historical experimental research, published over an extended period of time in peer-reviewed articles by experts in the field.

probative value of this evidence. We further find wanting the efforts of Petitioner's experts, Drs. Carty and Barnett, to explain away Respondent's critique of Petitioner's testing data.

Petitioner's survey conducted by Dr. Parikh, to establish that the primary significance of the color pink used in the context of hip implant components, was heavily criticized by Respondent's survey expert. Further problems with Dr. Parikh's survey were uncovered during her cross-examination. As we discussed above, these survey methodology defects alone cast significant doubt on the probative value of Petitioner's survey evidence.

As we also noted above, our greater problem with Petitioner's survey is that it asked the wrong question. Petitioner's survey in no way sought to determine whether pink as applied to the compound of a ceramic implant component is functional based on utilitarian considerations. We thus give Petitioner's survey evidence no probative weight.

## XVIII. Conclusion: Functionality

Respondent's expired '816 patent, as well the other patent properties in Respondent's portfolio discussed above, disclose the utilitarian advantages of $Cr^{3+}$-doped ZTA ceramic hip replacement component materials, which as a natural byproduct turns the chemical compound pink – and that is the color shown in Respondent's Trademark Registration Nos. 4319095 and 4319096. The advertising and public statements made by Respondent and OEM customers on Respondent's behalf – for an extended period of time – touted the utilitarian advantages of chromia to Respondent's ZTA ceramic compounds; some statements made in conjunction with

the comment that the addition of chromia turns the material pink. Respondent did not withdraw these noted advertising and other public statements until the parties were in litigation and its registrations were being challenged.

Facts pertaining to the availability of alternative "designs" (colors) comprise a neutral factor here, due to the dearth of relevant evidence. In view of the parties' testimony that the use of chromia either does not affect the cost of a ZTA ceramic or makes the product more expensive, whether the addition of chromia (turning the product pink) results from a comparatively simple or inexpensive method of manufacture is also a neutral factor.

The parties' product testing data, and the survey evidence offered by Petitioner, does not change our findings with respect to the *Morton-Norwich* factors. In sum, we find that the color pink (caused by the addition of chromia) of the compound used to make ceramic hip implant components, as shown in Respondent's trademark registrations, is functional based on utilitarian considerations.

## XIX. Respondent's Unclean Hands Defense

In its Answers to both Petitions for Cancellation, Respondent alleges that "Petitioner is precluded from petitioning to cancel [Respondent's] … U.S. Registration Number[s] 4,319,095 [and] 4,319,096 by the affirmative defense of unclean hands."[232] Generally, unclean hands is an available defense in cancellation proceedings before the Board. Trademark Act Section 19, 15 U.S.C. § 1069 ("In all inter partes

[232] Answer in in Cancellation No. 92058781, 28 TTABVUE 8-12, ¶¶ 37-52; Answer in Cancellation No. 92058796, 22 TTABVUE 8-12, ¶¶ 37-52.

proceedings equitable principles … where applicable, may be considered and applied."); Trademark Rule 2.114(b)(2), 37 C.F.R. § 2.114(b)(2) ("An answer may contain any defense, including the affirmative defense[] of unclean hands, …, or any other matter constituting an avoidance or affirmative defense.").

However, we may properly exercise our discretion, when there is a strong public policy interest in removing a category of marks from the Register, to find the defense unavailable against certain claims for cancellation. *See Loglan Inst., Inc. v. Logical Language Grp., Inc.*, 962 F.2d 1038, 22 USPQ2d 1531, 1534 (Fed. Cir. 1992) ("The Board did not err in declining to apply the [unclean hands] defense[], as the public interest in a cancellation proceeding to rid the register of a generic mark transcends [this defense]."); *Maids to Order of Ohio, Inc. v. Maid-to-Order, Inc.*, 78 USPQ2d 1899, 1904 (TTAB 2006) ("[S]ince … the affirmative defense of unclean hands … is … unavailable against a claim of fraud …, we have given it no consideration."); *Am. Vitamin Prods. Inc. v. DowBrands Inc.*, 22 USPQ2d 1313, 1314 (TTAB 1992) ("Where the ground for cancellation is abandonment, equitable defenses such as … unclean hands, are not available in light of the overriding public interest in removing abandoned registrations from the register.").

We exercise our discretion now, and thus hold that the unclean hands defense is unavailable in Board functionality proceedings in view of the prevailing public interest in removing registrations of functional marks from the register. *See ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 97 USQP2d 1048, 1057 (Fed. Cir. 2010) ("the 'functionality doctrine stems from the public interest in

enhancing competition' and avoiding improper hindrance of competition in the marketplace") (citation omitted).

## XX. Culmination of Findings and Rulings

In sum, we find that the color pink for the identified goods in Respondent's Trademark Registration Nos. 4319095 and 4319096 is functional and therefore unregistrable. In view of our determination of Petitioner's functionality claim, we do not reach Petitioner's alternative claim that Respondent's Registration Nos. 4319095 and 4319096 were procured through fraud. We further find Respondent's unclean hands defense inapplicable to these proceedings (including as against Petitioner's fraud claim that we did not reach). Finally, we deny as moot Respondent's motion filed in Cancellation No. 92058796 to amend the date of first use claimed in Registration No. 4319096.

**Decision**:

The Petitions to Cancel Trademark Registration Nos. 4319095 and 4319096 are granted. The registrations will be canceled in due course.

# United States of America

## United States Patent and Trademark Office



**Reg. No. 4,319,095**

**Registered Apr. 9, 2013**

**Int. Cl.: 10**

**TRADEMARK**

**SUPPLEMENTAL REGISTER**

CERAMTEC GMBH (FED REP GERMANY LIMITED LIABILITY COMPANY)
CERAMTEC-PLATZ 1-9
PLOCHINGEN, FED REP GERMANY 73207

FOR: HIP JOINT IMPLANTS AND THEIR PARTS MADE OF ARTIFICIAL MATERIALS, NAMELY, HIP JOINT BALLS, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 3-16-2000; IN COMMERCE 3-16-2000.

PRIORITY CLAIMED UNDER SEC. 44(D) ON FED REP GERMANY APPLICATION NO. 302011039903, FILED 7-21-2011.

THE COLOR(S) PINK IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF THE COLOR PINK APPLIED TO THE GOODS. THE CONFIGURATION OF A HIP JOINT BALL IS SHOWN IN DOTTED LINES IN THE DRAWING. THE MATTER SHOWN IN BROKEN LINES INDICATES PLACEMENT OF THE MARK ON THE GOODS AND NEITHER THE MATTER SHOWN IN BROKEN LINES NOR THE CONFIGURATION OF THE GOODS ARE CLAIMED AS A FEATURE OF THE MARK.

SER. NO. 85-521,237, FILED P.R. 1-20-2012; AM. S.R. 2-22-2013.

DAVID TOOLEY, EXAMINING ATTORNEY

UNITED STATES PATENT AND TRADEMARK OFFICE · DEPARTMENT OF COMMERCE

Acting Director of the United States Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

# United States of America
## United States Patent and Trademark Office



**Reg. No. 4,319,096**

**Registered Apr. 9, 2013**

**Int. Cl.: 10**

**TRADEMARK**

**SUPPLEMENTAL REGISTER**

CERAMTEC GMBH (FED REP GERMANY LIMITED LIABILITY COMPANY)
CERAMTEC-PLATZ 1-9
PLOCHINGEN, FED REP GERMANY 73207

FOR: HIP JOINT IMPLANTS AND THEIR PARTS MADE OF ARTIFICIAL MATERIALS, NAMELY, ACETABULAR SHELL, ACETABULAR FOSSA, IN CLASS 10 (U.S. CLS. 26, 39 AND 44).

FIRST USE 3-16-2000; IN COMMERCE 3-16-2000.

PRIORITY CLAIMED UNDER SEC. 44(D) ON FED REP GERMANY APPLICATION NO. 302011039903, FILED 7-21-2011.

THE COLOR(S) PINK IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF THE COLOR PINK APPLIED TO THE ENTIRE SURFACE OF THE GOODS. THE MATTER SHOWN IN BROKEN LINES INDICATES PLACEMENT OF THE MARK ON THE GOODS AND NEITHER THE MATTER SHOWN IN THE BROKEN LINES NOR THE CONFIGURATION OF THE GOODS IS CLAIMED AS A FEATURE OF THE MARK.

SER. NO. 85-521,240, FILED P.R. 1-20-2012; AM. S.R. 2-22-2013.

DAVID TOOLEY, EXAMINING ATTORNEY

Acting Director of the United States Patent and Trademark Office

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

DIVERGENT
LANGUAGE SOLUTIONS

STATE OF NEW YORK )
)
)
COUNTY OF NEW YORK ) ss

**CERTIFICATION**

This is to certify that the attached translation is to the best of my knowledge and belief a true and accurate translation from German into English of the attached Order from the Higher Regional Court of Stuttgart of Matter Number 2 W 47/20 dated March 13, 2023.

Edward J. Jacob
Divergent Language Solutions, LLC

State of New York
County of New York
Subscribed to and sworn before me this 8th day of May, 2023,
by Edward J. Jacob.

Notary Public

MATTHEW C. ZELAK
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ZE6350239
Qualified in Kings County
Commission Expires November 7, 2024

183 Madison Avenue, Suite 416 | New York, NY 10016 | p 917.979.4513 | f 415.525.4313
600 California Street, 11th Floor | San Francisco, CA 94108 | p 415.400.4538 | f 415.525.4313
divergent@divergentls.com | www.divergentls.com

Matter number:
2 W 47/20
17 O 1789/13, Regional Court of Stuttgart

Higher Regional Court of Stuttgart
SECOND CIVIL DIVISION

# Order

In the matter of

**CeramTec GmbH**, represented by its Managing Directors Dr. Hadi Saleh and Dominique Janbon, CeramTec-Platz 1-9, 73207 Plochingen
- Plaintiff and Appellant -

Attorneys of record:
Rechtsanwälte [Law Firm of] **Hogan Lovells**, Alstertor 21, 20095 Hamburg, Ref. No.: 891 bsc 1314-137

versus

**CoorsTek Bioceramics LLC**, 2451 Riverside Parkway, Grand Junction, CO 81505, U.S.A., United Kingdom [sic]
represented by its President, Brad Coors
- Defendant and Appellee -

Attorneys of record:
Rechtsanwälte [Law Firm of] **TaylorWessing**, Isartorplatz 8, 80331 Munich, Ref. No.: 2001060/14 / C5M

concerning trademark infringement
here: complaint

the Higher Regional Court of Stuttgart – Second Civil Division – ordered as follows on March 13, 2023, through Presiding Judge Stefani of the Higher Regional Court and Higher Regional Court Judges Wahle and Ketterer:

The order of the Regional Court of Stuttgart of February 25, 2020, matter No. 17 O 1789/13, is set aside in response to the Plaintiff's complaint subject to a time limit.

# Grounds:

**I.**

1.

Both Parties are manufacturers of hip joint implants. There is dispute between them regarding whether the Defendant is permitted to produce and/or market hip joint balls in the color pink. In its prayer for relief No. 1 in the present action, which has been pending since 2013, the Plaintiff is asserting a claim for injunctive relief, which it initially based primarily on three Community marks. The claims being pursued in the action concerned the territory of the EU, with the exception of France, where separate infringement proceedings were conducted before the Tribunal de Grande Instance de Paris owing to particularities of French civil procedure law.

On February 22, 2018, the Plaintiff’s Community marks were declared to be invalid in the legal dispute pending in Paris, as the applications had been filed in bad faith. The Plaintiff filed an appeal against this judgment with the Cour d'Appel de Paris. In response, the Regional Court suspended the proceedings until such time as the appellate proceedings subsequent to that judgment had been concluded with final, binding legal force.

On February 15/16, 2019, new European Union marks congruent with the previous marks in suit were registered in the Plaintiff’s favor in response to its applications dated May 9, 2018. Based on the newly registered EU marks, the Plaintiff petitioned the Court to continue the proceedings with regard to prayer for relief No. 1, meaning with regard to the claim for injunctive relief, and to find against the Defendant by way of a partial judgment. In response, the Defendant filed an application with the EUIPO for a declaration that the newly registered marks were invalid.

2.

On February 25, 2020, the Regional Court decided that the proceedings would remain suspended until the invalidity proceedings before the EUIPO had been concluded with final, binding legal force and until the appellate proceedings had been concluded with final, binding legal force. The Regional Court held that the EUIPO’s decision would anticipate the decision in the proceedings at hand, as the success of the prayers for injunctive relief would depend on the continued existence of the marks in suit, which in turn would depend on the decision in the invalidity proceedings. The court held further that within the scope of the decision in its discretion, it was necessary to take into account that the application for cancellation was overwhelmingly likely to succeed, as there were sufficient indications that the Plaintiff had applied for the marks that are the subject matter of the dispute again,

circumventing the judgment rendered by the EU trademark court in Paris. The court held that this legal principle was established, for example, in Sec. 261 (3) No. 1 of the German Code of Civil Procedure [Zivilprozessordnung (ZPO)], according to which neither Party is permitted to bring a dispute before another court or tribunal while it is pending, but that this was exactly what the Plaintiff had done in the matter at hand by applying to register marks congruent with the previous ones that were also pending as marks in suit before the EU trademark court in Paris. The court continued that it was immaterial whether the Plaintiff had presented to the EUIPO all documents concerning the legal disputes being conducted, as the issue of bad faith in applying for the EU marks was not being reviewed, and that the fact that the action had already been pending since 2013 was not a crucial aspect arguing against the suspension of the proceedings because the marks in suit that are now the subject matter of the dispute had only been pending since April 2019. The court held, finally, that the economic significance of the proceedings also argued in favor of suspension. According to the Plaintiff's own submissions, the Defendant does not market trademark-infringing goods in any significant extent. There is dispute regarding whether the Defendant imported trademark-infringing goods into the European Union at all from May 2018 onward, which is the sole operative point in time with regard to the action being extended. The court pointed out that the Plaintiff itself explicitly cites as grounds for the claim for injunctive relief the risk of initial commission of the act, and that in this regard, marketing of trademark-infringing goods has not been demonstrated.

3.

The Plaintiff is challenging this order, which was served on it on March 4, 2020, with its complaint subject to a time limit dated March 16, 2020, in which the Plaintiff seeks to have the decision being challenged set aside.

The Plaintiff asserts that suspending trademark infringement proceedings with an eye to pending cancellation proceedings would enter into consideration only if the application for a declaration of invalidity were associated with overwhelming prospects of success, and that this is not the case in the matter at hand. The Plaintiff asserts that the applications for a declaration that the more recent EU marks in suit are invalid that the Defendant has filed with the EUIPO have no prospect of prevailing.

The Plaintiff argues that the legal principle underlying Sec. 261 (3) No. 1 ZPO as invoked by the Regional Court does not give rise to any prohibition of filing an application for a trademark, especially not at the European Union level, nor does it cause the matter to involve bad faith. The Plaintiff asserts that in applying for the new EU marks, it was not attempting to circumvent the judgment rendered by the EU trademark court in Paris, but rather fully carrying out that judgment. With an eye to the accusation of filing trademark applications in bad faith, the Plaintiff states that as part of the application process, it notified the EUIPO of all relevant facts, particularly the allegedly relevant patents and the

decision rendered by the court in Paris in the first instance.

The Plaintiff asserts further that the Paris court's decision concerning cancellation was grossly erroneous, and that the Paris court's assumption that the Plaintiff should have disclosed the existence of the patents granted to the Plaintiff in the tool segment when applying for the older Community marks in suit has no basis in European trademark law. The Plaintiff states that the patents in question are immaterial to the question of applying for trademarks in bad faith and to the legal dispute at hand as a whole.

The Plaintiff asserts that the objections raised by the Defendant in the invalidity proceedings do not hold, and that the abstract color mark EM 17 897 789, which is the sole operative mark, was not applied for in bad faith for other reasons, nor do the European Union marks in suit lack the requisite decisiveness.

The Plaintiff argues that the weighing of factors that must be undertaken within the scope of Sec. 148 ZPO thus shows that the proceedings must be continued. In the alternative, the Plaintiff petitions the Court, by way of application mutatis mutandis of Article 132(3) of Regulation (EU) 2017/1001 in conjunction with Sec. 935 et seqq. ZPO, to order the suspension of the proceedings only in exchange for provisional protective measures, particularly a provisional prohibition of use.

4.

The Defendant contests the complaint.

The Defendant asserts that pursuant to the legal principle embodied in Article 132(1) of Regulation (EU) 2017/1001, an EU trademark court is, in principle, required to stay the infringement proceedings pending before that court if an application for a declaration of invalidity of the EU marks is already pending with the EUIPO or the legal validity of the EU marks has already been challenged by another EU trademark court on account of a counterclaim. The Defendant asserts that even though these prerequisites are not formally met because the invalidity applications were not filed until after the infringement action was brought, it must be taken into account that the new marks in suit are identical to the old ones, and that the Defendant challenged the continued existence of these older marks within the scope of a counterclaim before the court in Paris before the new EU marks were registered and made the subject matter of the infringement proceedings at hand. The Defendant continues that against this background, the fundamental notion that infringement proceedings should be suspended in principle in cases where nullity proceedings are already pending against the marks in suit cannot be hollowed out in that identical marks are applied for anew as European Union marks during ongoing proceedings.

The Defendant asserts that in light of the decisions rendered in the matter at hand by the court in Paris and the German Patent and Trade Mark Office [Deutsches Patent- und Markenamt (DPMA)], by which all of the original marks in suit were declared invalid, the new marks in suit cannot be presumed to be legally valid, as they are identical to the older marks in suit with regard to the subject matter of the marks. The Defendant states that the lists of goods for both marks contain the goods relevant to the present infringement proceedings, “joint surface replacement, hip joint balls,” in identical form, and that the additional term “Ceramic parts for endoprosthetics” that is used is encompassed by the broader wording of the terms in the lists for the older marks.

The Defendant asserts that it is immaterial whether the decision rendered by the court in Paris was in error in law, as this decision will be reviewed in the pending appellate proceedings and it is not for the Court to review or assess the correctness of this decision within the scope of the decision concerning the suspension of the present infringement proceedings.

The Defendant states further that the Court is not tasked with reviewing whether the Plaintiff acted in bad faith in applying for the new European Union marks. This question is not part of the subject of the review conducted during application proceedings before the EUIPO. Clarifying the question of whether the Plaintiff acted in bad faith when applying for the new European Union marks is reserved to the invalidity proceedings, which the Defendant has initiated in the meantime. Hence, the Defendant asserts, it is immaterial whether the Plaintiff informed the office of the existence of the patents that have expired in the meantime, especially as the fact that the protection afforded by the patents was not mentioned was also not the operative reason that the court in Paris declared the older marks to be invalid.

The Defendant asserts that the bad-faith nature of all of the trademark applications filed by the Plaintiff lies in the Plaintiff’s having intended, through these applications, to prevent competitors from producing and marketing ceramic material with the composition that had entered the public domain upon the expiration of the patents. Against this background, filing new applications for identical marks in suit constitutes circumvention of the Paris court’s invalidity decision. The Defendant asserts that in this regard, the Regional Court’s reference to the legal principle underlying Sec. 261 (3) No. 1 ZPO is also logical and consistent, as this legal principle is applied mutatis mutandis in European Union trademark law.

The Defendant asserts further that suspending the proceedings is also not prohibited because the Defendant placed significant quantities of trademark-infringing goods on the market in the EU, thereby exploiting the current legal limbo to the Plaintiff’s detriment. No such circumstances exist, the Defendant states, nor is the Plaintiff able to demonstrate that there have been any such infringing acts.

5.

The Regional Court did not grant redress in response to the complaint subject to a time limit and presented the files for a decision on the complaint. The Defendant asserts further that particularly upon consideration of the assessments made by the regulatory authorities responsible for drafting Regulation (EU) 2017/1001, the prerequisites for suspending the proceedings pursuant to Sec. 148 ZPO would be met, as according to this, the office takes precedence in deciding on the invalidity of a European Union mark. The Defendant states that the provisions set down in Article 128(7) and Article 132(2), second sentence, of Regulation (EU) 2017/1001 are based on the legislative principle that the office is to have central decision-making competence due to its particular expertise in European Union trademark law and its particular position outside the national legal systems. Whether infringement proceedings must be suspended pursuant to Sec. 148 ZPO with an eye to an application for a declaration of invalidity is therefore, the Defendant argues, decided based on a weighing of the prospects of prevailing in the proceedings concerning the invalidity of the mark in suit and the delay in the proceedings associated with the suspension, with particular consideration for these assessments set down in Regulation (EU) 2017/1001. Thus, suspension remains appropriate in the proceedings at hand.

**II.**

The Defendant’s complaint subject to a time limit is admissible pursuant to Sec. 252 ZPO and has merit.

1.

Staying the proceedings pursuant to Article 132 of Regulation (EU) 2017/1001 does not enter into consideration.

Article 132(1) of Regulation (EU) 2017/1001 requires the application for a declaration of invalidity to have already been filed with the office before the infringement action is brought. This is not the case in the matter at hand. At the time when the Defendant filed the application for a declaration that the Plaintiff’s newly registered marks were invalid with the office on July 12, 2019, these marks were already part of the subject matter of the legal action at hand due to the Plaintiff’s preceding application of April 25, 2019, by which the Plaintiff based the claim for injunctive relief that has been asserted primarily on the newly registered European Union marks by way of ex-post consolidation of the claims in the action.

Article 132(2) of Regulation (EU) 2017/1001 is immaterial from the outset. This provision concerns

cases in which the legal validity of the European Union mark has been challenged on account of a counterclaim. The Defendant has not filed any such counterclaim.

If the defendant has not filed a counterclaim for cancellation and an application for the cancellation of the European Union mark is not filed with the office until after the infringement action has been brought – as is the case in the matter at hand – Article 132 of Regulation (EU) 2017/1001 does not provide for any possibility of the European Union trademark court staying the proceedings (BeckOK MarkenR/Grüger, 32nd Ed., January 1, 2023, UMV 2017, Article 132, margin No. 55).

2.

However, suspending the proceedings pursuant to Sec. 148 ZPO enters into consideration in principle.

a)

The applicability of Sec. 148 ZPO does not conflict with the provisions of Article 132 of Regulation (EU) 2017/1001, as the latter does not provide exhaustively for all possibilities of imposing a stay (Higher Regional Court of Hamburg, GRUR-RR 2003, 356 – TAE BO; for a different view, see Grüger, in: BeckOK MarkenR, loc. cit., Article 132, margin Nos. 55 et seq., margin No. 60, who prefers application by way of analogy of Article 132(2), second sentence, or Article 128(7) of Regulation (EU) 2017/1001; the matter was left undecided by the Higher Regional Court of Düsseldorf, BeckRS 2017, 114519, margin No. 14 – Evolution; for an affirmative view in the law of registered designs, see German Federal Court of Justice [Bundesgerichtshof (BGH)], GRUR 2012, 512, margin No. 22 – Kinderwagen). Through Article 129(3) of Regulation (EU) 2017/1001, therefore, the possibilities of suspending the proceedings as provided in national law, such as Sec. 148 ZPO, also apply.

b)

Whether to suspend the proceedings pursuant to Sec. 148 ZPO is left to the court's discretion.

The only question that can be fully reviewed in the appellate proceedings is whether there are grounds for suspension on the merits of the case. With regard to the legal consequences, by contrast, the court hearing the complaint is limited, in reviewing an exercise of discretion by the court of first instance, to whether the statutory limits of discretion were observed or any errors in discretion have been made. In the course of this review, the court hearing the complaint must determine whether the lower court took all of the key aspects into account in rendering its decision. However, whether suspending the proceedings is expedient cannot be reviewed subsequently. The court hearing the complaint is barred from engaging in its own considerations of expediency (BGH, NJW-RR 2021, 638, margin No. 20;

Hacker, in: Ströbele/Hacker/Thiering, MarkenG, 13th Ed. 2021, Sec. 14, margin No. 21).

c)

The factual prerequisites for suspending the proceedings pursuant to Sec. 148 (1) ZPO are met.

Pursuant to Sec. 148 (1) ZPO, where the decision on a legal dispute depends either wholly or in part on the question of whether a legal relationship does or does not exist, and this relationship forms the subject matter of another legal dispute that is pending, or that is to be determined by an administrative agency, the court may direct that the hearing be suspended until the other legal dispute has been dealt with and terminated, or until the administrative agency has issued its decision.

The validity of the European Union marks is the subject matter of the decision to be rendered by the EUIPO based on the Defendant's invalidity application. The decision on the legal dispute depends on whether the European Union marks registered in the Plaintiff's favor in February 2019, which form the primary basis of the Plaintiff's action, are declared invalid pursuant to Article 59(1) of Regulation (EU) 2017/1001, as in this case, the action would be deprived of its basis pursuant to Article 62(2) thereof. However, if the EUIPO does not find the marks in suit to be invalid, then the Regional Court is obliged, pursuant to Article 127(1) of Regulation (EU) 2017/1001, to presume that they are legally valid.

d)

However, the Regional Court's considerations concerning whether the proceedings should be suspended are not free of errors in discretion.

aa)

Whether to suspend the proceedings pursuant to Sec. 148 ZPO is left to the court's discretion. This enters into consideration in infringement proceedings if the application for a declaration of invalidity appears to have reasonable prospects of success, especially if cancellation was already ordered in the first instance; that decision need not have already become final and legally binding. When exercising its discretion, the court is required to weigh the interest of the plaintiff in the infringement action in bringing about a prompt decision, the defendant's interest in not having a judgment entered against it based on a mark that is ready for cancellation, and the interest in preventing contradictory decisions. It must moreover consider, in the plaintiff's favor, whether the ongoing use of the mark being

challenged during the period when the proceedings are suspended should be expected to weaken the mark in suit and whether the plaintiff is also pursuing further claims based on other trademark rights that are not affected by the invalidity proceedings (Hacker, in: Ströbele/Hacker/Thiering, loc. cit., Sec. 14, margin No. 20).

When exercising its discretion, the court must weigh the potential delay in the proceedings against the aspects of procedural economy and prevention of contradictory decisions. The court must also take the overall duration of the proceedings into account and, as the duration increases, make sustained efforts to expedite the proceedings (see German Federal Constitutional Court [Bundesverfassungsgericht (BVerfG)], NJW 2013, 3432, margin No. 20).

bb)

When exercising its discretion, the Regional Court assumed that the Defendant's application for cancellation has overwhelming prospects of success. The Regional Court bases this assumption primarily on the idea that the Defendant's application for invalidity has good prospects of succeeding because the Plaintiff acted in bad faith in applying for the European Union marks. However, the grounds given for such action having been in bad faith are not persuasive.

It is true that the fact that in 2011, when the Plaintiff applied for the three Community marks, the Plaintiff was still operating on the assumption that the additive chromium oxide, which is responsible for the hip joint balls' pink coloration, improves the hardness of the composite materials can possibly serve as an indication that the marks were registered in bad faith at that time. That, too, is already doubtful because bad faith typically relates to better justification resting with a third party (Eisenführ, in: Eisenführ/Schennen, GMV, 4th Ed. 2014, Article 52, margin Nos. 10, 17), while the circumstance that the characteristic feature of the pink color is necessary to obtain a technical result actually constitutes an impediment to registration pursuant to Article 7(1)(e)(ii) of Council Regulation (EC) No. 207/2009, which should correctly have been asserted pursuant to Article 52(1)(a) thereof (registration contrary to the provisions of Article 7 of Council Regulation (EC) No. 207/2009) and not pursuant to Article 52(1)(b) thereof (bad faith).

This circumstance is, however, not suitable at any rate to establish that the application for registration of the European Union marks in 2019 was filed in bad faith in accordance with Article 59(1)(b) of Regulation (EU) 2017/1001, as at that time, the Plaintiff no longer believed that the additive chromium oxide brings about technical effects, so Article 7(1)(e) of Regulation (EU) 2017/1001 no longer constituted an impediment to registration from the Plaintiff's standpoint. Nor can the Plaintiff be accused of having changed its views on the mode of action of the chromium oxide merely for tactical

reasons, as the expert opinion dated March 7, 2018, obtained by the courts in the present proceedings also confirms that adding chromium oxide does not increase the hardness and durability of the ceramic.

Nor does bad faith arise from possible circumvention of the judgment of the EU trademark court in Paris. The EU trademark court's judgment relates to the Community marks, not the European Union marks, which must be reviewed independently with an eye to the absolute grounds for invalidity pursuant to Article 59(1) of Regulation (EU) 2017/1001 in conjunction with Article 7(1)(e)(ii) thereof. If – as set out above – there has been no bad faith, then the circumstance that the EUIPO is not yet able to review whether the application for registration is being filed in bad faith in the first place when that application is filed (see Brecht, in: Eisenführ/Schennen, UMV, 6th Ed. 2020, Article 59, margin No. 6), but rather must wait until the invalidity proceedings to do so, also cannot be held against the Plaintiff. At any rate, an absolute impediment to registration should also already have been taken into account when the mark was registered, pursuant to Article 7(1)(e) of Regulation (EU) 2017/1001.

Furthermore, the legal principle of the matter being pending before another court or tribunal is also not persuasive. The proceedings for registering new trademarks and invalidity proceedings or a counterclaim for a declaration of invalidity concerning marks that already exist evidently have different subject matters in dispute, which means that the legal principle set down in Sec. 261 (3) No. 1 ZPO cannot be relevant from the outset.

Nor does the circumstance, emphasized by the Defendant, that the marks were registered subsequent to a corresponding patent seem capable of establishing that the marks were registered in bad faith. This does not constitute abusive extension of limited-term rights. It is possible for intellectual property rights to be aggregated, as marks and other intellectual property rights serve different objectives and also have different prerequisites for protection to be afforded (Hanne, in: BeckOK MarkenR, loc. cit., UMV 2017, Article 59, margin No. 30).

cc)

There are no further concerns regarding the considerations made by the Regional Court in exercising its discretion.

(i)

To the extent that the Regional Court bases its decision not to grant redress on the office taking precedence, according to the legislative assessment, in deciding as to the invalidity of a European

Union mark, there can be no objection to its considering this aspect.

It is true that such preferential status does not arise directly from the provisions of the law. The provisions of Article 132 of Regulation (EU) 2017/1001 are irrelevant, as the factual prerequisites for suspending the proceedings pursuant to these provisions are not met. Therefore, it is also not possible to conclude from them that the office is to take precedence as a general principle in deciding whether a European Union mark is invalid.

However, a certain amount of precedence for a decision by the office does arise from the fact that in the event of a counterclaim for a declaration of invalidity, the EU trademark court can demand that the defendant file an application for a declaration of invalidity with the EUIPO within a certain time limit (Schennen, in: Eisenführ/Schennen, loc. cit., Article 132, margin No. 16). If the later application filed with the office originates with such a demand made by the court, it would make no sense to continue the infringement proceedings regardless (Kampmann/Eberhardt, in: Eisenführ/Schennen, loc. cit., Article 127, margin No. 5). There are several reasons to apply this assessment to cases in which the defendant has filed an application of its own as well. It seems not very understandable for a defendant that, in order to anticipate an expected application by the proprietor of the mark and a decision by the EU trademark court and save time, files an application with the office right away instead of bringing a counterclaim, to be placed in a worse or different position than one that awaits all this and thereby also brings about a considerable delay in the proceedings (Higher Regional Court of Düsseldorf, BeckRS 2017, 114519, margin No. 14 – Evolution).

(ii)

Moreover, there are no concerns regarding the considerations made by the Regional Court in exercising its discretion with respect to the delay in the proceedings caused by a suspension thereof. In this regard, there can be no objection to the Regional Court's consideration that the legal dispute concerning the European Union marks that are the subject matter of the dispute was not made pending until April 25, 2019.

(iii)

Nor are there any concerns regarding the consideration that the economic significance of the proceedings also argues in favor of a suspension because the Plaintiff has not demonstrated that the Defendant placed significant quantities of trademark-infringing goods on the market even after May 9,

2018, the date on which the application for registration of the European Union marks was filed.

3.

If there are errors in discretion, the only avenue available to the court hearing the complaint is to set aside the decision suspending the proceedings. This court has no power to make a decision in its own discretion (BGH, NJW-RR 2020, 98, margin No. 42).

Therefore, the Court cannot decide whether the remaining grounds or the additional grounds submitted by the Defendant justify suspending the proceedings. The Regional Court will be tasked with deciding this within its own jurisdiction.

## III.

There are no grounds for a decision as to the costs. The costs of the complaint proceedings caused by the decision to suspend the proceedings are part of the costs of the legal dispute, which the party that has not prevailed in the dispute on the merits is required to bear pursuant to Sec. 91 et seqq. ZPO, regardless of the outcome of the complaint proceedings and those concerning a complaint on points of law (BGH, NJW-RR 2021, 638, margin No. 23; Zöller/Greger, ZPO, 34th Ed. 2022, Sec. 252, margin No. 5).

There is no cause to admit a complaint on points of law.

| Stefani | Wahle | Ketterer |
| --- | --- | --- |
| Presiding Judge of the Higher Regional Court | Judge of the Higher Regional Court | Judge of the Higher Regional Court |

Aktenzeichen:
2 W 47/20
17 O 1789/13 LG Stuttgart

Oberlandesgericht Stuttgart

2. ZIVILSENAT

# Beschluss

In Sachen

**CeramTec GmbH**, vertr.d.d. GF Dr. Hadi Saleh und Dominique Janbon, CeramTec-Platz 1-9, 73207 Plochingen
- Klägerin und Beschwerdeführerin -

Prozessbevollmächtigte:
Rechtsanwälte **Hogan Lovells**, Alstertor 21, 20095 Hamburg, Gz.: 891 bsc 1314-137

gegen

**CoorsTek Bioceramics LLC**, 2451 Riverside parkway, 81505 Grand Junction CO, USA, Vereinigtes Königreich
vertr. d.d. Präsidenten Brad Coors
- Beklagte und Beschwerdegegnerin -

Prozessbevollmächtigte:
Rechtsanwälte **TaylorWessing**, Isartorplatz 8, 80331 München, Gz.: 2001060/14 / C5M

wegen Markenrechtsverletzung
hier: Beschwerde

hat das Oberlandesgericht Stuttgart - 2. Zivilsenat - durch den Vorsitzenden Richter am Oberlandesgericht Stefani, den Richter am Oberlandesgericht Wahle und den Richter am Oberlandesgericht Ketterer am 13.03.2023 beschlossen:

Auf die sofortige Beschwerde der Klägerin wird der Beschluss des Landgerichts Stuttgart vom 25.02.2020, Az. 17 O 1789/13, aufgehoben.

# Gründe:

**I.**

1.

Beide Parteien sind Hersteller von Hüftgelenkimplantaten. Zwischen ihnen besteht Streit darüber, ob die Beklagte Hüftgelenkkugeln in der Farbe Rosa herstellen bzw. vertreiben darf. Mit dem Klagantrag Ziff. 1 der vorliegenden, seit 2013 anhängigen Klage macht die Klägerin einen Unterlassungsanspruch geltend, den sie zunächst vorrangig auf drei Gemeinschaftsmarken gestützt hat. Die mit der Klage verfolgten Ansprüche bezogen sich auf das Gebiet der EU mit Ausnahme Frankreichs, wo aufgrund von Besonderheiten des französischen Zivilprozessrechts ein gesondertes Verletzungsverfahren vor dem Tribunal de Grande Instance de Paris durchgeführt wurde.

Am 22.02.2018 wurden die Gemeinschaftsmarken der Klägerin in dem in Paris anhängigen Rechtsstreit wegen bösgläubiger Markenanmeldung für nichtig erklärt. Die Klägerin legte gegen dieses Urteil Berufung zum Cour d'Appel de Paris ein. Das Landgericht setzte daraufhin das Verfahren bis zur rechtskräftigen Erledigung des diesem Urteil folgenden Rechtsmittelverfahrens aus.

Am 15./16. Februar 2019 wurden zugunsten der Klägerin auf deren Anträge vom 09.05.2018 neue, den bisherigen Klagemarken entsprechende Unionsmarken eingetragen. Gestützt auf die neu eingetragenen Unionsmarken beantragte die Klägerin, das Verfahren in Bezug auf den Klageantrag Ziff. 1, d.h. in Bezug auf den Unterlassungsantrag, fortzusetzen und die Beklagte per Teilurteil zu verurteilen. Die Beklagte beantragte daraufhin beim EUIPO, die neu eingetragenen Marken für nichtig zu erklären.

2.

Am 25.02.2020 hat das Landgericht beschlossen, dass die Verhandlung bis zur rechtskräftigen Erledigung des Nichtigkeitsverfahrens beim EUIPO und bis zur rechtskräftigen Erledigung des Rechtsmittelverfahrens ausgesetzt bleibt. Die Entscheidung des EUIPO sei vorgreiflich für die Entscheidung im hiesigen Verfahren, denn der Erfolg der Unterlassungsanträge hänge vom Bestand der Klagemarken ab und dieser hänge wiederum von der Entscheidung im Nichtigkeitsverfahren ab. Im Rahmen der Ermessensentscheidung sei dabei zu berücksichtigen, dass der Löschungsantrag überwiegende Aussicht auf Erfolg habe, weil zureichende Anhaltspunkte dafür bestünden, dass die Klägerin die streitgegenständlichen Marken unter Umgehung des Urteils des

Unionsmarkengerichts Paris erneut angemeldet habe. Dieser Rechtsgedanke sei beispielsweise in § 261 Abs. 3 Nr. 1 ZPO verankert, wonach eine Streitsache während der Dauer der Rechtshängigkeit von keiner Partei anderweitig anhängig gemacht werden dürfe. Genau dies habe die Klägerin aber vorliegend getan, indem sie Marken zur Anmeldung gebracht habe, die den bisherigen, auch vor dem Unionsmarkengericht Paris anhängigen Klagemarken entsprochen hätten. Ob die Klägerin dem EUIPO dabei alle Unterlagen zu den geführten Rechtsstreitigkeiten vorgelegt habe, spiele keine Rolle, weil die Frage der Bösgläubigkeit bei der Anmeldung der Unionsmarken nicht geprüft werde. Dass die Klage bereits seit 2013 anhängig sei, sei kein entscheidender Gesichtspunkt gegen eine Aussetzung des Verfahrens, weil die nunmehr streitgegenständlichen Klagemarken erst seit April 2019 anhängig seien. Zuletzt spreche auch die wirtschaftliche Bedeutung des Verfahrens für eine Aussetzung. Auch nach dem Vortrag der Klägerin bringe die Beklagte keine markenverletzende Ware in signifikantem Umfang in den Verkehr. Streitig sei, ob die Beklagte ab Mai 2018, dem allein für die Klageerweiterung maßgeblichen Zeitpunkt, überhaupt markenverletzende Ware in die Europäische Union eingeführt habe. Die Klägerin begründe den Unterlassungsanspruch auch explizit mit dem Vorliegen von Erstbegehungsgefahr. Ein Absetzen markenverletzender Ware werde insoweit nicht dargetan.

3.

Gegen diesen ihr am 04.03.2020 zugestellten Beschluss wendet sich die Klägerin mit ihrer sofortigen Beschwerde vom 16.03.2020, mit der sie beantragt, die angefochtene Entscheidung aufzuheben.

Die Aussetzung eines Markenverletzungsverfahrens mit Blick auf ein anhängiges Löschungsverfahren käme nur dann in Betracht, wenn dem Antrag auf Nichtigerklärung eine überwiegende Aussicht auf Erfolg beizumessen wäre. Dies sei vorliegend nicht der Fall. Die von der Beklagten beim EUIPO gestellten Anträge auf Nichtigerklärung der jüngeren Unionsklagemarken hätten keinerlei Aussicht auf Erfolg.

Aus dem vom Landgericht herangezogenen Rechtsgedanken des § 261 Abs. 3 Nr. 1 ZPO ergebe sich kein Verbot einer Markenanmeldung, zumal nicht auf Unionsebene, und auch keine Bösgläubigkeit. Die Klägerin habe durch die Neuanmeldung der Unionsmarken nicht versucht, das Urteil des Pariser Unionsmarkengerichts zu umgehen, sondern das Urteil vollständig umgesetzt. Wegen des Vorwurfs der bösgläubigen Markenanmeldung habe die Klägerin dem EUIPO im Rahmen der Anmeldung sämtliche relevanten Tatsachen mitgeteilt, insbesondere die vermeintlich relevan-

ten Patente sowie die erstinstanzliche Entscheidung des Pariser Gerichts.

Zudem sei die Löschungsentscheidung des Pariser Gerichts grob fehlerhaft. Die Annahme des Pariser Gerichts, dass die Klägerin bei der Anmeldung der älteren Gemeinschaftsklagemarken die Existenz der ihr erteilten Patente im Werkzeugbereich hätte offenlegen müssen, finde keine Grundlage im europäischen Markenrecht. Die betreffenden Patente seien weder für die Frage der bösgläubigen Markenanmeldung noch für den hiesigen Rechtsstreit insgesamt von Bedeutung.

Die von der Beklagten im Nichtigkeitsverfahren geltend gemachten Einwände verfingen nicht. Weder sei die allein maßgebliche abstrakte Farbmarke EM 17 897 789 aus anderen Gründen bösgläubig angemeldet, noch fehle es den Unionsklagemarken an der erforderlichen Entscheidungskraft.

Die im Rahmen des § 148 ZPO vorzunehmende Abwägung ergebe damit, dass das Verfahren fortzusetzen sei. Hilfsweise werde beantragt, analog Art. 132 Abs. 3 UMV i.V.m. §§ 935 ff. ZPO eine Aussetzung nur gegen vorläufige Sicherungsmaßnahmen, insbesondere gegen ein vorläufiges Benutzungsverbot, anzuordnen.

4.
Die Beklagte tritt der Beschwerde entgegen.

Nach dem in Art. 132 Abs. 1 UMV verkörperten Rechtsgedanken habe ein Unionsmarkengericht das bei ihm anhängige Verletzungsverfahren grundsätzlich auszusetzen, wenn beim EUIPO bereits ein Antrag auf Erklärung der Nichtigkeit der Unionsmarken anhängig sei oder die Rechtsgültigkeit der Unionsmarken bereits von einem anderen Unionsmarkengericht im Wege der Widerklage angefochten worden sei. Auch wenn diese Voraussetzungen formal nicht erfüllt seien, da die Nichtigkeitsanträge erst nach Erhebung der Verletzungsklage gestellt worden seien, sei zu berücksichtigen, dass die neuen Klagemarken identisch seien mit den alten Klagemarken und die Beklagte den Bestand dieser älteren Marken im Rahmen einer Widerklage vor dem Gericht in Paris angefochten habe, bevor die neuen Unionsmarken eingetragen und zum Gegenstand des hiesigen Verletzungsverfahrens gemacht worden seien. Der Grundgedanke, dass ein Verletzungsverfahren bei bereits anhängigen Nichtigkeitsverfahren gegen die Klagemarken grundsätzlich ausgesetzt werden soll, könne vor diesem Hintergrund nicht dadurch ausgehebelt werden, dass identische Zeichen während des laufenden Verfahrens neu als Unionsmarken angemeldet würden.

Angesichts der vorliegenden Entscheidungen des Gerichts in Paris und des DPMA, mit denen sämtliche ursprünglichen Klagemarken für nichtig erklärt worden seien, könne nicht von der Rechtsgültigkeit der neuen Klagemarken ausgegangen werden, denn diese seien hinsichtlich des Gegenstands der Marken mit den älteren Klagemarken identisch. Die für das vorliegende Verletzungsverfahren relevanten Waren „Gelenkflächenersatz, Hüftgelenkskugeln“ seien in den Warenverzeichnissen beider Marken identisch enthalten. Der zusätzlich verwendete Begriff „Keramische Teile für die Endoprothetik“ werde von den weiter gefassten Begriffen im Verzeichnis der älteren Marken umfasst.

Ob die Entscheidung des Gerichts in Paris rechtsfehlerhaft gewesen sei, spiele keine Rolle, denn diese Entscheidung werde im anhängigen Rechtsmittelverfahren überprüft und es sei nicht Sache der Kammer, die Richtigkeit dieser Entscheidung im Rahmen der Entscheidung über die Aussetzung des hiesigen Verletzungsverfahrens zu überprüfen oder zu bewerten.

Genauso wenig sei zu prüfen, ob die Klägerin bei der Anmeldung der neuen Unionsmarken bösgläubig gehandelt habe. Diese Frage sei beim Anmeldeverfahren vor dem EUIPO nicht Prüfungsgegenstand. Die Klärung der Frage, ob die Klägerin bei der Anmeldung der neuen Unionsmarken bösgläubig gehandelt habe, sei dem Nichtigkeitsverfahren vorbehalten, das die Beklagte zwischenzeitlich eingeleitet habe. Es komme deshalb nicht darauf an, ob die Klägerin das Amt über die Existenz der zwischenzeitlich ausgelaufenen Patente informiert habe, zumal das Verschweigen des Patentschutzes auch nicht der maßgebliche Grund dafür gewesen sei, dass das Gericht in Paris die älteren Marken für nichtig erklärt habe.

Die Bösgläubigkeit sämtlicher Markenanmeldungen der Klägerin liege darin begründet, dass sie mit den Anmeldungen verhindern wolle, dass Mitbewerber Keramikmaterial mit der nach Ablauf der Patente gemeinfrei gewordenen Zusammensetzung herstellen und vermarkten. Vor diesem Hintergrund stelle die Neuanmeldung identischer Klagemarken eine Umgehung der Nichtigkeitsentscheidung des Pariser Gerichts dar. Insoweit sei auch der Hinweis des Landgerichts auf den Rechtsgedanken des § 261 Abs. 3 Nr. 1 ZPO folgerichtig, denn dieser Rechtsgedanke finde im Unionsmarkenrecht entsprechende Anwendung.

Eine Aussetzung verbiete sich auch nicht deshalb, weil die Beklagte in signifikantem Umfang markenverletzende Ware in der EU in den Verkehr brächte und damit den derzeit herrschenden Schwebezustand zum Nachteil der Klägerin ausnutze. Derartige Umstände gebe es nicht. Die Klägerin sei nicht in der Lage, entsprechende Verletzungshandlungen darzulegen.

5.
Das Landgericht hat der sofortigen Beschwerde nicht abgeholfen und die Akten zur Entscheidung über die Beschwerde vorgelegt. Gerade auch unter Berücksichtigung der Wertungen des Verordnungsgebers der UMV lägen die Voraussetzungen für eine Aussetzung der Verhandlung nach § 148 ZPO vor, denn danach gebühre dem Amt bei der Entscheidung über die Nichtigkeit einer Unionsmarke der Vorrang. Den Regelungen in Art. 128 Abs. 7 UMV und 132 Abs. 2 Satz 2 UMV liege der gesetzgeberische Gedanke zugrunde, dass dem Amt wegen dessen besonderer Sachkunde für das Unionsmarkenrecht und dessen besonderer Stellung außerhalb der nationalen Gerichtsbarkeit eine zentrale Entscheidungskompetenz zustehen soll. Ob ein Verletzungsverfahren im Hinblick auf einen Antrag auf Erklärung der Nichtigkeit nach § 148 ZPO auszusetzen sei, entscheide sich daher anhand der Abwägung der Erfolgsaussichten des Verfahrens über die Nichtigkeit der Klagemarke und der mit der Aussetzung verbundenen Prozessverzögerung unter besonderer Berücksichtigung dieser Wertungen der UMV. Danach verbleibe es im vorliegenden Verfahren bei der Aussetzung.

**II.**

Die sofortige Beschwerde der Beklagten ist gem. § 252 ZPO zulässig und hat in der Sache Erfolg.

1.
Eine Aussetzung des Verfahrens nach Art. 132 UMV kommt nicht in Betracht.

Art. 132 Abs. 1 UMV setzt voraus, dass der Antrag an das Amt auf Erklärung der Nichtigkeit zeitlich vor der Verletzungsklage gestellt wurde. Das ist hier nicht der Fall. Als die Beklagte am 12.07.2019 beim Amt beantragte, die neu eingetragenen Marken der Klägerin für nichtig zu erklären, waren diese aufgrund des vorangegangenen Antrags der Klägerin vom 25.04.2019, mit dem die Klägerin den geltend gemachten Unterlassungsanspruch im Wege der nachträglichen Klagehäufung vorrangig auf die neu eingetragenen Unionsmarken stützte, bereits Gegenstand der hiesigen Klage.

Art. 132 Abs. 2 UMV ist von vornherein nicht einschlägig. Die Vorschrift betrifft den Fall, dass die

Rechtsgültigkeit der Unionsmarke im Wege der Widerklage angefochten worden ist. Eine derartige Widerklage hat die Beklagte nicht erhoben.

Hat der Beklagte keine Löschungswiderklage erhoben und wird erst nach Erhebung der Verletzungsklage beim Amt ein Antrag auf Löschung der Unionsmarke eingereicht - wie es hier der Fall ist -, sieht Art. 132 UMV keine Aussetzungsmöglichkeit des Unionsmarkengerichts vor (BeckOK MarkenR/Grüger, 32. Ed. 01.01.2023, UMV 2017, Art. 132, Rn. 55).

2.
Grundsätzlich in Betracht kommt aber eine Aussetzung des Verfahrens nach § 148 ZPO.

a)
Der Anwendbarkeit des § 148 ZPO steht die Regelung in Art. 132 UMV nicht entgegen, da die Aussetzungsmöglichkeiten in der UMV nicht abschließend geregelt sind (OLG Hamburg, GRUR-RR 2003, 356 - TAE BO; a.A. Grüger in BeckOK MarkenR, aaO., Art. 132, Rn. 55f., Rn 60, der eine analoge Anwendung des Art. 132 Abs. 2 Satz 2 UMV bzw. des Art. 128 Abs. 7 UMV bevorzugt; offengelassen von OLG Düsseldorf, BeckRS 2017, 114519, Rn. 14 - Evolution; für das Geschmacksmusterrecht bejahend BGH, GRUR 2012, 512, Rn. 22 - Kinderwagen). Über Art. 129 Abs. 3 UMV kommen daher auch die Aussetzungsmöglichkeiten des nationalen Rechts wie § 148 ZPO zur Anwendung.

b)
Die Aussetzung des Verfahrens nach § 148 ZPO steht im Ermessen des Gerichts.

Im Beschwerdeverfahren kann in vollem Umfang nur überprüft werden, ob auf Tatbestandsseite ein Aussetzungsgrund vorliegt. Auf der Rechtsfolgenseite hingegen darf das Beschwerdegericht eine Ermessensausübung des erstinstanzlichen Gerichts nur darauf überprüfen, ob die gesetzlichen Grenzen des Ermessens eingehalten oder ob Ermessenfehler gegeben sind. Dabei ist zu prüfen, ob das erstinstanzliche Gericht alle wesentlichen Gesichtspunkte in seine Entscheidung einbezogen hat. Ob es zweckmäßig ist, ein Verfahren auszusetzen, kann hingegen nicht nachgeprüft werden. Dem Beschwerdegericht sind eigene Zweckmäßigkeitserwägungen verwehrt (BGH, NJW-RR 2021, 638, Rn. 20; Hacker in Ströbele/Hacker/Thiering, MarkenG, 13. Aufl. 2021, § 14,

Rn. 21).

c)

Die tatbestandlichen Voraussetzungen für eine Aussetzung des Verfahrens nach § 148 Abs. 1 ZPO sind gegeben.

Nach § 148 Abs. 1 ZPO kann das Gericht, wenn die Entscheidung des Rechtsstreits ganz oder zum Teil von dem Bestehen oder Nichtbestehen eines Rechtsverhältnisses abhängt, das den Gegenstand eines anderen anhängigen Rechtsstreits bildet oder von einer Verwaltungsbehörde festzustellen ist, anordnen, dass die Verhandlung bis zur Erledigung des anderen Rechtsstreits oder bis zur Entscheidung der Verwaltungsbehörde auszusetzen ist.

Die Wirksamkeit der Unionsmarken ist Gegenstand der vom EUIPO aufgrund des Nichtigkeitsantrags der Beklagten zu treffenden Entscheidung. Die Entscheidung des Rechtsstreits ist davon abhängig, ob die zugunsten der Klägerin im Februar 2019 eingetragenen Unionsmarken, auf die die Klägerin ihre Klage vorrangig stützt, gem. Art. 59 Abs. 1 UMV für nichtig erklärt werden, da der Klage in diesem Fall gem. Art. 62 Abs. 2 UMV die Grundlage entzogen würde. Erklärt das EUIPO die Klagemarken hingegen nicht für nichtig, hat das Landgericht gem. Art. 127 Abs. 1 UMV von deren Rechtsgültigkeit auszugehen.

d)

Nicht ermessensfehlerfrei sind aber die Erwägungen des Landgerichts dazu, ob das Verfahren auszusetzen ist.

aa)

Die Aussetzung des Verfahrens nach § 148 ZPO steht im Ermessen des Gerichts. Sie kommt im Verletzungsprozess in Betracht, wenn der Nichtigkeitsantrag einige Erfolgsaussicht aufweist, insbesondere wenn erstinstanzlich bereits die Löschung angeordnet ist, ohne dass insoweit bereits Rechtskraft eingetreten sein muss. Bei der Ermessensausübung abzuwägen sind das Interesse des Verletzungsklägers an einer zeitnahen Entscheidung, das Interesse des Beklagten, nicht aufgrund einer löschungsreifen Marke verurteilt zu werden, und das Interesse, widersprüchliche Entscheidungen zu vermeiden. Zugunsten des Klägers ist darüber hinaus zu berücksichtigen, ob

durch die während der Verfahrensaussetzung andauernde Verwendung des angegriffenen Zeichens mit einer Schwächung der Klagemarke zu rechnen ist und ob der Kläger noch weitere Ansprüche aufgrund anderer Kennzeichenrechte verfolgt, die durch das Nichtigkeitsverfahren nicht betroffen sind (Hacker in Ströbele/Hacker/Thiering, aaO., § 14, Rn. 20).

Das Gericht muss bei der Ausübung seines Ermessens die mögliche Verfahrensverzögerung mit den Gesichtspunkten der Verfahrensökonomie und der Vermeidung sich widersprechender Entscheidungen abwägen. Dabei hat das Gericht auch die Gesamtdauer des Verfahrens zu berücksichtigen und sich mit zunehmender Dauer nachhaltig um eine Beschleunigung des Verfahrens zu bemühen (vgl. BVerfG NJW 2013, 3432, Rn. 20).

bb)

Das Landgericht ist bei seiner Ermessensausübung davon ausgegangen, dass der Löschungsantrag der Beklagten überwiegende Aussicht auf Erfolg habe. Das Landgericht stützt sich hierbei im Wesentlichen darauf, dass der Nichtigkeitsantrag der Beklagten erfolgversprechend sei, weil die Klägerin bei der Anmeldung der Unionsmarken bösgläubig gewesen sei. Die für die Bösgläubigkeit gegebene Begründung überzeugt jedoch nicht.

Mit dem Umstand, dass die Klägerin im Jahr 2011, als sie die drei Gemeinschaftsmarken angemeldet hatte, noch davon ausgegangen war, dass der Zusatzstoff Chromoxid, der für die Rosafärbung der Hüftgelenkkugeln verantwortlich ist, die Härte der Verbundmaterialien verbessert, kann zwar möglicherweise die Bösgläubigkeit der damaligen Markenanmeldung begründet werden. Auch das ist bereits zweifelhaft, weil sich die Bösgläubigkeit im Regelfall auf die bessere Berechtigung eines Dritten bezieht (Eisenführ in Eisenführ/Schennen, GMV, 4. Aufl. 2014, Art. 52, Rn. 10, 17), während der Umstand, dass das charakteristische Merkmal der Rosafärbung zur Erreichung einer technischen Wirkung erforderlich ist, eigentlich ein Eintragungshindernis gem. Art. 7 Abs. 1 lit. e (ii) GMV darstellt, das richtigerweise nach Art. 52 Abs. 1 lit. a GMV geltend zu machen gewesen wäre (Eintragung entgegen den Vorschriften des Art. 7 GMV) und nicht nach Art. 52 Abs. 1 lit. b GMV (Bösgläubigkeit).

Der Umstand ist aber jedenfalls nicht geeignet, die Bösgläubigkeit der Anmeldung der Unionsmarken im Jahr 2019 gem. Art. 59 Abs. 1 lit. b UMV zu begründen, denn zu diesem Zeitpunkt stand die Klägerin nicht mehr auf dem Standpunkt, dass der Zusatzstoff Chromoxid technische Wirkungen zeitigt, so dass Art. 7 Abs. 1 lit. e UMV aus Sicht der Klägerin kein Eintragungshindernis mehr begründete. Der Klägerin kann auch nicht vorgeworfen werden, nur aus taktischen Gründen ihre

Ansicht zur Wirkungsweise des Chromoxid geändert zu haben, denn auch das im vorliegenden Verfahren eingeholte gerichtliche Gutachten vom 07.03.2018 bestätigt, dass die Zugabe von Chromoxid die Härte und Verschleißfestigkeit der Keramik nicht erhöht.

Die Bösgläubigkeit ergibt sich auch nicht aus einer Umgehung des Urteils des Unionsmarkengerichts in Paris. Das Urteil des Unionsmarkengerichts bezieht sich auf die Gemeinschaftsmarken und nicht auf die Unionsmarken, die im Hinblick auf den absoluten Nichtigkeitsgrund nach Art. 59 Abs. 1 UMV i.V.m. Art. 7 Abs. 1 lit. e (ii) UMV eigenständig zu prüfen sind. Wenn - wie oben dargelegt - keine Bösgläubigkeit vorliegt, dann kann auch der Umstand nicht schaden, dass das EUIPO die Bösgläubigkeit bei der Anmeldung noch gar nicht prüfen kann (vgl. Brecht in Eisenführ/Schennen, UMV, 6. Aufl. 2020, Art. 59, Rn. 6), sondern erst im Rahmen des Nichtigkeitsverfahrens. Ohnehin wäre ein absolutes Eintragungshindernis nach Art. 7 Abs. 1 lit. e UMV auch schon bei der Eintragung der Marke zu berücksichtigen gewesen.

Im Übrigen überzeugt auch der Rechtsgedanke der anderweitigen Rechtshängigkeit nicht. Das Verfahren zur Anmeldung neuer Marken und ein Nichtigkeitsverfahren bzw. eine Widerklage auf Erklärung der Nichtigkeit bzgl. bereits bestehender Marken haben ersichtlich unterschiedliche Streitgegenstände, so dass der Rechtsgedanke von § 261 Abs. 3 Nr. 1 ZPO von vornherein nicht einschlägig sein kann.

Auch der von der Beklagten hervorgehobene Umstand, dass die Markenanmeldung im Nachgang zu einem entsprechenden Patent erfolgt ist, erscheint nicht geeignet, die Bösgläubigkeit der Markenanmeldung zu begründen. Eine missbräuchliche Verlängerung zeitlich begrenzter Rechte liegt darin nicht. Eine Kumulation von Immaterialgüterrechten ist möglich, da Marken und andere Immaterialgüterrechte unterschiedlichen Zielen dienen und auch unterschiedliche Schutzvoraussetzungen haben (Hanne in BeckOK MarkenR, aaO., UMV 2017, Art. 59, Rn. 30).

cc)

Keine Bedenken bestehen gegen die Ermessenserwägungen des Landgerichts im Übrigen.

(i)

Soweit sich das Landgericht im Rahmen seiner Nichtabhilfentscheidung darauf stützt, dass nach der gesetzgeberischen Wertung dem Amt bei der Entscheidung über die Nichtigkeit einer Unions-

marke der Vorrang gebühre, ist die Berücksichtigung dieses Gesichtspunkts nicht zu beanstanden.

Zwar ergibt sich ein derartiger Vorrang nicht unmittelbar aus den gesetzlichen Regelungen. Die Regelungen in Art. 132 UMV sind nicht einschlägig, da die tatbestandlichen Voraussetzungen für eine Aussetzung nach dieser Vorschrift nicht vorliegen. Aus ihnen lässt sich daher auch nicht herleiten, dass dem Amt grundsätzlich der Vorrang gebühren soll bei der Entscheidung über die Nichtigkeit einer Unionsmarke.

Ein gewisser Vorrang für eine Entscheidung durch das Amt ergibt sich aber daraus, dass das Unionsmarkengericht im Falle einer Widerklage auf Nichtigerklärung den Beklagten auffordern kann, innerhalb einer bestimmten Frist beim EUIPO die Erklärung der Nichtigkeit zu beantragen (Schennen in Eisenführ/Schennen, aaO., Art. 132, Rn. 16). Geht der spätere Antrag beim Amt auf eine derartige Aufforderung durch das Gericht zurück, wäre es widersinnig, wenn ungeachtet dessen das Verletzungsverfahren fortgeführt werden würde (Kampmann/Eberhardt in Eisenführ/Schennen, aaO., Art. 127, Rn. 5). Es spricht einiges dafür, diese Wertung auch auf den Fall einer eigenständigen Antragstellung durch den Beklagten zu übertragen. Denn es erscheint wenig nachvollziehbar, wenn der Beklagte, der, um einem zu erwartenden Antrag des Markeninhabers und einer Entscheidung des Unionsmarkengerichts zuvorzukommen und Zeit zu sparen, anstatt eine Widerklage zu erheben, gleich einen Antrag beim Amt stellt, schlechter oder anders gestellt wird als derjenige, der all dies abwartet und dadurch auch noch eine erhebliche Verzögerung des Verfahrens herbeiführt (OLG Düsseldorf, BeckRS 2017, 114519, Rn. 14 - Evolution).

(ii)

Keine Bedenken bestehen ferner gegen die Ermessenserwägungen des Landgerichts zu der durch eine Aussetzung verursachten Verfahrensverzögerung. Insoweit ist die Erwägung des Landgerichts nicht zu beanstanden, dass der Rechtsstreit bzgl. der streitgegenständlichen Unionsmarken erst seit dem 25.04.2019 anhängig ist.

(iii)

Ebenfalls keine Bedenken bestehen gegen die Erwägung, dass auch die wirtschaftliche Bedeutung des Verfahrens für eine Aussetzung spricht, weil die Klägerin nicht dargelegt hat, dass die Beklagte auch nach dem 09.05.2018, dem Tag der Anmeldung der Unionsmarken, noch marken-

verletzende Ware in signifikantem Umfang in den Verkehr gebracht hat.

3.

Liegen Ermessensfehler vor, darf das Beschwerdegericht die Aussetzungsentscheidung lediglich aufheben. Es ist nicht befugt, eine eigene Ermessensentscheidung zu treffen (BGH, NJW-RR 2020, 98, Rn. 42).

Der Senat kann daher nicht entscheiden, ob die verbleibenden Gründe bzw. die von der Beklagten zusätzlich vorgebrachten Gründe eine Aussetzung rechtfertigen. Hierüber wird das Landgericht in eigener Zuständigkeit zu entscheiden haben.

**III.**

Eine Kostenentscheidung ist nicht veranlasst. Die Kosten des Beschwerdeverfahrens, die durch die Aussetzungsentscheidung ausgelöst werden, bilden einen Teil der Kosten des Rechtsstreits, die unabhängig vom Ausgang des Beschwerde- und Rechtsbeschwerdeverfahrens die nach §§ 91 ff. ZPO in der Sache unterliegende Partei zu tragen hat (BGH, NJW-RR 2021, 638, Rn. 23; Zöller/Greger, ZPO, 34. Aufl. 2022, § 252, Rn. 5).

Anlass für die Zulassung der Rechtsbeschwerde besteht nicht.

| Stefani | Wahle | Ketterer |
|---|---|---|
| Vorsitzender Richter am Oberlandesgericht | Richter am Oberlandesgericht | Richter am Oberlandesgericht |

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing with the United States Court of Appeals for the Federal Circuit through the CM/ECF system on June 26, 2023. All case participants are registered CM/ECF users, and the Notice of Docketing Activity generated by this filing constitutes service under Fed. Cir. R. 25(e)(1).

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

*Counsel for Appellant CeramTec GmbH*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 32(b)(1). Excluding the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2), this brief contains 13,749 words.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman, a proportionally-spaced font.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

*Counsel for Appellant CeramTec GmbH*