No. 23-1502

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

CERAMTEC GMBH,

*Appellant,*

v.

COORSTEK BIOCERAMICS LLC, FKA C5 MEDICAL WERKS, LLC,

*Appellee.*

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Nos. 92058781, 92058796

# PRINCIPAL BRIEF OF APPELLEE

DIANA M. RUTOWSKI
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

STEVEN J. HOROWITZ
CAROLINE A. WONG
RACHEL L. HAMPTON
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

*Counsel for Appellee CoorsTek Bioceramics LLC, f/k/a C5 Medical Werks, LLC*

October 6, 2023

# CERTIFICATE OF INTEREST

Counsel for CoorsTek Bioceramics LLC, f/k/a C5 Medical Werks, LLC, Steven J. Horowitz, certifies the following:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

    CoorsTek Bioceramics LLC, f/k/a C5 Medical Werks, LLC

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

    Not Applicable.

3. **Parent Corporation and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47(a)(3).

    CoorsTek, Inc.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

    **Orrick, Herrington & Sutcliffe LLP**: Daniel Justice, Derek Knerr,* Peter D. Vogl,* Briggs M. Wright,* Lindsay Rindskopf

    *Formerly of Orrick, Herrington & Sutcliffe LLP

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's

decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5).

None.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable.

October 6, 2023

*/s/ Steven J. Horowitz*
Steven J. Horowitz
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
shorowitz@sidley.com

*Counsel for Appellee*
*CoorsTek Bioceramics LLC, f/k/a*
*C5 Medical Werks, LLC*

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ..... i

STATEMENT OF RELATED CASES ..... viii

INTRODUCTION ..... 1

STATEMENT OF THE ISSUES ..... 5

STATEMENT OF THE CASE ..... 6

A. The Development Of Ceramic Hip Implants ..... 6

B. CeramTec's Statements About Chromium Oxide. ..... 8

C. CeramTec's Trademark Registrations ..... 13

D. Litigations Between The Parties. ..... 14

1. CoorsTek's Lawsuit In Colorado. ..... 15

2. The Board Proceedings Below. ..... 18

SUMMARY OF THE ARGUMENT ..... 23

STANDARD OF REVIEW ..... 26

ARGUMENT ..... 27

I. The Board's Functionality Finding Is Supported By Substantial Evidence. ..... 27

A. The Board Correctly Assessed The Role Of CeramTec's Patents, Without Shifting Any Burden Under *TrafFix*. ..... 29

1. Substantial Evidence Supports The Board's Findings Under The First *Morton-Norwich* Factor. ..... 30

2. The Board Did Not "Shift The Burden" Under (Or Otherwise Misapply) *TrafFix*. ..... 36

B. Substantial Evidence Supports The Findings On The Other *Morton-Norwich* Factors. ........................................ 47

1. Substantial Evidence Supports The Board's Findings Under The Second *Morton-Norwich* Factor. ........................................................................ 48

2. Substantial Evidence Supports The Board's Findings Under The Third And Fourth *Morton-Norwich* Factors. ......................................................... 55

3. CeramTec's "Substantial Evidence" Arguments Fail Because They Merely Ask The Court To Reweigh Evidence. ...................................................... 58

II. The Board Appropriately Found CeramTec's Unclean Hands Defense Inapplicable In This Case................................ 66

CONCLUSION ........................................................................... 68

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Avalos v. Dep't of Hous. & Urb. Dev.*,
963 F.3d 1360 (Fed. Cir. 2020) .......... 26, 27, 33

*In re Becton, Dickinson & Co.*,
675 F.3d 1368 (Fed. Cir. 2012) .......... *passim*

*Biestek v. Berryhill*,
139 S. Ct. 1148 (2019) .......... 26

*Bodum USA, Inc. v. A Top New Casting Inc.*,
927 F.3d 486 (7th Cir. 2019) .......... 43, 44

*In re Bush Bros. & Co.*,
884 F.2d 569 (Fed. Cir. 1989) .......... 14

*C5 Med. Werks, LLC v. CeramTec GmbH*,
249 F. Supp. 3d 1210 (D. Colo. 2017) .......... *passim*

*C5 Med. Werks, LLC v. CeramTec GMBH*,
937 F.3d 1319 (10th Cir. 2019) .......... 17

*In re Dietrich*,
91 USPQ2d 1622 (TTAB 2009) .......... 42

*Eco Mf'g LLC v. Honeywell Int'l, Inc.*,
357 F.3d 649 (7th Cir. 2003) .......... 54, 55

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .......... 26, 27

*Hambsch v. Dep't of Treasury*,
796 F.2d 430 (Fed. Cir. 1986) .......... 27, 54

*Holmes v. U.S. Postal Serv.*,
987 F.3d 1042 (Fed. Cir. 2021) .......... 54, 55

*Interactive Gift Express, Inc. v. CompuServe, Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) .......... 44

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982) ........................................ 28, 33

*Licari v. Dep't of Transp.*,
705 F. App'x 978 (Fed. Cir. 2017) ........................................ 55

*Loglan Inst., Inc. v. Logical Language Grp., Inc.*,
962 F.2d 1038 (Fed. Cir. 1992) ........................................ 67

*Lozano v. Sec'y of Health & Hum. Servs.*,
958 F.3d 1363 (Fed. Cir. 2020) ........................................ 60

*Matal v. Tam*,
582 U.S. 218 (2017) ........................................ 27

*McAirlaids, Inc. v. v. Kimberly-Clark Corp.*,
756 F.3d 307 (4th Cir. 2014) ........................................ 42, 43

*McGowen Precision Barrels, LLC v. Proof Research, Inc.*,
No. 92067618, 2021 WL 2138663 (TTAB May 20, 2021) .................... 42

*Meza v. Dep't of Homeland Sec.*,
275 F. App'x 987 (Fed. Cir. 2008) ........................................ 60

*In re Morton-Norwich Products, Inc.*,
671 F.2d 1332 (CCPA 1982) ........................................ *passim*

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
55 F.4th 1354 (Fed. Cir. 2022) ........................................ 27

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ........................................ 61, 65

*Qualitex Co. v. Jacobson Prods. Co.*,
514 U.S. 159 (1995) ........................................ 28, 41, 67

*In re Reelex Packaging Sols., Inc.*,
834 F. App'x 574 (Fed. Cir. 2020) ........................................ 26, 29, 30, 58

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
903 F.3d 1286 (Fed. Cir. 2018) ........................................ 60, 61

*Regents of the Univ. of Minn. v. Gilead Scis., Inc.*,
61 F.4th 1350 (Fed. Cir. 2023) ............ 62

*Schultz v. U.S. Postal Serv.*,
323 F. App'x 912 (Fed. Cir. 2009) ............ 64

*In re Society of Health & Physical Educators*,
127 USPQ2d 1584 (TTAB 2018) ............ 66

*Tech. Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008) ............ 38

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
532 U.S. 23 (2001) ............ *passim*

*Valu Eng'g, Inc. v. Rexnord Corp.*,
278 F.3d 1268 (Fed. Cir. 2002) ............ *passim*

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) ............ 60

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988) ............ 38

**Other Authority**

TTAB Manual of Procedure
§ 101.03 (June 2022) ............ 66, 67

## STATEMENT OF RELATED CASES

No other appeal from this proceeding was previously before this or any other appellate court. In addition, CoorsTek Bioceramics LLC, f/k/a C5 Medical Werks, LLC is not aware of any pending case that will directly affect or be directly affected by the Court's decision in this case. *See* Fed. Cir. R. 47.5.

## INTRODUCTION

More than a quarter century ago, CeramTec GmbH invented a new ceramic material that had ground-breaking implications for orthopedic medicine. The key to CeramTec's invention was that it used a specific ratio of chromium oxide in proportion to other chemical compounds. This novel use of chromium oxide made ceramics harder—a significant innovation for orthopedic implants, which ideally should last in the human body for as long as possible without wearing down. CeramTec obtained a patent for its invention, exchanging its public disclosures in the patent for exclusive rights to practice the invention for a limited term, and it began selling hip implants with its patented material. These new hip implants enjoyed great success: over the life of its patent monopoly, CeramTec sold more than a million of them.

But in 2013, CeramTec's patent expired, and competitors began introducing their own chromium-oxide ceramic hip implants into the market. Threatened by competition, and past the term of the patent monopoly it had long enjoyed, CeramTec changed strategies. As it so happens, the level of chromium oxide in CeramTec's ceramic hip implants turns the material a light shade of pink. So CeramTec

registered two trademarks for the pink color of its ceramic hip implants. It then wielded its asserted trademark rights by seizing competitor hip implants which also used chromium oxide—and which also were pink, because that is the color that chromium oxide naturally causes.

CoorsTek Bioceramics LLC, formerly known as C5 Medical Werks, LLC, was one of CeramTec's new competitors in the market for ceramic hip implants. In 2014, after learning about CeramTec's trademarks during a trade show where CeramTec seized its products, CoorsTek filed cancellation petitions to challenge those trademarks before the Trademark Trial and Appeal Board (the "Board"), on the ground that the pink color that is naturally caused by the amount of chromium oxide in CeramTec's ceramic hip implants is a "functional" feature and thus cannot be registered as a trademark.

After receiving thousands of pages of evidence from the parties, the Board agreed with CoorsTek and issued a 106-page opinion explaining its finding that pink is, in fact, a functional feature of CeramTec's ceramic hip implants. The record readily supports the Board's findings: time and time again over a multi-decade period, CeramTec told the world—including in its patents, patent applications,

FDA submissions, marketing materials, and other technical literature—that the new ceramic material it had invented, and which gives the material its pink color, was superior to prior generations of ceramic material precisely because it used a special ratio of chromium oxide to increase the ceramics' hardness.

The substantial-evidence standard that applies in this case affords great deference to the Board's decision. In an attempt to sidestep that standard, CeramTec argues that the Board committed an error of law by applying *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001), to shift the burden of proof to CeramTec. But the Board did no such thing. It expressly noted that CoorsTek—not CeramTec—bore the burden of proving functionality by a preponderance of the evidence, and found that CoorsTek met that burden in light of the record as a whole. The case does not present any "burden shifting" issue.

That leaves CeramTec with its criticisms of the Board's factual findings. But those arguments amount to nothing more than CeramTec's disagreements with how the Board weighed the evidence. It argues that the Board "disregarded" a 2018 study conducted by a research institute in Germany (even though a whole section of the

Board's decision addresses that very study), gave insufficient weight to CeramTec's evidence about alternative designs and production costs (the Board addressed that evidence, too), and did not have enough evidence to conclude that chromium oxide affects other material properties besides hardness (it did, though the findings about hardness were enough on their own to support its decision anyway). This Court's precedent is clear: these kinds of requests for a reweighing of the evidence before the Board do not go anywhere.

At the end of its brief, CeramTec tries to raise one other "legal" issue: it says the Board erred by holding that the affirmative defense of unclean hands is categorically unavailable in Board proceedings. This, too, is an issue that is not presented here. The Board merely exercised its discretion in declining to apply the defense in this particular case, in a non-precedential opinion. And even if the Board had instead declared a categorical rule, that rule would make sense, given the strong public interest in canceling improper trademark registrations—especially where, as here, the registration serves to subvert the patent bargain by artificially extending an expired patent monopoly.

The Board's decision should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether the Board's decision is supported by substantial evidence.

2. Whether the Board correctly found the unclean hands defense inapplicable when CeramTec's patent has expired and the public interest in cancellation proceedings is strong.

## STATEMENT OF THE CASE

### A. The Development Of Ceramic Hip Implants.

Each year, tens of thousands of people in the United States undergo surgery to have a hip replaced. During hip replacement surgery, diseased bone and cartilage are removed from the patient and replaced with orthopedic implants. (*See* Appx13152–13153.) These implants typically comprise a hip joint "ball," which is attached to the end of the patient's femur with a metal stem, and a "shell" or "cup," which is attached to the side of the pelvis. (*See* Appx13152–13153.) The ball fits inside the cup to operate as a ball-and-socket joint, as shown here:




(Appx13152–13153; *see also* Appx27.)

Hip replacement surgery is a major medical procedure. (Appx27.) It is critical that hip implants perform well, and that they do not fail, degrade, or cause adverse reactions inside the body. (Appx28.)

Historically, medical-device companies faced major challenges in developing hip implants. (Appx28.) Some hip-replacement systems used metal and polyethylene implants, but those systems can create debris that can cause osteolysis, a type of bone decay. (Appx28; Appx611–612(¶¶ 4–5).) To reduce the risk of bone decay, companies experimented with ceramics as an alternative material. (Appx28; Appx612(¶¶ 4–5).) But early ceramic hip implants had their own problems: they had limited impact resistance and a greater risk of fracturing. (Appx28; Appx612(¶ 5).) At least one company tried to address those problems by using a type of ceramic made with yttria-stabilized zirconia, but the material was susceptible to adverse changes that produced "very high fracture rates" and thus had to be abandoned. (Appx2299.)

In the 1990s, CeramTec, a medical-device company headquartered in Germany, made a scientific breakthrough: it invented a new ceramic hip implant that used a material marketed as "BIOLOX delta." (*See,*

*e.g.*, Appx2299–2300; *see also* Appx20.) BIOLOX delta is made with a type of ceramic called "zirconia-toughened alumina," or "ZTA." (Appx29.) The key innovation of BIOLOX delta was that it used a ZTA composite with a specific ratio of "chromium oxide," a compound of chromium and oxygen that is also known as "chromia." (Appx30; *see also* Appx22.) CeramTec's BIOLOX delta material was a major advance for ceramic hip implants. It "virtually doubled the strength and fracture toughness" compared to implants made with pure alumina (Appx2299–2300), and it had superior fracture rates and wear rates compared to CeramTec's prior generation of products (Appx29). The presence of chromium oxide also makes the ceramic pink. (Appx30; Appx10589(¶ 14).)

### B. CeramTec's Statements About Chromium Oxide.

CeramTec applied for a patent to obtain exclusive rights over the new chemical composition it invented. (*See* Appx34–37.) During prosecution of its patent application, in an effort to overcome a prior-art rejection of its then-pending claims, CeramTec emphasized to the Patent Office that its invention used "an entirely unique composition." (Appx1627–1628.) In particular, it used "a very specific molar ratio" of

chromium oxide to zirconium dioxide. (Appx1628.) This combination made it possible "for the first time" to "obtain hardness values" that had previously "not been achievable." (Appx1628.) Based on these representations to the Patent Office, CeramTec overcame the prior-art reference raised by the patent examiner (Appx1627–1629), and successfully obtained a patent in November 1998 (U.S. Patent No. 5,830,816, "the '816 patent"). (*See* Appx34–36; Appx1230–1242.)

CeramTec's patent covered "the same chemical composition" that is used in its BIOLOX delta ceramic hip implants. (Appx34; *see also, e.g.*, Appx2754.) As set forth in the patent specification, that chemical composition addressed the "problem" that had existed before CeramTec's breakthrough: it had been difficult to make ceramics with a "high strength level and in which good toughness is combined with great hardness." (Appx1238(3:39–3:42).) CeramTec's invention solved that problem with a "ceramic matrix" in which "chromium oxide" has a "specific molar ratio" to zirconium dioxide. (Appx1238(3:51–3:61).) This chemical composition "ma[de] it possible for the first time to achieve hardness values such as ha[d] not previously been achieved." (Appx1238(3:61–3:66).) Although the '816 patent was directed to

ceramic cutting tools, the patent made clear that cutting tools were only an "illustrative" example of the invention's uses. (Appx1241(9:21–9:24).) It broadly claimed—and thus gave CeramTec a limited-term monopoly over—*all* ceramics with the specific chemical combination and ratio of chromium oxide that CeramTec had developed, regardless of how those ceramics were used. (Appx1241(9:60–10:37).)

Over the following years, CeramTec applied for other patents that claimed and spoke to the benefit of using chromium oxide in ceramics. (Appx39–42.) It also submitted materials to the FDA for review and approval of ceramic hip implants using its BIOLOX delta composition. (Appx49–52.) Those materials reiterated what CeramTec had stated in the '816 patent: that the chromium oxide in the BIOLOX delta material solved the problems of prior generations of ceramics by increasing their hardness.

For example, in April 2004, CeramTec submitted information to the FDA explaining that it had designed BIOLOX delta to achieve "[i]mproved fracture toughness" and "[i]mproved strength distribution" in its ceramic hip implants. (Appx1247; *see also* Appx1244.) The submission further explained that CeramTec had achieved these

"excellent properties" through "the addition of chromium oxide." (Appx1248.) The BIOLOX delta material uses zirconia to increase strength and toughness, but the zirconia "cause[s]" a "drop in hardness"—and "the addition of chromium oxide" is the "means of compensating for th[is] drop." (Appx1248–1249; *see also* Appx1249–1251, Appx53.)

CeramTec's 2008 submission to the FDA likewise explained that "the basic idea for the development" of a ceramic material using BIOLOX delta was to "increase its strength and toughness" while still "preserv[ing] all the desirable properties" of prior ceramic hip implant materials. (Appx1310.) To achieve this, "[c]hromium is added," which "increases the hardness of the composite." (Appx1310.) The submission also noted that "chromium is the reason for the pink color" of ceramics made with this material. (Appx1310; *see also*, *e.g.*, Appx53–55.)

Marketing materials for BIOLOX delta contained similar statements. For example, a brochure from 2003 extolled BIOLOX delta as "a high-strength material with high hardness and high toughness" and "perfectly suited" for hip implants, and attributed this "high hardness" to the presence of chromium oxide:

> The alumina material provides BIOLOX delta with high hardness . . . In zirconia-toughened alumina (ZTA) materials, some of the original hardness of the alumina material is lost. *The addition of chromium oxide restores the desired material hardness.*

(Appx2671–2672 (emphasis added).) The brochure also included a bar chart showing BIOLOX delta's superior hardness compared to other materials, shown in pink to match the color of the material:







(Appx2673, Appx2678.)

As another example, a set of "FAQ's" that CeramTec circulated in early 2012 touted its ceramic hip implants as having "[d]iamond like hardness." (Appx2638.) It explained: "Chromium oxide is added to increase the hardness" and "gives the pink color." (Appx2641.) Other marketing materials similarly described the use of chromium oxide to "enhance the performance" and "increase the hardness" of CeramTec's

hip implants, and connected the presence of chromium to "[t]he pink color." (Appx56–58; *see also, e.g.*, Appx1835–1836 ("The pink color is due to the chromium oxide ($Cr_2O_3$) that improves the hardness.").)

### C. CeramTec's Trademark Registrations.

CeramTec's invention was a success. For years, its '816 patent blocked competitors from using chromium oxide in the claimed ratio, and by February 2012, "more than 1 million artificial hip joints" made with CeramTec's BIOLOX delta composition had been "successfully implanted." (Appx4587.)

But by then, CeramTec's '816 patent covering the composition that made its products pink was about to expire. Facing the end of its patent-based exclusivity, CeramTec registered two trademarks for the pink color of its BIOLOX delta hip implants. (Appx237–245.) The '816 patent expired in January 2013. (Appx34.) The trademarks were placed on the Supplemental Register[1] in April 2013. (Appx107–110.)

[1] The Supplemental Register is the United States Patent and Trademark Office's secondary register of trademarks. It provides limited trademark rights for marks that do not meet all the requirements for registration on the Principal Register. In particular, if a mark is not yet "distinctive" of the registrant's goods, but "is capable of becoming so," then it is ineligible for the Principal Register but may

### D. Litigations Between The Parties.

CoorsTek is a relatively new entrant in the medical-implant component business, though it is no newcomer to ceramics. (Appx20.) It was formed in 2005 to apply its parent company's 90 years of ceramics experience to orthopedics, including to hip implants. (*See* Appx82, Appx4899–4890(¶¶ 3–6), Appx1099–1103(149:19–153:17).) CoorsTek first introduced its pink ceramic component products to the market in 2013—after CeramTec's '816 patent's expiration, which CoorsTek understood would open the market for such implants to any and all entrants. (Appx1076(923:1–923:20); Appx4906–4911 (¶¶ 9–10); *see also* Appx29, Appx82–83.) Unbeknownst to CoorsTek, however, CeramTec had meanwhile registered trademarks for the pink color of its ceramic hip implants. CoorsTek first learned about CeramTec's trademark registrations in late 2013, when CeramTec, claiming authority under its new registrations, seized CoorsTek's products at a trade show and then sent CoorsTek a cease-and-desist letter commanding it to stop selling pink hip balls. (Appx1058–1060(253:22–255:25), Appx2788–2794; *see also* Appx83–84.)

---

be eligible for the Supplemental Register. *In re Bush Bros. & Co.*, 884 F.2d 569, 570 (Fed. Cir. 1989).

After learning about CeramTec's trademark registrations, CoorsTek initiated two sets of legal proceedings on the same day in March 2014: a federal lawsuit in the District of Colorado, and a cancellation proceeding before the Board. This appeal arises from the latter.

**1. CoorsTek's Lawsuit In Colorado.**

Much of the evidence presented to the Board below consisted of trial testimony and exhibits from the federal suit in Colorado. In that suit, CoorsTek asserted (among other things) that the pink color of CeramTec's BIOLOX delta ceramics is ineligible for trademark protection because it is a natural byproduct of the chromium in the material, and chromium is functional. *See C5 Med. Werks, LLC v. CeramTec GmbH*, 249 F. Supp. 3d 1210, 1215 (D. Colo. 2017). After years of pre-trial proceedings and an 11-day bench trial, the court agreed with CoorsTek, finding that the color is functional because chromium "affects the quality" of the product. *Id.* at 1218–19 (quotation marks omitted).

The district court identified a wealth of evidence supporting its decision. For example, following the Supreme Court's lead in *TrafFix*

*Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001), the court found that CeramTec's patents and prosecution history "illustrate" that the chromium in BIOLOX delta "is the reason the device works." *C5 Med. Werks*, 249 F. Supp. 3d at 1219. It also found that "over the span of roughly two decades," CeramTec "made no less than six FDA filings, published additional research, and distributed training and marketing materials that all maintained that chromium affects the quality of BIOLOX Delta by making it harder." *Id.* at 1220 (quotation marks omitted).

The court rejected CeramTec's efforts to distinguish the functional component (chromium) from the color it produces (pinkness), finding that "one cannot logically separate" the two. *Id.* at 1221. Pink was no "arbitrary design flourish"; it was "the natural byproduct of the chromium." *Id.* (citing Dr. Meinhard Kuntz, a key CeramTec witness, *see* Appx1188). The court similarly rejected CeramTec's "newfound position" on the science. *Id.* at 1222. CeramTec had argued that, despite what it had told the Patent Office, the FDA, and the market for years, "science now suggests that chromium does *not* increase hardness." *Id.* at 1221–22. The court found that, "for two reasons,"

CeramTec's "attempt to put the toothpaste back in the tube" was "unavailing." *Id.* First, CeramTec's position relied on a non-peer-reviewed "white paper" by a CeramTec employee (Dr. Kuntz) that, in the court's view, was "plainly slanted to achieve a litigation objective." *Id.* at 1222. And second, CeramTec's "newfound position" on the science "clashes with the vast majority of evidence," including "the '816 patent and CeramTec's own decades-long paper trail." *Id.*

As an alternative basis for its ruling, the court found that CeramTec was "estopped from denying that chromium is functional" in light of its patents and its statements to the Patent Office, the FDA, the public, and the scientific community—"all made during the period that CeramTec was enjoying the monopoly created by the '816 patent." *Id.*

On appeal, the Tenth Circuit vacated the Colorado court's decision on a purely procedural ground: there was no personal jurisdiction over CeramTec in Colorado. *See C5 Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319, 1325 (10th Cir. 2019). That decision prompted the resumption of the previously stayed Board proceedings.

**2. The Board Proceedings Below.**

As noted above, CoorsTek initiated the Colorado case and the Board cancellation proceedings on the same day in 2014, but the Board proceedings were suspended until the final resolution of the Colorado litigation. (*See* Appx4.) After the Board proceedings resumed, the parties submitted evidence from the Colorado case, as well as extensive supplemental discovery, and proceeded to briefing and an oral hearing before the Board. (*See* Appx4.)

In a thorough, 106-page opinion, the Board reached the same conclusion the Colorado court did before it: the color pink in CeramTec's hip implants is functional and thus cannot be registered as a trademark. (Appx4–5.)[2]

After highlighting key evidence in the multi-thousand-page record—including CeramTec's patents, patent prosecution history, representations to the FDA, and marketing materials, plus voluminous additional evidence (Appx7–14, Appx34–72)—the Board turned to the functionality analysis. It began with key guiding principles of

[2] In light of its finding of functionality, the Board did not need to address CoorsTek's claim based on CeramTec's fraud upon the Patent Office. (Appx5.)

trademark law, including that trademark law is designed to ensure that inventors cannot make an "end run" around the patent system. (Appx86.) It then applied the four "*Morton-Norwich* factors" to assess whether CeramTec's claimed mark is "functional." (Appx87–99.)

In applying the first *Morton-Norwich* factor, the Board evaluated CeramTec's utility patents, patent applications, and statements to the Patent Office. (Appx89–94.) It found that CeramTec's '816 patent claimed the addition of chromia to ZTA ceramics, including as practiced in BIOLOX delta, and that CeramTec's patent specifications and communications to the Patent Office confirmed that chromia increases the ceramics' hardness. (Appx91–92; *see also* Appx1230–1242 ('816 patent); Appx1625–1628 (key prosecution history); Appx1440–1446, Appx1640–1642, Appx3353–3361 (other patents); Appx3349–3351 (patent application).) The Board found that these materials were "strong evidence" of functionality. (Appx94.)

As to the second factor, the Board considered marketing materials for BIOLOX delta, CeramTec's FDA submissions, and other statements to the scientific community and the public regarding the role of chromia in ZTA ceramics. (Appx42–58, Appx94–97.) For example, CeramTec's

submissions to the FDA in 2004, 2008, and 2012—and even in 2013 and 2015, *after* CeramTec registered the marks at issue—stated that chromia contributes to the hardness of its ceramic hip components and turns them pink. (*See, e.g.*, Appx1249 (2004: "chromium oxide . . . compensat[es] for the drop in hardness"), Appx4651 (June 2013: "Chromium . . . increase[s] hardness" and "is the reason for the pink color."), Appx1734 (same in 2015).)[3]

In addition, for years, CeramTec and its customers issued promotional literature extolling the benefits of chromia for the performance of CeramTec's ceramic hip implants. (*See, e.g.*, Appx2521–2528 (CeramTec brochure highlighting at Appx2523 that "hardening result[s] from the addition of chromium oxide"); *see also* Appx56–59.) Numerous articles and other technical literature further confirmed these benefits of chromia and noted that chromia turns ceramics pink. In fact, a "good number of [these] articles" had been "written or co-written by [CeramTec's] current or former employees," including Dr. Wolfgang Burger (the lead inventor listed on the '816 patent, *see*

---

[3] *See also* Appx1244–1283 (CeramTec's 2004 FDA submission), Appx1285–1331 (2008 submission), Appx1333–1396 (2012 submission), Appx4616–4700 (2013 submission), Appx1705–1810 (2015 submission).

Appx1230) and Dr. Meinhard Kuntz (former Manager of Oxide Development at CeramTec, *see* Appx10587(¶ 4)). (Appx95.) In one paper, Dr. Burger explained that, "due to the addition of chrom[ium] oxide, the hardness may [] be kept at a very high level" in certain ceramics. (Appx4271; *see also* Appx4269–4273.) In two others, published in 2006 and 2009, Dr. Kuntz found that "the hardness" of certain ceramics is "recaptured by alloying the material with chromium oxide" (Appx2848; *see also* Appx2847–2851), and that "[c]hromium . . . increases the hardness of the composite" and "is the reason for the pink color of the material" (Appx3096; *see also* Appx3092–3114). Other papers, including one published in 2017, similarly noted that "chromium oxide is added to the composite to help increase the hardness." (Appx4178; *see also* Appx4179–4184.)

In light of these materials, the Board found that the second *Morton-Norwich* factor yielded "strong evidence" of functionality, too. (Appx97.)

The Board also evaluated the third and fourth *Morton-Norwich* factors, "for the sake of completeness." (Appx89.) It concluded that those factors were neutral. (Appx98–99.) With two factors weighing in

favor of functionality and the others neutral, the Board ultimately found that CoorsTek carried its burden in proving functionality "by a preponderance of the evidence." (Appx4–5.) More specifically, the Board found that "the color pink (caused by the addition of chromia)" is "functional." (Appx103–104.)

CeramTec had put forth evidence purporting to show the opposite. The Board analyzed that evidence, too, including by weighing the parties' competing expert evidence, but ultimately concluded that the record as a whole demonstrated functionality. (*See, e.g.*, Appx99–103.) The Board also found that certain of CeramTec's evidence was not credible because it post-dated the start of the parties' litigation and conflicted with CeramTec's pre-2013 statements—that is, statements it made before registering its trademarks. (*See* Appx96–97, Appx99 n.228.) This finding was based in part on documents in which CeramTec's employees discussed a need to combat market competition after CeramTec's patent expired—including through efforts "designed to obtain trademark protection for the color pink." (Appx96 (quoting Appx878–881); *see also* Appx828, Appx914.)

Finally, the Board addressed CeramTec's affirmative defense of unclean hands. (Appx104–106.) It decided to "exercise [its] discretion" to find this equitable defense "inapplicable to these proceedings," in light of the "strong public policy interest" in removing ineligible marks from the Supplemental Register. (Appx105; *see also* Appx5.)

For these reasons, the Board granted CoorsTek's Petitions to Cancel Trademark Registration Nos. 4319095 and 4319096. (Appx106.)

## SUMMARY OF THE ARGUMENT

**1.** The Board's decision is supported by substantial evidence. The Board considered thousands of pages of record materials, including from the prior district court litigation in which CoorsTek prevailed on the very question presented to the Board below: whether the color pink in CeramTec's ceramic hip implants, a natural byproduct of the chromium oxide used in those products, is functional and therefore ineligible for trademark protection. The Board answered "yes" to that question after considering the record as a whole and weighing all the evidence, as reflected in its meticulous 106-page opinion. Its conclusion is amply supported, including by: (1) statements in CeramTec's patents and representations to the Patent Office, where CeramTec repeatedly

claimed that chromium oxide increases ceramics' hardness; (2) CeramTec's FDA submissions, which repeated that chromium "increases the hardness" of its ceramic hip implants and also "is the reason for the pink color"; (3) marketing materials for these products, which touted them as superior precisely because they used chromium oxide to increase hardness; and (4) other technical literature about chromium oxide's hardening effect and other benefits in ceramics. Applying the four *Morton-Norwich* factors to this and other evidence, the Board correctly concluded that the pink color of CeramTec's BIOLOX delta composition is functional.

CeramTec's brief leads off with an attempt to conjure legal error by attacking reasoning that appears nowhere in the Board's decision. In particular, CeramTec says the Board was wrong to impose a "heavy burden" on CeramTec to disprove functionality under *TrafFix*. But the Board did no such thing. Its opinion is clear that CoorsTek bore—and met—the burden of proof. (*E.g.*, Appx4–5.) To be sure, the Board's opinion includes a 15-line block quote from *TrafFix* that has the words "heavy burden" (Appx90), but the Board never said CeramTec bore (or failed to meet) *any* burden to disprove functionality. As a result,

CeramTec's challenge to the Board's assessment of the first *Morton-Norwich* factor—the existence of a utility patent that discloses the utilitarian advantages of the registered subject matter—reduces to a straightforward substantial-evidence analysis. And on that analysis, CeramTec falls short.

On the other *Morton-Norwich* factors, CeramTec's arguments boil down to run-of-the-mill disagreements with how much weight the Board gave to CeramTec's favorite evidence. CeramTec claims the evidence shows that "[s]cience evolves," and that chromium oxide does not actually increase hardness after all. (Br. 28.) But the only thing that has "evolved" is CeramTec's *position* on chromium oxide, which changed after CeramTec registered its marks and then sought to defend them in litigation. The Board's factual findings were substantially supported by the record, and none of CeramTec's arguments comes close to warranting reversal under the deferential standard of review that applies.

**2.** The Board correctly found that CeramTec's unclean hands defense does not apply in this case. CeramTec contends that the Board erred by holding that the unclean hands defense is "categorically"

inapplicable in Board proceedings. But that is not what the Board held, and in any event, such a rule would be appropriate in light of the public's interest in ridding the register of marks ineligible for trademark protection. That public interest is especially strong where, as here, the registrant seeks to use trademark laws to improperly extend its rights of exclusivity after its patent monopoly over the invention at issue has expired.

## STANDARD OF REVIEW

The Board's factual findings are reviewed for "substantial evidence," and "functionality of a proposed mark is a question of fact." *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1372–73 (Fed. Cir. 2012).

The "threshold" for this standard is "not high." *In re Reelex Packaging Sols., Inc.*, 834 F. App'x 574, 579–80 (Fed. Cir. 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). All it requires is that a "reasonable person might find that the evidentiary record supports the agency's conclusion," *Becton*, 675 F.3d at 1373, based on an "examination of the record as a whole," *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000). Moreover, agency credibility determinations are "virtually unreviewable." *Avalos v. Dep't of Hous. &*

*Urb. Dev.*, 963 F.3d 1360, 1369 (Fed. Cir. 2020) (quoting *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986)).

The Court applies the *de novo* standard of review to questions of law, where they exist. *Gartside*, 203 F.3d at 1315.

## ARGUMENT

### I. The Board's Functionality Finding Is Supported By Substantial Evidence.

Despite CeramTec's attempt to lead with an asserted legal error—the supposed wrongful burden-shifting under *TrafFix*—this appeal boils down to one key question: whether the Board's decision is supported by substantial evidence. The answer to that question is "yes."

The essential purpose of trademarks is to protect distinctive marks that identify the source of goods or services, in order to help avoid consumer confusion about where such goods or services come from. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218, 223–24 (2017). A feature of a product, however, "cannot serve as a trademark" if the feature is "functional." *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1367 (Fed. Cir. 2022). Without that rule, a monopoly over functional features "could be obtained without regard to whether they qualify as patents" and "could be extended forever," thus hampering competition

and harming consumers. *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1273–74 (Fed. Cir. 2002) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)).

A feature is "functional" if it is "essential to the use or purpose" of the product, or if it "affects the cost or quality." *Id.* at 1275 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). To evaluate whether a feature or design is functional under this test, this Court considers the four "*Morton-Norwich*" factors, named after *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332 (CCPA 1982):

> (1) the existence of a utility patent disclosing the utilitarian advantages of the design;
>
> (2) advertising materials in which the originator of the design touts the design's utilitarian advantages;
>
> (3) the availability to competitors of functionally equivalent designs; and
>
> (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product.

*Becton*, 675 F.3d at 1374 (summarizing *Morton-Norwich*, 671 F.2d at 1340–41). Not every factor needs to be evaluated in every case. In particular, if other considerations show that a feature is functional, "there is no need to consider" the third *Morton-Norwich* factor, because a feature "cannot be given trade dress protection merely because

there are alternative designs available." *Valu Eng'g*, 278 F.3d at 1276. Nor do all four categories have to weigh in favor of functionality in order for the Board to find that a mark is functional. *See Becton*, 675 F.3d at 1376.

### A. The Board Correctly Assessed The Role Of CeramTec's Patents, Without Shifting Any Burden Under *TrafFix*.

The first *Morton-Norwich* factor asks whether there is "a utility patent that discloses the utilitarian advantages of the design sought to be registered." *Reelex*, 834 F. App'x at 580. For guidance on this inquiry, the Board looked to *TrafFix*, which directs that courts consider patent claims for this analysis, and also counsels "going beyond" and "examining the patent and its prosecution history" as a whole. (Appx90 (quoting *TrafFix*, 532 U.S. at 34).)

CeramTec contends that the Board erred by purportedly "applying [a] presumption of functionality" under *TrafFix*. (Br. 24.) But the Board applied no such presumption. And contrary to CeramTec's arguments, the Board's finding that CeramTec's patents weighed in favor of functionality under the first *Morton-Norwich* factor was amply supported by the evidence.

### 1. Substantial Evidence Supports The Board's Findings Under The First *Morton-Norwich* Factor.

In evaluating the first *Morton-Norwich* factor, the Board found that CeramTec's patents and statements to the Patent Office are "strong evidence that the color pink for ceramic hip implant components is functional." (Appx94.) Substantial evidence—including from multiple patents and one of CeramTec's patent applications—supports that finding.

**The '816 Patent.** First, the Board reasonably found that, considered "collectively," the "claims, specification and prosecution history of the '816 patent disclose the functional benefits of chromia with respect to the toughness, hardness, stability and suppression of brittleness of the ZTA ceramic." (Appx92.)

The claims of the '816 patent support the Board's finding because they claim—and thus "demonstrate the functionality of"—certain ceramics made with chromium oxide. *Reelex*, 834 F. App'x at 581 (affirming Board decision applying *Morton-Norwich*). For example, claim 3 is directed to a chemical compound with a certain volume of "aluminum oxide/chromium oxide mixed crystal," and a "molar ratio between the zirconium dioxide . . . and the chromium oxide amounting

to 1,000:1 to 20:1." (Appx1241(9:60–10:38).) These claims defined the metes and bounds of CeramTec's patent exclusivity. And as CeramTec has admitted, its pink BIOLOX delta ceramic hip implants fell within those bounds. (Appx2754 (CeramTec's RFA responses: "CeramTec admits that the BIOLOX Delta ZTA ceramic material practices one or more claims of U.S. Patent No. 5,830,816."); *see also* Appx1168–1170(1018:20–1020:18).)

The specification of the '816 patent further supports the Board's finding because it confirms that the specified level of chromium oxide serves a key function in the claimed material: it increases the material's hardness. In particular, the specification explains that the invention was an "entirely special composition" that solved the "problem" of earlier ceramics because of its "specific molar ratio" of zirconium dioxide to chromium oxide. (Appx1238(3:39–3:61).) "This measure"—*i.e.*, the claimed ratio of chromium oxide to zirconium dioxide—was essential to the invention, because it "ma[de] it possible for the first time to achieve hardness values such as have not previously been achieved at such zirconium dioxide contents." (Appx1238(3:61–3:66); *see also* Appx36.)

CeramTec's statements to the Patent Office during prosecution of the '816 patent further confirm that chromia is functional. In particular, to overcome prior art raised by the patent examiner, CeramTec represented that its invention used "an entirely unique composition" containing "a very specific molar ratio" of "chromium oxide" to zirconium dioxide (Appx1628)—and that "[o]nly" with this combination was it "possible to obtain hardness values" which had previously "not been achievable." (Appx1628; *see also* Appx38.) Those very representations enabled CeramTec to overcome a prior art rejection, and thus cleared the way for it to obtain its patent. (Appx1625–1629.)

In its brief, CeramTec argues that it was merely an old "belief" that "chromia alongside yttria had the added benefit of increasing the ZTA ceramic's hardness" (Br. 9), and that—contrary to CeramTec's statements in its patents and to the Patent Office—later "studies began to cast doubt on the idea that the tiny amount of chromia in BIOLOX Delta had any hardening benefit" (*id.* at 12 (citing Appx10622)). But the evidence does not support that. Rather, the "evidence" CeramTec cites about these "studies" is merely a demonstrative exhibit prepared

by its expert witness and former employee, Dr. Kuntz. (Appx10622.) Dr. Kuntz's report makes clear that the "studies" noted in the demonstrative were not published; they consist of two unpublished experiments that he recalled his co-workers performing at CeramTec (Appx10598–10599(¶¶ 41–44)), along with a post-litigation "white paper" he authored in 2014 (Appx10604–10605(¶ 57)), which he admitted was "not scientific journal quality" (Appx62; *see also* Appx1194–1198(1154:6–1158:17)). The Board found that evidence from Dr. Kuntz was not credible, including in light of his publication of papers that "appear to have been written to justify [CeramTec's] litigation positions." (Appx99 & n.228.) That credibility determination was sound, and it is "virtually unreviewable" on appeal. *Avalos*, 963 F.3d at 1369; *see also, e.g.*, *Inwood*, 456 U.S. at 856 ("Determining the weight and credibility of the evidence is the special province of the trier of fact.").

**CeramTec's Other Patents.** The Board also correctly found further evidence of functionality in CeramTec's other patents claiming compositions of ceramic materials. (Appx92.) The specifications of

those patents confirm "the benefits of chromia to toughness and hardness" in ZTA ceramics. (Appx92.)

First, like the '816 patent, the specification of CeramTec's U.S. Patent No. 9,237,955 ("the '955 patent") explains chromium oxide's functional benefits. Specifically, it states that the "specific molar ratio" of "chromium oxide" in relation to zirconium dioxide "makes it possible for the first time for hardness values to be attained" that had previously "not been attainable" in compositions with certain levels of zirconium dioxide. (Appx3356(2:51–2:60).) In particular, "when the proportion of zirconium dioxide rises," there may be a "drop in the hardness values" of the material—and "the chromium addition counteracts any drop." (Appx3359(7:33–7:35).)

Other patents also confirm the benefits of adding chromium oxide to certain ceramics. For example, CeramTec's U.S. Patent No. 8,932,970 ("the '970 patent") requires the specific chromium-oxide ratio of "0.35 wt%," approximately the ratio of chromium oxide used in BIOLOX delta, in one of its claims. (Appx1642(4:27–4:30).) And 19 of the 20 claims in CeramTec's U.S. Patent No. 6,452,957 ("the '957 patent") include chromium oxide as an element, too. (Appx1445–

1446(9:31–12:22).) The disclosures in that patent's specification further explain that "the chromium addition" in the claimed material "counteracts any drop in the hardness values when the proportion of zirconium dioxide rises." (Appx1443(5:41–5:46); *see also* Appx1442(4:43–4:56).)

**<u>The '237 Application.</u>** Finally, the Board found further support for its functionality finding based on disclosures in U.S. Patent Application No. 2012/0142237 ("the '237 application"), which Dr. Kuntz filed while he was a manager at CeramTec. (Appx41; *see also* Appx92.)

This finding, too, was supported by the evidence. The application, which was directed to a certain ceramic material, underscores the significance of chromium: it specifies that the claimed invention was directed to a chemical composition that uses "chromium doping" or ("Cr-doping"), which is "particularly suitable for medi[c]al application." (Appx3349.) Moreover, chromium was an element of every claim in the application, confirming its key role in the invention. (*See* Appx3350–3351 (including a "chromium doping" limitation for the sole independent claim).)

* * *

In sum, the ’816 patent and its prosecution history, as well as the ’955, ’957, and ’970 patents and the ’237 application, provide abundant support for the Board’s finding that the pink color caused by chromium oxide is “not merely an ornamental, incidental, or arbitrary aspect of what is disclosed in the patent, but rather the natural byproduct of practicing the patent” and thus is “functional.” (Appx93–94.)

#### 2. The Board Did Not “Shift The Burden” Under (Or Otherwise Misapply) *TrafFix.*

CeramTec’s primary challenge to the Board’s assessment of the first *Morton-Norwich* factor is to attack a move the Board did not make. According to CeramTec, the Board “legally erred” because the Board “began by erroneously shifting the burden to CeramTec under *TrafFix*.” (Br. 28–29; *see also id.* at 23.)

CeramTec’s attempt to raise an issue of law about *TrafFix* on appeal fails because it relies on a fiction about the Board’s opinion. Contrary to what CeramTec claims (*id.* at 23, 28–29), the Board did not “shift” the burden to CeramTec. Searching the opinion for the word “shift” reveals that the word appears nowhere in it. And the only time the Board discussed which party bore the “burden,” it made clear that the burden was on *CoorsTek*, not CeramTec. It stated that “*Petitioner*

bears the burden of proving its Trademark Act Section 23(c) functionality claim by a preponderance of the evidence." (Appx4 (emphasis added).) And after it "considered the evidentiary record," it found that "*Petitioner* has carried this burden." (Appx5 (emphasis added).) No burden-shifting happened.

To be sure, the passages from *TrafFix* block-quoted in the Board's opinion include language about circumstances in which a party who "seeks to establish trade dress protection" must carry a "heavy burden" of overcoming an inference of functionality. (Appx90 (quoting *TrafFix*, 532 U.S. at 30).) But there is no indication that the Board shifted any burden to CeramTec, especially given that its only two statements about the burden in these proceedings stated that *CoorsTek* bore—and met—the burden. (*See* Appx4–5.) Contrast the Board's assignment of the burden with what happened in the district court proceedings, where the court concluded that "*CeramTec* ha[d] failed to carry its heavy burden of proving that chromium's pink color in BIOLOX Delta is 'non-functional.'" *C5 Med. Werks*, 249 F. Supp. 3d at 1218 (citing *TrafFix*, 532 U.S. at 31–33) (emphasis added). Unlike the district court, the

Board said CoorsTek bore the burden of proof. This Court should take the Board at its word.

In any event, it is unclear what difference a stray reference to a burden-shifting framework from review of a summary judgment decision in the trademark-infringement context (*TrafFix*) could make in the context of a Board opinion that weighs all of the evidence and makes factual findings on the full record before it. *See, e.g.*, *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988) ("shifting burdens are meant only to aid courts and litigants in arranging the presentation of evidence"). Indeed, in the "context of the case and the opinion," it is clear that the Board understood "where . . . the ultimate burden of persuasion lay," *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329–30 (Fed. Cir. 2008)—with CoorsTek, as the Board observed (Appx4–5).

CeramTec's arguments for why *TrafFix* should not apply also fail on their own terms.

***First***, CeramTec asserts in one of its argument headings that the Board "erroneously conflated chromia with pink." (Br. 31.) To be clear, CeramTec has *conceded* on appeal that the amount of chromia in its

ceramic hip implants naturally turns the products pink. (*See, e.g.*, *id.* at 2 ("A side effect of adding this small amount of chromia was that it turned the ceramic component pink."); *id.* at 11 ("This amount of chromia produced a pink ceramic.").) This point was undisputed in the proceedings below, too. (*See, e.g.*, Appx30, Appx1188(1127:3–1127:4).)

CeramTec's concession is key because when a visual cue is a natural byproduct of a functional feature, the visual cue is functional as a matter of law. That follows from *TrafFix*. There, the Supreme Court held that a dual-spring design that helped keep temporary road signs upright in windy conditions was functional. 532 U.S. at 30–32. The lower court had reached the opposite conclusion, reasoning that competitors could simply design "a *hidden* dual-spring mechanism." *Id.* at 27 (emphasis added). The Supreme Court rejected that reasoning, and its explanation for doing so applies here: When a feature (here, chromium oxide) is functional, it is "unnecessary for competitors to explore designs to hide" a visual indicator of that feature (pink). *Id.* at 34. The visual indicator "assures the user" that the product has the functional feature, and it would be "at cross-purposes to those

objectives, and something of a paradox, were [courts] to require the manufacturer to conceal the very item the user seeks." *Id.*

CeramTec disputes none of this (and disputed none of it in the proceedings below). Instead, CeramTec's assertion that the Board "conflated chromia with pink" (Br. 31) is based on a narrow factual argument: Ceram Tec contends that the Board should have concluded CeramTec's patents do not weigh in favor of functionality because they cover ratios of chromia (0.1% to 5%) that can generate a range of shades, from "almost white" to "purple or red," or "yellow" or "gray," rather than covering only the specific ratio that makes BIOLOX delta pink (0.33%). (Br. 32–33.)

But CeramTec made a key concession on this point, too: it "concede[d] that [the] BIOLOX delta chemical combination practices one or more of the inventions described and claimed in the '816 patent." (Appx36; *see also* Appx2754 (CeramTec's admission).) It does not matter that the '816 patent also covered some *other* chemical combinations. What matters is that the patent gave CeramTec a monopoly over all of the chemical combinations covered by its patent claims—including the specific combination that CeramTec has admitted

it used in BIOLOX delta.[4]

The purpose of our patent system is to "encourage invention by granting inventors a monopoly over new product designs or functions." *Qualitex*, 514 U.S. at 164. A key feature of this system is that the patent monopoly lasts only "for a limited time, after which competitors are free to use the innovation." *Id.* Although CeramTec tries to paint competitors' efforts to reverse-engineer an invention as nefarious (Br. 2–3, 63), those efforts are exactly what the patent system allows and encourages: After a patent expires, the invention can be "subject to copying," which generally has "salutary effects" in a "competitive economy." *TrafFix*, 532 U.S. at 29. CeramTec enjoyed the benefit of the monopoly it got through the '816 patent. It should not be allowed to now use the trademark laws to maintain exclusive rights "in perpetuity" to sell products whose patent protection has expired. *Qualitex*, 514 U.S. at 164–65.

[4] Even when a claimed mark does *not* practice claims in a patent, "statements in a patent's specification illuminating the purpose served by a design may constitute equally strong evidence of functionality." *Becton*, 675 F.3d at 1375. So even if CeramTec had not conceded that its BIOLOX delta material practices one or more of the claims in the '816 patent, the statements in that patent's and others' specifications about the role of chromium oxide in increasing hardness would still support the Board's finding of functionality.

Moreover, contrary to CeramTec's suggestion (Br. 35), the Board's analysis finds strong support in its own precedent. For example, in *McGowen Precision Barrels, LLC v. Proof Research, Inc.*, the Board explained that "the fact that [a] patent may encompass a wide variety" of designs "means only that the patent is broad in scope, not that [the] particular registered design is not functional." No. 92067618, 2021 WL 2138663, at *27 (TTAB May 20, 2021) (brackets omitted) (quoting *In re Dietrich*, 91 USPQ2d 1622, 1633 (TTAB 2009)). The same reasoning applies here.

CeramTec also attempts to prop up its argument with out-of-circuit decisions, but those cases bear little connection to this one. For example, *McAirlaids, Inc. v. v. Kimberly-Clark Corp.* involved the *de novo* review of a grant of summary judgment in an infringement case, and, in any event, the Fourth Circuit did not even mention the "*TrafFix* presumption" or "heavy burden" standard that CeramTec focuses on. 756 F.3d 307 (4th Cir. 2014) (cited at Br. 36). The only burden-based distinction had to do with the fact that the trade dress in *TrafFix* was not registered, whereas the *McAirlaids* one was. *Id.* at 311. In any event, the Fourth Circuit's conclusion was that the relevant patents *did*

provide evidence of functionality, but, on the facts, not the same "strong evidence" as in *TrafFix*. *Id.* at 312. And there was important evidence cutting the other way that precluded the grant of summary judgment, including employee testimony that the pattern at issue was chosen only "because it looked nice." *Id.* at 313. That testimony makes *McAirlaids* wholly distinguishable from this case, in which CeramTec has conceded that its hip implants are pink not because someone thought pink might "look nice," but because pink is the natural byproduct of the specific amount of chromia used in the material. (Appx30, Appx1188; *see also* Br. 2, 11.)

*Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486 (7th Cir. 2019), is similarly unhelpful to CeramTec. *Bodum* is another infringement case with no mention of a "heavy burden," "burden-shifting," or "presumptions." There, the Seventh Circuit was reviewing the exclusion of evidence of patents at trial under Federal Rule of Evidence 403, and it held that the district court did not abuse its discretion in concluding that the evidence, "while relevant to the question of functionality, posed too significant a risk of jury confusion." *Id.* at 497. And the mark at issue (a domed lid) was neither mentioned

nor the natural byproduct of any feature described in the patent. *Id.* at 496 (noting that counsel "could not point to any language in the patents to support the contention" that the patents "described knobs and domed lids"). Here, again, the color pink is undisputedly a natural byproduct of chromium (*see, e.g.*, Appx30, Appx1188), and is featured numerous times in CeramTec's patents as the key to achieving unprecedented hardness in ceramics (*see supra*, pp. 30–35).

***Second***, CeramTec argues that the '816 patent is not proof of functionality because it is directed to cutting tools, not hip implants. (Br. 39–41.) That argument fails because nothing in the patent, whether in the claims or specification, limits the invention to cutting tools. (*See* Appx1237–1241.) In fact, the patent expressly notes that cutting tools are only an "illustrative" example of the disclosed inventions (Appx1241(9:21–9:24)). *Accord Interactive Gift Express, Inc. v. CompuServe, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims."). The specification further explains that the claimed use of chromium oxide "ma[de] it possible for the first time to achieve hardness values such as ha[d] not previously been achieved"

(Appx1238(3:51–3:66)), which belies CeramTec's assertion that "nothing in the '816 patent explains why chromia would be useful in the context of hip joint components" (Br. 40). And most importantly, CeramTec has "concede[d] that [the] BIOLOX delta chemical combination practices one or more of the inventions described and claimed in the '816 patent." (Appx36; *see also* Appx2754 (CeramTec's admission).) CeramTec got the benefit of the patent bargain; its time is up, and it cannot fall back on trademark law to extend its monopoly.

The Board's rejection of CeramTec's argument was supported not only by CeramTec's concession, but also by other evidence. As Board found, although the claimed invention may have first been applied to cutting tools, it has "since been optimized for medical use—specifically for prosthetic hip joint components—with ZTA formulations including chromium oxide as contributing to the desired mechanical properties of hardness, toughness and strength." (Appx93; *see also* Appx729–730, Appx1692–1698, Appx2610, Appx4290 (CeramTec materials stating that this material was optimized for medical use).) In other words, "as noted numerous times in the record," the use of chromium oxide to increase hardness was a "central advance" for the material that

CeramTec patented, regardless of the particular application for which the material was used. (Appx93.) Indeed, CeramTec's statements to the Patent Office about this advance were the very reason it was able to overcome the prior art and obtain the '816 patent in the first place. (*See* Appx1625–1629.)

Nor was the Board incorrect in stating in the alternative that the "central advance" language is a passing comment in *TrafFix*. CeramTec seems to think that unless a patent provides evidence about some single, narrowly defined "central advance," it cannot be evidence of functionality. (Br. 30, 39.) But that position has no support in the law. Patents have been used as evidence of functionality under *Morton-Norwich* for decades (including well before *TrafFix*), and *TrafFix* confirmed that practice. *Accord Valu Eng'g*, 278 F.3d at 1276 ("We do not understand the Supreme Court's decision in *TrafFix* to have altered the *Morton-Norwich* analysis."). In fact, *TrafFix* held that statements made in patent specifications, as well as statements "made in the patent applications and in the course of procuring the patents," "demonstrate the functionality of the design." *TrafFix*, 532 U.S. at 32. That principle is not narrowly limited to statements about a patent's

"central advance," as this Court's precedent bears out. *See, e.g.*, *Becton*, 675 F.3d at 1375 ("*TrafFix* does not require that a patent claim the exact configuration for which trademark protection is sought. . . . *TrafFix* teaches that statements in a patent's specification illuminating the purpose served by a design may constitute equally strong evidence of functionality."). And even if *TrafFix* had held that a presumption applies only in light of statements about a patent's "central advance," that would be irrelevant here because, as discussed above, no presumption or burden-shifting was applied in this case.

### B. Substantial Evidence Supports The Findings On The Other *Morton-Norwich* Factors.

The Board did not need to consider all of the *Morton-Norwich* factors, but the Board's opinion "address[ed] each *Morton-Norwich* factor" anyway, "for the sake of completeness" (Appx89), and still found that pink is functional (Appx103–104).

CeramTec contends that those findings are not supported by substantial evidence because, according to CeramTec, the Board (i) "summarily disregarded" evidence about testing performed in connection with litigation in Germany, (ii) erred by finding that the third and fourth *Morton-Norwich* factors were "neutral," and (iii) erred

by finding that chromia affects material properties other than "hardness," such as "toughness, stability, or suppression of brittleness." (Br. 25–26, 56.) Those arguments merely ask this Court to reweigh the evidence, and none of them warrants reversal.

### 1. Substantial Evidence Supports The Board's Findings Under The Second *Morton-Norwich* Factor.

With regard to the second *Morton-Norwich* factor—*i.e.*, "advertising materials in which the originator of the design touts the design's utilitarian advantages," *Becton*, 675 F.3d at 1374—the Board found "strong evidence" of functionality. (Appx97.) That finding was supported by substantial evidence.

**Marketing Materials.** Until at least 2013, when it registered its trademarks, CeramTec "made promotional literature available to the public extolling the benefits of chromia to the mechanical properties and performance of its compound used to make ceramic hip implant components." (Appx94; *see also* Appx56–59.) For example, CeramTec advertised in its brochures that "BIOLOX delta is a new alumina matrix composite, which makes use of . . . hardening resulting from the addition of chromium oxide." (Appx2523; *see also* Appx2723 (CeramTec

2008 presentation: "Chromium Oxide Compensates the Hardness difference."); Appx2717–2743.) In 2012, CeramTec circulated a set of "FAQs" that confirmed: "Chromium oxide is added to increase the hardness of Biolox delta." (Appx2641; *see also* Appx2607–2659.) Materials issued by customers similarly advertised chromium oxide as increasing the hardness of CeramTec's ceramic hip implants. (*See, e.g.*, Appx1835–1838 ("The pink color is due to the chromium oxide ($Cr_2O_3$) that improves the hardness of the composite material."), Appx4725 ("The mixed oxides consist of chromium oxide which helps to achieve the desired hardness.").)[5]

Even as late as 2019, CeramTec was sending customers materials stating that "by addition of chromia[,] the hardness" of ZTA ceramics "is increased significantly." (Appx15318; *see also* Appx15295–15302 (2019 CeramTec email linking article at Appx15317–15320 for customer), Appx15236–15240(214:22–222:24), Appx95.)

**<u>FDA Submissions.</u>** CeramTec's FDA submissions relating to BIOLOX delta likewise touted the benefits of chromium oxide. For

[5] For additional evidence regarding similar marketing materials, *see also, e.g.*, Appx2669–2680, Appx687–695, Appx4379–4395, Appx4286–4303, Appx4711–4739, Appx3689, Appx12806(¶ 26), Appx15234–15244(212:19–226:19), Appx1140–1142(1476:24–1478:16).

example, in its 2004 submission, CeramTec explained that "chromium oxide" is "a means of compensating for the drop in hardness" caused by certain other ingredients in BIOLOX delta. (Appx1249.) Its 2008 and 2012 submissions stated that "[c]hromium . . . increases the hardness of the composite" and "is the reason for the pink color of the material." (Appx1310, Appx1358.) CeramTec even repeated these statements in its submissions to the FDA in 2013 and 2015—after it had registered its trademarks. (*See* Appx4651, Appx1734.)

**Technical Literature.** Decades of technical literature also "express[ed] the benefits of chromia," and thus further supported the Board's functionality finding. (Appx95.) Indeed, many such articles were "written or co-written by [CeramTec's] current or former employees," including Dr. Burger and Dr. Kuntz. (Appx95.)

For example, in 2001, Dr. Burger published a paper about ZTA ceramics in which he reported: "Experimental investigation has shown that by addition of chromia the hardness is increased significantly." (Appx1830; *see also* Appx1829–1833.) In 2008, Dr. Kuntz authored a paper reporting a similar finding: "[c]hromium . . . increases the hardness of the composite," and "is the reason for the pink color of the

material." (Appx2858; *see also* Appx2853–2868.) Dr. Kuntz reiterated this finding—that chromium "increases the hardness" of ZTA ceramics—in other papers in 2009, 2010, and 2013. (Appx2272, Appx2871, Appx2877; *see also* Appx2266–2291, Appx2870–2873, Appx2875–2883.)

More recent literature confirms findings about these benefits of chromium, too. In 2017, one researcher wrote that "[i]n addition to enhancing toughness, the addition of chromium oxide in [the] alumina matrix enhances the hardness, the tensile strength and resistance to corrosion and thermal shock." (Appx3487; *see also* Appx3463–3488.) And in 2019, a paper published in the Journal of Bone and Joint Surgery described CeramTec's BIOLOX delta material as having been "optimized with zirconia, strontium oxide, and chromium oxide to diffuse crack energy, limit crack propagation, and improve hardness." (Appx3730; *see also* Appx3729–3734.)[6]

---

[6] For additional evidence regarding similar articles and technical literature, *see also* Appx4126–4134 (1990 paper), Appx4259–4263 (1997 Dr. Burger paper), Appx4147–4153 (2000 paper), Appx4230–4244 (2000 Dr. Burger book chapter), Appx2661–2667 (2010 paper), Appx2838–2845 (2010 paper), Appx4082–4093 (2012 paper), Appx4155–4161 (2013 paper), Appx3847–3856 (2014 paper), Appx3435–3446 (2014 paper), Appx3736–3741 (2018 paper), Appx4163–4169 (2018 paper), Appx4020–

CeramTec offered counterexamples of documents that, in its view, showed that "the scientific record supporting chromia's nonfunctionality continued to grow." (Br. 20.) In particular, CeramTec pointed to papers authored in 2014 and 2018 by its expert witness and former employee Dr. Kuntz, a report by another one of its expert witnesses, Dr. Jack Mecholsky, and a study conducted in connection with CeramTec's trademark litigation in Germany. (*Id.* at 19–20.) The Board correctly concluded that those materials were not credible. (*See* Appx96–97, Appx99.)

First, in addition to finding CoorsTek's expert's criticisms of these materials persuasive, the Board noted that it was "troubled" by certain facts about CeramTec's expert witnesses. (Appx99 & n.228.) In particular, Dr. Mecholsky had been the peer reviewer for the 2018 Dr. Kuntz paper that CeramTec relied on—yet Dr. Mecholsky had a conflict of interest as CeramTec's litigation expert, and, critically, "failed to disclose his conflict of interest to the publisher." (Appx99 n.228.) The Board found that Dr. Mecholsky's failure to disclose this

4026 (2019 paper), Appx4028–4035 (2019 paper), Appx4171–4176 (2019 paper), Appx3726–3727 (2020 paper).

"clear conflict of interest" had "particular import in adjudicating witness credibility." (Appx65.)

Second, as the Board found, CeramTec's "current litigation position" about the science regarding chromia's function in ceramics was not credible because it was "contrary to what [CeramTec] has publicly stated over an extended period of time," including in its patents, FDA submissions, and marketing materials. (Appx96.) What is more, the idea that CeramTec manufactured a new position on the science in order to support its litigation position is not merely theoretical; it is directly supported by CeramTec's own documents about its strategy. In particular, in making its credibility findings, the Board considered correspondence among employees at CeramTec expressing concerns about increased competition from CoorsTek—and expressly stating that CeramTec planned to use trademark law to stave off that competition. For example, in 2013, an internal memo at CeramTec announced: "we have verifiable information that our competitors are preparing to enter the market with a ceramic in the color pink. *For this reason*, we are currently engaged in activities designed to obtain

trademark protection for the color pink." (Appx880 (emphasis added).)

And in 2014, a CeramTec employee wrote in an email:

> The Coorste[k] guys are not just "ceramic bloody starters," in my eyes their current strategy will become very very dangerous for us and this very very soon . . . [T]his is poison for us. . . . The feedback we got so far from customers is absolut[e]ly negativ[e]—all of them are looking for alternatives.

(Appx828 (quoted in Appx96); *see also* Appx914.)

In light of this evidence, the Board discounted the credibility of CeramTec's newfound position on the science. (*See* Appx96–97.)[7] These "credibility determinations" are "'virtually unreviewable' on appeal." *Holmes v. U.S. Postal Serv.*, 987 F.3d 1042, 1048 (Fed. Cir. 2021) (quoting *Hambsch*, 796 F.2d at 436). CeramTec tries to overcome the highly deferential standard of review by focusing on its mantra—"[s]cience evolves"—and citing *Eco Manufacturing LLC v. Honeywell International, Inc.* for support. (Br. 28.) But *Eco Manufacturing* supports CoorsTek, not CeramTec. There, Honeywell had registered a trademark for the round shape of its thermostats, insisting that the

[7] The Colorado court had discounted CeramTec's new position on the science for similar reasons. *See C5 Med. Werks*, 249 F. Supp. 3d at 1222 ("I did not find CeramTec's position (or Dr. Kuntz's testimony) to be credible, as it was plainly slanted to achieve a litigation objective.").

shape was non-functional because of "[t]echnological change" that rendered it merely ornamental, even though its round thermostats had previously been patented. 357 F.3d 649, 653 (7th Cir. 2003). That argument lost because the court of appeals deferred to the findings below that the shape was, in fact, functional. *Id.* at 654–55. In light of the Board's credibility determinations and other factual findings below, this Court should likewise reject CeramTec's narrative about how the science on chromia purportedly "evolved." There is "no reason to disturb these determinations here." *Holmes*, 987 F.3d at 1047; *see also, e.g.*, *Licari v. Dep't of Transp.*, 705 F. App'x 978, 981 (Fed. Cir. 2017) ("Credibility determinations . . . are almost never overturned.").

#### 2. Substantial Evidence Supports The Board's Findings Under The Third And Fourth *Morton-Norwich* Factors.

The Board's conclusion that the third and fourth *Morton-Norwich* factors were "neutral," and thus did not weigh against functionality (Appx97–99), was also supported by the evidence.

To begin, the Board did not need to reach the third *Morton-Norwich* factor at all. If "a product feature is found functional based on other considerations," then "there is no need to consider" that factor

because "the feature cannot be given trade dress protection merely because there are alternative designs available." *Valu Eng'g*, 278 F.3d at 1276.

The Board addressed the third factor anyway. It appropriately found that this factor was neutral because the parties had not offered enough evidence on whether "competitors' products are equivalent in desired ceramic mechanical properties" compared to CeramTec's BIOLOX delta implants. (Appx97–98.) CeramTec had introduced evidence that its customers purchase other manufacturers' ceramic components in different colors (*see* Appx97–98), but it provided no evidence that those products had similar hardness as BIOLOX delta. The closest it got was high-level testimony from its discredited expert, Dr. Kuntz, that one Japanese manufacturer made a blue ceramic hip ball that had "similar properties" to BIOLOX delta. (Appx10601(¶ 48) (cited in Br. 54).) That testimony was too vague to have weight. Plus, CoorsTek's evidence pointed the other way: its testing data showed that its white ceramic hip implants, which were made without chromium oxide, did not achieve the same hardness as its pink ceramic hip implants, and evidence further showed that the white implants were

less popular among customers for that reason. (Appx4906–4914(¶¶ 16–26).)

Substantial evidence likewise supports the Board's finding that the fourth factor (overall cost) was neutral, in light of testimony indicating that adding chromia "does not make the product simpler or less expensive" to produce. (Appx98–99.) On the one hand, one of CoorsTek's witnesses testified that there is a higher cost associated with making CoorsTek's white ceramic material compared to its pink ceramic material. (Appx16825(69:12–69:17), Appx16839–16840(83:12–84:14).) On the other hand, one of CeramTec's witnesses (Dr. Kuntz, yet again) testified to the contrary: that using chromia makes pink ceramic material more expensive to produce. (Appx5459–5460(1096:23–1097:4.)

Given this conflicting evidence, the Board's findings that the third and fourth factors were neutral should not be disturbed on substantial-evidence review. *Accord Becton*, 675 F.3d at 1376 (holding that the "Board did not err in refusing to weigh" the fourth *Morton-Norwich* factor, given the "scarce evidence").

### 3. CeramTec's "Substantial Evidence" Arguments Fail Because They Merely Ask The Court To Reweigh Evidence.

CeramTec contends that Board's assessment of these *Morton-Norwich* factors and its ultimate finding of functionality were not supported by substantial evidence for three reasons. None has merit.

***First***, CeramTec argues that the Board's decision is "not supported by substantial evidence" because it "disregarded" evidence of testing conducted by the Federal German Institute for Materials Research and Testing, known as the "Institute" or "BAM."[8] (Br. 25–26; *see also id.* at 43–51; Appx17599–17668 (Institute's report, dated March 14, 2018).) But the Board did not "disregard" this evidence. It devoted an entire section of its opinion to it (Appx67–70), and ultimately concluded that it did not outweigh the evidence of functionality (Appx99). That finding is amply supported by the record. *See Reelex*, 834 F. App'x at 582 (affirming Board decision where respondent argued that the Board "ignored" a declaration, yet "the Board explicitly addressed it").

[8] "BAM" is an abbreviation of the Institute's German name, "Bundesanstalt für Materialforschung und -prüfung." (Appx67.)

The "testing" that CeramTec focuses on arises from CeramTec's trademark litigation in Germany. In connection with that litigation, the Stuttgart Regional Court directed the Institute to examine whether chromium affected the material properties of "certain ceramic hip implant components." (Appx67.) The Institute performed "Vickers hardness testing" on ceramic samples with 0.0%, 0.1%, 0.3%, and 0.5% chromium-oxide content by weight percent, and concluded that these differences in chromium-oxide levels had no effect on hardness. (Appx17648–17651; *see also* Appx68.)

CoorsTek's expert, Dr. Carty, raised multiple criticisms of the Institute's report. (Appx3284–3290; *see also* Appx68–69.) For example, Dr. Carty explained that the Institute's methodology and conclusions were not reliable because the Institute did not test for "the role of chromium in a ZTA system optimized for performance in the body over long periods of time," did "not mirror the environmental conditions" for in vivo performance, and did not provide certain information about pre-testing procedures. (Appx69; *see also* Appx3285–3287(¶¶ 184–185, 188–191).) CeramTec had a rebuttal expert, Dr. Mecholsky, who responded to Dr. Carty's criticisms of the Institute's report. (Appx69.)

Based on its review of the Institute's report and the competing expert opinions, the Board decided to credit Dr. Carty's criticisms (Appx99), and found that the Institute's report did "not change [the Board's] findings with respect to the *Morton-Norwich* factors." (Appx104.) The Board's determination that CoorsTek's expert was "simply more credible" than CeramTec's is entitled to the utmost deference. *Meza v. Dep't of Homeland Sec.*, 275 F. App'x 987, 992 (Fed. Cir. 2008) (deferring to agency fact finding as to competing expert evidence); *see also, e.g.*, *Lozano v. Sec'y of Health & Hum. Servs.*, 958 F.3d 1363, 1370 (Fed. Cir. 2020) (findings regarding "credibility of the experts" are "virtually unchallengeable on appeal" under the substantial-evidence standard).

CeramTec contends that the Institute's study "should have been accepted by the Board" because the study was "independent." (Br. 45.) But those arguments merely "contest the weight the [Board] afforded to the record evidence." *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1334 (Fed. Cir. 2016). The Court should decline CeramTec's request to "reweigh facts" on appeal. *Id.*; *see also, e.g.*, *Regents of Univ. of Cal. v.*

*Broad Inst., Inc.*, 903 F.3d 1286, 1294 (Fed. Cir. 2018) ("We do not reweigh the evidence.").[9]

Nor does CeramTec get anywhere with its criticisms that the Board purportedly "did not explain with sufficient precision" its view of this evidence (Br. 43 (quotation marks omitted)) or that it "failed to explain why Dr. Mecholsky's analysis of Dr. Carty's conclusions was wrong" (*id.* at 49). The Board was "not require[d] . . . to address every argument raised" by the parties or "explain every possible reason supporting its conclusion." *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017) (citation omitted). That is especially so here, where the Board noted that its opinion did not provide additional detail about the Institute's report and CeramTec's rebuttal expert opinions solely because *CeramTec* had designated those materials as confidential. (Appx67, Appx69.)

---

[9] This Court should also disregard the German court opinion attached as an addendum to CeramTec's brief. The opinion was not before the Board. *See* Add. 1 (noting translation date of March 13, 2023). And the opinion does not address the reliability of the Institute's report or the parties' expert opinions about it; instead, it narrowly addresses whether CeramTec acted in bad faith in applying for certain European Union trademarks. (*See* Br. 44 & n.5 (citing Add. 10–11).)

Ultimately, CeramTec's arguments boil down to its view that the Board should have provided more detailed "credibility determination or other fact finding concerning its expert's testimony." *Regents of the Univ. of Minn. v. Gilead Scis., Inc.*, 61 F.4th 1350, 1359 (Fed. Cir. 2023). "That is not required." *Id.*

***Second***, according to CeramTec, the Board should have found that the third and fourth *Morton-Norwich* factors—*i.e.*, alternative designs, and overall cost—"both weigh heavily in CeramTec's favor." (Br. 26; *see also id.* at 51–55.) These arguments merely boil down to a disagreement with how the Board weighed the evidence. Neither warrants disturbing the Board's well-reasoned decision.

As to the "alternative designs" factor, CeramTec contends there was evidence that CoorsTek could have created ceramic hip implants that used an amount of chromium resulting in a different color, such as "off-white, red, purple, gray, [or] yellow," and that this could be done "without affecting the ceramic's performance." (*Id.* at 52.) But none of the evidence CeramTec cites—for example, a snippet of testimony from its expert Dr. Kuntz, and a paragraph from a report by its expert Dr. Mecholsky—actually says that any of those amounts would achieve the

same hardness as the one that turns the ceramic pink. (*Id.* (citing Appx13759–13760, Appx12790); *see also id.* at 54.) The Board did not err in concluding that there was a "dearth of probative evidence" on this factor. (Appx98.) And none of this matters anyway because "there is no need to consider" the third *Morton-Norwich* factor at all when, as here, the Board found other evidence that the color pink is functional. *Valu Eng'g*, 278 F.3d at 1276.

As to the "overall costs" factor, CeramTec said this factor should have gone in its favor because "CeramTec presented evidence" on it and "[CoorsTek] had none." (Br. 56.) But CoorsTek *did* have evidence: One witness testified unequivocally that there is "a higher cost" for CoorsTek to manufacture white ceramic hip implants (with no chromium oxide) compared to pink ceramic hip implants (with chromium oxide). (Appx16839–16840(83:12–84:14).) Another witness testified that the costs are "pretty similar." (Appx13527(314:14–314:25).[10]) CeramTec says this evidence is contradicted by the testimony of its expert Dr. Kuntz. (Br. 55 (citing Appx13730,

[10] Notably, CeramTec points to this portion of the transcript (without quotation) to suggest that the witness did not know *whether* there was a difference in cost, when in fact he testified that the costs are similar. (Br. 55.)

Appx13820–13821).) The Board acted well within its discretion in resolving the conflicting testimony on this topic by finding this factor to be neutral—especially given the Board's overarching concerns that evidence from Dr. Kuntz was not credible (*see* Appx99 & n.228). *See Schultz v. U.S. Postal Serv.*, 323 F. App'x 912, 916 (Fed. Cir. 2009) ("[A] Board's evaluation of witness credibility is virtually unreviewable on appeal.") (quotation marks omitted).

***Third***, CeramTec argues that there was "no substantial evidence supporting the Board's finding that chromia affects [1] toughness, [2] stability, or [3] suppression of brittleness." (Br. 56 (citing Appx92).) That argument is undermined by the evidence, which reflects the advantages of chromia with respect to those material properties. (*See, e.g.*, Appx1238(3:39–3:42) ('816 patent: "good toughness is combined with great hardness"), Appx1247–1248 (2004 FDA submission attributing "excellent properties" of "[i]mproved fracture toughness" and "[i]mproved strength distribution" to "the addition of chromium oxide"), Appx2844 ("this paper [] suggests a role of $Cr_2O_3$ dopant on thermal stability"), Appx3487 (2017 research paper: "In addition to enhancing toughness, the addition of chromium oxide . . . enhances the hardness,

the tensile strength and resistance to corrosion and thermal shock.”).) In fact, CeramTec even acknowledges that “technical articles excerpted by the Board” support this finding. (Br. 59.) CeramTec critiques the Board for not discussing those articles more extensively. (*Id.*) But as this Court has said “on multiple occasions,” “failure to explicitly discuss every issue or every piece of evidence does not alone establish that the tribunal did not consider it.” *Novartis*, 853 F.3d at 1328 (collecting cases).

In any event, CeramTec’s argument is beside the point because it ignores the fourth material property that the Board identified: “hardness.” (Appx92.) As discussed above (*supra*, pp. 30–35, 48–51), CeramTec’s patents, patent applications, statements to the Patent Office, FDA submissions, marketing materials, and technical literature are replete with evidence that chromia improves ceramic hip implants because it increases their hardness. That evidence provides more than sufficient support for the Board’s ultimate conclusion that “the color pink (caused by the addition of chromia) . . . is functional.” (Appx104.) Pink is functional, even if one assumes that pinkness is not associated with *every* desirable functional feature of a ceramic material.

## II. The Board Appropriately Found CeramTec's Unclean Hands Defense Inapplicable In This Case.

CeramTec briefly argues that the Board erred because it "adopted a categorical rule that 'the unclean hands defense is unavailable in Board functionality proceedings.'" (Br. 61 (quoting Appx105).) The Court should reject that argument.

As an initial matter, contrary to CeramTec's assertion, the Board did not "adopt[] a categorical rule" about the unclean hands defense. (*Id.*) Instead, the Board "f[ou]nd" the defense "inapplicable to these proceedings" specifically. (Appx5.) In other words, rather than using a categorical rule, it "exercised[] [its] discretion now," based on the evidence before it. (Appx104–106.) Moreover, the Board chose not to publish its decision. (*See* Appx1 ("This Opinion is Not a Precedent of the TTAB.").) That confirms that the Board neither intended to make, nor in fact made, any categorical rule that would affect any future case. By definition, its decision below is "not binding" because it was "not designated as precedent," and thus cannot establish any categorical rules. *In re Society of Health & Physical Educators*, 127 USPQ2d 1584, 1587 n.7 (TTAB 2018); *see also* TTAB Manual of Procedure § 101.03

(June 2022) ("[A] decision or order designated as not precedential is not binding.").

Moreover, even if the Board had categorically barred the unclean hands defense, that holding would be sound. This Court has previously endorsed the Board's decision to decline to apply equitable defenses in Board proceedings, in light of the prevailing "public interest in a cancellation proceeding to rid the register of a generic mark." *Loglan Inst., Inc. v. Logical Language Grp., Inc.*, 962 F.2d 1038, 1042 (Fed. Cir. 1992) (cited in Appx105 and Br. 61–62). The same reasoning applies here—only with more force, given the Board's finding that CeramTec sought trademark protection to "stave off competition after the expiration of its patent protection." (Appx97.) By "inhibiting legitimate competition" through "control [of] a useful product feature," CeramTec has engaged in precisely the behavior that the functionality doctrine aims to prevent. *Qualitex*, 514 U.S. at 164. No equitable defense can override the public's overwhelming interest in blocking CeramTec's improper attempt to extend its patent monopoly, and in restoring competition to the hip implant market.

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision of the Board.

October 6, 2023

Respectfully submitted,

/s/ Steven J. Horowitz
Steven J. Horowitz
Caroline A. Wong
Rachel L. Hampton
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

Diana M. Rutowski
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

*Counsel for Appellee CoorsTek Bioceramics LLC, f/k/a C5 Medical Werks, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). The brief contains 12,400 words, excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

October 6, 2023

*/s/Steven J. Horowitz*
Steven J. Horowitz