No. 23-1502

IN THE

# United States Court of Appeals for the Federal Circuit

CERAMTEC GMBH,

*Appellant,*

v.

COORSTEK BIOCERAMICS LLC,
F/K/A C5 MEDICAL WERKS

*Appellee.*

On Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Cancellation Nos. 92058781 and 92058796

## REPLY BRIEF OF APPELLANT CERAMTEC GMBH

KATHERINE B. WELLINGTON
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110

JOHANNAH WALKER*
HOGAN LOVELLS US LLP
4 Embarcadero, Suite 3500
San Francisco, CA 94111

JESSICA L. ELLSWORTH
ANNA KURIAN SHAW
REEDY C. SWANSON
RYAN J. STEPHENSON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20001
(202) 637-5600
jessica.ellsworth@hoganlovells.com

November 13, 2023

*Counsel for Appellant CeramTec GmbH*

* *Admitted only in the District of Columbia and Arkansas. Practice supervised by principals of the Firm admitted in California.*

# CERTIFICATE OF INTEREST

Counsel for CeramTec GmbH certifies the following pursuant to Federal Circuit Rule 47.4:

1. Represented Entities (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

   **CeramTec GmbH**

2. Real Party in Interest (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **Not Applicable.**

3. Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **CeramTec GmbH is a (wholly-owned) subsidiary of CeramTec Group GmbH. No publicly held company owns 10% or more of stock in CeramTec Group GmbH.**

4. Legal Representatives – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   - **Hogan Lovells US LLP**
     - Raymond Kurz*
     - Gina Rodriguez*
     - Valerie Brennan*
     - Clay C. James*
     - Keith O'Doherty*
     - Andrea Hamilton Weinstein*
     - Shelby Martin*
     - Lauren Chamblee*
     - Lauren B. Cury
     - Katherine Bastian

*These attorneys are no longer affiliated with Hogan Lovells US LLP.

- **Orrick, Herrington &Sutcliffe LLP**
  - Daniel Justice
  - Derek Knerr
  - Peter D. Vogl*
  - Briggs M. Wright*
  - Lindsay Rindskopf

*These attorneys are no longer affiliated with Orrick, Herrington & Sutcliffe LLP.

5. Related Cases – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

   **Not Applicable.**

6. Organizational Victims and Bankruptcy Cases – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   **Not Applicable.**

Dated: November 13, 2023

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

# TABLE OF CONTENTS

Page


CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ v

INTRODUCTION ........ 1

ARGUMENT ........ 3

I. THE BOARD LEGALLY ERRED IN APPLYING THE LOGIC OF *TRAFFIX* TO THIS CASE ........ 3

A. CeramTec's Utility Patents Do Not Ascribe Any Functional Value To The Color Pink ........ 3

B. The Board Erred By Applying *TrafFix* Outside The Context Of The Patent's "Central Advance" ........ 12

II. THE BOARD'S FUNCTIONALITY FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ........ 15

A. C5 Cannot Insulate The Board's Functionality Finding By Deeming The Flawed Components Non-Essential ........ 16

B. The Board Failed To Explain Why It Found Four Independent, Controlled Experiments Unpersuasive ........ 18

C. The Board's Findings On Alternative Designs And Cost Contradict The Record ........ 23

D. The Board's Finding That Chromia Affects Toughness, Stability, And Suppression Of Brittleness Is Unsupported By Substantial Evidence And Barely Defended By C5 ........ 27

III. THE BOARD LEGALLY ERRED BY HOLDING THAT THE UNCLEAN HANDS DEFENSE IS CATEGORICALLY UNAVAILABLE IN CANCELLATION PROCEEDINGS ASSERTING FUNCTIONALITY ........ 28

CONCLUSION ........ 30

# TABLE OF CONTENTS—Continued

Page

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Alacritech, Inc. v. Intel Corp.*,
966 F.3d 1367 (Fed. Cir. 2020)........................................................................ 22

*Anderson v. Bessemer City*,
470 U.S. 564 (1985)........................................................................................ 20

*Bodum USA, Inc. v. A Top New Casting Inc.*,
927 F.3d 486 (7th Cir. 2019)...................................................................... 10, 11

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)..................................................................................... 16, 17

*Cabanayan v. Office of Personnel Mgmt.*,
375 F. App'x 6 (Fed. Cir. 2010) ........................................................................ 5

*Calcutt v. Federal Dep. Ins. Corp.*,
598 U.S. 623 (2023)........................................................................................ 17

*Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*,
909 F.3d 1110 (Fed. Cir. 2018)........................................................................ 24

*Donner Tech., LLC v. Pro Stage Gear, LLC*,
979 F.3d 1353 (Fed. Cir. 2020)........................................................................ 16

*Galperti, Inc. v. Galperti S.r.l.*,
17 F.4th 1144 (Fed. Cir. 2021)......................................................................... 29

*Grissenauer v. Department of Energy*,
754 F.2d 361 (Fed. Cir. 1985).......................................................................... 20

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
882 F.2d 1556 (Fed. Cir. 1989).......................................................................... 6

*Hupp v. Siroflex of Am., Inc.*,
122 F.3d 1456 (Fed. Cir. 1997)........................................................................ 23

**TABLE OF AUTHORITIES—Continued**

Page(s)

*In re Becton, Dickinson & Co.*,
675 F.3d 1368 (Fed. Cir. 2012)........................................................................ 3

*In re Morton-Norwich Prods., Inc.*,
671 F.2d 1332 (C.C.P.A. 1982) ................................................................ 16, 26

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016)............................................................. 2, 18, 21

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016)...................................................................... 21

*Loglan Inst., Inc. v. Logical Language Grp.*,
962 F.2d 1038 (Fed. Cir. 1992)................................................................ 29, 30

*McAirlaids, Inc. v. Kimberly Clark Corp.*,
756 F.3d 307 (4th Cir. 2014)........................................................................ 9, 10

*McGowen Precision Barrels, LLC v. Proof Research, Inc.*,
No. 92067618, 2021 WL 2138663 (T.T.A.B. 2021) .......................................... 11

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157 (Fed. Cir. 2006)...................................................................... 20

*Michigan v. EPA*,
576 U.S. 743 (2015) ....................................................................................... 16

*Nuvasive, Inc., v. Warsaw Orthopedic, Inc.*,
No. IPR2013-00208, 2014 WL 3422010 (P.T.A.B. July 10, 2014) .................... 21

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ......................................................................................... 30

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015).......................................................................... 18

*Qualitex Co. v. Jacobson Products Co.*,
514 U.S. 159 (1995) ............................................................................. 8, 12, 24

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Regents of Univ. of California v. Broad Institute, Inc.*,
903 F.3d 1286 (Fed. Cir. 2018)........................................................................ 21

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018) ........................................................................................ 6

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ....................................................................................... 16, 29

*Broad Inst., Inc. v. Regents of Univ. of Cal.*,
No. 106,048 (DK), 2017 WL 657415 (P.T.A.B. Feb. 15, 2017)........................ 21

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
532 U.S. 23 (2001) ......................................................................................*passim*

*Valu Eng'g Inc. v. Rexnord Corp.*,
278 F.3d 1268 (Fed. Cir. 2002)........................................................................ 24

*Vicor Corp. v. SynQor, Inc.*,
869 F.3d 1309 (Fed. Cir. 2017)................................................................... 16, 28

**REGULATION:**

37 C.F.R. § 2.114(b)(2)................................................................................ 29, 30

**OTHER AUTHORITY:**

1 J. Thomas McCarthy,
*McCarthy on Trademarks and Unfair Competition* § 7:75 (4th ed. 2001).......... 24

# INTRODUCTION

C5's position ultimately comes down to this: Because CeramTec once believed that chromia contributed to the hardness of its hip joint components, it is forever estopped from taking a contrary position. But estoppel is not a scientific principle, and the science today decisively refutes C5's functionality arguments. The only controlled experiments assessing those arguments—including experiments conducted by a neutral third party—have rejected C5's claims outright.

To paper over this scientific reality, C5 relies heavily on CeramTec's expired utility patents, defending the Board's statement that they are "strong evidence" of functionality. Appx94. That conclusion, however, suffers from a fatal legal flaw: It rests on a presumption of functionality from the Supreme Court's opinion in *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001). According to the Board and C5, *any* design that results from "implementation of" claims in an expired patent is functional. Appx92. That proposition stretches *TrafFix*'s logic beyond its breaking point. CeramTec's patents at most disclose an advantage for a range of chromia values—not the color pink—and it is undisputed that the range disclosed can produce almost any color on the spectrum. Nothing in the patents suggests an advantage for pink over any other color. *TrafFix* does not apply to designs that are "merely an … incidental … aspect of the" claims. 532 U.S. at 30.

C5 also invokes CeramTec's former marketing and regulatory statements to dodge the scientific record, but these efforts founder on another legal principle: An agency's action may be sustained only on the rationale it actually gave. The Board's rejection of the scientific evidence in this case rested on one sentence summarily adopting the critiques of C5's expert without explanation, Appx99, and a set of "additional concerns" that not even C5 tries to defend, Appx99-103. This Court has repeatedly rejected similar efforts to simply "summarize and reject arguments without explaining why," *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016), and should do so again here. Tellingly, C5 also fails to reckon with its *own* history of shifting positions. For years before litigation, C5 insisted that the pink color of CeramTec's product had no impact on its performance. Opening Br. 16-17. Those statements only reinforce the importance of the neutral, third-party testing in this case.

C5 ultimately seeks refuge in the standard of review—trying to paint this case as turning exclusively on whether the Board accurately recited historical facts. But this Court reviews legal questions *de novo*, and here the Board misread the Supreme Court's seminal opinion in *TrafFix* and committed legal error in assessing CeramTec's affirmative defense. And, even applying the substantial evidence standard, the Board's order cannot stand. Despite its length, the Board's opinion—which first turns to its legal analysis on page 85—mistakes summarizing arguments

for analyzing them and adopts conclusions contrary to undisputed facts. This Court should reverse.

## ARGUMENT

### I. THE BOARD LEGALLY ERRED IN APPLYING THE LOGIC OF *TRAFFIX* TO THIS CASE.

The Board committed two separate legal errors by overextending the Supreme Court's opinion in *TrafFix*. *First*, the Board read *TrafFix* to apply a presumption of functionality for any design feature that can be produced by practicing an expired utility patent, even when practicing those same claims might equally produce all sorts of other designs. *Second*, the Board held that the *TrafFix* presumption applies beyond the "central advance" of the patent at issue—even when the patent gives no reason to believe that any functional value extends to an entirely different context. Each error independently warrants vacatur.

#### A. CeramTec's Utility Patents Do Not Ascribe Any Functional Value To The Color Pink.

The Board committed a fundamental legal error by applying the Supreme Court's opinion in *TrafFix* to this case. *TrafFix* imposes a presumption of functionality on any feature that is claimed or disclosed in an "expired patent," explaining that anyone seeking to establish trade dress protection for such a feature "must carry [a] heavy burden of showing that the feature is not functional." *TrafFix*, 532 U.S. at 30; *see also In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1375 (Fed.

Cir. 2012). In this case, however, it is undisputed that the utility patents CeramTec held do not claim or even mention the color pink. *See* Appx13987-98; Appx5848-54. The same is true of the cited prosecution history. *See* Appx1625-29.[1] Nevertheless, the Board assumed that any color that might result from "implementation of the patent" is presumptively functional under *TrafFix*, Appx92—even when implementing the very same patent claims may produce *nearly any* color. That presumption was legal error.

Rather than respond to this argument on the merits, C5 tries to avoid it. According to C5, because the Board technically recited the correct burden of proof at the outset of its opinion, CeramTec's arguments have no force. *See* Resp. Br. 36-37 (citing Appx4-5). C5 offers this as proof positive that the Board imposed no "heavy burden" on CeramTec under *TrafFix*. But the rest of the Board's opinion refutes this characterization. The Board quoted—and *added emphasis to*—the language in *TrafFix* stating that a former patent holder "must **carry the heavy burden of showing that the feature is not functional**." Appx90 (quoting *TrafFix*, 532 U.S. at 30) (bold emphasis added by the Board).

[1] C5 does not dispute that it relied exclusively on one patent (the '816 patent) and its prosecution history before the Board. *See* Opening Br. 34. Although C5 now briefly attempts to defend the Board's reference to other patent materials, including those in which CeramTec abandoned its claims related to chromia, it does not argue that these documents add anything material beyond the '816 patent. Resp. Br. 33-35.

The Board then proceeded to apply the *TrafFix* burden-shifting framework. The Board first examined the patents' language, concluding that merely because the color pink could be produced by "implementation of" the patents they were "strong evidence" of functionality. Appx92-94; *see TrafFix*, 532 U.S. at 29. The phrase "strong evidence" reflects that the Board was applying *TrafFix*'s "heavy burden" framework, as it is drawn from the same paragraph of *TrafFix* as the "heavy burden" language that the Board emphasized. *See TrafFix*, 532 U.S. at 29-30.

Subsequently, in evaluating other functionality factors, the Board analyzed whether *CeramTec* had presented sufficient evidence to dispel the presumption created by the patent and concluded it had not. *See, e.g.*, Appx100 ("The problem with Respondent's research is that it goes only so far, and not far enough in its scope—to address the full range of chromia content encompassed by the '816 patent."). Similarly, where the Board perceived a "lack of proof" on an issue, it counted that as a strike against CeramTec. Appx102. Thus, although the Board recited the proper burden in its preliminary pages, it departed from that burden after applying *TrafFix* at the outset of its legal analysis and from then on asked whether CeramTec had rebutted a presumption of functionality. *Cf. Cabanayan v. Office of Personnel Mgmt.*, 375 F. App'x 6, 8-9 (Fed. Cir. 2010) (vacating order where agency "misapplied the legal standard for assessing [certain] evidence"). That was reversible error. None of this should come as a surprise to C5, which urged the

Board to apply this "heavy burden" standard and described that standard as "dispositive" in this case. Appx19621 (quoting *TrafFix*, 532 U.S. at 30).

At a minimum, the Board misapplied *TrafFix* when evaluating the evidentiary weight of the patents—the most important aspect of its evaluation of the functionality factors. *See* Appx89-94, Appx103-104. The Board described *TrafFix* as setting out "the *legal* significance" of the patents and centered its entire discussion of the patents around *TrafFix*. Appx89-94 (emphasis added). Based on *TrafFix*, the Board *presumed* that any feature that could be produced by "implementation of the patent" is functional, regardless of whether that feature or its function appears in the patent. Appx92-94. That erroneous reading of Supreme Court precedent infected the Board's ultimate decision—even apart from the Board's improper shifting of the burden of proof onto CeramTec. That separate legal error is also reviewed *de novo*. *See, e.g.*, *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (treating "overread[ing]" of Supreme Court "precedent" as a question of whether an agency's action was "not in accordance with law" (quotation marks omitted)); *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d 1556, 1562 (Fed. Cir. 1989) (similar).

C5's procedural arguments primarily serve to mask the weakness of its response on the merits. Consider everything C5 does not dispute: C5 does not dispute that the patents and associated prosecution history disclose a wide range of chromia values. *See, e.g.*, Resp. Br. 30-31 (recognizing the '816 patent claimed a

particular "molar ratio of chromium oxide" (quotation marks omitted)). C5 does not dispute that any utilitarian advantage ascribed to chromia in the patents and prosecution history applies *with equal force* to any amount of chromia within that range. *See id.* at 31 (asserting that the patent "confirms that *the specified level* of chromium oxide serves a key function"). In other words, the patents make no distinction between the amount of chromia at the very bottom end of the claimed range and that at the very top. *See* Appx13987-98; Appx5848-54. And C5 does not dispute that within that wide range, the resulting product can be almost any color of the rainbow—red, purple, white, black, gray, or yellow, in addition to pink. *See* Resp. Br. 40 (acknowledging this fact without disputing it).

Despite all this, C5 maintains the Board was correct to conflate the entire range of chromia content disclosed in the patents with the specific amount of chromia that happens to produce the color pink. *See* Resp. Br. 40. But, as C5 does not dispute, nothing in the patents or prosecution history even suggests that this specific amount of chromia is superior to the amounts that produce any other color. *See* Appx13987-98; Appx5848-54; Appx1625-29.

The Board's decision thus presumed that expired patents are "strong evidence" of functionality *anytime* a design feature results from practicing the claims. Appx92-94. That presumption is the legal error that CeramTec now challenges—both because the Board used it to place a "heavy burden" on CeramTec

and because the Board's misreading of the Supreme Court's opinion in *TrafFix* led it to misunderstand the patents' relevance to functionality. *Supra* pp. 4-6.

This is not about whether "substantial evidence" supports the Board's reading of the patents and prosecution history, as C5 contends. Resp. Br. 29-30. Indeed, CeramTec's argument *assumes* that the Board correctly reads CeramTec's patent materials to disclose a functional advantage *for the claimed range* of chromia content—rendering C5's lengthy recitation of those materials beside the point. *Compare id.* at 30-36, *with* Opening Br. 31-34. The parties' dispute instead concerns "the legal significance" the Board assigned the patents, Appx90—namely, that the patents are "strong evidence" that the color pink is functional in light of *TrafFix*, Appx94.

On that legal question, C5 claims that it "does not matter that the '816 patent also covered some *other* chemical combinations." Resp. Br. 40. Thus, according to C5, every color associated with every possible combination of materials disclosed in the patents is "functional as a matter of law" under "*TrafFix*." *Id.* at 39. The Supreme Court and lower courts have consistently rejected this unbounded conception of functionality.

In *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159 (1995), where the Supreme Court considered whether a company could obtain trade dress protection for the color of dry cleaning pads, the Supreme Court explained that even though "it

is important to use *some* color on press pads to avoid noticeable stains," it did not follow that *all* colors were off limits for trade dress protection. *Id.* at 166. Because other colors were "equally usable" for the same function, the company was entitled to trade dress protection on its distinctive choice. *Id.* (quotation marks omitted). Here, C5 never disputed that other colors are "equally usable" within the range of chromia content claimed by the patents, and CeramTec is thus entitled to its distinctive choice of pink. Competitors can make their product any of the many other colors—including red, white, purple, gray, yellow, or black—that result from practicing the patented composition ranges, thus obtaining the functional benefits of chromia (if any) while avoiding CeramTec's trademarks. Indeed, it is telling that C5 did not select pink in an effort to duplicate CeramTec's chromia content or its alleged function; C5 matched its product to *a Home Depot paint swatch* for "Cupid's Arrow" pink to find "the closest color to match." Appx13666-67 (865:7-867:24); *see also* Opening Br. 15-16; Appx14230-31 (similar).

C5 fails to distinguish precedent reflecting these principles. In *McAirlaids, Inc. v. Kimberly Clark Corp.*, the Fourth Circuit recognized that *TrafFix*'s logic does not apply where a patented manufacturing process will result in *multiple* different patterns, and the specific pattern chosen "was a purely aesthetic choice among many alternatives." 756 F.3d 307, 312-313 (4th Cir. 2014). The same is true here. Although including the patented amount of chromia here will result in *some* color,

nothing in the patents teaches a preference for the specific amount that results in pink. C5 tries to distinguish the case on its facts by claiming that CeramTec's choice of pink is not driven by aesthetics. But undisputed evidence shows that CeramTec stuck with pink even when, before BIOLOX Delta hit the market, manufacturing advances made it unnecessary to add that specific amount of chromia out of a desire to have a specific amount of yttria in the BIOLOX Delta. Opening Br. 11. CeramTec did so because it recognized the value of a strong investment in the pink brand. *Id.* C5 also quibbles about the procedural posture in *McAirlaids*, but cannot avoid that the Fourth Circuit vacated the judgment there because it erroneously extended "*TrafFix*'s holding" to a context where it was "inapplicable." 756 F.3d at 312. That is the same legal error CeramTec presses here.

C5 similarly fails to distinguish *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486 (7th Cir. 2019), which held that a district court properly excluded evidence of expired utility patents related to a coffee maker lid, even though it was undisputed that the lid-design choice in dispute (a domed lid) fell within the broad terms of the expired patent language (a "removable cover"). *Id.* at 496; *see also* Opening Br. 36-37. Like *McAirlaids*, this case refutes C5's position that any design choice produced by "implement[ing]" patent claims is presumptively evidence of functionality. Appx92. C5 does not—because it cannot—dispute that "a domed lid" implements the language "removable cover" and serves the function that "a domed

lid" would serve, even if other design choices would serve the same function. And although C5 emphasizes that the "domed lid" was never "mentioned" in the patent, Resp. Br. 43, the same is true here: The patents at issue never mention the color pink. And, much like the "domed lid" in *Bodum*, the color pink is not the inevitable "natural byproduct" of practicing the patent, Resp. Br. 36: It is just one of many options for practicing the patent.[2] Opening Br. 11. Thus, under the Board's expansive interpretation of *TrafFix*, the *Bodum* court would have been wrong to exclude the patents because they would have been "strong evidence" of functionality. Appx94.

Tellingly, C5 cannot point to any authority purporting to apply *TrafFix* to a situation like the one here. It instead parrots the Board's reference to *McGowen Precision Barrels, LLC v. Proof Research, Inc.*, No. 92067618, 2021 WL 2138663 (T.T.A.B. 2021). But CeramTec explained why *McGowen* is inapplicable: *Every* unique pattern that might be produced by the patented gun barrel-making process in *McGowen* had a "different" effect on function. *Id.* at *28. Here, however, the patents indicate that *any* amount of chromia within the claimed ranges will have the *same* effect. *See* Opening Br. 35; Appx13987-98; Appx5848-54. C5 entirely fails to acknowledge this critical difference. Resp. Br. 42.

---

[2] Confirming that C5's concerns about pink being a "natural byproduct" of the patent claims are a distraction, C5's pink product, cerasurf-p, *does not even practice* the '816 patent, Appx11418 (¶ 300), Appx11423 (¶ 322).

C5 invokes the principles underlying patent and trademark law, *see id.* at 41, but those principles favor CeramTec, too. The reason patented features are generally presumed functional is because the public should usually be "free to use" those features after the patents' terms have ended. *Qualitex*, 514 U.S. at 164. Here, the public is free to take advantage of the patent's teachings regarding chromia without producing a pink product. C5 does not argue that CeramTec's marks meaningfully "deplete the supply of useable colors." *Id.* at 168 (quotation marks omitted). On the contrary, it is undisputed that a competitor may achieve any disclosed benefits from chromia by producing a product in almost any other color. *See* Opening Br. 10-11, 32; Resp. Br. 40. The Court should reject the Board's erroneous overreading of *TrafFix*.

### B. The Board Erred By Applying *TrafFix* Outside The Context Of The Patent's "Central Advance."

The Board separately erred by applying the logic of *TrafFix* well beyond the context of "the central advance claimed" in the '816 patent. *TrafFix*, 532 U.S. at 30. The "central advance" language was integral to the *TrafFix* Court's reasoning, not merely "a passing comment." Resp. Br. 46. Indeed, the very reason *TrafFix* considered the feature described in a utility patent to be "vital" evidence of functionality is because the patent itself described how that feature contributed to the device's function. *TrafFix*, 532 U.S. at 29. The Court spent several pages outlining why the claimed design was "the reason the device works" based on

language in the patent claims and specification. *Id.* at 30-32, 34. Even C5 ultimately recognizes as much. *See* Resp. Br. 46 (recognizing patents are evidence of functionality because they "demonstrate the functionality" (quoting *TrafFix*, 532 U.S. at 32)).

When a party seeks to establish functionality in a very different context from any described in the patent, the patent is no longer "strong evidence" of functionality. Appx94. This case illustrates why. The '816 patent describes advances that make the material "suitable as a cutting tool." Appx13995 (col. 3:46). Its descriptions of chromia's contributions to hardness make sense in that context: Hardness measures resistance to deformation resulting from pressing down on a surface, Appx23, and is therefore critically important when dealing with industrial cutting tools that bear down so hard they heat to over a thousand degrees Celsius, Appx13736 (1010:10-20).[3] There is no evidence that any marginal contributions to hardness are similarly useful for hip joint components, where other mechanical attributes are more important. *See id.*; Appx10601 (¶ 49). C5 fails to identify any record evidence suggesting that any marginal contribution chromia makes to hardness translates to improved performance in a hip joint component. *See* Resp. Br. 44-47.

---

[3] C5 claims hardness is important because hip joint components should last "as long as possible without wearing down." Resp. Br. 1. But, as the Board recognized, "wear resistance" is not the same as "hardness," Appx23-24, and C5 is wrong to conflate the two.

Instead, C5 points to one line in the ’816 patent stating that its “specification and examples are illustrative.” Appx1241 (col. 9:21-22). That truism does not undermine CeramTec’s point. This case is not about whether C5 or CeramTec’s products technically practice the patent’s limitations. The question is whether the discussion of hardness within the ’816 patent—which is specifically tethered to cutting tools—is still “strong evidence” of functionality for hip joint components. Appx94.

C5 also looks to “other evidence,” Resp. Br. 45—by which it means evidence entirely unrelated to the ’816 patent. *See* Appx729-730 (question and answer sheet prepared by CeramTec regarding BIOLOX Delta); Appx1692-1698 (internal CeramTec memo describing development testing); Appx2610 (CeramTec internal FAQ on BIOLOX Delta). This evidence does nothing to illuminate the evidentiary value of the ’816 patent under *TrafFix*. C5 highlights a statement from the Board’s opinion—in turn drawn from a CeramTec training document—saying that the ’816 patent’s formula has been “optimized for medical use.” Resp. Br. 45 (quoting Appx93 and citing Appx4290). But that training document merely confirms that the “Delta material was used in the industrial division as a cutting tool for >20 years before it was optimized for medical use.” Appx4290. The presentation does not indicate whether the hardness contributions from chromia made any difference to the device’s performance for “medical use”; on the contrary, it focuses heavily on

*other* properties more important to hip joint components, such as fracture toughness and wear resistance. *See* Appx4313-4327.

* * *

The Board believed under *TrafFix* that CeramTec's expired patents were "strong evidence" that the color pink is functional, Appx94, even though those patents do not ascribe any functional benefit to pink as opposed to a wide range of other available colors and describe chromia's advantages in the context of cutting tools, not hip joint components. The Board's extension of *TrafFix* despite these circumstances constitutes legal error warranting vacatur.

## II. THE BOARD'S FUNCTIONALITY FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

The Board's *TrafFix* error aside, this Court should vacate because substantial evidence does not support the Board's finding that pink is functional for ceramic hip joint components. Opening Br. 41-60. The Board summarily disregarded independently conducted, controlled experiments on whether chromia affected hardness or wear resistance. *Id.* at 43-51. The Board compounded this error by finding evidence related to cost and alternative designs was "neutral" when CeramTec's undisputed evidence showed that potential (and actual) alternative designs are available, and evidence from *both sides* showed that the color pink did not afford any cost advantages. *Id.* at 51-60.

The Board's finding thus lacked any "rational connection between the facts found and the choice made." *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1358 (Fed. Cir. 2020) (quotation marks omitted). C5 cannot salvage the Board's decision by unilaterally labeling some parts of that decision non-essential and describing the Board's summary conclusions as "credibility findings."

### A. C5 Cannot Insulate The Board's Functionality Finding By Deeming The Flawed Components Non-Essential.

The Board's finding that chromia is functional with respect to a ceramic hip joint's hardness (or any other properties) must be justified on "the same basis articulated in the order by the agency itself," not the grounds C5 would prefer to defend on appeal. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962); *see also Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1324 (Fed. Cir. 2017) (similar, citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)). When the grounds for an agency's decision do not justify its conclusion, the decision falls—even if the agency could have reached the same result another way. *See Michigan v. EPA*, 576 U.S. 743, 757-758 (2015) (rejecting attempt to uphold agency decision on alternative grounds).

The Board concluded that chromia was functional because the first two factors from *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332 (C.C.P.A. 1982)—utility patents and CeramTec's former statements—favored a finding of functionality, Appx89-97, Appx99-102, while the latter two factors—cost and alternative

designs—were "neutral," Appx97-99. CeramTec's appeal explains why the Board's consideration of the first factor is legally flawed, and its evaluation of the third and fourth factors is clearly wrong and cannot be reconciled with direct independent testing that the Board failed to adequately consider.[4]

C5 attempts to neutralize the Board's errors at the outset by contending that the Board did not even "need to consider all of the *Morton-Norwich* factors" that it relied upon. Resp. Br. 47; *see also id.* at 55-56, 63. This Court should not take the bait. Here, the Board in fact considered all the *Morton-Norwich* factors, along with "other considerations," and accounted for each of them in its "Conclusion [on] Functionality." Appx103-104. This Court must therefore evaluate whether the Board's application of each *Morton-Norwich* factor is consistent with law and supported by substantial evidence. This Court cannot uphold the functionality finding based on an analysis the Board did not adopt. *See Burlington Truck Lines*, 371 U.S. at 168 ("courts may not accept appellate counsel's *post hoc* rationalizations"); *Calcutt v. Federal Dep. Ins. Corp.*, 598 U.S. 623, 624 (2023) (per curiam) (similar).

[4] C5 spends seven pages defending the Board's analysis of *Morton-Norwich* factor two, CeramTec's prior statements—a factor CeramTec did not challenge on appeal. Resp. Br. 48-55. But those statements merely reflect CeramTec's views at the time based on science that has since been proven wrong.

### B. The Board Failed To Explain Why It Found Four Independent, Controlled Experiments Unpersuasive.

Independent, controlled experiments like those conducted by the Federal German Institute for Materials Research and Testing (the Institute) are the gold standard for scientific testing—a fact that not even C5 disputes. The Institute's independent testing should have been particularly probative in this case, where *both sides'* views about chromia's role in ceramics changed over time, and the Institute was asked by a German court to act as an independent arbiter of that question. Opening Br. 44-45. The Institute's testing consistently showed that small amounts of chromia, including the amount in BIOLOX Delta, have no effect on hardness or wear resistance. Opening Br. 43-45; Appx17599-668 (exemplar Institute report). These findings were corroborated by two other controlled experiments in the record testing the impact of chromia; C5's experts did not attempt a *single* experiment to address this issue. *See* Opening Br. 19-21.

Instead of giving the Institute's findings the close attention they deserved, the Board accepted Dr. Carty's "criticisms" of these studies without explanation. Appx99. The Board's conclusory treatment of fiercely disputed evidence does not withstand substantial-evidence review. *See Nuvasive*, 842 F.3d at 1383 ("It is not adequate to summarize and reject arguments without explaining why."); *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 971 (Fed. Cir. 2015) (agency

erred by failing to explain why it treated two studies "as though they cancelled each other out").[5]

C5 defends the Board by invoking three undisputed, but inapplicable, principles of agency law: (1) an agency's credibility findings are "virtually unchallengeable," Resp. Br. 60; (2) courts should not "reweigh facts" on appeal, *id.*; and (3) an agency is not required to "explain every possible reason supporting its conclusion," *id.* at 61 (quotation marks omitted). None of these truisms salvage the Board's conclusory analysis.

*First*, the Board did not and could not accept Dr. Carty's criticisms of the Institute's studies based on a finding that Dr. Carty was more "credible" than CeramTec's expert, Dr. Mecholsky. The Board adopted Dr. Carty's critiques with a single sentence: "As detailed above, Dr. Carty extensively criticized this research, and we find his criticisms persuasive." Appx99. Nothing in that sentence deems Dr. Carty more "credible" than Dr. Mecholsky. In fact, other portions of the Board's decision adopt Dr. Mecholsky's testimony *over* Dr. Carty's. Appx102.[6]

The Board *could not* have found Dr. Carty more "credible" because it had no basis for assessing witness credibility. The discretion to make credibility findings is

---

[5] The Board cited its own misguided "additional concerns," Appx99-102, which C5 does not even try to defend. *See* Resp. Br. 58-62.

[6] C5 is therefore wrong to suggest (at 52-53) that Dr. Mecholsky's report was categorically "not credible."

afforded to a "presiding official who heard [the witnesses'] testimony and saw their demeanor." *Grissenauer v. Department of Energy*, 754 F.2d 361, 364 (Fed. Cir. 1985). Here, the Board did neither. The parties did not present a word of live or video testimony. As a result, the Board was no more aware than this Court "of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

Nor can C5 inject credibility determinations from the now-vacated Colorado proceedings into the Board's analysis; as the Board itself recognized, that decision "has been set aside and has no effect." Appx15.[7] C5's repeated attempts to immunize the Board's factual findings by recasting them as credibility findings—Resp. Br. 53, 54, 60, 62, 63—all fall flat.

*Second*, CeramTec does not ask this Court to "reweigh evidence" regarding Dr. Carty's and Dr. Mecholsky's discussion of the Institute experiments. Resp. Br. 60. The Board never explained how it weighed the evidence in the first place. *See* Opening Br. 43-51. With a single sentence, the Board accepted Dr. Carty's criticism

[7] Even setting aside that the decision "has no effect," Appx15, the different proceedings involved different evidence. Of particular note, the Colorado court did not have before it any evidence about the Institute's findings.

of the Institute's studies over Dr. Mecholsky's response to those critiques. Appx99. It provided no reasoning, violating basic principles of agency decision-making. That the Board spent an "entire section of its opinion" summarizing the experiments and both parties' arguments, Resp. Br. 58, does not excuse the Board's lack of analysis, Opening Br. 43; *In re Nuvasive, Inc.*, 842 F.3d at 1383 ("summariz[ing] and reject[ing]" party arguments is no substitute for "reasoned explanation").

C5's cites *In re Warsaw Orthopedic, Inc.* and *Regents of the University of California v. Broad Institute, Inc.* to defend the Board's conclusory statements, Resp. Br. 60-61, but both cases highlight the type of analysis that is expected of agencies and absent here. *See Broad Inst.*, 903 F.3d 1286, 1293-94 (Fed. Cir. 2018) (declining to reweigh evidence where PTAB provided detailed findings[8] for why it rejected one party's evidence); *Warsaw Orthopedic*, 832 F.3d 1327, 1334 (Fed. Cir. 2016) (declining to reweigh evidence where PTAB evaluated in detail[9] competing testimony about a patent's disclosures). If anything, this authority supports CeramTec. In *Warsaw Orthopedics*, for example, this Court vacated part of the decision because it could not conclude from "[t]he PTAB's conclusory assertion"

---

[8] *Broad Inst., Inc. v. Regents of Univ. of Cal.*, No. 106,048 (DK), 2017 WL 657415, at *7-25 (P.T.A.B. Feb. 15, 2017).

[9] *Nuvasive, Inc. v. Warsaw Orthopedic, Inc.*, No. IPR2013-00208, 2014 WL 3422010, at *6-7 (P.T.A.B. July 10, 2014).

that the agency "followed the proper path." *Id.* at 1335. The Board's rejection of the Institute's findings is just as conclusory.

The best indication that the Board's analysis falls short is that there is no explanation for this Court to review. This Court requires an agency's explanation to "be sufficient 'for [the Court] to see that the agency has done its job.' " *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1371 (Fed. Cir. 2020) (quotation marks omitted). Yet, the Board provided no reason for why it found Dr. Carty's criticisms "persuasive" in the face of Dr. Mecholsky's detailed rebuttal, Appx99, Appx12793-96 (¶¶ 114-121), and therefore, no grounds to assess whether those reasons were valid.

*Third*, the rule that an agency need not "explain every possible reason supporting its conclusion," Resp. Br. 61 (quotation marks omitted), gets C5 nowhere, because the Board provided *no reasons* why it found Dr. Carty's critiques of the Institute's findings more "persuasive." C5 is wrong to suggest (at 61) that the confidentiality of Dr. Mecholsky's report excused the Board's lack of analysis. The Board made clear that it did not consider itself "bound" by either party's confidentiality designations. Appx15-16. And the Board described in detail much of the confidentially filed evidence. Neither C5 nor the Board explain why the bevy of information that the Board's decision made public made it impossible to give

more than a one-sentence explanation for adopting Dr. Carty's critiques of the Institute's independent studies.

### C. The Board's Findings On Alternative Designs And Cost Contradict The Record.

Substantial evidence does not support the Board's findings that the third and fourth *Morton-Norwich* factors—alternative designs and cost—are neutral. CeramTec presented unrefuted evidence that C5 could have created a competitive hip joint component in a range of colors without materially affecting performance—and, indeed, it already produces a competing white product. Opening Br. 52-53; *see also* Appx13759-60 (1033:1-1034:3); Appx12790 (¶ 106). And evidence from *both sides* showing that the color pink did not confer any manufacturing-cost advantages. Opening Br. 55-56; *see also* Appx13821 (1097:2-8) (CeramTec testimony that the compound responsible for BIOLOX Delta's pink color made the ceramic "more expensive" to manufacture); Appx13527 (314:14-25) (C5 testimony that the manufacturing costs of cerasurf-w and cerasurf-p were "pretty similar"). An agency's findings are unsupported by substantial evidence when they contradict the evidence of both parties. *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1461 (Fed. Cir. 1997).

1. *Alternative Designs.* C5 contends that the Board was right to find that the alternative-designs factor was neutral because the parties did not "offer[] enough evidence on whether competitors' products are equivalent … to CeramTec's

BIOLOX delta implants." Resp. Br. 56 (internal quotation marks omitted). But as CeramTec argued—and C5 does not dispute—the third *Morton-Norwich* factor looks for evidence of "*potential* alternative designs," not just those already on the market. *Valu Eng'g Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002) (emphasis added) (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:75, 7-180-1 (4th ed. 2001)); *see also* Opening Br. 54. *Qualitex* did not require proof of actual pads in different colors equivalent to the green-gold ones at issue. *See Qualitex*, 514 U.S. at 168. Nor did *Converse* require evidence of actual, alternative toe-cap designs that worked as well as the protected design. *Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1124 (Fed. Cir. 2018). C5 all but concedes legal error by failing to identify a single case suggesting that the third *Morton-Norwich* factor requires proof of equivalent alternatives already in use by competitors.

C5 likewise fails to support its suggestion (at 56-57) that the Board based its alternative-design ruling on competing evidence. In addition to Dr. Kuntz's testimony about potential alternative designs, Appx13759-60 (1033:1-1034:3); Appx12790 (¶ 106), CeramTec pointed to statements by C5 that its white and pink ceramics were equivalent, Opening Br. 54 (collecting record cites), and produced evidence that Kyocera, a Japanese ceramics company, creates a blue ceramic hip joint with similar properties to BIOLOX Delta. Opening Br. 54; Appx10601 (¶ 48);

*see also* Appx13767 (1041:18-24). The Board recognized the Kyocera ceramic as evidence of a competitor product that was "equivalent in desired ceramic mechanical properties" to BIOLOX Delta, and had no critique of it. Appx98. By contrast, the Board rejected as unpersuasive the only "competing" evidence that C5 presented: "testing data" designed to illustrate that white ceramic hip joints were inferior to pink ones. Appx78 (finding "wanting the efforts of Petitioner's experts, Drs. Carty and Barnett, to explain away Respondent's critique of Petitioner's testing data"). Because C5 has not challenged that finding on appeal, it has no basis to argue that there was evidence on both sides of the alternative-design ledger.

2. *Cost.* C5's defense of the Board's finding on the fourth *Morton-Norwich* factor likewise falls apart upon inspection. According to C5, it presented testimony that "there is a higher cost associated with making CoorsTek's white ceramic material compared to its pink ceramic material." Resp. Br. 57. In support, C5 cites testimony from two of its employee witnesses. First, Jonathan Haftel testified that "yields" from C5's pink product "implicate[] a higher price" than its white product. Appx16839-40 (83:12-84:14). This equivocal testimony does not isolate the cost of the components responsible for color, and the Board did not credit it—finding instead that C5 "is not aware of any difference in the overall cost for manufacturing its pink and white products." Appx98.[10] Second, Steven Hughes testified that

[10] C5 does not challenge this finding on appeal.

manufacturing costs of C5's pink and white products are "pretty similar." Appx13527 (314:14-25). This testimony supports CeramTec, not C5. If it is "pretty similar" in cost to manufacture a hip joint implant with and without 0.33% chromia, then adding that amount of chromia does not make BIOLOX Delta "comparatively simple or cheap" to manufacture. *Morton-Norwich*, 671 F.2d at 1341. Based on C5's evidence alone, *Morton-Norwich*'s fourth factor should have favored CeramTec.

But CeramTec separately presented additional evidence that the color pink is not comparatively inexpensive to manufacture. Opening Br. 55. If anything, CeramTec pays *more* to maintain its signature pink color. As Dr. Kuntz explained, the compound in BIOLOX Delta that is responsible for its color is more expensive than the compound a manufacturer would use to create a white ceramic. Appx13730 (1004:7-25), Appx13820-21 (1096:23-1097:7). C5 cannot do away with this testimony by suggesting the Board made an "overarching" determination that Dr. Kuntz was not credible. Resp. Br. 63-64. Several portions of the Board's decision rely exclusively on Dr. Kuntz's testimony to support factual findings. *See, e.g.*, Appx22-23 & n.38; Appx31 & n.67; Appx101 n.230.

### D. The Board's Finding That Chromia Affects Toughness, Stability, And Suppression Of Brittleness Is Unsupported By Substantial Evidence And Barely Defended By C5.

The Board found that chromia also affects toughness, stability, and suppression of brittleness even though C5 never took that position and the evidence does not support it. Opening Br. 22, 56-59. CeramTec's prior patents *refer* to these physical properties, but they do not attribute these properties to chromia. *Id.* at 37-39, 56. None of the parties' scientific testing creates this link. Nor do CeramTec's prior statements. *Id.* at 57-59.

C5's perfunctory defense of the Board's finding ignores the Board's actual reasoning and all of CeramTec's arguments. Much like the Board, C5 highlights out-of-context references from the '816 patent and CeramTec's FDA statements to suggest both documents linked chromia and toughness. Neither did. As CeramTec explained in its opening brief, the '816 patent attributed its "especially good toughness" to its "relatively high zirconium dioxide contents." Opening Br. 37-38; Appx13995 (col. 3:61-66). And CeramTec's statements to the FDA explained that BIOLOX Delta "offer[s] a major improvement in strength and toughness," but does not attribute those characteristics to the addition of chromia. Opening Br. 57; Appx4649, Appx4651. C5 offers no response.

C5 then pivots to the list of technical articles that the Board excerpted in describing the parties' evidence. But C5 does not claim that the Board relied on

these articles when it finally ends its summary of the parties' contentions and comes to its substantive analysis of the *Morton-Norwich* factors on page 85 of its opinion. It did not. Appx85-104. Nor does C5 explain how a smattering of technical articles can justify the Board's finding when the Board did not rely on them or offer any reason for accepting some over others. It cannot. *See* Opening Br. 59; *Vicor Corp.*, 869 F.3d at 1324 (agency decision must be justified on grounds given by agency).[11] The Board's functionality determination cannot be affirmed based on a partially excerpted, "somewhat contradictory," Appx11325 (¶ 127), list of technical articles that the Board never claimed to rely on.

## III. THE BOARD LEGALLY ERRED BY HOLDING THAT THE UNCLEAN HANDS DEFENSE IS CATEGORICALLY UNAVAILABLE IN CANCELLATION PROCEEDINGS ASSERTING FUNCTIONALITY.

As with the Board's misreading of *TrafFix*, C5's primary response to the Board's error regarding CeramTec's unclean hands affirmative defense is to pretend it did not happen. Resp. Br. 66 (claiming that "the Board did not adopt a categorical rule about the unclean hands defense" (cleaned up)). But this Court need only look to the Board's decision to settle this debate:

> We exercise our discretion now, and thus hold that the unclean hands defense is unavailable in Board functionality proceedings in view of the

[11] C5 suggests that CeramTec somehow conceded that the excerpted articles support the Board's finding that chromia affects the toughness, stability, and suppression of brittleness of ceramic hip implants. Resp. Br. 64. Obviously not. CeramTec merely forecasted that C5 would take that misguided position. *See* Opening Br. 59.

> prevailing public interest in removing registrations of functional marks from the register.

Appx105. True, the Board used the word "discretion." Resp. Br. 66 (selectively quoting Appx105). But it exercised that "discretion" to find the unclean hands defense *categorically* "unavailable against certain claims for cancellation"—here, functionality claims. Appx105. That was legal error. *See Loglan Inst., Inc. v. Logical Language Grp.*, 962 F.2d 1038, 1042 (Fed. Cir. 1992).

C5 makes much ado about the precedential effect of the Board's decision. Resp. Br. 66-67. This is a sideshow. The question before the Court is whether *this* order of cancellation can be sustained for the reasons given by the Board. *Chenery*, 318 U.S. at 94. Because the Board committed legal error, the answer is no. *Galperti, Inc. v. Galperti S.r.l.*, 17 F.4th 1144, 1145-46 (Fed. Cir. 2021). The Board cannot immunize its own errors merely by designating them "non-precedential."

Once C5 reaches the merits, its argument takes on an even more remarkable scope. C5 maintains that "[n]o equitable defense" could ever "override the public's overwhelming interest" in cancelling a functional mark. Resp. Br. 67. In C5's view, once the Board finds that a party "has engaged in precisely the behavior that the functionality doctrine aims to prevent," equitable considerations are irrelevant. *Id.*

This theory cannot be squared with the Board regulation that affirmatively *authorizes* equitable defenses, including unclean hands, in cancellation proceedings. Opening Br. 61; 37 C.F.R. § 2.114(b)(2). To amend or rescind this rule, an agency

must "use the same procedures … as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). The Board therefore cannot choose to ignore § 2.114(b)(2) by way of adjudication.

Nor can *Loglan* justify the Board's categorical rule. *Loglan* said the exact opposite: "the Board must consider [equitable] defenses." 962 F.2d at 1042. The Board's failure to do so was a legal error that not even C5 claims was harmless. C5's functionality challenge offered a one-sided view of the equities that influenced the Board's view of CeramTec's evidence on nearly every functionality factor. Opening Br. 63. Properly considered, CeramTec's unclean hands defense would have prevented the Board from conducting a functionality analysis with C5's loaded dice.

## CONCLUSION

For the foregoing reasons, this Court should reverse the Board's December 22, 2022, order cancelling CeramTec's marks.

Respectfully submitted,

/s/ Jessica L. Ellsworth

JESSICA L. ELLSWORTH
ANNA KURIAN SHAW
REEDY C. SWANSON
RYAN J. STEPHENSON
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20001
(202) 637-5600
jessica.ellsworth@hoganlovells.com

KATHERINE B. WELLINGTON
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110

JOHANNAH WALKER*
HOGAN LOVELLS US LLP
4 Embarcadero, Suite 3500
San Francisco, CA 94111

*Counsel for Appellant CeramTec GmbH*

* *Admitted only in the District of Columbia and Arkansas. Practice supervised by principals of the Firm admitted in the California.*

November 13, 2023

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing with the United States Court of Appeals for the Federal Circuit through the CM/ECF system on November 13, 2023. All case participants are registered CM/ECF users, and the Notice of Docketing Activity generated by this filing constitutes service under Fed. Cir. R. 25(e)(1).

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

*Counsel for Appellant CeramTec GmbH*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 32(b)(1). Excluding the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b), this brief contains 6,991 words.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman, a proportionally-spaced font.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

*Counsel for Appellant CeramTec GmbH*